22-4601

# United States Court of Appeals

*for the*

# Fourth Circuit

———————————●———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

– v. –

ASHLEY NICHOLE KOLHOFF,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

## JOINT APPENDIX
## VOLUME ONE (PAGES JA1-JA381)

JACQUELINE R. BECHARA
SETH M. SCHLESSINGER
OFFICE OF THE UNITED STATES
   ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3819
jacqueline.bechara@usdoj.gov
seth.schlessinger@usdoj.gov

*Attorney for Plaintiff-Appellee*

CHRISTOPHER B. AMOLSCH
LAW OFFICES OF CHRISTOPHER AMOLSCH
12005 Sunrise Valley Drive, Suite 200
Reston, Virginia 20191
(703) 969-2214
chrisamolsch@yahoo.com

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

**VOLUME I**

Criminal Docket for Case No: 1:21-cr-00158, United States
District Court for the Eastern District of Virginia ................................JA1

Indictment, filed July 6, 2021 ..........................................................JA17

Transcript of Jury Trial, Volume I, before The Honorable Leonie M. Brinkema
on March 2, 2022 ............................................................................JA20

    Testimony of James Fottrell

        Direct examination by Mr. Schlessinger .......................................JA45
        Cross-examination by Mr. Amolsch...........................................JA84
        Redirect examination by Mr. Schlessinger ...................................JA89

    Testimony of Brandon Smock

        Direct examination by Mr. Schlessinger .......................................JA91
        Cross-examination by Mr. Amolsch...........................................JA181

    Testimony of Michael Hendricks

        Direct examination by Mr. Amolsch ........................................JA108
        Cross-examination by Mr. Schlessinger ...................................JA153
        Redirect examination by Mr. Amolsch......................................JA170

    Testimony of Michael Del Vacchio

        Direct examination by Mr. Schlessinger .................................JA191

Transcript of Jury Trial, Volume II, before The Honorable Leonie M. Brinkema
on March 3, 2022 ..........................................................................JA203

Testimony of Rachel Kalbeitzer

    Direct examination by Mr. Schlessinger ......................................JA215
    Cross examination by Mr. Amolsch ............................................JA245
    Redirect examination by Mr. Schlessinger .................................JA283

Motion for Judgment of Acquittal, filed March 3, 2022 ..................JA296

Government's Closing Brief, filed March 17, 2022 ........................JA308

Transcript of Jury Trial, Volume III, before The Honorable Leonie M. Brinkema on April 12, 2022 ..................................................................JA332

Order of The Honorable Leonie M. Brinkema, filed April 12, 2022 ..............JA339

Transcript of Sentencing Hearing before The Honorable Leonie M. Brinkema on July 12, 2022 ..................................................................JA340

Judgment, filed July 12, 2022 ........................................................JA371

Defense Position on Sentencing, filed July 20, 2022 ......................JA378

Notice of Appeal, filed July 20, 2022 ...............................................JA381

## VOLUME II (SEALED)

Affidavit in Support of a Criminal Complaint and an Arrest Warrant, filed June 9, 2021 ................................................................JA382

Government's Trial Brief, filed February 23, 2022 .........................JA391

Government's Trial Exhibit 209 – On-Line Chat Printout ...............JA419

Government's Trial Exhibit 210 – On-Line Chat Printout ...............JA432

Defendant's Closing Brief, filed March 31, 2022 ...........................JA457

Position of the United States with Respect to Sentencing, filed July 5, 2022..JA498

Presentence Investigation Report, filed July 6, 2022 ......................................JA507

Statement of Reasons, filed July 12, 2022......................................................JA522

APPEAL,CLOSED

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CRIMINAL DOCKET FOR CASE #: 1:21-cr-00158-LMB-1

Case title: USA v. Kolhoff                    Date Filed: 07/06/2021
Magistrate judge case number: 1:21-mj-00201-JFA        Date Terminated: 07/12/2022

---

Assigned to: District Judge Leonie M.
Brinkema

Appeals court case number: 22-4601 4th
Circuit

**Defendant (1)**

**Ashley Nichole Kolhoff**                 represented by    **Christopher Bryan Amolsch**
*TERMINATED: 07/12/2022*                                  Law Office of Christopher Amolsch
                                                          12005 Sunrise Valley Drive
                                                          Suite 200
                                                          Reston, VA 20191
                                                          703-969-2214
                                                          Fax: 703-774-1201
                                                          Email: chrisamolsch@yahoo.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: CJA Appointment*

                                                          **Nathaniel Wenstrup**
                                                          Office of the Federal Public Defender
                                                          (Alexandria N/A)
                                                          1650 King Street
                                                          Suite 500
                                                          Alexandria, VA 22314
                                                          *Na*
                                                          703-600-0800
                                                          Email: nate_wenstrup@fd.org
                                                          *TERMINATED: 09/14/2021*
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: Public Defender*

**Pending Counts**                            **Disposition**

JA1

| | |
|---|---|
| 18:2251(a)and(e) Production of Child Pornography FORFEITURE (1) | 15 years with credit for time served--15 years as to Count 1 and 5 years as to Count 2, to be served concurrently; supervised release 15 years as to each of counts 1 and 2, to run concurrently; $200.00 special assessment |
| 18:2252(a)(2)and(b)(1) Distribution Child Pornography FORFEITURE (2) | 15 years with credit for time served--15 years as to Count 1 and 5 years as to Count 2, to be served concurrently; supervised release 15 years as to each of counts 1 and 2, to run concurrently; $200.00 special assessment |

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                          **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                                **Disposition**

18:2251(a) and 2251(e) Production of
child pronography

**Plaintiff**

**USA**                                  represented by   **Seth Schlessinger**
                                                          US Attorney's Office (Alexandria)
                                                          2100 Jamieson Avenue
                                                          Alexandria, VA 22314
                                                          **NA**
                                                          703-299-3700
                                                          Email: seth.schlessinger@usdoj.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*
                                                          *Designation: US Attorney*

                                                          **Whitney Kramer**
                                                          US Attorney's Office (Alexandria)
                                                          2100 Jamieson Avenue
                                                          Alexandria, VA 22314

JA2

**NA**
703-299-3700
Email: whitney.kramer2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: US Attorney*

**Annie Zanobini**
US Attorney's Office (Alexandria)
2100 Jamieson Avenue
Alexandria, VA 22314
**NA**
703-299-3700
Email: annie.zanobini2@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/09/2021 | 1 | COMPLAINT as to Ashley Nichole Kolhoff (1). (shea, ) [1:21-mj-00201-JFA] (Entered: 06/09/2021) |
| 06/09/2021 | 2 | UNDER SEAL AFFIDAVIT in Support 1 COMPLAINT by USA as to Ashley Nichole Kolhoff (shea) Modified text on 6/11/2021 (jlan). [1:21-mj-00201-JFA] (Entered: 06/09/2021) |
| 06/09/2021 | 4 | Redacted Criminal Case Cover Sheet (shea) [1:21-mj-00201-JFA] (Entered: 06/09/2021) |
| 06/09/2021 | 5 | Redacted version of 2 Affidavit filed by USA. (jlan) [1:21-mj-00201-JFA] (Entered: 06/11/2021) |
| 06/16/2021 | 6 | Rule 5(c)(3) Documents Received from the Northern District of Ohio as to Ashley Nichole Kolhoff. (jlan) [1:21-mj-00201-JFA] (Entered: 06/22/2021) |
| 06/22/2021 | | Arrest of Ashley Nichole Kolhoff in Northern District of Ohio. (jlan) [1:21-mj-00201-JFA] (Entered: 06/22/2021) |
| 07/06/2021 | 7 | INDICTMENT as to Ashley Nichole Kolhoff (1) count(s) 1, 2. (jlan) (Entered: 07/08/2021) |
| 07/08/2021 | 10 | Redacted Criminal Case Cover Sheet (jlan) (Entered: 07/08/2021) |
| 07/08/2021 | | Set Hearing as to Ashley Nichole Kolhoff: Arraignment set for 7/13/2021 at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (jlan) (Entered: 07/08/2021) |
| 07/08/2021 | | ORAL ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Ashley Nichole Kolhoff Nathaniel Wenstrup for Ashley Nichole Kolhoff appointed. Entered by District Judge Leonie M. Brinkema on 07/08/2021. (jlan) (Entered: 07/09/2021) |
| 07/12/2021 | 11 | Pretrial Services Bond REPORT (Initial Pretrial Services Bond Report) (SEALED - |

JA3

CM/ECF - vaed                                                                                     1/12/23, 9:45 AM

|            |    | government and defense counsel) as to Ashley Nichole Kolhoff. (smith, teneisha) (Entered: 07/12/2021) |
|------------|----|---|
| 07/12/2021 | 12 | ORDER directing that the arraignment scheduled for Tuesday, July 13, 2021, be and is continued to Wednesday, July 28, 2021 at 9:00 am. Signed by District Judge Leonie M. Brinkema on 7/12/2021. (shea, ) (Entered: 07/12/2021) |
| 07/12/2021 |    | Set/Reset Hearings as to Ashley Nichole Kolhoff: Arraignment set for 7/28/2021 at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (shea) (Entered: 07/12/2021) |
| 07/22/2021 | 13 | Minute Entry for proceedings held before Magistrate Judge Theresa Carroll Buchanan:Initial Appearance as to Ashley Nichole Kolhoff held on 7/22/2021. USA appeared through Colin Trudle. Deft appeared w/counsel Nate Wenstrup. Deft informed of rights, charges and penalties. Deft already indicted; USA seeks detention-Granted. Detention Hearing set for 7/26/2021 at 02:00 PM in Alexandria Courtroom 301 before Magistrate Judge Ivan D. Davis. Deft remanded to the custody of the USMS.(Tape #FTR.)(tfitz, ) (Entered: 07/22/2021) |
| 07/23/2021 | 14 | Addendum to Pretrial Services Bond Report (Sealed Document) as to Ashley Nichole Kolhoff (smith, teneisha) (Entered: 07/23/2021) |
| 07/26/2021 | 15 | MOTION Remove Detention Hearing from Docket by Ashley Nichole Kolhoff. (Attachments: # 1 Proposed Order)(Wenstrup, Nathaniel) (Entered: 07/26/2021) |
| 07/26/2021 | 16 | ORDER as to Ashley Nichole Kolhoff. This matter comes before the Court upon Defendant's Motion to remove her Detention Hearing from the July 26, 2021 docket; and IT APPEARING that there is good and just cause shown, it is hereby ORDERED that Ms. Kolhoff's Detention Hearing is removed from the docket and she reserves her right to a Detention Hearing in the future. Signed by Magistrate Judge Ivan D. Davis on 7/26/2021. (lgue, ) (Entered: 07/26/2021) |
| 07/26/2021 |    | Terminate Hearings as to Ashley Nichole Kolhoff: Detention Hearing on 7/26/2021 - TERMINATED per order entered. (lgue, ) (Entered: 07/26/2021) |
| 07/26/2021 | 17 | ORDER OF DETENTION as to Ashley Nichole Kolhoff. Signed by Magistrate Judge Ivan D. Davis on 7/26/2021. (lgue, ) (Entered: 07/26/2021) |
| 07/28/2021 | 18 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema: Arraignment as to Ashley Nichole Kolhoff (1) Count 1,2 held on 7/28/2021. USA appeared through Whitney Kramer and Seth Schlessinger. Defendant appeared with counsel Nathaniel Wenstrup. Deft. WFA, PNG, and demands trial by jury. **Motion Hearing set for 9/14/2021 at 09:00 AM** in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. **Jury Trial set for 9/27/2021 at 10:00 AM (2 Days)** in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. Discovery Order entered in open court. Deft remanded. Court Reporter: A. Thomson (tran) (Entered: 07/28/2021) |

JA4

| 07/28/2021 | 19 | Agreed Discovery Order as to Ashley Nichole Kolhoff. Signed by District Judge Leonie M. Brinkema on 07/28/2021. (tran) (Entered: 07/28/2021) |
|---|---|---|
| 07/28/2021 | 20 | ORDER: This matter comes before the Court on its own initiative. In accord with the Due Process Protections Act and Rule 5(f) of the Federal Rules of Criminal Procedure, this Court CONFIRMS the United States' obligation to disclose to the defendant all exculpatory evidence, that is, evidence that favors the defendant or casts doubt on the United States' case, as required by *Brady v. Maryland*, 313 U.S. 83 (1963) and its progeny, and hereby ORDERS the United States to do so. Signed by District Judge Leonie M. Brinkema on 07/28/2021. (See Order for further details) (tran) (Entered: 07/28/2021) |
| 08/05/2021 | 21 | Joint MOTION for Protective Order *Victim Information* by USA as to Ashley Nichole Kolhoff. (Attachments: # 1 Proposed Order)(Kramer, Whitney) (Entered: 08/05/2021) |
| 08/05/2021 | 22 | Consent MOTION for Protective Order *Sensitive Investigative Information* by USA as to Ashley Nichole Kolhoff. (Attachments: # 1 Proposed Order)(Kramer, Whitney) (Entered: 08/05/2021) |
| 08/05/2021 | 23 | Protective Order re 21 Joint MOTION for Protective Order *Victim Information* filed by USA. Signed by District Judge Leonie M. Brinkema on 8/6/2021. (shea) (Entered: 08/06/2021) |
| 08/05/2021 | 24 | Protective Order re 22 Consent MOTION for Protective Order *Sensitive Investigative Information* filed by USA. Signed by District Judge Leonie M. Brinkema on 8/5/2021. (shea) (Entered: 08/06/2021) |
| 08/25/2021 | 25 | Sealed Document (jlan ) (Entered: 08/25/2021) |
| 09/13/2021 | 26 | ORDERED that the motions hearing for Tuesday, September 14, 2021, be and is cancelled. Signed by District Judge Leonie M. Brinkema on 9/13/2021. (c/s 9/13/2021 shea) (Entered: 09/13/2021) |
| 09/13/2021 | | Motions hearing terminated. Signed by District Judge Leonie M. Brinkema on 9/13/2021. (shea) (Entered: 09/13/2021) |
| 09/14/2021 | 27 | MOTION to Withdraw as Attorney by Nathaniel Wenstrup. by Ashley Nichole Kolhoff. (Wenstrup, Nathaniel) (Entered: 09/14/2021) |
| 09/14/2021 | 28 | ORDER granting 27 MOTION to Withdraw as Attorney; directing that the jury trial scheduled for July 27, 2021 be and is cancelled; directing that the Clerk immediately appoint Christopher Amolsch to represent the defendant; directing that a status hearing to determine when defense counsel can be ready for trial or disposition of the case be and is scheduled for Wednesday, September 22 2021 at 9:30. Signed by District Judge Leonie M. Brinkema on 9/14/2021. (shea) (Entered: 09/14/2021) |
| 09/14/2021 | | Terminate Deadlines and Hearings as to Ashley Nichole Kolhoff: (shea) (Entered: 09/14/2021) |
| 09/14/2021 | | CJA 20 as to Ashley Nichole Kolhoff: Appointment of Attorney Christopher Bryan Amolsch. Signed by District Judge Leonie M. Brinkema on 21cr158. (shea) (Entered: |

JA5

| | | |
|---|---|---|
| | | 09/16/2021) |
| 09/15/2021 | 29 | Amended Order re 28 Order as to Ashley Nichole Kolhoff; cancelling the jury trial scheduled for September 27, 2021; directing the Clerk to immediately appoint Christopher Amolsch to represent the defendant; directing that a status hearing to determine when defense counsel can be ready for trial or other disposition of the case be and is scheduled for Wednesday, September 22, 2021 at 9:30. Signed by District Judge Leonie M. Brinkema on 9/15/2021. (c/s 9/15/2021 shea) (Entered: 09/15/2021) |
| 09/15/2021 | | Set/Reset Hearings as to Ashley Nichole Kolhoff: Status Conference set for 9/22/2021 at 09:30 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (shea) (Entered: 09/15/2021) |
| 09/22/2021 | 30 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Status Conference as to Ashley Nichole Kolhoff held on 9/22/2021. U.S. appeared through Whitney Kramer & Seth Schlessinger. Deft appeared with counsel Christopher Amolsch. Court advised of case status. Court deft has made a knowing & voluntary waiver. Waiver of Speedy Trial filed & entered in open court. Govt directed to provide full discovery to defense counsel. Deft counsel request to set hearing is granted. Status Conference/Plea Agreement Hearing set for 10/13/2021 at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. Deft remanded.(Court Reporter A. Thomson.)(yguy) (Entered: 09/22/2021) |
| 09/22/2021 | 31 | WAIVER of Speedy Trial by Ashley Nichole Kolhoff (yguy) (Entered: 09/22/2021) |
| 09/29/2021 | | Set/Reset Hearings as to Ashley Nichole Kolhoff: Change of Plea Hearing **RESET to 10/12/2021 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (yguy) (Entered: 09/29/2021)** |
| 10/12/2021 | | Set/Reset Hearings as to Ashley Nichole Kolhoff: Status Conference/Change of Plea Hearing reset 10/12/2021 10:30 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (yguy) (Entered: 10/12/2021) |
| 10/12/2021 | 32 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Status Conference as to Ashley Nichole Kolhoff held on 10/12/2021. U.S. appeared through Whitney Kramer & Seth Schlessinger. Deft appeared with counsels Chris Amolsch & Frank Salvado. Court advised of case status. Deft oral request to schedule another status hearing is Denied. Court finds deft has made a knowing and voluntary decision to extension of speedy trial. Waiver of speedy trial is extended. Court orders Jury Trial be set for 11/15/2021 at 10:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. Deft remanded.(Court Reporter A. Thomson.)(yguy) (Entered: 10/12/2021) |
| 10/21/2021 | 33 | Ex Parte Sealed Motion (Attachments: # 1 Attachment 1, # 2 Attachment 2, # 3 Proposed Order)(shea) (Attachment 3 replaced on 11/2/2021) (shea, ). (Entered: 10/21/2021) |
| 10/22/2021 | 34 | Ex Parte Under Seal Order as to Ashley Nichole Kolhoff. Signed by District Judge Leonie M. Brinkema on 10/22/2021. (c/m to filing party) (jlan) (Entered: 10/22/2021) |
| | | |

JA6

| 10/22/2021 | 36 | Ex Parte Under Seal Order. Signed by District Judge Leonie M. Brinkema on 10/22/2021. (c/m to filing party) (jlan) (Entered: 10/28/2021) |
| 10/26/2021 | 35 | Under Seal and ExParte Order as to Ashley Nichole Kolhoff. Signed by District Judge Leonie M. Brinkema on 10/26/2021. (c/m 10/26/2021 shea) (Entered: 10/26/2021) |
| 11/01/2021 | 37 | Notice of Hearing Date Set for November 9, 2021 at 9:00 am in re 39 Motion to Continue Trial (Amolsch, Christopher) Modified text on 11/3/2021 (clar, ). (Entered: 11/01/2021) |
| 11/01/2021 | | Set Deadlines re Motion or Report and Recommendation in case as to Ashley Nichole Kolhoff 39 MOTION to Continue *Trial*. Motion Hearing set for 11/9/2021 at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (clar, ) (Entered: 11/03/2021) |
| 11/03/2021 | 38 | Subpoenas issued for Jury Trial set for 11/15/2021 (swil) (Entered: 11/03/2021) |
| 11/03/2021 | 39 | MOTION to Continue *Trial* by Ashley Nichole Kolhoff. (Amolsch, Christopher) (Entered: 11/03/2021) |
| 11/08/2021 | | Set/Reset Deadlines re Motion or Report and Recommendation in case as to Ashley Nichole Kolhoff 39 MOTION to Continue *Trial*. Motion Hearing set for 11/9/2021 at 08:45 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (shea) (Entered: 11/08/2021) |
| 11/08/2021 | 40 | EXHIBIT LIST by USA as to Ashley Nichole Kolhoff (Kramer, Whitney) (Entered: 11/08/2021) |
| 11/08/2021 | 41 | Proposed Jury Instructions by USA as to Ashley Nichole Kolhoff (Kramer, Whitney) (Entered: 11/08/2021) |
| 11/08/2021 | 42 | Proposed Jury Instructions by USA as to Ashley Nichole Kolhoff (Kramer, Whitney) (Entered: 11/08/2021) |
| 11/08/2021 | 43 | WITNESS LIST by USA as to Ashley Nichole Kolhoff (Kramer, Whitney) (Entered: 11/08/2021) |
| 11/08/2021 | 44 | Trial Exhibit Custody Form. (dvanm, ) Modified to correct text on 11/19/2021 (dvanm, ). (Entered: 11/08/2021) |
| 11/09/2021 | 45 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Motion Hearing as to Ashley Nichole Kolhoff held on 11/9/2021. U.S. appeared through Whitney Kramer & Seth Schlessinger. Deft appeared with counsels Chris Amolsch & Frank Salvato. Court advised of case status. Deft's 39 MOTION to Continue *Trial is argued in open court and GRANTED(in the interest of justice). If govt endorses & files waiver of jury trial, 1/06/22 trial will be a bench trial. Bench Trial set for 1/6/2022 at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. 11/15/21 jury trial is cancelled; Jury notified. Deft remanded.(Court Reporter A. Thomson.)(yguy)* (Entered: 11/09/2021) |
| 11/09/2021 | | Terminate Hearings(Jury Trial set for 11/15/2021 at 10:00 AM ) as to Ashley Nichole Kolhoff: (yguy) (Entered: 11/09/2021) |

JA7

| 11/09/2021 | 46 | WAIVER of *Jury Trial* by Ashley Nichole Kolhoff (Kramer, Whitney) (Entered: 11/09/2021) |
| 11/09/2021 | 48 | WAIVER of Right to Trial by Jury by Ashley Nichole Kolhoff. Signed by District Judge Leonie M. Brinkema on 11/9/2021. (shea) (Entered: 11/10/2021) |
| 11/10/2021 | 47 | ORDERED that the jury trial originally scheduled for Monday November 15, 2021, be and is CONTINUED to Thursday, January 6, 2022, as a bench trial to begin at 9 a.m. in Courtroom 700. Signed by District Judge Leonie M. Brinkema on 11/10/2021. (c/s to usm on 11/10/2021 shea ) (Entered: 11/10/2021) |
| 11/10/2021 |  | Set/Reset Deadlines/Hearings as to Ashley Nichole Kolhoff: Bench Trial set for 1/6/2022at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (shea) (Entered: 11/10/2021) |
| 11/16/2021 | 49 | MOTION for Disclosure *Deadline* by USA as to Ashley Nichole Kolhoff. (Kramer, Whitney) (Entered: 11/16/2021) |
| 11/23/2021 | 50 | ORDERED that the report of any psychological evaluation of the defendant prepared for the defense be provided to the prosecution team no later than December 1, 2021. Failure to provide the report by that date may result in defendant being barred from relying on that report during her trial. Signed by District Judge Leonie M. Brinkema on 11/23/2021. (shea) (Entered: 11/24/2021) |
| 11/30/2021 | 51 | NOTICE *ON EXPERT EVALUATION* by Ashley Nichole Kolhoff re 50 Order on Motion for Disclosure, (Attachments: # 1 Exhibit)(Amolsch, Christopher) (Entered: 11/30/2021) |
| 12/03/2021 | 52 | NOTICE *on Expert Evaluation* by Ashley Nichole Kolhoff re 51 Notice (Other) (Amolsch, Christopher) (Entered: 12/03/2021) |
| 12/06/2021 | 53 | NOTICE *Pursuant to Rule 12.2(b)* by Ashley Nichole Kolhoff (Amolsch, Christopher) (Entered: 12/06/2021) |
| 12/06/2021 | 54 | MOTION to Seal by Ashley Nichole Kolhoff. (Attachments: # 1 Proposed Order) (Amolsch, Christopher) (Entered: 12/06/2021) |
| 12/06/2021 | 55 | Under Seal Proposed Order in re 54 MOTION to Seal filed by Ashley Nichole Kolhoff (dest) (Entered: 12/07/2021) |
| 12/06/2021 | 56 | Under Seal Notice filed by Ashley Nichole Kolhoff. (dest) (Entered: 12/07/2021) |
| 12/06/2021 | 57 | Psychological Evaluation and Risk Assessment filed by Ashley Nichole Kolhoff. (dest) (Entered: 12/07/2021) |
| 12/07/2021 | 58 | Under Seal Order as to Ashley Nichole Kolhoff. Signed by District Judge Leonie M. Brinkema on 12/7/2021. (c/m&s 12/7/2021 shea) (Main Document 58 replaced on 12/7/2021) (shea, ). (Entered: 12/07/2021) |
| 12/08/2021 | 59 | Sealed Motion by USA as to Ashley Nichole Kolhoff. (Attachments: # 1 Proposed Order)(shea) (Entered: 12/08/2021) |

JA8

| 12/08/2021 | 60 | Sealed Motion by USA as to Ashley Nichole Kolhoff. (Attachments: # 1 Proposed Order)(shea) (Entered: 12/08/2021) |
|---|---|---|
| 12/08/2021 | 61 | Sealed Order as to Ashley Nichole Kolhoff. Signed by District Judge Leonie M. Brinkema on 12/8/2021. (shea) (Entered: 12/08/2021) |
| 12/08/2021 | 62 | Sealed Order as to Ashley Nichole Kolhoff. Signed by District Judge Leonie M. Brinkema on 12/8/2021. (shea) (Entered: 12/08/2021) |
| 12/14/2021 | 63 | Subpoena issued (shea) (Entered: 12/15/2021) |
| 12/17/2021 | 64 | ORDERED that a status conference be and is SCHEDULED for Tuesday, December 21,2021, at 9:00 am. Signed by District Judge Leonie M. Brinkema on 12/17/2021. (shea) (Entered: 12/17/2021) |
| 12/17/2021 | | Set/Reset Deadlines/Hearings as to Ashley Nichole Kolhoff: Status Conference set for 12/21/2021 at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (shea) (Entered: 12/17/2021) |
| 12/21/2021 | 65 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Status Conference before Trial as to Ashley Nichole Kolhoff held on 12/21/2021. U.S. appeared through Seth Schlessinger & Whitney Kramer. Deft appeared through counsels Chris Amolsch & Frank Salvado. Deft's appearance is waived. Court advised of case status. Bench Trial reset to 1/6/2022 at 11:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema.(Court Reporter A. Thomson.)(yguy) (Entered: 12/21/2021) |
| 12/29/2021 | 66 | Sealed Motion. (Attachments: # 1 Proposed Order)(jlan) (Entered: 12/29/2021) |
| 12/29/2021 | 67 | Sealed Document (Attachments: # 1 Attachment)(jlan) (Entered: 12/29/2021) |
| 12/30/2021 | 68 | Sealed Order. Signed by District Judge Leonie M. Brinkema on 12/30/2021. (kgall) (C/M to parties) (Entered: 12/30/2021) |
| 12/30/2021 | 69 | *Amended* EXHIBIT LIST by USA as to Ashley Nichole Kolhoff (Kramer, Whitney) (Entered: 12/30/2021) |
| 12/30/2021 | 70 | Trial Exhibit Custody Form. (kgall) (Entered: 12/30/2021) |
| 01/04/2022 | 71 | MOTION to Continue *Trial* by Ashley Nichole Kolhoff. (Amolsch, Christopher) (Entered: 01/04/2022) |
| 01/05/2022 | 72 | ORDERED that the trial scheduled for Thursday, January 6, 2022 be and is CANCELLED; and it is further ORDERED that the parties appear at 9:00 a.m. on Tuesday, January 18, 2022 for a status conference to set a new trial date (see order for details). Signed by District Judge Leonie M. Brinkema on 1/5/2022. (shea) (Entered: 01/05/2022) |
| 01/05/2022 | | Set/Reset Deadlines/Hearings as to Ashley Nichole Kolhoff: Status Conference set for 1/18/2022 at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (shea) (Entered: 01/05/2022) |
| 01/05/2022 | | Terminate Deadlines and Hearings as to Ashley Nichole Kolhoff: (shea) (Entered: |

JA9

| | | |
|---|---|---|
| | | 01/05/2022) |
| 01/14/2022 | 73 | ORDERED that the status conference currently scheduled for Tuesday, January 18, 2022 be and is cancelled; and it is further ORDERED that, pending confirmation from the parties about their expert witnesses, an order setting a new trial date will be issued next week (see order for details). Signed by District Judge Leonie M. Brinkema on 1/14/2022. (shea) (Entered: 01/14/2022) |
| 01/14/2022 | | Terminate Deadlines and Hearings as to Ashley Nichole Kolhoff: (shea) (Entered: 01/14/2022) |
| 01/18/2022 | 74 | ORDERED that the bench trial in this case be and is scheduled for Wednesday, March 2, 2022, to begin at 9:00 a.m. in Courtroom 700. Signed by District Judge Leonie M. Brinkema on 1/18/2022. (shea) (Entered: 01/18/2022) |
| 01/18/2022 | | Set/Reset Deadlines/Hearings as to Ashley Nichole Kolhoff: Bench Trial set for 3/2/2022at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (shea) (Entered: 01/18/2022) |
| 02/23/2022 | 75 | MOTION to Seal Trial Brief by USA as to Ashley Nichole Kolhoff. (Attachments: # 1 Proposed Order)(shea) (Entered: 02/24/2022) |
| 02/23/2022 | 76 | Under Seal Document re 75 MOTION to Seal filed by USA (shea) (Entered: 02/24/2022) |
| 02/23/2022 | 77 | ORDER granting 75 MOTION to Seal Trial Brief as to Ashley Nichole Kolhoff (1). Signed by District Judge Leonie M. Brinkema on 2/23/2022. (shea) (Entered: 02/24/2022) |
| 02/25/2022 | 78 | MOTION to Seal *Motion for Trial Continuance* by USA as to Ashley Nichole Kolhoff. (Attachments: # 1 Proposed Order)(Schlessinger, Seth) (Entered: 02/25/2022) |
| 02/28/2022 | 79 | Under Seal Order as to Ashley Nichole Kolhoff. Signed by District Judge Leonie M. Brinkema on 2/28/2022. (c/m 2/28/2022 shea) (Entered: 02/28/2022) |
| 02/28/2022 | 80 | Sealed Motion by USA as to Ashley Nichole Kolhoff. (Attachments: # 1 Proposed Order)(shea) (Entered: 02/28/2022) |
| 02/28/2022 | 81 | Under Seal Response re 80 Sealed Motion filed by USA (Attachments: # 1 Proposed Order)(shea) (Entered: 02/28/2022) |
| 02/28/2022 | 82 | ORDER denying 80 Sealed Motion. ORDERED that the bench trial in this case will be held as planned, beginning on Wednesday, March 2, 2022 at 9:00 a.m., in Courtroom 700; and it is further ORDERED that the defendant's opposition [Dkt. No. 81] be and is SEALED for the same reasons that the original Motion was sealed. Signed by District Judge Leonie M. Brinkema on 2/28/2022. (shea) (Entered: 02/28/2022) |
| 03/01/2022 | 83 | MOTION for Electronic Device Application by Ashley Nichole Kolhoff. (Amolsch, Christopher) (Entered: 03/01/2022) |
| 03/01/2022 | 84 | ORDER granting 83 Motion for Electronic Device Application as to Ashley Nichole Kolhoff (1). Signed by District Judge Leonie M. Brinkema on 3/1/2022. (shea) |

JA10

| | | (Entered: 03/01/2022) |
|---|---|---|
| 03/01/2022 | 85 | MOTION for Electronic Device Application by USA as to Ashley Nichole Kolhoff. (Schlessinger, Seth) (Entered: 03/01/2022) |
| 03/02/2022 | 86 | ORDER granting 85 Motion for Electronic Device Application. Signed by District Judge Leonie M. Brinkema on 3/2/2022. (shea) (Entered: 03/02/2022) |
| 03/02/2022 | 87 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Bench Trial(day 1) as to Ashley Nichole Kolhoff held on 3/2/2022. U.S. appeared through Seth Schlessinger, Whitney Kramer, Case agent Brandon Smock. Deft appeared with counsels Christopher Amolsch & Frank Salvado. Case came on for trial by the Court. Rule on witnesses. Opening statements. Govt adduced evidence. Deft adduced evidence out of turn. Bench Trial (day 2) set for 3/3/2022at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. Deft remanded.(Court Reporter S. Austin.)(yguy) (Entered: 03/02/2022) |
| 03/02/2022 | 88 | TRIAL BRIEF by Ashley Nichole Kolhoff (Amolsch, Christopher) (Entered: 03/02/2022) |
| 03/03/2022 | 89 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Bench Trial(day 2) as to Ashley Nichole Kolhoff completed on 3/3/2022. U.S. appeared through Seth Schlessinger, Whitney Kramer, Case agent Brandon Smock. Deft appeared with counsels Christopher Amolsch & Frank Salvado. Govt rests. Deft argues Rule 29 motion - Denied without prejudice. Deft rests. Govt adduced rebuttal evidence & rests. Matter is TAKEN UNDER ADVISEMENT. Counsel is directed to file post trial briefs within 14 days. 14 days to respond. Deft remanded. (Court Reporter S. Austin.)(yguy) (Additional attachment(s) added on 3/3/2022: # 1 Witness List) # 2 Admitted Exhbits, # 3 Deft Exhibits) (Entered: 03/03/2022) |
| 03/03/2022 | 90 | MOTION for Acquittal *Pursuant to F.R.Cr.P. 29* by Ashley Nichole Kolhoff. (Amolsch, Christopher) (Entered: 03/03/2022) |
| 03/08/2022 | 91 | TRANSCRIPT of Proceedings held on 3/2/22, before Judge Leonie M. Brinkema. Court reporter Stephanie Austin, Telephone number 571-298-1649. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 4/7/2022. Redacted Transcript Deadline set for 5/9/2022. Release of Transcript Restriction set for 6/6/2022.(Austin, Stephanie) (Entered: 03/08/2022)** |
| 03/08/2022 | 92 | TRANSCRIPT of Proceedings held on 3/3/22, before Judge Leonie M. Brinkema. Court reporter Stephanie Austin, Telephone number 571-298-1649. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no** |

JA11

| | | |
|---|---|---|
| | | such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 4/7/2022. Redacted Transcript Deadline set for 5/9/2022. Release of Transcript Restriction set for 6/6/2022.(Austin, Stephanie) (Entered: 03/08/2022) |
| 03/17/2022 | 93 | CLOSING BRIEF by USA as to Ashley Nichole Kolhoff (Kramer, Whitney) Modified on 3/18/2022 (shea, ). (Entered: 03/17/2022) |
| 03/17/2022 | 94 | Under Seal Closing Brief (shea) (Main Document 94 replaced on 3/22/2022) (shea, ). (Entered: 03/18/2022) |
| 03/31/2022 | 95 | TRIAL BRIEF by Ashley Nichole Kolhoff (Amolsch, Christopher) (Entered: 03/31/2022) |
| 04/06/2022 | 96 | Transcript Redaction Request in case as to Ashley Nichole Kolhoff re 92 Transcript,,, 91 Transcript,,, filed by attorney Whitney Kramer (Attachments: # 1 Exhibit Attachment A, # 2 Proposed Order)(Kramer, Whitney) (Attachment 1 replaced on 4/28/2022) (jlan, ). (Entered: 04/06/2022) |
| 04/07/2022 | 97 | ORDERED that counsel meet and confer to select a Tuesday at 9 a.m. on which matters related to this case may be addressed and to notice a hearing for that date. Signed by District Judge Leonie M. Brinkema on 04/07/2022. (jlan) (Entered: 04/07/2022) |
| 04/08/2022 | 98 | ORDERED that a hearing be and is SCHEDULED for Tuesday, April 12, 2022, at 8:30 in Courtroom 700. Signed by District Judge Leonie M. Brinkema on 4/8/2022. (kgall) (Entered: 04/08/2022) |
| 04/08/2022 | | Set Hearings as to Ashley Nichole Kolhoff: Hearing set for 4/12/2022 at 08:30 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. (kgall) (Entered: 04/08/2022) |
| 04/12/2022 | 99 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Motion Hearing as to Ashley Nichole Kolhoff held on 4/12/2022. U.S. appeared through Seth Schlessinger & Whitney Kramer. Deft appeared with counsel Chris Amolsch & Frank Salvado. Deft's 90 MOTION for Acquittal *Pursuant to F.R.Cr.P. 29 is argued and DENIED. Court finds deft is guilty as to both counts 1 & 2. Sentencing set for 7/12/2022 at 09:00 AM in Alexandria Courtroom 700 before District Judge Leonie M. Brinkema. Deft directed to cooperate with prob for psir. Deft remanded.(Court Reporter S. Austin.)(yguy) (Entered: 04/12/2022)* |
| 04/12/2022 | 100 | ORDER as to Ashley Nichole Kolhoff: For the reasons stated in open court and to be further developed in a Memorandum Opinion, the government has produced evidence establishing that defendant Ashley Nichole Kolhoff is guilty beyond a reasonable doubt of Production and Distribution of Child Pornography in violation of 18 U.S.C. §§ 2251 and 2252, as described in Counts I and II of the indictment; and it is hereby ORDERED that a sentencing hearing in this case be and is scheduled for Tuesday, |

JA12

| | | |
|---|---|---|
| | | July 12, 2022 at 9:00 a.m. in Courtroom 700. Signed by District Judge Leonie M. Brinkema on 4/12/22. (yguy) (Entered: 04/12/2022) |
| 04/18/2022 | 101 | ORDER re 96 Transcript Redaction Request. ORDERED that the trial transcripts shall be redacted in accordance with Attachment A of the United States' motion. Signed by District Judge Leonie M. Brinkema on 4/18/2022. (nneb) (Entered: 04/18/2022) |
| 04/29/2022 | 102 | Redaction Transcript in re 91 Transcript in case as to Ashley Nichole Kolhoff. (jlan) (Entered: 04/29/2022) |
| 04/29/2022 | 103 | Redaction Transcript in re 92 Transcript in case as to Ashley Nichole Kolhoff. (jlan) (Entered: 04/29/2022) |
| 06/07/2022 | 104 | PRESENTENCE INVESTIGATION REPORT (Disclosed Presentence Investigation Report) (SEALED - government and defense counsel) as to Ashley Nichole Kolhoff. Objections to PSI due 06/24/2022. (lazaroff, nadja) (Entered: 06/07/2022) |
| 06/08/2022 | 105 | TRANSCRIPT of Proceedings held on 4/12/22, before Judge Leonie M. Brinkema. Court reporter Stephanie Austin, Telephone number 571-298-1649. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/8/2022. Redacted Transcript Deadline set for 8/8/2022. Release of Transcript Restriction set for 9/6/2022.(Austin, Stephanie) (Entered: 06/08/2022)** |
| 07/05/2022 | 108 | Position of the United States with Respect to Sentencing. Filed under seal pursuant to 18 U.S.C. 3509(d)(2). (dvanm) (Entered: 07/06/2022) |
| 07/06/2022 | 106 | NOTICE OF ATTORNEY APPEARANCE Annie Zanobini appearing for USA. (Zanobini, Annie) (Entered: 07/06/2022) |
| 07/06/2022 | 107 | MOTION for Forfeiture of Property *--Entry of a Preliminary Order of Forfeiture* by USA as to Ashley Nichole Kolhoff. (Attachments: # 1 Proposed Order)(Zanobini, Annie) (Entered: 07/06/2022) |
| 07/06/2022 | 109 | PRESENTENCE INVESTIGATION REPORT (Sentencing Presentence Investigation Report) (SEALED - government and defense counsel) as to Ashley Nichole Kolhoff. (Attachments: # 1 Letter DF-178)(lazaroff, nadja) (Entered: 07/06/2022) |
| 07/08/2022 | 111 | SENTENCING MEMORANDUM by Ashley Nichole Kolhoff (Amolsch, Christopher) (Entered: 07/08/2022) |
| 07/12/2022 | 112 | Minute Entry for proceedings held before District Judge Leonie M. Brinkema:Sentencing/Motion Hearing held on 7/12/2022 for Ashley Nichole Kolhoff (1). U.S. appeared through Seth Schlessinger & Whitney Kramer. Deft appeared with counsels Chris Amolsch & Frank Salvato. Counsel has reviewed pgs 12-13 of psr with |

JA13

deft. Deft renewed rule 29 motion. Deft is committed to the custody of the BOP to serve a term of: 15 years with credit for time served--15 years as to Count 1 and 5 years as to Count 2, to be served concurrently; supervised release 15 years as to each of counts 1 and 2, to run concurrently; $200.00 special assessment. Govt 107 MOTION for Forfeiture of Property --*Entry of a Preliminary Order of Forfeiture is GRANTED. Forfeiture order filed & entered in open court. Special conditions: 1. The defendant shall undergo a mental health evaluation and, if recommended, participate in a program approved by the United States Probation Office for mental health treatment which shall include a psychosexual evaluation and sex offender treatment. The defendant shall take all medications as prescribed and waive all rights of privacy concerning her sex offender/mental health treatment to allow the release of information to the probation office and authorize communication between the probation officer and the treatment provider. The costs for the evaluation, testing and treatment are waived.2. The defendant shall submit to polygraph testing as directed by the probation officer. The costs of the testing is waived.3.The defendant must remain drug free and her probation officer may require random testing at any time. Should a test indicate illegal drug use, then the defendant must satisfactorily participate in, and complete, any inpatient or outpatient treatment to which defendant is directed by the probation officer. The defendant shall waive all rights of confidentiality regarding treatment to allow the release of information to the United States Probation Office and authorize communication between the probation officer and the treatment provider. The costs for testing and treatment are waived.4. The defendant shall not engage in employment or volunteer services that allow her access to minors.5. The defendant shall not purchase, possess or view any sexually explicit material or images using minors in any format including, but not limited to, in magazines, books, on the computer, or any electronic device, in videos, movies, and television.6. The defendant shall have no contact with minors unless supervised by a competent, informed adult, approved in advance by the probation officer.7. The defendant shall not go to and/or loiter within 100 feet of school yards, parks, playgrounds, arcades, or other place primarily used by minors, without prior written permission of the probation officer.8. Pursuant to the Adam Walsh Child Protection and Safety Act of 2006, the defendant shall register with the State Sex Offender Registration Agency in any state where the defendant resides, is employed, carries on a vocation, or is a student, according to federal and state Law and as directed by the probation officer.9. Pursuant to the Adam Walsh Child Protection and Safety Act of 2006, the defendant shall submit to a search of her person, property, house, residence, vehicle, papers, computer, other electronic communication or data storage devices or media, and effects at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of supervision.10. The defendant shall comply with the requirements of the comuter monitoring program as administered by the probation office. The defendant shall consent to the installation of computer monitoring software on any computer to which the defendant has access. Installation shall be performed by the probation officer. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. The defendant shall also*

JA14

*notify others of the existence of the monitoring software. The defendant shall not remove, tamper with, reverse engineer, or in any way circumvent the software. Recommendation to BOP: 1. defendant to be designated to F.C.I. Alderson, West Virginia; 2. defendant to participate in the Residential Drug Abuse Treatment Program (RDAP). Deft advised of appeal rights. Deft remanded. (Court Reporter S. Austin.)(yguy) (Entered: 07/13/2022)*

| 07/12/2022 | 113 | JUDGMENT as to Ashley Nichole Kolhoff (1), Count(s) 1, 2: 15 years with credit for time served--15 years as to Count 1 and 5 years as to Count 2, to be served concurrently; supervised release 15 years as to each of counts 1 and 2, to run concurrently; $200.00 special assessment. Signed by District Judge Leonie M. Brinkema on 7/12/22. (yguy) (Entered: 07/13/2022) |
| 07/12/2022 | 114 | Sealed Statement of Reasons as to Ashley Nichole Kolhoff (yguy) (Entered: 07/13/2022) |
| 07/12/2022 | 115 | Preliminary Order of Forfeiture as to Ashley Nichole Kolhoff. Signed by District Judge Leonie M. Brinkema on 7/12/22. (yguy) (Entered: 07/13/2022) |
| 07/20/2022 | 116 | NOTICE OF APPEAL re 113 JUDGMENT by Ashley Nichole Kolhoff (Amolsch, Christopher) Modified to link Notice of Appeal to Judgment on 10/20/2022 (Dest). (Entered: 07/20/2022) |
| 07/20/2022 | 117 | MOTION *FOR APPROPRIATE RELIEF* by Ashley Nichole Kolhoff. (Amolsch, Christopher) (Entered: 07/20/2022) |
| 07/20/2022 | 118 | SENTENCING MEMORANDUM by Ashley Nichole Kolhoff (Amolsch, Christopher) (Entered: 07/20/2022) |
| 07/21/2022 | 119 | ORDER granting 117 Motion for Appropriate Relief. ORDERED that the United States Marshals Service continue to hold Ms. Kolhoff at the Alexandria Detention Center until after she receives the COVID-19 vaccine as to Ashley Nichole Kolhoff. Signed by District Judge Leonie M. Brinkema on 7/21/2022. (swil) (Entered: 07/21/2022) |
| 08/15/2022 | 120 | TRANSCRIPT of Proceedings held on 7/12/22, before Judge Leonie M. Brinkema. Court reporter Stephanie Austin, Telephone number 571-298-1649. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 9/14/2022. Redacted Transcript Deadline set for 10/17/2022. Release of Transcript Restriction set for 11/14/2022.(Austin, Stephanie) (Entered: 08/15/2022)** |
| 08/19/2022 | 121 | Motion for Redaction of Sentencing Transcript in case as to Ashley Nichole Kolhoff re 120 Transcript, filed by attorney Whitney Kramer (Attachments: # 1 Attachment A, # |

JA15

| | | |
|---|---|---|
| | | 2 Proposed Order)(Kramer, Whitney) Modified to correct docket event on 9/1/2022 (nlop, ). (Entered: 08/19/2022) |
| 08/19/2022 | 122 | ORDER granting 121 Motion for Redaction of Sentencing Transcript in case as to Ashley Nichole Kolhoff. ORDERED that the sentencing transcript shall be redacted in accordance with Attachment A of the United States motion. Signed by District Judge Leonie M. Brinkema on 08/19/2022. (nlop, ) Modified docket text on 9/1/2022 (nlop, ). (Entered: 08/19/2022) |
| 09/12/2022 | 123 | Redaction Transcript in re 120 TRANSCRIPT of Proceedings held on 7/12/22, before Judge Leonie M. Brinkema. Court reporter Stephanie Austin, Telephone number 571-298-1649 in case as to Ashley Nichole Kolhoff. (jlan) (Entered: 09/12/2022) |
| 10/20/2022 | 124 | Transmission of Notice of Appeal to 4CCA as to Ashley Nichole Kolhoff to US Court of Appeals re 116 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (jlan) (Entered: 10/20/2022) |
| 10/24/2022 | 125 | USCA Case Number 22-4601 4th Circuit, Case Manager Jeffrey S. Neal for 116 Notice of Appeal filed by Ashley Nichole Kolhoff. (nlop) (Entered: 10/24/2022) |
| 10/24/2022 | 126 | ORDER of USCA as to 116 Notice of Appeal filed by Ashley Nichole Kolhoff. The court appoints Christopher Bryan Amolsch to represent Ashley Nichole Kolhoff. (nlop) (Entered: 10/24/2022) |
| 11/14/2022 | | Transcript Order Acknowledgment from USCA re 116 Notice of Appeal: Court Reporter/Transcriber Stephanie Austin. (Dest) (Entered: 11/14/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/12/2023 09:43:55 | | | |
| **PACER Login:** | chrisamolsch | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cr-00158-LMB |
| **Billable Pages:** | 12 | **Cost:** | 1.20 |

JA16

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 1:21-CR-00158 |
| | ) | |
| v. | ) | <u>Count 1</u>: 18 U.S.C. § 2251(a) & (e) |
| | ) | Production of Child Pornography |
| ASHLEY NICHOLE KOLHOFF, | ) | |
| | ) | <u>Count 2</u>: 18 U.S.C. § 2252(a)(2) & (b)(1) |
| *Defendant.* | ) | Distribution Child Pornography |
| | ) | |
| | ) | <u>Forfeiture Notice</u> |
| | ) | |

## INDICTMENT

July 2021 Term—at Alexandria, Virginia

### COUNT ONE
### (Production of Child Pornography)

THE GRAND JURY CHARGES THAT:

Between in or about September 2020 and in or about October 2020, within the Eastern District of Virginia and elsewhere, the defendant, ASHLEY NICHOLE KOLHOFF, did employ, use, and coerce a minor, MINOR VICTIM 1, to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, knowing and having reason to know that such visual depiction would be transported and transmitted using any means or facility of interstate and foreign commerce and in and affecting interstate and foreign commerce, and which visual depiction was actually transported or transmitted using any means or facility of interstate and foreign commerce and in and affecting interstate and foreign commerce or mailed, and which visual depiction was produced using materials that have been mailed, shipped, and transported in and affecting interstate and foreign commerce, by any means, including by computer.

(In violation of Title 18, United States Code, Section 2251(a) and (e).)

1

JA17

## COUNT TWO
### (Distribution of Child Pornography)

THE GRAND JURY FURTHER CHARGES THAT:

Between in or about September 2020 and in or about October 2020, within the Eastern District of Virginia and elsewhere, the defendant, ASHLEY NICHOLE KOLHOFF, did knowingly distribute a visual depiction using any means and facility of interstate or foreign commerce, and had been shipped or transported in or affecting interstate or foreign commerce, or which contained materials which had been mailed or so shipped or transported, by any means, including by computer, and the producing of such visual depiction involved the use of a minor engaging in sexually explicit conduct, and the visual depiction was of such conduct.

(In violation of Title 18, United States Code, Section 2252(a)(2) and (b)(1).)

JA18

## FORFEITURE NOTICE

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT:

The defendant, ASHLEY NICHOLE KOLHOFF, is hereby notified, pursuant to Federal Rule of Criminal Procedure 32.2(a), that upon conviction of any Count set forth in the Indictment, she shall forfeit to the United States, pursuant to 18 U.S.C. §§ 2253(a): (1) any visual depiction described in 18 U.S.C. § 2251 *et seq.* or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction; (2) any property real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense; and (3) any property, real or personal, used or intended to be used to commit or to promote the commission of such offense or any property traceable to such property.

Pursuant to 21 U.S.C. § 853(p), the defendant shall forfeit substitute property, if, by any act or omission of the defendant's, the property referenced above cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(In accordance with Title 18, United States Code, Section 2253(a); and Federal Rule of Criminal Procedure 32.2.)

A TRUE BILL

Pursuant to the E-Government Act,
The original of this page has been filed
FOREPERSON under seal in the Clerk's Office

Raj Parekh
Acting United States Attorney

By:  *Whitney Kramer*
Whitney Kramer
Special Assistant United States Attorney (LT)
Seth Schlessinger
Assistant United States Attorney

3

JA19

REDACTED TRANSCRIPT

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3   --------------------------x
     UNITED STATES OF AMERICA,  :    Criminal Action No.:
 4                              :    1:21-cr-158
          versus                :
 5                              :
     ASHLEY NICHOLE KOLHOFF,     :    Wednesday, March 2, 2022
 6                              :
               Defendant.   :    Volume I - REDACTED TRANS.
 7   --------------------------x

 8        The above-entitled bench trial was heard before the
     Honorable Leonie M. Brinkema, United States District Judge.
 9
                    A P P E A R A N C E S :
10
     FOR THE GOVERNMENT:    SETH SCHLESSINGER, ESQUIRE
11                          WHITNEY KRAMER, ESQUIRE
                            OFFICE OF THE UNITED STATES ATTORNEY
12                          2100 Jamieson Avenue
                            Alexandria, Virginia  22314
13                          (703) 299-3700

14   FOR THE DEFENDANT:    CHRISTOPHER AMOLSCH, ESQUIRE
                            LAW OFFICES OF CHRISTOPHER AMOLSCH
15                          12005 Sunrise Valley Drive
                            Suite 200
16                          Reston, Virginia  20191
                            (703) 969-2214
17
                            FRANK SALVATO, ESQUIRE
18                          THE LAW OFFICES OF FRANK SALVATO
                            1203 Duke Street
19                          Alexandria, Virginia  22314
                            (703) 548-5000
20

21

22

23        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

24

25
                                                        1
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA20

REDACTED TRANSCRIPT

```
1                    TABLE OF CONTENTS

2                      WITNESSES

3   On behalf of the Government:

4   JAMES FOTTRELL

5   Direct examination by Mr. Schlessinger ....26
    Cross-examination by Mr. Amolsch ..........65
6   Redirect examination by Mr. Schlessinger ..70

7   BRANDON SMOCK

8   Direct examination by Mr. Schlessinger ....72
    Cross-examination by Mr. Amolsch ..........162
9
    MICHAEL DEL VACCHIO
10
    Direct examination by Mr. Schlessinger ....172
11

12  On behalf of the Defendant:

13  MICHAEL HENDRICKS

14  Direct examination by Mr. Amolsch .........89
    Cross-examination by Mr. Schlessinger .....134
15  Redirect examination by Mr. Amolsch .......151

16                     EXHIBITS

17  On behalf of the Government:
    Admitted
18
    Numbers 201 through 223 ...................31
19  Number 301 ...............................75
    Number 501 ...............................78
20  Numbers 405 through 408 ..................80
    Number 409B ..............................82
21  Numbers 410 through 416 ..................83
    Numbers 409 and 409A .....................83
22  Numbers 402 through 404 ..................175
    Number 601 ...............................175
23  Numbers 602 through 604 ..................176
    Numbers 605 through 616 ..................177
24  Numbers 701 and 702 ......................180

25
                                                    2
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA21

REDACTED TRANSCRIPT

```
1                         MISCELLANY

2    Proceedings March 2, 2022 .................4
     Opening statement by Ms. Kramer ..........7
3    Opening statement by Mr. Amolsch .........14
     Certificate of Court Reporter ............183
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                         3
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA22

REDACTED TRANSCRIPT

1                      P R O C E E D I N G S

2              THE DEPUTY CLERK:  Criminal Case 21-158, United

3     States of America versus Ashley Nichole Kolhoff.  This case

4     comes on for a trial by the Court.

5              Would counsel please note their appears for the

6     record.

7              MR. SCHLESSINGER:  Good morning, Your Honor.  Seth

8     Schlessinger and Whitney Kramer for the United States.  And

9     we're joined at counsel table by Homeland Security

10    Investigation Special Agent Brandon Smock.

11             THE COURT:  Good morning.

12             MR. AMOLSCH:  Good morning, Your Honor.

13    Christopher Amolsch for Ms. Kolhoff, who is present.  And

14    present with me is Mr. Salvato.

15             THE COURT:  All right.  We're ready to go.

16             Do we need a rule on witnesses?

17             MR. SCHLESSINGER:  Your Honor, yes.  The only

18    exception that we would ask the Court to consider is whether

19    the Court would permit the Government's expert witness to be

20    present for and during the testimony of the defense expert

21    witness.  I think it may facilitate and speed up her

22    testimony if she's able to hear what she's rebutting.

23             THE COURT:  All right.  Any objection?

24             MR. AMOLSCH:  No, Your Honor, as it relates to

25    Dr. Hendricks.  This case was initially set to go at 1:00,

                                                              4

JA23

REDACTED TRANSCRIPT

1    as Your Honor will remember, and we moved it to 9.  Talked

2    to Dr. Hendricks.  He's able to come today, but not

3    tomorrow.  So I'm going to call him at 11.  We talked about

4    calling him out of order.  We're going to go to 1.  Would

5    think that would give us enough time.

6              THE COURT:  And 1 is a hard stop.

7              MR. AMOLSCH:  I understand that.

8              THE COURT:  All right.

9              MR. AMOLSCH:  I'm working with his schedule.  And

10   so he's going to be here at 11, and so we'll just need to

11   stop the proceeding.

12             THE COURT:  How long do you anticipate your direct

13   examination taking?

14             MR. AMOLSCH:  An hour.  I'm trying -- but I'm

15   trying to give him wiggle room.  I'm trying to not run up

16   against the hour, the 1:00 hard deadline.

17             THE COURT:  Otherwise he'll have to come back

18   tomorrow or -- it's a bench trial.  Sometimes bench trials,

19   you know, leach over time.

20             MR. AMOLSCH:  No, I understand that.  I just

21   wanted to let the Court know I've done my best to anticipate

22   and predict the amount of time.  I've asked him to be here

23   at 11, and he'll be here and we'll just do that out of order

24   then.

25             THE COURT:  That's fine.

5

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA24

REDACTED TRANSCRIPT

```
1              MR. AMOLSCH:  Okay.

2              THE COURT:  So any witnesses other than the case

3     agent and the Government's expert are not permitted to be in

4     the courtroom while any other witness is testifying.  Once

5     the witness is excused, then he or she can come back in and

6     watch the trial.

7              Any other preliminary matters before we get

8     started?

9              MR. SCHLESSINGER:  Just to advise the Court --

10             THE COURT:  Counsel, you should be at the lectern,

11    all right, that's where the microphone is.

12             MR. SCHLESSINGER:  Thank you, Your Honor.

13             It's just to advise the Court that defense and the

14    Government have reached a stipulation with regard to a

15    certain set of exhibits, as the Court advised on the phone

16    call, and I believe it's with Mr. Amolsch waiting for his

17    signature now.

18             THE COURT:  All right.

19             MR. AMOLSCH:  That's fine, Your Honor.  We've

20    agreed on a stipulation.

21             THE COURT:  All right.  That's fine.

22             Mr. Schlessinger, do you or Ms. Kramer wish to

23    make an opening statement?

24             MR. SCHLESSINGER:  Yes.  Ms. Kramer will make an

25    opening statement.
```

                                                        6

JA25

REDACTED TRANSCRIPT

```
 1              THE COURT:  All right.  That's fine.
 2              MS. KRAMER:  May I take this off, Your Honor,
 3    while --
 4              THE COURT:  As long as lawyers --
 5              MS. KRAMER:  Vaccinated.
 6              THE COURT:  -- are fully vaccinated and boosted.
 7              MS. KRAMER:  Yes, ma'am.
 8         OPENING STATEMENT ON BEHALF OF THE GOVERNMENT
 9              MS. KRAMER:  Good morning, Your Honor.
10              In September of 2020, Ashley Kolhoff made a series
11    of choices.  First, while home ████████████████████
12    ██, she chose to explore a website called Rapey, a website
13    that I expect the evidence today will show was dedicated to
14    facilitating rape and the sexual abuse of children.
15              Then, she chose to create her own user profile on
16    Rapey, where she referred to herself as ██████.  I expect
17    the evidence will show that she not only created a full
18    profile for herself under the name ██████, but that she
19    also chose to refer to herself on this site as, in her
20    words, a 21-year-old ██████.
21              Next, Ms. Kolhoff chose to create public postings
22    on this exploitative website where she offered herself and
23    ██████ out to the approximately 8,000 users of the site.
24    In her own words, Your Honor:  "Who wants me and ██████?"
25    "Would anyone want me and my ████████████████?"  "
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

REDACTED TRANSCRIPT

1     █████████████████.  Anyone want pics?"

2          Then, after countless users responded with

3     overwhelming enthusiasm to her initial post offering up ███

4     ███, I expect the evidence will show that Ms. Kolhoff

5     discovered that, in order to become a trusted member of the

6     Rapey website, she needed to engage in Rapey's delineated

7     confirmation process, which I expect the evidence will show

8     involved sending a nude or sexually-explicit photo of

9     herself with the name of the website written on her body.

10         After learning this, the evidence will show

11    Ms. Kolhoff engaged in a lengthy private conversation with

12    one of the Rapey administrators who had the power to confirm

13    her as a member, wherein she offered to meet up with this

14    man to allow him to graphically exploit ████████████,

15    telling him "she'll be your play thing."  And, pardon the

16    language, Your Honor, but "of course you can fuck her in the

17    car if you'd like.  She needs to be fucked and trained

18    young."

19         Now, the following morning near the end of this

20    conversation, which the evidence will show was a lengthy

21    back-and-forth spanning two days, Ms. Kolhoff chose to send

22    this man a sexually-explicit image of ████████████

23    genitals, to which he responded:  "OMG.  So fuckable.

24    More."  And Ms. Kolhoff gave him more.

25         She then sent him additional sexually-explicit

                                                              8

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA27

REDACTED TRANSCRIPT

```
 1    images of ███████████ where Ms. Kolhoff's hand can be seen

 2    spreading open ████████████ labia, and she captions the

 3    image:  "You want her."

 4            Now, by this point, Ms. Kolhoff had received a

 5    barrage of enthusiastic responses to her posting from the

 6    day before where she asked if anyone wanted pictures of ██

 7    ███████████, including the response from the main top

 8    administrator of the website instructing her to do it.

 9            Ms. Kolhoff then proactively created her own

10    direct message thread to this main administrator of the

11    Rapey website and included several photos of ███████████,

12    including multiple depicting Ms. Kolhoff manipulating and

13    lasciviously exhibiting this little girl's genitals.

14    "Here's some pics," she wrote.  "Hope you like them."

15            And, Your Honor, that was just the beginning of

16    Ms. Kolhoff's exploitation of ████████████.  Because

17    after she produced these abusive images of ███████████ and

18    sent them directly to two of the website's administrators

19    the evidence will show that over the next two days, she then

20    proceeded to engage in a litany of graphic exploitative

21    conversations with several other users wherein she discussed

22    allowing ████████ again to be sexually abused, and where she

23    distributed these sexually-abusive images of ████████████

24    directly to seven additional individuals in seven separate

25    private conversations on this website.
```

9

REDACTED TRANSCRIPT

1          For example again, Your Honor, in the defendant's
2     words, she told one man that he should "treat ███████ like
3     the slut she is and raise her to be the perfect sex slave."
4     And when another man encouraged her to sexually abuse ████
5     ██████ while ██████████ slept, telling her, "it's easier when
6     they sleep, they don't fuss," Ms. Kolhoff responded that she
7     promised she would.
8          Now, Your Honor, we expect the evidence to show
9     that Ms. Kolhoff took these sexually-explicit images of ████
10    ██████████ and engaged in these postings on the Rapey website
11    from her home in Port Clinton, Ohio, between September 11th
12    and September 13th, 2020.  However, we also expect that the
13    evidence will show that when Ms. Kolhoff posted these images
14    onto the website and, in particular, directly to the
15    administrator of the website, who was located in Fauquier
16    County, Virginia, that the images were transmitted over the
17    Internet and into the EDVA, and backed up onto a server
18    located at the administrator's home no later than early
19    October of 2020.
20         Your Honor, today the Government plans to call
21    three witnesses in its case in chief.  First, you'll hear
22    from the director of the Department of Justice's Child
23    Exploitation and Obscenities Section High Technology
24    Investigative Unit, James Fottrell, who conducted and
25    oversaw the forensic analysis of the Rapey website.

10

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA29

REDACTED TRANSCRIPT

```
 1          We expect Mr. Fottrell will testify as to
 2   Ms. Kolhoff's actions on the site and will also provide the
 3   relevant forensic information and website context to assist
 4   the Court in fully understanding the nature and extent of
 5   Ms. Kolhoff's sexual exploitation of ████████ on Rapey.
 6          Second, you'll hear from the case agent, Special
 7   Agent Brandon Smock who, after learning that a woman
 8   identified as Ms. Kolhoff was exploiting ████████████
 9   ██████, drove through the night from Virginia to Ohio in
10   order to execute a search of Ms. Kolhoff's home, ultimately
11   culminating in Ms. Kolhoff's arrest.
12          I expect he'll testify that the freckle markings
13   he observed and photographed on Ms. Kolhoff's hand matched
14   those of the individual who can be seen manipulating the
15   victim's genitals in the abusive images.  And I expect he'll
16   testify that when he interviewed the defendant, she admitted
17   to being on the Rapey website, but denied posting any of the
18   content in question, asserting that her presence on the site
19   was part of her work through a Save Our Children Facebook
20   group that Ms. Kolhoff subsequently told investigators got
21   shut down for allegedly supporting terrorism.
22          Lastly, Your Honor, you'll hear briefly from
23   Special Agent and Computer Forensic Analyst Michael
24   Del Vacchio who was present for the search of Ms. Kolhoff's
25   home and was responsible for the forensic analysis of her
```

                                                          11

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA30

REDACTED TRANSCRIPT

1   iPhone.  I expect he'll testify just briefly that the

2   evidence on Ms. Kolhoff's phone included her Rapey user name

3   and password, stored in the phone's Apple key chain

4   indicating that she had accessed the site from her phone.

5   And several photos of Ms. Kolhoff and ████████ were also

6   located on the device, including a clothed picture of ██

7   ██ that appeared nearly, if not completely identical to

8   one of the photos she posted on the Rapey website.

9          Now, Your Honor, the Government is of course aware

10  that we bear the sole burden of proof in this case and that

11  the defendant is under no obligation whatsoever to present

12  any evidence today and certainly may choose not to.

13  However, the defendant has, as the Court is aware, filed a

14  notice of intent to introduce an expert witness to testify

15  that the defendant was in a dissociative state at the time

16  of the offense and therefore could not have formed the

17  requisite criminal intent.

18         Accordingly, the Government also expects to call a

19  psychologist, Dr. Rachel Kalbeitzer, who has also had the

20  opportunity to examine Ms. Kolhoff.  We expect

21  Dr. Kalbeitzer will testify that she administered several

22  psychological tests to Ms. Kolhoff, and that the results

23  demonstrated, among other things, that Ms. Kolhoff portrayed

24  herself in an overly negative manner and that the results

25  exaggerated her degree of psychopathology, that her score on

12

JA31

REDACTED TRANSCRIPT

```
 1   the test designed to measure malingering suggested she was

 2   attempting to portray herself as more cognitively impaired

 3   than she is and was likely exaggerating the deficits in her

 4   memory, and that her score resulting from the defendant's

 5   responses to the test measuring dissociation was so high

 6   that it even exceeded the typical scores of people who are

 7   hospitalized because they have such severe genuine

 8   psychiatric conditions.

 9           Importantly, Your Honor, I expect Dr. Kalbeitzer

10   will testify that when she interviewed Ms. Kolhoff,

11   Ms. Kolhoff did, indeed, recall several critical pieces of

12   information from this time.  She recalled her reason for

13   going to the site, that she was curious to see what was on

14   it; she recalled the nature of the site, in her words

15   "sexually explicit and very upsetting"; she recalled her

16   actions on the site, that she sent a picture of herself with

17   the website's name written on it and that she sent

18   sexually-explicit images of ███████████ genitals; and

19   eventually, Your Honor, her reason for doing it.  She told

20   Dr. Kalbeitzer that she thought she may have done it to get

21   attention, and she recounted for Dr. Kalbeitzer having a

22   history of, in her words, "reaching out for attention in the

23   wrong way."

24           Finally, Your Honor, I expect you'll hear

25   testimony that when Dr. Kalbeitzer asked Ms. Kolhoff why she
```

                                                           13

JA32

REDACTED TRANSCRIPT

1   didn't just post pictures of herself on the site and leave

2   ███████ out of it, Ms. Kolhoff responded:  "Because

3   that's what the website was for, children."

4          Your Honor, the evidence today will clearly

5   demonstrate that Ms. Kolhoff repeatedly chose to exploit ██

6   ████████████████████ by producing sexually-explicit

7   images of her and sending her into a hornet's nest of online

8   predators during the three days that she engaged on the

9   Rapey website.

10          This case is not only straightforward, but the

11  overwhelming majority of it is documented in the defendant's

12  own words, and we respectfully submit to the Court that the

13  defendant's own words and the defendant's repeated actions

14  over those three days will prove far beyond a reasonable

15  doubt that Ms. Kolhoff produced and distributed

16  sexually-explicit images of ███████████ and that each and

17  every one of the series of choices and the actions that she

18  took was entirely volitional.  Thank you.

19          THE COURT:  All right.  Thank you.

20          Mr. Amolsch.

21          MR. AMOLSCH:  Thank you, Your Honor.  And, Your

22  Honor, I am vaccinated and boosted.

23      OPENING STATEMENT ON BEHALF OF THE DEFENDANT

24          MR. AMOLSCH:  Good morning, Your Honor.

25  Christopher Amolsch for Ms. Kolhoff.  May it please the

                                                              14

JA33

REDACTED TRANSCRIPT

```
 1   Court.
 2          Before we get to the specific charges in the
 3   Government's burden of proof as to each of the essential
 4   elements, I think it's important that we take a step back
 5   and understand who Ashley is as a person so we can
 6   understand how her -- who she is applies to the elements the
 7   Government's required to prove.
 8          This is a young woman with no history of child
 9   predation or an utter interest in child pornography.
10   There's no evidence of any other kind of sexual-deviant
11   behavior at all other than this two-day period the
12   Government's talked about.
13          So let's talk about Ashley's life.  She was
14   abandoned by her mother as an infant.  Her father was
15   already in prison for having sexual assaulted and raped her
16   older sister as an infant.  Her mother was a barely
17   functioning drug addict.  Ashley was raised thinking and
18   believing she had been raped and sexually assaulted by her
19   father as well, being told repeatedly her father had been
20   caught finishing on her, that is ejaculating on her, as an
21   infant.
22          The fact that this is actually not true is
23   completely beside the point, because she grew up
24   internalizing it and believing it, and so it became true for
25   her, even if it wasn't true in the real world.
```

15

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA34

REDACTED TRANSCRIPT

```
 1          She was repeatedly molested when she was in fourth
 2   grade by the older son of her babysitter.  She was raped at
 3   16, sexually trafficked ten times over a period of months,
 4   and the victim of child pornography herself when she was 17,
 5   and then raped again when she was 19.  All of this has been
 6   corroborated one degree or another either by her adoptive
 7   parents or the relevant police reports.
 8          Her early years then, her formative years, were a
 9   series of repeated violent and degrading instances of sexual
10   trauma.  And we're not just speculating about that.  That's
11   not guesswork; that's real.
12          Not surprisingly, and probably as a direct result
13   of the experiences, Ashley developed a condition which
14   Dr. Hendricks has diagnosed as recurrent and complex
15   post-traumatic stress disorder.  This is a condition
16   regularly seen in those who have survived sex trauma as
17   children.  It is a self-defense mechanism in which the mind
18   seeks to protect itself from trauma in any way that it can,
19   and it often involved a mind dissociating from reality, if
20   only for a time.
21          Now, Ashley has experienced dissociative events
22   throughout her life in times of stress.  The earliest memory
23   she has of this dissociating was when she was being molested
24   in fourth grade by the older son of her babysitter.  She
25   remembers what happened.  This isn't an issue of memory.
```

                                                              16

JA35

REDACTED TRANSCRIPT

1   She remembers being molested, but she also undoubtedly

2   dissociated during that time and began describing and

3   developing her own self-defense mechanisms.

4            So contrary to what the Government might be

5   telling you, Judge, this is not about blackouts.  This is

6   not about amnesia.  This is not about memory.  This is about

7   recognition.  This is about whether Ashley was able -- the

8   Government can prove that Ashley was able to recognize what

9   she was doing at the time she was doing it.

10           Now, as I said, Ashley's been aware of her

11  condition in this regard for a long time.  So, at 18, long

12  before these events took place, she sought out the mental

13  health professional where she lives to help her, Dr. Jha.

14  She was only able to see Dr. Jha twice and only for a

15  preliminary diagnosis and never for therapy, because she ran

16  out of money.  But she does her best to explain to him

17  what's going on, and on the limited information he has,

18  Dr. Jha diagnoses her with bipolar disorder and prescribes

19  two medications.  Risperidone, if I'm pronouncing that

20  correctly, to help with the mania, mania that is associated

21  with CPTSD, and hydroxyzine to treat the anxiety, the kind

22  typically seen in those suffering from complex traumatic

23  stress disorder.

24           Dr. Jha's diagnosis is not accurate, either

25  because his visits were so short or didn't have the

                                                           17

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA36

REDACTED TRANSCRIPT

1    necessary expertise.  Dr. Jha recognized the symptoms, but

2    he didn't have the proper diagnosis.  He recognized the

3    mania, he recognized the anxiety, but he missed at

4    diagnosis.  He diagnosed her with bipolar.  And so Ashley

5    was sent back into the world to fend for herself thinking

6    she was bipolar and depressed when, in reality, it was much

7    worse.

8             She ultimately meets Grant, her boyfriend.  They

9    get an apartment and try to make a life of themselves.

10   Ashley and Grant generally have a healthy relationship, but

11   there's tension and arguing because Ashley is not always

12   able to say with certainty why she did and said certain

13   things, and she seems to forget entire experiences and

14   conversations.

15        Ashley ███████████████████████

16   █████████████████████████████████████

17   █████████████████████████████████████

18   the predators who traumatized her throughout her life.

19             She starts a Facebook group on her own called Save

20   Our Children specifically to help parents and police

21   identify and locate child predators.  She's running this

22   site on top of working full time and ████████████

23   ██████, and running the site turns out to be a much more

24   involved and bigger job than she thought it would be.

25             She initially set this site up to the private so

                                                              18

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA37

REDACTED TRANSCRIPT

1    that she must give permission to anybody who wants to join,

2    but the interest in this site is overwhelming, she soon

3    starts allowing people onto the site en masse with the idea

4    being that she will go back and review after.  And, in doing

5    this, she mistakenly allows the owner of rapey.su onto the

6    site.  She sees what she has done, goes to the rape site,

7    sees what it is, and all her past trauma comes back to her.

8         She thinks she's done the one thing in the world

9    she vowed she would never do, which is put another child at

10   risk.  And this is the triggering event in where she goes

11   down the rabbit hole again, taking photos of ████████,

12   posting them on the site.  Lying about who she is on the

13   site and her personal situation, trying to make herself as

14   vulnerable as she can be.  She is alone.  She has no place

15   to stay.  She's desperate.  None of which is true.

16        Ultimately, she snaps out of it, deletes all the

17   photos, doesn't tell anybody what she has done and never

18   does anything like this again.  Nothing even remotely

19   similar.  So we're talking about a period of two days,

20   September 11th and 12th and -- however many days you want to

21   count, that's two or three.  And that's really important.

22   Ashley has never done anything like this ever.  Not before

23   the event, not in the intervening time between the time she

24   posted the pics and she was initially interviewed by the

25   police.

                                                          19

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA38

REDACTED TRANSCRIPT

1           There will be no other evidence of child

2   pornography.  No other images, no other children, no other

3   sites, no child pornography search terms of the kind Your

4   Honor is intimately familiar with.  This is, without

5   question, a one-off event by someone with no history of

6   similar behavior.  It is completely aberrational and out of

7   character, and it shocked everyone who knows Ashley.

8           So this case, Your Honor, is not really about what

9   she did.  As the Government said, it's pretty

10  straightforward.  The question is all about why she did it.

11          Now, when she was interviewed by the police, she

12  denied having done it.  In various other interviews, she

13  said she didn't know why she did it.  When she was

14  interviewed by Dr. Hendricks, she said she wanted to

15  desperately understand why she did what she did.  And it's

16  this uncertainty, Your Honor, about why she did what she did

17  and why the Government's going to ask you to guess about why

18  she did what she did is just the first reason why Your Honor

19  cannot find her guilty of production of child pornography.

20          There are three essential elements to the

21  production of child pornography, Your Honor.  The second

22  essential element of the offense reads as follows:  The

23  Government must prove that Ashley employed, used, coerced

24  the minor to engage in sexually-explicit conduct for the

25  purpose of producing a visual production of that conduct.

                                                              20

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA39

REDACTED TRANSCRIPT

1        So this element actually has two subcomponents.

2   One, the Government has to prove that it was sexually

3   explicit.  Now, this is a term of art within the Federal

4   child pornography statutes and with a meaning that must be

5   understood in that context.  And, that Ashley's purpose and

6   actually engaged the minor for the purpose of taking the

7   image.  So let's break that down.

8        18 USC 2256 lists five definitions in the child

9   pornography statute of what constitutes sexually-explicit

10  conduct.  Sexual intercourse, beastiality, masturbation,

11  sadomasochistic images, graphic lascivious exhibition.

12       As the Government said and the evidence will show,

13  none of the first four definitions apply to the images in

14  this case.  Graphic lascivious exhibition then is the only

15  definition which could possibly apply.

16       And as the Supreme Court jurisprudence makes clear

17  on the Federal child pornography laws "lascivious" and

18  "graphic lascivious" is a term of art specific to the child

19  pornography statutes.  It must be understood within that

20  context.  It is not an examination of what lascivious might

21  mean out there in the real world or in common parlance.

22  This is, what does it mean within the child pornography

23  statutes.  And as the evidence will come in, it will become

24  clear the case law which decides and defines what's

25  lascivious contact within the child pornography statutes is

                                                           21

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA40

REDACTED TRANSCRIPT

1    the critical inquiry, and these images don't qualify.

2    Regardless of anything else, these images, as an initial

3    matter, are not lascivious within the meaning of the child

4    pornography statutes.

5         The Government must also prove Ashley's purpose in

6    creating the images.  Now, what does that mean?  First and

7    foremost, it means that 2251 is not a strict liability

8    offense.  The Fourth Circuit has repeatedly held that it is

9    not enough for the Government to show that the image was

10   lascivious, assuming they can do that, and that she took a

11   picture.  The Fourth Circuit has also repeatedly said that

12   it's not enough for the Government to show that she acted

13   knowingly, that is that she acted not by accident.  2251 is

14   a specific intent crime, and because it's a specific intent

15   crime, the Government must prove she acted willfully with

16   the specific intent to do something the law forbids.

17        Now, in regard to the purpose element of 2251, the

18   Fourth Circuit is clear.  In order to find her guilty, Your

19   Honor must be convinced by proof beyond a reasonable doubt

20   that her dominant or significant purpose for engaging in the

21   behavior was to create the image.  It is not enough,

22   therefore, for the Government to prove that she took a

23   picture deemed to be lascivious.  It is not enough for the

24   Government to prove that taking the photo wasn't an

25   accident.  It is not enough for the Government to prove that

22

JA41

REDACTED TRANSCRIPT

```
 1   creating the image was one of many or several competing or

 2   potentially much more significant interests.  The Government

 3   must prove it was her dominant purpose; nothing less.  This

 4   is the essential holding of United States v. McCauley, Your

 5   Honor, from 2021.  And the evidence will show the Government

 6   can't do this by proof beyond a reasonable doubt.

 7            As I mentioned before, Dr. Hendricks' professional

 8   opinion is that she suffers from CPTSD, complex traumatic

 9   stress disorder, which frequently involves episodes of

10   dissociation, and that it can't be ruled out she was

11   experiencing dissociation directly related to this at the

12   time.

13            Now, a dissociative experience that she's already

14   had, in which she has previously discussed, as corroborated

15   by her husband -- boyfriend, Grant, by her adoptive father,

16   as corroborated by Dr. Jha years before this incident.  Even

17   the Government's expert recognizes she has mental health

18   issues, but her evaluation, much like Dr. Jha's, misses the

19   mark.

20            As the Government said, Dr. Kalbeitzer's report is

21   primarily focused on Ashley's memory, that is her ability to

22   recall events at a later date.  Because this was the primary

23   focus, she administered a test designed to test memory and

24   recall.  It's called the Test of Memory Malingering, the

25   TOMM.
```

23

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA42

REDACTED TRANSCRIPT

```
 1          The Test of Memory Malingering is not an overall

 2   test of cognitive difficulties; it's a test of memory.  This

 3   is how the TOMM is administered.  Ashley was shown a series

 4   of 25 common objects, five seconds to look at each, and then

 5   shown a series of 50 drawings, 25 of which are the same,

 6   asked what she has seen before.  It's a test of recognition

 7   memory.  That's the easiest type of memory; that's why it's

 8   a good measure for whether you're malingering on your

 9   memories.

10          But this case is not about Ashley's memory.  It's

11   not about whether she has amnesia or blackouts.  It's not

12   about whether she's minimizing or denying events she can

13   remember.  This is about her recognition at the time, her

14   intent at the time, her purpose at the time of these events.

15   So her performance on the Test of Memory Malingering, one

16   way or the other is beside the point and irrelevant.

17          The Government cannot prove that -- Ashley's

18   dominant purpose in this case.  The Government's guessing,

19   and they're asking you to guess along with them.  But this

20   is not a guessing game.  You must be convinced that her

21   dominant purpose was to create the sexual image and not some

22   other competing interest, and there's simply no way to do

23   that, not on these facts.

24          On the distribution -- she's also charged with

25   distribution, Your Honor.  Now, that statute actually
```

24

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA43

REDACTED TRANSCRIPT

1    contains a scienter requirement.  Unlike the 2251, which
2    doesn't contain any, this one actually does use the word
3    "knowingly."  Knowingly distributed a lascivious image.
4            And, again, as the evidence comes in and the
5    argument will make clear, these images aren't lascivious
6    within the meaning of the child pornography statutes.  Maybe
7    in everyday life, but not within those statutes, so she
8    can't be guilty of that.
9            Now, finding Ashley not guilty doesn't mean she's
10   innocent of everything.  She's quite likely guilty of some
11   various State laws in Ohio for which she can be prosecuted.
12   It just means she's not guilty of violating the Federal
13   child pornography laws.  She shouldn't be prosecuted in
14   Federal court.
15           It is the underlying theme of the Fourth Circuit's
16   decision in *United States v. Palomino-Coronado* and *United*
17   *States v. McCauley* that there is an over-federalization of
18   child pornography statutes, and the Court is displeased with
19   the stretching of the statute to its limits.
20           Congress wrote these statutes with incredible
21   penalties so that the feds would pick the worst and the most
22   serious, the hardcore pornographers, the commercial
23   producers of child pornography, organizations that cross
24   state lines and make local --
25           THE COURT:  All right.  Now you're making a

25

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA44

REDACTED TRANSCRIPT

```
 1    closing argument.  You need to get to the evidence,
 2    Mr. Amolsch.
 3              MR. AMOLSCH:  The evidence isn't going to -- the
 4    reason -- this gets to the point, Your Honor.
 5              The reason this fact doesn't fit into the Federal
 6    statutes, the reason it's not lascivious, the reason they
 7    can't prove for dominant purpose is because it's not a
 8    Federal case.
 9              Thank you.
10              THE COURT:  All right.  Call your first witness.
11              MR. SCHLESSINGER:  Thank you, Your Honor.  The
12    Government calls James Fottrell.
13              THE CSO:  Face the deputy clerk.  Please raise
14    your right hand.
15    Thereupon,
16                        JAMES FOTTRELL,
17    having been called as a witness on behalf of the Government
18    and having been first duly sworn by the Deputy Clerk, was
19    examined and testified as follows:
20                    (Time noted:  9:31 a.m.)
21              THE DEPUTY CLERK:  Thank you.
22              THE CSO:  You may be seated.
23                      DIRECT EXAMINATION
24    BY MR. SCHLESSINGER:
25    Q    Mr. Fottrell, good morning, sir.
```

                                                              26

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA45

REDACTED TRANSCRIPT

```
 1   A    Good morning.

 2   Q    Where do you work?

 3   A    I work for the Department of Justice in the Child

 4   Exploitation and Obscenity Section in Washington, D.C.

 5   Q    And do you work for a specific unit within that Child

 6   Exploitation and Obscenity Section?

 7   A    Yes, I do.  I work in the High Technology Investigative

 8   Unit.

 9   Q    And what's your position with the High Technology

10   Investigative Unit?

11   A    I'm the director.

12   Q    How long have you been the director of HTIU?

13   A    Approximately 20 years.  Since 2002.

14   Q    Can you give the Court a sense what HTIU does?

15   A    Sure.  We partner up with our Federal law enforcement

16   partners, FBI agents, HSI agents.  They go out, execute

17   search warrants and seize evidence.  Myself and my staff are

18   specialized in child exploitation cases.  They turn over the

19   evidence to us, we conduct forensic examinations of that

20   evidence.  We write reports, and we testify in court.

21   Q    How many people do you supervise in the HTIU?

22   A    Approximately seven people right now.

23   Q    And what type of devices are those people that you

24   supervise involved in examining?

25   A    All types of digital evidence that gets seized in
```

                                                          27

JA46

REDACTED TRANSCRIPT

1   cases.  So it's computers, desktops, laptops, external

2   storage devices, mobile devices, mobile phones.  Any piece

3   of electronic evidence that can store digital data.

4   Q    And as the director of that unit, do you review their

5   work?

6   A    Yes, I do.

7   Q    In addition as director, do you also conduct forensic

8   examinations of those types of devices yourself?

9   A    Yes, I do.

10  Q    Have you received extensive training in areas

11  specific --

12          THE COURT:  Is there any dispute about this?  From

13  the way the opening statement went, we can get right to the

14  core of his testimony.

15          MR. AMOLSCH:  I don't have any objection to any of

16  this, Your Honor.

17          MR. SCHLESSINGER:  Your Honor, if I can just note

18  for the record, Mr. Fottrell being tendered as an expert in

19  computer forensic examinations.

20          MR. AMOLSCH:  I have no objection.

21          THE COURT:  That's fine.

22          MR. SCHLESSINGER:  Thank you.

23  BY MR. SCHLESSINGER:

24  Q    Now, Mr. Fottrell, are you familiar, as part of your

25  work with HTIU, with an investigation into an Internet

                                                              28

JA47

REDACTED TRANSCRIPT

```
 1   website called Rapey?
 2   A    Yes, I am.
 3   Q    And did you ever come to analyze any computer servers
 4   that was associated with that website?
 5   A    Yes, I did.
 6   Q    How did you come into possession of them?
 7   A    I was meeting with the HSI agent, Brandon Smock, and a
 8   few of the computer forensics agents at the HSI office in
 9   Reston, Virginia.
10   Q    And did they provide those forensic images of those
11   computer servers to you?
12   A    Yes, they did.
13   Q    And what did you decide to do with those forensic
14   images once you received them?
15   A    So I conducted an analysis of information that was
16   contained on those images, and I found evidence related to
17   the Rapey website.
18   Q    How did you sort of process that -- how, if at all, did
19   you process that evidence associated with the website to be
20   able to view it effectively?
21   A    So in order to -- and very typically that I do in
22   multiple other investigations.  I will take the evidence
23   that exists and look for the components of the website.  So
24   typically there's going to be a few different components.
25   There's going to be a database associated with all of the
```

                                                          29

JA48

REDACTED TRANSCRIPT

1    activity, there's going to be some files that make up the

2    database itself.  And it's just a matter of taking that

3    information, joining it together, and the ability to

4    recreate the website on a standalone computer.  And that's

5    what I did in this case.

6    Q    And once you did that, then were you able to review the

7    contents of the website almost as though you were either an

8    administrator or a user of the website just browsing it when

9    it was still up?

10   A    Yes.  So I basically -- once we recreate the website,

11   it's recreated at the exact moment it was seized and these

12   backup copies exists, and we can look at that in our

13   controlled environment.

14         MR. SCHLESSINGER:  Your Honor, at this time if I

15   might briefly publish a stipulation.

16         THE COURT:  Go ahead.

17         MR. SCHLESSINGER:  If I could recover that from

18   defense counsel, regarding the admissibility of those

19   exhibits.

20         MR. AMOLSCH:  Oh, I'm sorry.

21         Court's indulgence, Your Honor.

22                        (Pause.)

23         MR. SCHLESSINGER:  And, Your Honor, this

24   stipulation reads as follows:  The parties hereby stipulate

25   and agree that the following facts are true and correct and

                                                          30

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA49

REDACTED TRANSCRIPT

1   may be regarded as having been proven beyond a reasonable

2   doubt.

3           Government's Exhibits 201 through 223 are true and

4   accurate copies of portions of the digital contents of a

5   computer server recovered from a residence in Catlett,

6   Virginia within the Eastern District of Virginia on or about

7   December 17th, 2020 and are admissible as evidence at trial,

8   and it's signed by both the Government and attorney for the

9   defense.

10          THE COURT:  All right.  That's fine.

11          MR. SCHLESSINGER:  With that stipulation, Your

12  Honor, the Government would now move into evidence

13  Government's Exhibits 201 through 223.

14          THE COURT:  Any objection?

15          MR. AMOLSCH:  No objection.

16          THE COURT:  All right.  They're in.

17   (Government Exhibit Numbers 201 through 223 admitted into

18                      evidence.)

19  BY MR. SCHLESSINGER:

20  Q    So I'll hand you first, Mr. Fottrell, Exhibit 205, if

21  you don't mind.  And it's in the white binder.

22  A    Okay.

23  Q    So now that 205's been admitted, Mr. Fottrell, can you

24  give the Court a sense of just what is 205 as you recognize

25  it?

                                                        31

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA50

REDACTED TRANSCRIPT

```
 1   A    So 205 is the member profile page for the member named
 2   ██████.
 3   Q    Does it give a date that the user name ████████ joined
 4   the site?
 5   A    Yes, it does.  It lists the date that they joined as
 6   September 11th, 2020.
 7   Q    Does it indicate where user █████ is from?
 8   A    It's listed from Ohio.
 9   Q    And at the bottom, are there some fields where there's
10   certain information about █████ entered?
11   A    Yes.  So basically during the registration process for
12   all members of the board, there's kind of a questionnaire
13   that basically all members see and records the answers to
14   those questions, and that's what's reflected here.
15   Q    And under location, what's listed?
16   A    The location is Ohio.
17   Q    And under tell us about yourself, what's listed?
18   A    It says: "████████████████████████."
19   Q    Two questions down, is there a question about whether,
20   essentially, the █████ would have any objection to severe
21   child sex abuse?
22   A    No.  There's a statement that says:  "If a man wants to
23   rape his three-year-old daughter up every hole while she's
24   crying and screaming, do you have a problem with that?"  And
25   the answer is no.
```

32

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

REDACTED TRANSCRIPT

1  Q    Again, the answer would have been provided by ███████?

2  A    Yes.

3  Q    All right.  If we could go to Exhibit 206,

4  Mr. Fottrell.

5         If you could tell the Court what's shown here.

6  A    So this is the same member profile for the user

7  ███████.  If you look towards the middle, the highlighted

8  section says "postings," and it lists just the subject of

9  the seven postings that were posted by the member ███████.

10 Q    Okay.  If we can turn to Government's Exhibit 207 now,

11 Mr. Fottrell.

12        If you can give the Court some information about

13 what's shown in 207.

14 A    What's on Government's Exhibit 207 is part of the

15 administrative control panel where the computer software

16 automatically keeps track of activity associated with a

17 user, and it's in reverse chronological order, so the

18 earliest material is at the bottom.  And it shows the date,

19 for example, September 11th, 2020 at 8:34 p.m. when the

20 user, ███████, accepts the terms and rules and basically

21 begins to join the board.  And then there's other entries as

22 you move up where the member basically changed their

23 Instagram ID from one field to another.  And a little bit

24 further up it just reflects other activity associated with

25 that user.

                                                        33

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA52

REDACTED TRANSCRIPT

1    Q    So just to be clear, for example, the Instagram entry

2    near the bottom, does that reflect that user ███████ would

3    have changed the Instagram account associated with the Rapey

4    account from Ashleyk99 to Allynichole2k17?

5    A    Yes.

6    Q    And that subsequent Instagram entry of near the top,

7    does that show a change from Allynichole2k17 to no

8    associated Instagram account?

9    A    Yes.  Correct.

10   Q    And are those changes that would have to be made -- or

11   would have been made by the user, ███████?

12   A    Correct.  It would not be done automatically by the

13   computer -- by the software; it would have to be done by the

14   computer user, ███████.

15   Q    And along the same lines at the top entry under email

16   address, is there a change in email address given there?

17   A    Yes.  So it was originally

18   ashley.kolhoff2k17@gmail.com.  And it was changed to

19   allynichole99@gmail.com.

20   Q    Mr. Fottrell, I'm going to ask you to turn to now

21   what's been admitted to -- as Exhibit 209.  And I believe

22   that's going to be in the white binder.

23   A    In the white binder?

24   Q    Yes.

25   A    Okay.

34

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA53

REDACTED TRANSCRIPT

```
 1   Q     Do you recognize Exhibit 209?

 2   A     Yes, I do.

 3   Q     What is that?

 4   A     It's a printout of an area of the board.  We are in the

 5   section of the board called "Rapey discussion" and then

 6   "Rapey misogyny."  It's a posting by the user ███████, and

 7   the title of the posting is:  "Who wants me and ███████?"

 8   Q     Now, to be clear, this particular posting, is this kind

 9   of like in a public section of the board that any -- that

10   other Rapey members could see and respond to?

11   A     Yes.  So this is not a -- the alternative is a private

12   conversation between another member.  This is not that.

13   This is a public posting to all of the members of the board.

14   Q     And it's initiated by ███████ or some other member?

15   A     By ███████.

16   Q     Okay.  And I think you mentioned the subject of the

17   thread, but what's written in the body of the first message

18   by ███████?

19   A     So the body of the message is:  "Would anyone want me

20   and my ███████████████?"

21   Q     Now, do you see to the left of ███████'s user name in

22   pink, below that there are a couple of words or phrases in

23   colored rectangles; do you recognize those?

24   A     Yes, I do.

25   Q     What are those for the Court's benefit?
```

                                                                35

JA54

REDACTED TRANSCRIPT

```
 1   A    Those are called badges.  And basically one of the

 2   features of the board is that members can be awarded badges

 3   for different types of participation.  So the badges that

 4   are associated with ████████ are femoid and confirmed

 5   femoid.

 6   Q    And I'm not going to ask you to go through all of the

 7   responses, but just generally speaking, were there responses

 8   from other Rapey users to ████████'s question about wanting

 9   her and her ████████████████████?

10   A    Yes.  There's lots of messages from other members who

11   are expressing an interest in that.

12   Q    Mr. Fottrell, I'm going to ask you to go ahead and turn

13   to Exhibit 210.

14   A    Okay.

15   Q    Do you recognize 210, and could you explain what it is?

16   A    Yes, I do.  We're in another section of the board

17   called "whores.  Femoid discussion."  There is a posting on

18   this section of the board by the same user, ████████, and

19   the title of this posting is:  "████████ is beautiful."

20   Q    And what is the content of the body of this?

21   A    The content that user ████████ says is:  "Anyone want

22   pics?"

23   Q    And, again, this thread was initiated by ████████?

24   A    Yes, it was.

25   Q    And what is the general tenor of the response, if any,
```

                                                            36

JA55

REDACTED TRANSCRIPT

```
 1   to the question anyone want pics?
 2   A     So there is lots of responses.  Two people saying, yes,
 3   I want to see pictures.  Yes, and yes.  And they have an
 4   interest in that.
 5   Q     I want to ask you briefly about the first person who
 6   responded on the first page of 210.  You see another Rapey
 7   user who's the first one to respond?
 8   A     Yes.  So the -- right below that, there's the user name
 9   █████.  And basically he responds:  "Answer my DMs."  And DMs
10   is short for direct messages.
11   Q     Mr. Fottrell, I'm going to ask you to turn to what I
12   believe is in the black binder, 211, at this time.
13   A     Okay.
14   Q     Do you recognize Exhibit 211?
15   A     Yes, I do.
16   Q     What is that?
17   A     This is a section on the board called "conversations,"
18   and it's a conversation between the user ███████  and the
19   administrator of the board who goes by the name ██████████.
20   Q     Now, you said the administrator of the board, you mean
21   the person who's essentially in charge of the entire Rapey
22   website?
23   A     Yes.
24   Q     And Government's Exhibit 211, is that essentially kind
25   of an example of a direct conversation between ██████ and
                                                              37
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA56

REDACTED TRANSCRIPT

```
 1    then -- and the administrator?

 2    A    That is correct.

 3    Q    And what is the subject of this direct text message --

 4    or direct message thread?

 5    A    So this conversation has the title: "███████ pics,"

 6    and then the body of it is: "Here are some pics.  Hope you

 7    like them."

 8    Q    Who is initiating this message exchange?

 9    A    ███████.

10    Q    And are there any pictures attached to the very first

11    message in the thread that was initiated by ███████?

12    A    Yes.  There are five images attached to that posting.

13    Q    Now I'm just going to ask you to look collectively at

14    211A through 211E.  All but B are in the black binder.  B is

15    in the white binder.

16    A    Okay.

17    Q    Are 211A through 211E just broken out individually

18    examples of these five pictures that were sent in the

19    message contained in Exhibit 211?

20    A    Yes, they are.

21    Q    Can you give just a brief description just for the

22    benefit of the record of what's shown in each of A through

23    E?

24    A    Sure.  211A appears to be ███████████████.  She is

25    wearing a ███████████, it looks like.  She is not
```

38

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA57

REDACTED TRANSCRIPT

```
1    wearing ████, and her vagina is exposed and her legs are
2    exposed.
3            211B is a closeup of ████'s face where you
4    could see an adult hand touching ████'s mouth and the
5    baby is clothed from the top up.
6            211C is a closeup of ████'s genital area.
7            211D is a picture of ████'s anus with an adult
8    hand spreading ████'s butt cheeks.
9            211E is a picture of ████ lying on ████.
10   ████ is wearing a top of what appears to be ████,
11   and ████'s naked butt is displayed.
12   Q    And going back to 211D for a second.
13           On the adult hand that you mentioned is visible in
14   the photo, do you see any potentially identifying marks?
15   A    Yes.  There are some moles or freckles that are
16   distinctive on the adult's right hand.
17   Q    Okay.  Now, Mr. Fottrell, in one of the public message
18   threads that I asked you about previously, was it the case
19   that you mentioned ████ had responded to a post by ████
20   asking her to respond to his DMs?
21   A    That's correct.
22   Q    All right.  May I ask you to please turn to
23   Exhibit 208, which I believe is in the white binder.  I'm
24   sorry, in the black binder.
25   A    Okay.  I'm at 208.
```

39

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA58

REDACTED TRANSCRIPT

```
 1   Q     What's shown in 208?

 2   A     So 208 is a conversation between the user ████ and the

 3   user ██████.  And it has -- and the title is

 4   "confirmation."

 5   Q     Okay.  What's the date by the way of this direct

 6   message thread between ██████ and ████?

 7   A     September 11th, 2020.

 8   Q     And if you mentioned it already, I apologize, but

 9   what's the subject of this message thread?

10   A     Confirmation.

11   Q     Are you familiar with what confirmation would be in the

12   context of the Rapey website?

13   A     Yes.

14   Q     Can you explain that.

15   A     So just briefly, the rules of the board for members to

16   be confirmed is they would have to basically take a naked

17   picture of themselves and write the name of the website on

18   their body and upload it to one of the persons who would be

19   confirming them to show that you're serious and to show that

20   you are a serious member and you want to be a participant of

21   this board.  So part of that confirmation process is

22   confirming that they want to basically take a naked picture

23   of themselves with the name of the website written on it.

24   Q     And without reading verbatim this conversation between

25   ████ and ██████, does it -- is that -- fair to say that
```

                                                              40

REDACTED TRANSCRIPT

```
 1   the first topic of the conversation is whether ████ will
 2   be willing to get confirmed?
 3   A    Yes.
 4   Q    Skipping ahead to, I think it's page 7.
 5            Does ████ eventually send a photograph of
 6   herself with something written on her as part of this
 7   confirmation process?
 8   A    Yes.
 9   Q    And what exactly has she sent?
10   A    She sent -- the title is "picture," and she sends a
11   picture of herself.  You can see her torso with the name of
12   the website "Rape.su" written on it.
13   Q    Now, looking at Exhibit 208A.  And I apologize, it's
14   back in the white binder.  208A.
15   A    Okay.
16   Q    What is that?
17   A    That's a full-size version of that picture.  So that's
18   just basically showing the torso with the name of the
19   website written in lipstick.  What appears to be lipstick.
20   Q    Now, when you reviewed that digital photograph as it
21   was stored on the website, are you aware of whether it had
22   any, what's known as EXIF data associated with it?
23   A    Yes, I did.  And this picture did have additional EXIF
24   information.
25   Q    Just very briefly, what's EXIF data?
```

                                                                41

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA60

REDACTED TRANSCRIPT

```
 1   A    EXIF is additional information that the manufacturer of

 2   the camera embeds in each particular image.  So, for

 3   example, it might have the make and model of the camera that

 4   was used to create the image.  It might have the date and

 5   time that it was taken.  And it might have the GPS

 6   coordinates of where the picture was taken.

 7            (Reporter interrupted for clarification.)

 8            MR. SCHLESSINGER:  I'm sorry.  EXIF, E-X-I-F.

 9   BY MR. SCHLESSINGER:

10   Q    Looking at 208B, if you recognize that, Mr. Fottrell,

11   what does that show?

12   A    Yeah.  So 208B is showing the image and the -- and some

13   of the embedded EXIF information, which lists the date and

14   time that the picture was taken on September 11 at

15   10:08 p.m.  It lists information associated with the device.

16   It was taken with an iPhone 7.  And the GPS coordinates has

17   a map towards the bottom, and it lists the location as Port

18   Clinton, Ohio.

19   Q    Does it show what type of device was used to create

20   that photo?

21   A    An iPhone 7.

22   Q    And if I could ask you just page forward to 208C,

23   Mr. Fottrell.

24            If you recognize that, can you please tell us what

25   that is?
```

                                                                    42

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA61

REDACTED TRANSCRIPT

1    A    Yes.  That is looking at that same GPS coordinate's

2    information.  That is the Google street view of the location

3    of that -- of where that picture was taken.

4    Q    And that's a location -- is that in Port Clinton, Ohio?

5    A    Yes.

6    Q    So returning to Exhibit 208 then in the black binder,

7    if you could just go ahead one page, Mr. Fottrell.

8         Does ███████ identify a location where she's

9    from?

10   A    I'm sorry.  I couldn't hear you.  Can you say that one

11   more time?

12   Q    I'm sorry.  Does ████████ identify a location where

13   she's from on the next page?

14   A    Yes.  A little further down on the next page, she

15   includes the text "Port Clinton."

16   Q    On the next few pages, is there discussion about ████

17   also being in Ohio?

18   A    Yes.

19   Q    Is there a discussion about, essentially, how far away

20   it is?

21   A    Correct.  So there's conversations about the different

22   locations in Ohio, and ████ is asking how far from Columbus,

23   Ohio is that.

24   Q    If I could ask you to page ahead approximately five

25   pages in 208, Mr. Fottrell, to a page where there's three

                                                            43

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA62

REDACTED TRANSCRIPT

```
 1    images of ███████ in a row along the bottom.

 2    A    Okay.

 3    Q    Right above those three images of ███████ on the

 4    bottom, what does ████ say?

 5    A    ████ says:  "May I see ████████?"  And ████████

 6    responds:  "Yes," and then sends three images.

 7    Q    And -- okay.

 8         What's the general nature of the discussion

 9    between ███████ and ████ in the next several pages

10    following sending of those pictures?

11    A    It's basically -- it turns to a sexual -- you know, a

12    sexual nature, and they're describing the events that the --

13    the events that I want to do to you and all of the activity

14    that I want to engage in.

15    Q    And when you say "you," is ████ including user ████████

16    or ████████ of the pictures that are being sent or both?

17    A    Both.  So basically it includes all three.  It includes

18    ████████, ████ and ████████.

19    Q    Skipping ahead several pages, Mr. Fottrell, do you see

20    a message from ████ to ███████ reading:  "Do you have more

21    of ███████?"

22    A    Yes.

23    Q    And the next page after that, what does ████████

24    respond with?

25    A    ████████ responds:  "Not really.  Let me look."  And
                                                              44
```

REDACTED TRANSCRIPT

```
 1    ██  says:  "Do you do anything dirty" -- "do you do dirty

 2   things to ██████?"

 3   Q    And what does ██████ reply?

 4   A    And then she responds next:  "This is it," and then

 5   sends two more images of ██████.

 6   Q    And what does ██████ respond in response to --

 7   seemingly in response to the query of whether she does

 8   anything with ██████?

 9   A    She responds:  "No.  I haven't yet."

10   Q    And the next ensuing two to three pages, are there

11   further discussions about ████ engaging in sexual activity

12   with ██████ and ██████?

13   A    Yes.

14   Q    Okay.

15          THE COURT:  Counsel, for the record in the future,

16   when you have a multi-page document like this, you ought to

17   put Bates stamp numbers on it; all right?

18          MR. SCHLESSINGER:  Yes, Your Honor.  I apologize

19   for that.

20          THE COURT:  It makes it very difficult.  The

21   appellate record would be almost impossible to figure out.

22          MR. SCHLESSINGER:  I understand, Your Honor.  It's

23   the nature of the way they were printed out.  I apologize

24   for that.

25   BY MR. SCHLESSINGER:
```
                                                              45

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA64

REDACTED TRANSCRIPT

```
 1   Q    Mr. Fottrell, if you could page ahead several pages to

 2   what is the beginning of the fourth page of the -- not the

 3   fourth page of the exhibit, but the fourth segment of the

 4   conversation that starts with a comment by ████████.

 5   A    Okay.

 6   Q    Do you have that?

 7   A    Yes, I do.

 8   Q    What does ████████ say?

 9   A    "Of course you can fuck her in the car if you'd like."

10   Q    On the ensuing page after that, does the conversation

11   appear to end for the day?

12   A    Yes.  A little bit further on, ████████ states:  "I

13   really need to go to bed.  I have to get up early," et

14   cetera, et cetera.

15   Q    Okay.  And the last message on September 11th, 2020 is

16   from ████:  "Good night, love"; is that correct?

17   A    Yes.

18   Q    The following message is on September 12th, 2020; is

19   that correct?

20   A    Yes.

21   Q    And who initiates that -- who reinitiates the

22   conversation by sending the first message on that next day,

23   September 12th, 2020?

24   A    The member ████ says:  "Good morning, ████."

25   Q    Slightly above that, and I believe it may be cut off,
```

                                                          46

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA65

REDACTED TRANSCRIPT

```
1    Mr. Fottrell, between --

2    A    I'm sorry.  You're right.

3              █████████, it's cut off, but she says "good

4    morning" as well before ██████ does.

5    Q    And after ████████ says "good morning, ██████," what does

6    ██████████ say?

7    A    "I just ██████████████████████."

8    Q    Now, to be clear, in the previous conversation, █████████████

9    had just said "good morning, ███████"; right?

10   A    Yep.

11   Q    So █████ had not said anything about █████████████ in the

12   previous message?

13   A    Correct.

14   Q    But ██████████████ injects ████████████ into the conversation?

15   A    Yes.

16   Q    And after she does so, what does ████████ say in response?

17   A    "May I see her?"

18   Q    And what does █████████████ do in response?

19   A    She says:  "Just got done ████████████," and sends a picture.

20   Q    Skipping one page ahead, does █████████████ send a picture

21   along with a message reading:  "I look rough.  I need to get

22   in the shower"?

23   A    Yes.  So she says:  "I look rough.  I need to get into

24   the shower," and includes a picture of what appears to be

25   herself.
```

47

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

REDACTED TRANSCRIPT

1    Q    And what does she appear to be wearing in that seeming

2    selfie?

3    A    A red sweatshirt.

4    Q    At the bottom of this same page, does ██████ send

5    another image of ██████?

6    A    Yes.

7    Q    Okay.  If you turn to -- just keep that page --

8    disregard that.

9         Going to the next page in 208, how does ████

10   respond to that single image of ██████ that was sent by

11   ████?

12   A    He responds:  "OMG" -- which stands for oh my God --

13   "so fuckable.  More."

14   Q    How does ██████ respond to that?

15   A    She says:  "You want her?"  And then includes three

16   more images.

17   Q    What are those three images that are shown there?

18   A    So we've seen those images before.  The first image is

19   of ██████ with what appears to be ████████'s hand on ██

20   ██████, and then the second pictures are the closeups

21   of ██████'s vagina.

22   Q    If we were to turn to 208G, H and I, are those

23   broken-out images of the three images you just described?

24   A    Yes.

25   Q    Turning to 208 and skipping ahead to two pages, is

48

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA67

REDACTED TRANSCRIPT

1   there a message -- another message in the thread with █████

2   in which ████████ sends three images depicting ██████████?

3   A    Yes.  A little bit further, she sends three more

4   pictures.

5   Q    And if we were to look at 208J, K and L, are those the

6   three images that she sent in the message thread that you

7   just referenced?

8   A    Yes.

9   Q    All right.  Just to finish out Exhibit 208.

10           Does it continue on with further discussions of a

11  sexual nature between ██████ and ████████?

12  A    Yes.

13  Q    All right.  So everything -- to be clear, Mr. Fottrell,

14  everything we've just been discussing as it pertains to 208

15  and its subexhibits, that's all about just a single direct

16  message conversation between ████████ and user ████?

17  A    That is correct.

18  Q    Did ████████ also send images of ████████ --

19  sexually-explicit images of ████████ to other Rapey users?

20  A    Yes.

21  Q    All right.  I'm going to ask you now, Mr. Fottrell, to

22  turn to Exhibit 212 in that black binder, please.

23  A    Okay.

24  Q    What are we looking at here in Exhibit 212?

25  A    So this is a conversation, and the conversation is

49

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA68

REDACTED TRANSCRIPT

```
1   between two people.  I'm going to spell the first name,
2   ████████, I'm going to pronounce that ██████, if I'm
3   pronouncing that correctly.  Maybe I'll just use the
4   initials █, and then user ██████.
5   Q    Okay.  Now, this conversation is initiated by which of
6   those two users?
7   A    By the user █.
8   Q    And to be clear, this is another -- this is occurring
9   on the Rapey website?
10  A    Correct.
11  Q    And what is the subject of the message that's sent by
12  user █?
13  A    "I want to see you and ████████."
14  Q    And what does the body of the message say?
15  A    The body says:  "Want to know what I'm working with."
16  Q    And did ██████ respond?
17  A    █████ responds with the number of images.  She includes
18  the text:  "Here you go."  There's -- one, two, three, four,
19  eight -- nine images included.
20  Q    And among those nine images, do those include the
21  sexually-explicit images of ██████ that we had seen in
22  other portions of the website?
23  A    Yes.
24  Q    After ██████ sent those images to user █, is
25  there -- does there follow several pages of discussion about
```

50

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA69

REDACTED TRANSCRIPT

```
1    the possibility of sexual abuse of ██████████?
2    A    Yes.
3    Q    Going now to Exhibit 213, if you wouldn't mind?
4    A    Okay.
5    Q    What's shown there?
6    A    Here's another conversation between the user ████████
7    and the user name ██████████████.
8    Q    What's the date of this conversation?
9    A    September 12th, 2020.
10   Q    And the subject is?
11   A    "██████."
12   Q    And the body is?
13   A    ████████████    says:  "You really giving out pic of
14   ████████?"
15   Q    And ████████'s reply?
16   A    She replies:  "Yes."
17   Q    What does ████████████ say?
18   A    "I wouldn't mind getting some from you."
19   Q    And ██████████ replies how?
20   A    ████████ responds with three images that we've seen
21   before.
22   Q    And, again, these are sexually-explicit images of █
23   ██████████?
24   A    Yes.
25   Q    After those images were sent, did ██████████████ make
                                                        51
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA70

REDACTED TRANSCRIPT

```
1   any inquiry about ████████'s viewing habits?

2   A   Yes.  He responds:  "Oh, wow.  That's hot.  Do you

3   watch CP ████████████████?"  ████████ responds:  "No, I

4   haven't."

5   Q   And going on to the next page, is there a message from

6   ████████████████ about whether she -- ████████ has any more

7   of ████████████?

8   A   Yes.  "About nine to ten, I think."  "Do you have any

9   more of ████████████?"

10  Q   And what does ████████ say?

11  A   ████████ responds:  "I will when ████████████."

12  Q   On the following page, what does ████████████████ ask?

13  A   "What does ████████ think of this?"

14  Q   And what does ████████ say?

15  A   ████████ responds:  "████ no idea."

16  Q   What does ████████████ ask after that?

17  A   "Do you want him to be involved, or do you want other

18  guys to ████████████ with?"

19  Q   And what does ████████ say?

20  A   She responds:  "Other guys."

21  Q   Mr. Fottrell, let's go ahead to Exhibit Number 214, if

22  we can.

23  A   214?

24  Q   Yes.

25  A   It's a conversation between ████████ and a user named
```

52

REDACTED TRANSCRIPT

```
 1  █████ , ████████ .
 2  Q    And the subject is?
 3  A    The subject is "████████ ."
 4  Q    And what's the date of this conversation?
 5  A    September 12th, 2020.
 6  Q    And what does ████ say to open this conversation?
 7  A    "Hey.  Wondering if I would see you all any pics."
 8  Q    And I'm sorry, it breaks across the next page.  But
 9  what does ██████ respond?
10  A    "Of course.  Do you have any?"  And ███████ sends four
11  images.
12  Q    Do the images include at least some of the
13  sexually-explicit images of ████████ that we've been
14  talking about so far?
15  A    Yes, they do.
16  Q    And what does ████ say in response after ██████ sent
17  those pictures?
18  A    He responds:  "I don't have pics, but I have" -- "I
19  have a, like, 30-second video if that's okay.  By the way,
20  super cute pics."
21  Q    What does ██████ say in response?
22  A    "Yes.  Please, and thank you."
23  Q    Now, if we can go ahead, Mr. Fottrell, to Exhibit 215
24  now.  And I think that's in the white binder.  Sorry.
25  A    Okay.
                                                          53
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA72

REDACTED TRANSCRIPT

```
 1   Q    What's shown in 215?

 2   A    215 is a conversation between the user ███████████

 3   and ██████, and it's titled:  "Have a ████████."

 4             (Reporter interrupted for clarification.)

 5             THE WITNESS:  ████, ████.

 6   BY MR. SCHLESSINGER:

 7   Q    And does that user, ████████████, ask ████████ what

 8   she's on the website for?

 9   A    Yes.  He says, I'm paraphrasing:  "Ooouuu, and what are

10   you on here for?"

11   Q    And what does ████████ say?

12   A    "Looking for someone to take me ███████████████

13   in exchange for a place to live."

14   Q    And on the next page in response to a request for her

15   location, what does ████████ identify as her location?

16   A    She identifies the location as Port Clinton, Ohio.

17   Q    All right.  If we could go on to Exhibit 26.  It's in

18   the black binder, Mr. Fottrell.

19   A    Okay.

20   Q    What's 216?

21   A    216 is a conversation between ████████ and the user

22   ██████, ████████, ██.

23   Q    And what's the text portion of the subject of the

24   conversation?

25   A    The text is:  "Can I see ████████?  I'll trade in
```

                                                        54

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA73

REDACTED TRANSCRIPT

```
 1   return."

 2   Q    And what's the date of this conversation?

 3   A    September 12th, 2020.

 4   Q    Did ████████ reply to the request to see ████████?

 5   A    Yes.  ████████ responds with two images, including one

 6   of the sexually-explicit ones we've seen before.

 7   Q    How did ████████ respond to ████████ sending those two

 8   images?

 9   A    He responds:  "So sexy.  Do you do anything with her?"

10   And ████████ responds:  "I haven't yet."  And then includes

11   four more pictures that we've seen before as well.

12   Q    And, again, we've seen them before, and they're --

13   included among them are sexually-explicit images of ██

14   ████? 

15          MR. AMOLSCH:  Objection.  Calls for a legal

16   conclusion.

17          THE COURT:  I'm going to overrule the objection.

18   BY MR. SCHLESSINGER:

19   Q    Now, to be clear, Mr. Fottrell, on this -- in the

20   immediately preceding comment, ████████ says:  "So sexy.  Do

21   you do anything with her?"; correct?

22   A    That is correct.

23   Q    And that message, did ████████ even ask for any

24   photographs from ████████?

25   A    No.
```

                                                                    55

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA74

REDACTED TRANSCRIPT

1  Q    But in the response, ███████ did send

2  sexually-explicit photographs of ███████?

3  A    Yes.

4  Q    Let's go forward to Exhibit 217 now, still in the black

5  binder.

6       What is that?

7  A    Okay.

8  Q    What's shown there?

9  A    It's a conversation between the user ███████,

10 ███████, ███████, and ███████ on September 12, 2020.

11 The title is:  "Hello."

12 Q    And what's the content of the first message from that

13 Rapey user?

14 A    He asks:  "How old are you?"

15 Q    And what does ███████ say in response?

16 A    "21 ███████."

17 Q    And the reply?

18 A    ███████ says:  "Cool.  Can I see some pics?"

19 ███████ responds:  "Of me or ███████?"  He asks both.  And

20 ███████ responds:  "Here you go," and sends two pictures.

21 Q    And just in the interest of time, if we could forward

22 to the second-to-last page of this Exhibit 217.

23       Are there additional photographs sent by ███████?

24 A    Yes.  Four more images.

25 Q    All right.  Let's go ahead to Exhibit 218,

56

JA75

REDACTED TRANSCRIPT

```
 1   Mr. Fottrell, if we can.

 2   A    Okay.

 3   Q    What is 218?

 4   A    This is a conversation between ███████ and the user

 5   ██████ on September 12, 2020.  The title of the post is:

 6   "Hey, I saw your post."

 7   Q    And what's the text of the first message from ██████?

 8   A    "Hey, I saw your post about you and ██████████, and

 9   I'm interested in seeing both of your pussies and

10   masturbating to them, so message me back and let me see

11   those pussies."

12   Q    Okay.  And does ████████ reply?

13   A    She responds:  "You want her?"  And then she basically

14   includes a number of -- one, two, three -- eight pictures.

15   Q    And do some of those pictures include some of the

16   sexually-explicit images of ██████████ that we've seen

17   before?

18   A    Yes.

19   Q    What does ███████ reply in response to those images?

20   A    ███████ responds:  "You got Snapchat or something?

21   Because I can't download the images for some reason.  And if

22   I can't download them, I can't jerk off to them later."

23   Q    Let's go ahead to Exhibit 219 still in the black

24   binder.

25            Mr. Fottrell, what is that, if you recognize it?
```

57

JA76

REDACTED TRANSCRIPT

```
 1   A    It's a conversation between the user ████, ████████,

 2   and ██████ on September 12th, and the title is: "Howdy."

 3   Q    And what does ████ say in the first message?

 4   A    "Can I get nudes of you and ████████?"

 5   Q    And how does ████████ respond?

 6   A    She responds: "Want more?" And then sends two

 7   pictures.

 8   Q    And what does ██████ say in response to "want more?"

 9   A    "Hell yeah." And then ████████ sends two more

10   images -- two more sexually-explicit images.

11   Q    Let's go ahead to Exhibit 220. If you recognize 220,

12   please tell us what that is.

13   A    Yes, I do. It is a conversation between ████████ and

14   the user ████, ████████, on September 12th. And the title

15   is: "██████."

16   Q    And what does user ██████ say in the first message in

17   that thread?

18   A    "I'd like to see you and ████████." ████████ responds:

19   "Is this good?" And sends six images.

20   Q    And in -- at least some of the images are depicting ██

21   ██████; is that correct?

22   A    That's correct.

23   Q    Now, if we could go ahead, Mr. Fottrell, and I believe

24   we're back in the white binder now. If we could look at

25   what's been admitted as Exhibit 221.
```
                                                              58

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA77

REDACTED TRANSCRIPT

```
 1    A    Okay.
 2    Q    Now, Exhibit 221 here, are we still in the direct
 3    message world, or are we back to public postings that
 4    multiple users can respond to?
 5    A    So we're in the public area of the board.  If you look
 6    towards the center of the middle of the page, we're in a
 7    section called "Rapey discussion," and then "off topic."  So
 8    this is just available to all the members on the board.
 9    Q    And who's the first one -- who's creating this thread
10    in the first post?
11    A    So there's a user by the name of ███████, and
12    there's a line through his name which indicates that he was
13    a deleted user at the point in time that the board was
14    seized.  But at the time this posting was made, he wasn't a
15    deleted user.  So the user ██████ is basically saying
16    why are you here.  And basically saying, you know, one post
17    per person, male and females allowed.  Tell me in detail why
18    you are on this site.
19    Q    Who is the first Rapey user to respond to that thread?
20    A    The user ██████.
21    Q    And what does she say in that response?
22    A    "Looking for someone to take on me and ██████████
23    ████████ and use us."
24    Q    All right.  Let's look at Exhibit 222 now still in the
25    white binder.
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA78

REDACTED TRANSCRIPT

```
1              What are we looking at there?
2    A    The same thing.  We're in the public section of the
3    board.  We're on a section of the board called "Rapey
4    discussion," and then another subsection called "Rapey
5    misogyny."  And there's -- the title of the posting is:
6    "Looking for a ███████," ██████.
7    Q    And what's --
8              THE COURT:  Hold on a second.  Hold on a second.
9              I see a date of September 10; is that correct?
10             THE WITNESS:  Yes.  Did I say the wrong date?  I'm
11   sorry.
12   BY MR. SCHLESSINGER:
13   Q    So it's posted -- this thread is first posted -- the
14   first post is September 10, 2020; is that correct?
15   A    Correct.
16   Q    And what's the content of that first post from
17   September 10?
18   A    The user ████████is asking:  "Looking for ██████████
19   to abuse kids together."
20   Q    Now, who is the first Rapey user to respond to that
21   message?
22   A    ████████ is the first to respond.  She responds:  "█
23   ████████████████████."
24   Q    Okay.  And to be clear, by the time ████████ responds,
25   what date is the actual response by ████████?
                                                              60
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA79

REDACTED TRANSCRIPT

```
 1   A     It rolls over to the next day onto September 11th.
 2   Q     Now, just briefly, Mr. Fottrell, in the white binder
 3   looking back finally at what's been admitted as Exhibit 201.
 4             What's Exhibit 201, just generally?
 5   A     201.  201 is what the board looks like if you would
 6   navigate to the website, and then you're not logged in.  So
 7   this is just what the board looks like if you would go to
 8   the website as a regular user.
 9   Q     And on the first page of 201, does it show, for
10   example, certain of the message boards -- certain examples
11   of the messages in which we were talking about earlier?
12   A     Yes.  So under the main board, there's a section called
13   "Rapey discussion."  It further breaks down the categories
14   for "Rapey misogyny," "pedorotica," and then "off topic."
15             There's another area called "whores."  Within that
16   section there's subsections called "proana," "femoid
17   discussion," "femoid gallery."  There's another section
18   called "meta" that's broken down into "members-only
19   discussion, announcements, feedback and other site
20   information."  And there's another category called
21   "meet-ups" that are broken down into different geographical
22   areas of the country.  And after that, there is a section
23   for "software and systems," and "gastronomy, cooking and
24   mixing."
25   Q     And if I could just break down, Mr. Fottrell, on the
```

61

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA80

REDACTED TRANSCRIPT

1    previous page here under "meet-ups," is there one particular
2    board that is for online role play only on the second page
3    of the exhibit?
4    A    Yes.  Yep.  The second category is "meet-ups, online
5    role play only."
6    Q    Otherwise outside of the "online role play only," are
7    there what appear to be a significant number of
8    geographically divided up boards for meet-ups?
9    A    Yes.  Broken down into the west four corners, upper
10   midwest, the Sunbelt, the Great Lakes area, northeast, New
11   England, et cetera.  So there's just geographically dividing
12   up areas of the United States.
13   Q    Let's look at 201A briefly, Mr. Fottrell, if we can.
14        What is that?
15   A    201A is the member profile for the user ███████████,
16   who is the administrator of the board.
17   Q    And just under location, what's given for the location
18   of the administrator of the board?
19   A    The location is listed as Catlett, which is Catlett,
20   Virginia.
21   Q    Is that a location within the Eastern District of
22   Virginia?
23   A    Yes, it is.
24   Q    And what does it say under ███████████'s profile about
25   tell us about yourself?

                                                              62

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA81

REDACTED TRANSCRIPT

```
 1   A    Under "tell us about yourself" it says:  "I run this
 2   site."
 3   Q    Looking briefly at 202.
 4           What is that?
 5   A    Okay.  This is a section of the board called "whores,"
 6   and then under "whores," there's a section called
 7   "confirmations."  So this is a list of information about
 8   recently confirmed members of the board.
 9   Q    And if you were to page through the various pages of
10   this, would it have information about, you know, specific
11   users and their status on whether they had successfully
12   completed the confirmation process?
13   A    Yes.
14   Q    And finally, just 203 briefly.
15           What is that?
16   A    203 is just a sample of what the board looks like.
17   We're in a section of the board called "Rapey discussion."
18   And then under "Rapey misogyny," there's just a listing of
19   all of the threaded conversations that are happening in
20   here.
21   Q    Now, for the clarity of the record, Mr. Fottrell,
22   because Rapey is a website where all of the messages and
23   transmission of images that -- about which you've testified
24   so far, did they occur over the Internet?
25   A    Yes, they did.
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA82

REDACTED TRANSCRIPT

1   Q    Now, Mr. Fottrell, did you alert agents at HSI to what

2   you had found, as you've just testified about, regarding the

3   activity of ██████████ on Rapey?

4   A    Yes, I did.

5   Q    In particular among other information, did you share

6   with them the EXIF location data for the one confirmation

7   photo about which you testified?

8   A    Yes, I did.

9   Q    And, further, did your analysis of the Rapey servers

10  reveal an IP address from which ████████ had logged into the

11  Rapey server?

12  A    I did.

13  Q    Did you also share that IP address with HSI

14  investigators?

15  A    Yes, I did.

16        MR. SCHLESSINGER:  Your Honor, Court's indulgence.

17                        (Pause.)

18        THE COURT:  Well, is there any dispute -- again,

19  based upon the defendant's opening statement, my

20  understanding is that they are not disputing that these

21  images and these conversations were, in fact, sent by the

22  defendant from her home in Ohio to this website.

23        Mr. Amolsch, am I correct?

24        MR. AMOLSCH:  That's correct, Your Honor.  We have

25  no objection.

                                                              64

JA83

REDACTED TRANSCRIPT

```
 1              THE COURT:  Then that's been established.  We can
 2    move this along.
 3              MR. SCHLESSINGER:  Thank you, Your Honor.
 4              I'm sorry, Your Honor.  Court's indulgence for one
 5    moment.
 6                         (Pause.)
 7              MR. SCHLESSINGER:  All right, Your Honor.  Thank
 8    you.  Thank you for that.  No further questions.
 9              THE COURT:  Mr. Amolsch.
10              MR. AMOLSCH:  Thank you, Your Honor.
11                    CROSS-EXAMINATION
12    BY MR. AMOLSCH:
13    Q     Good afternoon, sir.  Is it Kottrell or Pottrell?
14    A     Fottrell.  F, as in Frank, O-T-T-R-E-L-L.
15    Q     And is it Mr. or agent?
16    A     Mr.
17    Q     Mr. Fottrell, my name is Christopher Amolsch.  I
18    represent Ashley Kolhoff.
19              The Government just asked you a series of
20    questions about the Rapey.su website.  I'd like to explore
21    that a little bit with you as part of my initial questions
22    to you.
23              The exhibit the Government showed you,
24    Exhibit 201, can you bring that up again.
25    A     201?
```

65

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA84

REDACTED TRANSCRIPT

```
1    Q    Yes, sir.

2    A    Yes.

3    Q    Okay.  And that's, what you testified, was the

4    administrator of the website; is that correct?

5    A    201 is just, like, the log-in page.  201A maybe.

6    Q    201A.  Thank you, sir.

7    A    201A is the administrator.

8    Q    And that looks like there was a creation date of 2019;

9    is that right?

10   A    Say that again.

11   Q    What is the --

12   A    Oh, I'm sorry.  His join date is December 10th, 2019.

13   Q    Okay.  And is that -- I'm trying to establish or get a

14   sense of how long has the Rapey.su site been up?

15   A    I don't know.  A longer time.  Certainly longer than

16   this.  It basically moved around over a number of years.  I

17   don't have the exact date in front of me, but it probably

18   dates back to 2016 or 2017.

19   Q    Did you examine the forensic records associated with

20   Rapey.su from 2016 up until the time it was disabled?

21   A    Yes.  So I have backup copies of all that information,

22   yes.

23   Q    And in the course of your looking at that -- those

24   records, did you see any other instances in which

25   Ms. Kolhoff logged onto the Rapey.su website?
```

66

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA85

REDACTED TRANSCRIPT

```
 1   A     No, I did not.
 2   Q     Did you see any other instances in which she attempted
 3   to do so under -- using a different name?
 4   A     Not that I found.
 5   Q     Did you see any evidence of her trying to disguise her
 6   location or her identity?
 7   A     No, I did not.
 8   Q     So really what we're talking about here then is a
 9   period between September 11th, 2021; is that right?
10   A     2020.
11   Q     2020.  And September 13th, 2020.
12         And the site was shut down on what day?
13   A     Approximately the second week of December.
14   December 10th, December 11th, 2020.
15   Q     Of 2020.
16         And just so we're clear, you found no evidence
17   before September 11th, and you found no evidence after
18   September 13th of Ms. Kolhoff ever accessing the site?
19   A     Correct.
20   Q     No -- you didn't see her sending any messages; correct?
21   A     Correct.
22   Q     Images?
23   A     After those dates, correct.
24   Q     Attempted log-ons?
25   A     Not after that date, correct.
```
67

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA86

REDACTED TRANSCRIPT

1    Q    Her account was created you said on September 11th.

2         Are you familiar with the process by which an

3    account gets deleted from the website?

4    A    Yes, I am.

5    Q    And how does that happen?

6    A    So the user can try to delete their account, but the

7    administrator of the board sets it up so that they're not

8    really deleted.  The administrator could still see them.

9    And we had a couple of examples of that where the user name

10   has a line through it, means it was deleted, but their

11   content was still there.

12   Q    Okay.  So you're able to tell then the entire universe

13   at the time that that website was up about her limited

14   activity?

15   A    Correct.  Well, yeah.  The activity that I have.

16   Q    Thank you.

17        Did you complete any of the forensics on her -- on

18   her devices themselves, like her iPhone or on her computer

19   or any of those things?

20   A    No, sir, I did not.

21   Q    Okay.  So the Government then asked you a series of

22   questions about some images.  Do you remember those

23   questions?

24   A    Yes, I do.

25   Q    Some of them involved non-graphic images, some involved

                                                            68

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

REDACTED TRANSCRIPT

1   pictures of anus and vagina.  Do you remember those

2   comments?

3   A    Yes, I do.

4   Q    Okay.  In viewing those images, any of them that the

5   Government asked you about, in any of them, is there actual

6   or simulated sexual intercourse?

7   A    There is very explicit pictures of somebody spreading

8   the genitals and anus of ████████.  That's alarming to me.

9   Q    Let me ask you the question again, because I didn't ask

10  about spreading the anus.  It's a specific question.

11       Is there any evidence of actual or simulated

12  sexual intercourse?

13  A    No.

14  Q    Is there any actual evidence of actual or simulated

15  beastiality?

16  A    No beastiality.

17  Q    Actually or simulated masturbation?

18  A    Spreading the hand -- I'm not sure if spreading the

19  hands would count as masturbation.  I'm not sure of the

20  answer to that question.

21  Q    Sadistic or masochistic abuse?

22  A    No masochistic abuse.

23  Q    So really what we have are nude photos of the vagina;

24  is that correct?

25  A    Very sexually-explicit pictures of ████████'s vagina.

                                                          69

JA88

REDACTED TRANSCRIPT

```
 1   Q    Just answer the question I'm asking you.

 2            What we have are nude pictures of the vagina;

 3   correct?

 4   A    Yes.

 5   Q    And we have nude pictures of the anus --

 6   A    Yes.

 7   Q    -- is that correct?  All right.

 8            MR. AMOLSCH:  Court's indulgence, Your Honor.

 9                        (Pause.)

10            MR. AMOLSCH:  Thank you, Your Honor.  I have no

11   more questions for this witness.  But I did object earlier

12   to the Government's characterization of them as being

13   sexually explicit.

14            THE COURT:  Look, this is a bench trial.

15            MR. AMOLSCH:  I understand.  I just want to put on

16   the record, Your Honor, that I have a continuing objection

17   to that.

18            THE COURT:  All right.

19            MR. AMOLSCH:  I don't want to the object every

20   time.

21            THE COURT:  I overruled it anyway.

22            MR. AMOLSCH:  Thank you, Your Honor.

23            THE COURT:  Any redirect?

24                   REDIRECT EXAMINATION

25   BY MR. SCHLESSINGER:
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA89

REDACTED TRANSCRIPT

```
 1   Q    I'd ask you to turn in the black binder, Mr. Fottrell,

 2   to --

 3          THE COURT:  Now, that was a very short cross, so

 4   this has to be a really short redirect.

 5          MR. SCHLESSINGER:  It will be, Your Honor.

 6          THE COURT:  All right.

 7   BY MR. SCHLESSINGER:

 8   Q    Exhibit 211D, Mr. Fottrell.

 9   A    211D.  Yep.

10   Q    Okay.  What's shown in 211D?

11   A    211D is an adult's hand basically spreading the butt

12   cheeks of ███████.

13   Q    So it is not just a nude picture of ███████'s behind?

14          MR. AMOLSCH:  Objection.  Leading, Your Honor.

15          MR. SCHLESSINGER:  I'm sorry, Your Honor.  I'll

16   rephrase that.

17          THE COURT:  Look, you can argue -- the evidence is

18   in.  I don't need a witness to tell me what's in the

19   picture; all right?

20          MR. SCHLESSINGER:  All right.

21          Other than that, no further questions.

22          THE COURT:  All right.  Thank you.  You may

23   then -- is anyone going to call this witness again in the

24   course of the trial?

25          MR. AMOLSCH:  Not for Ms. Kolhoff, Your Honor.
```

71

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA90

REDACTED TRANSCRIPT

```
 1              MR. SCHLESSINGER:  No, not from the Government.
 2              THE COURT:  Then, sir, you're no longer required
 3    to remain outside of the courtroom.  If you want to stay and
 4    watch the remainder of the trial, you may, but you're not to
 5    discuss your testimony or anything you see or hear in court
 6    with any witness who has not yet testified.
 7              THE WITNESS:  Thank you, Your Honor.
 8                   (Witness excused at 10:25 a.m.)
 9              THE COURT:  All right.  Your next witness.
10              MR. SCHLESSINGER:  The Government calls
11    Brandon Smock.
12              THE CSO:  Face the deputy clerk.  Please raise
13    your right hand.
14    Thereupon,
15                   BRANDON SMOCK,
16    having been called as a witness on behalf of the Government
17    and having been first duly sworn by the Deputy Clerk, was
18    examined and testified as follows:
19                   (Time noted:  10:26 a.m.)
20              THE DEPUTY CLERK:  Thank you.
21                   DIRECT EXAMINATION
22    BY MR. SCHLESSINGER:
23    Q    Agent Smock, good morning.
24    A    Good morning.
25    Q    Where do you work, sir?
```

                                                                    72

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA91

REDACTED TRANSCRIPT

```
 1   A    I work for Department of Homeland Security.  Homeland
 2   Security Investigations.
 3   Q    Do you have a title with Homeland Security
 4   Investigations?
 5   A    Special agent.
 6   Q    How long have you been a special agent with HSI?
 7   A    I was hired in 2019.
 8   Q    And what do you do at HSI on a day-to-day basis?
 9   A    I conduct child investigations involving children on
10   the Internet.
11   Q    Before you worked at HSI, how were you employed?
12   A    I was a local police officer with the Prince William
13   County Police Department and was employed as a special
14   victims unit and assigned to the ICAC task force.
15              (Reporter interrupted for clarification.)
16              THE WITNESS:  Oh, ICAC.  I-C-A-C, ma'am.
17   BY MR. SCHLESSINGER:
18   Q    Now that you're a special agent at HSI, and as part of
19   your duties with HSI, are you familiar with a website that's
20   been discussed during this trial known as Rapey?
21   A    Yes.
22   Q    All right.  Have you been involved with the
23   investigation into that website and at least one of its
24   users?
25   A    Yes.
```

73

JA92

REDACTED TRANSCRIPT

```
 1   Q    As part of that investigation, did you become familiar
 2   with the user of the Rapey website known as ████████?
 3   A    Yes.
 4   Q    How did user ████████ specifically come to your
 5   attention?
 6   A    We were provided information from Mr. Fottrell who was
 7   assisting on the investigation.
 8   Q    And did you have a sense what it was about ████████'s
 9   activity in particular that Mr. Fottrell wanted to draw your
10   attention to?
11   A    Yes.  It appeared to be a user who was disseminating
12   images of ████████ over the website.
13   Q    Did it appear to be at least possible that ████████
14   whose images were being disseminated ████████████████
15   ██████████████████████████████████████████████
16   those images?
17   A    Yes, that's correct.
18   Q    When you get information like that, does that create an
19   urgent situation for you?
20   A    Yes, it did.
21   Q    So what did you decide to do once you obtained that
22   information about ████████?
23   A    We contacted the Internet service provider of the IP
24   address that was associated with the user ████████.
25   Q    To be clear, who provided you with that IP address
```

74

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA93

REDACTED TRANSCRIPT

```
 1   associated with the user?

 2   A    Mr. Fottrell's unit.

 3   Q    Okay.  What Internet service provider was that that was

 4   providing service to that particular IP address?

 5   A    It was Charter.

 6   Q    Did you get a response from Charter?

 7   A    Yes, we did.

 8   Q    All right.  I'd like to show you what's marked as

 9   Exhibit 301 in the white binder for a minute.

10          THE COURT:  Any objection?

11          MR. AMOLSCH:  No objection, Your Honor.

12          THE COURT:  All right.  It's in.

13     (Government Exhibit Number 301 admitted into evidence.)

14          MR. SCHLESSINGER:  Thank you, Your Honor.

15   BY MR. SCHLESSINGER:

16   Q    Turning to page 2 of what's been admitted now as

17   Exhibit 301, you see here subscriber information associated

18   with that IP address, Agent Smock?

19   A    Yes, I do.

20   Q    And, first of all, what's the name that's given?

21   A    It comes back to a G██ W██████.

22   Q    What's the service address that's given there?

23   A    ████████████████████████, Port Clinton, Ohio,

24   ██████████.

25   Q    In addition to obtaining the subscriber information for
```

75

JA94

REDACTED TRANSCRIPT

```
 1   the IP address, did you -- were you provided with any EXIF
 2   data associated with any photographs that had been recovered
 3   from the Rapey website?
 4   A    Yes, we were.
 5   Q    And what -- if you can go ahead and turn to what's been
 6   admitted already as Exhibit 208B in that white binder.
 7   A    Okay.
 8   Q    Do you recognize that as the picture and some of its
 9   associated EXIF metadata?
10   A    Yes, I do.
11   Q    And 208C, what's shown there?
12   A    This appears to be a Google image of the front of the
13   residence of          .
14   Q    Based on this information that you just testified to,
15   did it appear to you at the time that user Mommyxxx was
16   accessing Rapey from                  in Port Clinton, Ohio?
17   A    Yes, it did.
18   Q    So once that occurred to you, what did you decide to do
19   next?
20   A    We decided to conduct a search warrant at the residence
21   in Ohio.
22   Q    Was a -- did you apply for a search warrant with a
23   judge?
24   A    Yes, we did.
25   Q    Was that search warrant issued?
```
                                                              76

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA95

REDACTED TRANSCRIPT

```
1    A    Yes, it was.

2    Q    And did you travel to Port Clinton yourself to

3    participate in the execution of that search warrant?

4    A    I did.

5    Q    How did you get there?

6    A    We drove overnight.

7    Q    How long did it --

8         THE COURT:  Counsel, again, there's no sense in

9    taking up court time with issues that are not in dispute.

10   It's my understanding the defense is not disputing that the

11   defendant's -- the images and the conversations did arise

12   from this defendant at the Port Clinton residence.

13        So get into some new territory with this witness.

14        MR. SCHLESSINGER:  I will, Your Honor.

15        THE COURT:  Okay.

16        MR. SCHLESSINGER:  I'll move quick.

17   BY MR. SCHLESSINGER:

18   Q    Do you know the date the search was conducted?

19   A    June 9th.

20   Q    And was Ms. Kolhoff present there?

21   A    Yes, she was.

22   Q    Were ████████████████████?

23   A    Yes, there was.

24   Q    Describe ███████████████████████.

25   A    There was ██████████████.
```

                                                        77

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA96

REDACTED TRANSCRIPT

```
1   Q    Did it appear ████████████████████████████████
2   ████████████████████████████████████████████████████
3   ████████████?
4   A    ███ .  ██████████████████████████ .
5   Q    I'd like to show you Exhibit 501, please.
6            Do you recognize Exhibit 501?
7   A    This appears to be a ██████████████ .
8   Q    Okay.  Does that appear to be ████████████████
9   ████████████████████████████████████████████████████
10  ██████████?
11  A    Yes, it does.
12           MR. SCHLESSINGER:  Your Honor, we move for
13  admission Exhibit 501.
14           MR. AMOLSCH:  No objection.
15           THE COURT:  It's in.
16    (Government Exhibit Number 501 admitted into evidence.)
17  BY MR. SCHLESSINGER:
18  Q    Can you describe the layout of the residence?  And you
19  can refer to Exhibit 208C if you need to.  But can you
20  describe the layout of the residence when you conducted the
21  search warrant?
22  A    The residence was separated into what appeared to be
23  two sections.  The top floor was one entire sectioned off
24  what appeared to be an apartment.  Inside there it had
25  multiple rooms and a living room, as well as like a kitchen.
```

78

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

REDACTED TRANSCRIPT

```
 1              THE COURT:  Can you keep your voice up, please.
 2              THE WITNESS:  Yes, ma'am.
 3              THE COURT:  All right.  Move closer to the
 4    microphone.
 5    BY MR. SCHLESSINGER:
 6    Q    Agent Smock, during the course of the search, did you
 7    come to learn which portion of that divided house did
 8    Ms. Kolhoff ███████████████████?
 9    A    They lived in the top section of that residence.
10    Q    Okay.  So showing you Exhibit 401, is that -- is that
11    something you recognize?
12              THE COURT:  Counsel, this is going -- you're not
13    adding anything.  The layout in the apartment right now
14    doesn't seem to add anything to this case given the issues
15    which the defense has said are the core issues.  So ask --
16    please move this testimony to something that's directly
17    related to those issues and that's not repetitive.
18              MR. SCHLESSINGER:  All right.  I understand, Your
19    Honor.
20    BY MR. SCHLESSINGER:
21    Q    Why don't you take a look collectively at 405 through
22    408.
23              THE COURT:  Any objection to 405 through 408?
24              MR. AMOLSCH:  No objection.  We agreed to
25    stipulate to all this, Your Honor.
```

                                                              79

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA98

REDACTED TRANSCRIPT

```
 1              THE COURT:  All right.  They're in.
 2     (Government Exhibit Numbers 405 through 408 admitted into
 3                          evidence.)
 4              MR. SCHLESSINGER:  Thank you, Your Honor.
 5   BY MR. SCHLESSINGER:
 6   Q    And I'll just ask you specifically about 406.
 7              What's shown in 406?
 8   A    406 appears to be the right hand of Ms. Kolhoff with
 9   two freckles or moles located on the top of the hand.
10   Q    What, if anything, was relevant to you about the
11   freckles?
12   A    That appeared to be consistent with the image that we
13   identified on the website of the sexually-explicit image of
14   ██████████.
15   Q    Was that the image of specifically spreading the
16   child's exposed anus?
17   A    Yes.
18   Q    You mentioned Ms. Kolhoff was present at the time of
19   the search.
20              First I'm going to ask you if you recognize
21   Ms. Kolhoff as being present here in court today.  And if
22   you do, point out where she's sitting, what she's wearing.
23   A    Yes, I do, and she's wearing green next to the defense
24   counsel.
25              THE COURT:  Any objection --
```

80

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA99

REDACTED TRANSCRIPT

```
 1              MR. AMOLSCH:  No objection.
 2              THE COURT:  -- about the identification?
 3         The witness identified the defendant.
 4              MR. SCHLESSINGER:  Thank you.
 5  BY MR. SCHLESSINGER:
 6  Q    Now, part of the search, I gather, was to search the
 7  house for evidence; is that correct?
 8  A    Yes.
 9  Q    But was it also your hope to be able to conduct an
10  interview with Ms. Kolhoff at the time?
11  A    Yes.
12  Q    Did you conduct an interview of Ms. Kolhoff on the day
13  of the search?
14  A    Yes, I did.
15  Q    I think -- I should ask, what was the day of the
16  search?
17  A    June 8th, sir, 2021.
18  Q    What year?
19              Now, at the outset of the interview with
20  Ms. Kolhoff, did you explain to her her Miranda rights?
21  A    Yes, I did.
22  Q    Did she appear to understand those rights?
23  A    Yes, she did.
24  Q    After the rights were explained to her, did she agree
25  to speak to you in an interview?
```
                                                              81

JA100

REDACTED TRANSCRIPT

```
 1   A    Yes.
 2   Q    And did she sign anything indicating that she
 3   understood her rights?
 4   A    She signed a waiver form indicating that she would
 5   speak with us.
 6   Q    Is Government Exhibit 409B, is that the waiver form?
 7   A    Yes, it is.
 8        MR. SCHLESSINGER:  We would move for admission of
 9   409B.
10        THE COURT:  Any objection?
11        MR. AMOLSCH:  No objection.
12    (Government Exhibit Number 409B admitted into evidence.)
13        THE COURT:  Is there any claim of involuntariness
14   as to the statements?
15        MR. AMOLSCH:  No, Your Honor.
16        THE COURT:  All right.  We can move right to that.
17        MR. SCHLESSINGER:  Thank you.
18   BY MR. SCHLESSINGER:
19   Q    Was that interview recorded?
20   A    Yes, it was.
21   Q    Okay.  I'd like you to look at both 409 and 409A
22   together in that white binder and tell me what those are.
23   A    Okay.
24   Q    What are 409 and 409A?
25   A    One appears to be the transcript of the interview, and
```

82

JA101

REDACTED TRANSCRIPT

```
1    the next is the interview itself on a CD.
2    Q    Okay.  And in addition, I'd like you to look -- page
3    410 through 416 all together.
4              THE COURT:  Again, any objection to 410 through
5    416?
6              MR. AMOLSCH:  No, Your Honor.
7              THE COURT:  All right.  They're all in.
8     (Government Exhibit Numbers 410 through 416 admitted into
9                         evidence.)
10             MR. SCHLESSINGER:  Including 409 and 409A, Your
11   Honor?
12             THE COURT:  I believe they're already in, yes.
13      (Government Exhibit Numbers 409 and 409A admitted into
14                        evidence.)
15             MR. SCHLESSINGER:  Thank you, Your Honor.
16             All right.  Let's go ahead then and go ahead --
17   and if we could go ahead and publish what's been admitted
18   now as Exhibit 410.
19             And in the transcript that's before Your Honor, I
20   would advise the Court this excerpt begins at page 2,
21   line 2.
22                     (Audio played.)
23             THE COURT:  Wait a minute.  Let's stop.  Let's
24   stop.  There's no dispute -- there's no dispute that she got
25   her Miranda warnings, and the defense is not disputing that
```

83

JA102

REDACTED TRANSCRIPT

```
 1   this was a voluntary statement.

 2           Let's move to the meat of this.  All right.

 3           MR. SCHLESSINGER:  Your Honor, that's -- I'm happy

 4   to do that.  I also think that hearing her mental state,

 5   given the defense that's been lodged in this, at various

 6   points in the interview is relevant for the Court's

 7   consideration, and I think that could include her mental

 8   state, her lucidity, her responsiveness and coherence,

 9   including her response to being read Miranda rights.  It's a

10   very brief clip.

11           THE COURT:  All right.  Go ahead.  Again, I don't

12   want to be wasting my time and your time listening to things

13   that are not in contest.

14           Go ahead.

15           MR. SCHLESSINGER:  I understand, Your Honor.

16                   (Audio played.)

17           MR. SCHLESSINGER:  Okay.  If we can go ahead and

18   publish 411 now.  For the Court's benefit, that's a portion

19   of the transcript that starts at page 4, line 9.

20                   (Audio played.)

21           MR. SCHLESSINGER:  If we could go ahead and

22   publish now Exhibit 412.  And, Your Honor, that transcript

23   portion starts at page 14, line 18.

24                   (Audio played.)

25   BY MR. SCHLESSINGER:
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA103

REDACTED TRANSCRIPT

```
 1   Q    Now, before we play the next one, let me ask you:
 2            Agent Smock, there was a reference there to ██████.
 3   Do you know who that is?
 4   A    ████████████████████████████████████  boyfriend of
 5   ██████████.
 6   Q    Do you know his last name?
 7   A    ████████.
 8   Q    And was he present at the time of the search warrant?
 9   A    He was.
10   Q    Now, before we play the next one also, there's
11   reference in this clip and I think one other one to prior
12   contact with Ms. Kolhoff by FBI investigators?
13   A    Yes, that's correct.
14   Q    Were you able to confirm that that indeed happened, she
15   was contacted by FBI investigators before the execution of
16   the search warrant?
17   A    She had been contacted by other law enforcement, that's
18   correct.
19   Q    So that's true?
20   A    Yes, it is.
21            MR. SCHLESSINGER:  If we can go ahead and publish
22   Exhibit 413.
23            THE COURT:  What pages?
24            MR. SCHLESSINGER:  I'm -- it's my fault.  I'm
25   sorry.  It's page 21, line 12.  And if we could start at 413
```

85

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA104

REDACTED TRANSCRIPT

1   from the beginning.  I'm sorry.

2            THE COURT:  Thank you.

3                       (Audio played.)

4            MR. SCHLESSINGER:  Okay.  And the next one begins

5   on page 24, line 5.  If we could publish now Exhibit 414

6   please.

7                       (Audio played.)

8   BY MR. SCHLESSINGER:

9   Q    Agent Smock, during this interview, were you or other

10  agents doing anything to intimidate the defendant?

11  A    No, sir.

12           MR. SCHLESSINGER:  Go ahead and publish 415, and

13  that starts on transcript page 29, line 10.

14                      (Audio played.)

15           MR. SCHLESSINGER:  All right.

16  BY MR. SCHLESSINGER:

17  Q    Now, Agent Smock, to be clear, at the same time, we

18  just heard portions, not the entirety of the recorded

19  interview; is that correct?

20  A    That's correct.

21  Q    Was there another portion of the recorded interview

22  that we didn't hear and we're not going to play in which she

23  indicated -- which Ms. Kolhoff indicated whose Internet

24  access she used?

25  A    Yes, she did.

                                                           86

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA105

REDACTED TRANSCRIPT

```
1    Q    And who did she say had the Internet access that she

2    used to access the Internet?

3    A    It was an individual living below her on the first

4    floor by the name of T██ [sic] W█████.

5    Q    Okay.  And that would seemingly be the Ms. W█████

6    referenced in the subscriber information, Exhibit 301?

7    A    That's correct.

8    Q    Now, during your interview of Ms. Kolhoff and Agent

9    Smock, did she seem at any time to you to be confused or

10   disoriented?

11   A    No.

12   Q    Were you able at all times during your interview to

13   understand what the defendant was saying to you?

14   A    Yes.

15   Q    As far as you could tell, did she seem able to

16   understand what you were saying to her?

17   A    Yes.

18   Q    She mentioned that she was part of a Save Our Children

19   Facebook group?

20   A    That's correct.

21   Q    I think she mentioned that she was an administrator of

22   that group?

23   A    Yes.

24   Q    But did she provide to you any evidence that she had

25   collected regarding child predators in connection with that
```

87

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA106

REDACTED TRANSCRIPT

```
 1   Facebook group?

 2   A    No, she did not.

 3   Q    Once the interview of Ms. Kolhoff was completed and the

 4   search of the residence was finished, what did you do with

 5   respect to Ms. Kolhoff?

 6   A    We placed her under arrest.

 7          MR. SCHLESSINGER:  No further questions, Your

 8   Honor.

 9          THE COURT:  All right.  This is a perfect time.

10   We're going to take a short break.  Hopefully you all can

11   use just ten minutes.  Start up at five after 11 with the

12   defendant's expert.  All right.  We're going to have to have

13   this witness come back.

14          Is there going to be cross-examination for this

15   witness?

16          MR. AMOLSCH:  There is, Your Honor, but I think

17   that's fine.

18          THE COURT:  All right.  So, Agent, you're released

19   for the day.  You'll need to be back here at 9:00 tomorrow

20   morning to complete your testimony; all right?

21          THE WITNESS:  Yes, Your Honor.

22          THE COURT:  Do not discuss your testimony with

23   anyone other than of course you can with counsel; all right?

24   So you're free to go at this point, and we'll reconvene at

25   five after 11.
```

88

JA107

REDACTED TRANSCRIPT

```
 1                    (Witness excused at 10:56 a.m.)

 2                        (A brief recess was taken.)

 3            THE COURT:  All right.  Mr. Amolsch, your witness.

 4            MR. AMOLSCH:  Good morning, Your Honor.

 5   Christopher Amolsch for Ms. Kolhoff who is present.  May it

 6   please the Court.

 7            I call Dr. Michael Hendricks.

 8            THE COURT:  All right.

 9            THE CSO:  Face the deputy clerk.  Please raise

10   your right hand.

11   Thereupon,

12                    MICHAEL HENDRICKS,

13   having been called as a witness on behalf of the defendant

14   and having been first duly sworn by the Deputy Clerk, was

15   examined and testified as follows:

16                        (Time noted:  11:07 a.m.)

17            THE DEPUTY CLERK:  Thank you.

18            THE CSO:  You may be seated.

19            MR. AMOLSCH:  May it please the Court.

20                    DIRECT EXAMINATION

21   BY MR. AMOLSCH:

22   Q    Good morning, Dr. Hendricks.  If you could introduce

23   yourself to the Judge, please.

24   A    Sure.  Dr. Michael Hendricks.

25   Q    I'm going to ask you if you can move closer to the
```

89

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA108

REDACTED TRANSCRIPT

1   microphone.

2   A    Okay.  Is that better?

3        MR. AMOLSCH:  Can you hear him okay, Your Honor?

4        THE COURT:  That's fine.

5        MR. AMOLSCH:  Thank you.  Okay.

6   BY MR. AMOLSCH:

7   Q    And how are you employed, Dr. Hendricks?

8   A    I am a clinical and forensic psychologist at the

9   Washington Psychological Center where I'm a partner.

10  Q    And how long have you been doing that?

11  A    Since 1999.

12  Q    All right.  Do you have any academic positions?

13  A    I am a clinical professor at George Washington

14  University, and I'm an adjunct professor at Catholic

15  University where I teach one graduate course.

16  Q    Can you tell the Judge a little bit about your

17  education?

18  A    Sure.

19        THE COURT:  I'm sorry.  Is there any dispute about

20  the curriculum vitae for this defendant -- this witness?

21        MR. SCHLESSINGER:  No, there's not, Your Honor.

22        THE COURT:  All right.  Do you have an exhibit?

23        MR. AMOLSCH:  No, Your Honor.  I can submit his

24  curriculum vitae afterwards.

25        THE COURT:  There's no dispute that Dr. Hendricks

90

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA109

REDACTED TRANSCRIPT

1    is an expert in the area of clinical and forensic

2    psychology; is there?

3              MR. SCHLESSINGER:  No objection as being

4    designated as an expert.

5              THE COURT:  All right.  That's fine.  I'll let you

6    supplement the record with the doctor's CV.  Let's move

7    this --

8              MR. AMOLSCH:  Yes, Your Honor.  Thank you.

9              May it please the Court again.

10   BY MR. AMOLSCH:

11   Q    Dr. Hendricks, you're familiar with Ashley Kolhoff?

12   A    Yes, I am.

13   Q    How did you come to be familiar with her?

14   A    I was asked by defense counsel, by you, to do an

15   evaluation of risk assessment to assist the Court in

16   understanding what factors might have applied in her

17   behavior and what the outlook looked like for whether she

18   might do this in the future and what treatment, if any,

19   would be appropriate.

20   Q    In the course of your investigation -- in the course of

21   your examination -- let's talk about the documents or --

22   that you reviewed.

23              Did you review the affidavit in support of the

24   criminal complaint?

25   A    I did.

                                                            91

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA110

REDACTED TRANSCRIPT

```
 1   Q    Did you have the Pretrial Services report?

 2   A    I did, and the addendum to the report.

 3   Q    The indictment?

 4   A    I had the indictment, yes.

 5   Q    Did you listen to the audio recordings of Ms. Kolhoff

 6   and the detective?

 7   A    Yes, I did.

 8   Q    Okay.  And Mr. M█████  as well --

 9   A    Yes.

10   Q    -- ████████?

11        Did you read the investigative reports regarding

12   this case?

13   A    Yes.

14   Q    And did you review any other medical records?

15   A    Yes.  I also had records from Dr. Jha, who is a

16   psychiatrist that Ms. Kolhoff saw in 2018.

17   Q    And do you remember those dates as being March 8th,

18   2018 and May 1st, 2018?

19   A    That's correct.

20   Q    And was reviewing this information important in

21   reaching your conclusions?

22   A    Yes, it was.

23   Q    All right.  Let's talk about your process for

24   conducting your evaluation.

25        Can you explain the scientific method a little bit
```
                                                              92

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA111

REDACTED TRANSCRIPT

```
 1   to Judge Brinkema?

 2   A     Sure.  So in doing an evaluation, I use a scientific

 3   method, which is I start with the information that I'm given

 4   upfront, and, from that, I form hypotheses, and then I set

 5   out to test those hypotheses.  And sometimes the hypotheses

 6   change with the additional information; sometimes they're

 7   simply refuted; sometimes they are supported.

 8          And so I started out -- the way that I start is,

 9   first do an interview with the defendant to be able to get

10   some information directly from the defendant, but keeping in

11   mind that, in a forensic situation, the defendant -- what

12   the defendant says isn't taken as necessarily the truth.

13          And then I did -- then I did psychological testing

14   to test certain hypotheses that I had developed, and then

15   also met -- or spoke with, by telephone, Mr. M███████ and

16   Mr. Mike Kolhoff.

17   Q     So let's talk about those initial clinical interviews.

18          Were they done -- was the first one done by video

19   conference?

20   A     Yes.  All of the interviews that I did with Ms. Kolhoff

21   were done by video conference.  And that's because the

22   protocol -- the COVID protocol in the jail is that we would

23   need to be masked, and I need to see her face in order to

24   make a judgment about what she's telling me.

25   Q     And so tell the judge a little bit about what you're
```

                                                              93

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA112

REDACTED TRANSCRIPT

1    looking for as -- when you're conducting your initial

2    clinical interview.

3    A    So, because this was a case of a sex offense, I was

4    looking first to see does she have a sexual deviation, a

5    sexual diagnosis.  And also looking at other things, other

6    mood-related or other related possible diagnoses that might

7    explain what she did, or at least help us understand whether

8    what her chances of continuing this behavior in the future

9    might be, and looking at what might be treatable or what

10   might not be treatable.

11   Q    Did you discuss her past history of sexual trauma?

12   A    Yes, I did.

13   Q    Was she --

14   A    In a fair amount of detail.

15   Q    Would you describe her as being reluctant to talk about

16   that?

17   A    She was initially.

18   Q    How did you push through that reluctance?

19   A    So I actually start by getting just very early

20   background information, like where were you born, and

21   learned about how she was adopted and all of that.  And that

22   sort of develops a bit of a rapport.  It's a clinical skill

23   that, you know, you have to pay attention to how the

24   person's responding and make adjustments along the way.

25           But with the idea of being able to get -- knowing

94

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA113

REDACTED TRANSCRIPT

1  that I would be getting her to a place where I would be

2  asking her to talk about things that she might not want to

3  talk about or that would be difficult for her to talk about

4  and developing that trust and that rapport with her so that

5  she would be comfortable doing that.

6  Q    Do you -- in addition to doing forensic evaluations,

7  are you also a therapist?

8  A    Yes, I am.

9  Q    And how long have you been doing individual therapy?

10  A    Well, I got my doctoral degree in 1993.  I've been

11  doing it since before then.

12  Q    All right.  And would you say that the fact that you're

13  a therapist is among the skills you developed to be able to

14  get Ashley to open up and talk to you?

15  A    Yes, because it helps me to develop the rapport to be

16  able to get people to talk about difficult information.

17  Q    All right.  I'm going to ask you to speak up just a

18  little bit; okay?

19  A    Okay.  Sorry.

20  Q    You mentioned that you talked to Ms. Kolhoff about her

21  past trauma, and you did so in detail.  I want to follow up

22  a little bit on that.

23         What did she report to you about her belief about

24  being sexually assaulted by her father?

25  A    So she told me that she was informed by her mother and

95

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA114

REDACTED TRANSCRIPT

1   her biological family that she was sexually abused by her

2   biological father as an infant.  She was told that he was

3   caught by her mother when she was -- when he was having sex

4   with their -- with ████████████, who, at that time,

5   would have been ██████████.  And she caught him when she

6   had, in her words, finished, with ████████████.  And that he

7   was then prosecuted, convicted and sent to prison.

8          She didn't have any direct memory of anything that

9   had happened.  She -- her understanding was that she was --

10  she was told she was an infant at the time; however, when I

11  spoke with Mike Kolhoff, her adopted father, I learned that

12  all of the -- the reality was that this happened when she

13  was still in utero.  So this could not have happened to her,

14  but it did happen ████████████.  But the information that

15  she continued to get from her mother and from other family

16  members -- and she maintained contact with her biological

17  family -- that information was consistently that she had

18  ████████████ abused.

19  Q    What's the relevance of -- or the importance of whether

20  she believed it to be true as opposed to whether it actually

21  happened?

22  A    If she believed it to be true, she grew up with that

23  understanding that that's what happened.  And she had no

24  direct memory for it, but she wouldn't have anyway because

25  of how old she was at -- how old she was told that she was

96

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA115

REDACTED TRANSCRIPT

```
 1    at the time.
 2              But if she believed that, then that would have
 3    colored her understanding of her relationship with her
 4    father and possibly her relationship with her mother, and
 5    also would have framed, in her mind, that she was a victim
 6    of early childhood sexual abuse.
 7    Q    Did she talk about being molested when she was in
 8    fourth grade?
 9    A    Yes, she did.
10    Q    What did she tell you?
11    A    So she -- after school in fourth grade, she went to a
12    babysitter's house, a woman who watched her until her mother
13    got home from work.  And she -- the babysitter had a
14    17-year-old son who, on multiple occasions, sexually abused
15    her.  And he -- then when he was 19, I believe, a couple of
16    years later, he died by suicide.  And when I spoke with
17    Mr. Kolhoff, he confirmed that he had known of that.
18    Q    Did she tell you about being sex trafficked?
19    A    Yes, she did.
20    Q    What did she tell you?
21    A    So she told me when she was -- I think she was about 16
22    or 17, she was -- she was on social media and was contacted
23    by somebody who ended up basically pimping her out.  And she
24    talked about how this happened several times over the course
25    of a couple of months until one of the guys that she had met
```
                                                              97

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

REDACTED TRANSCRIPT

1  up with attempted to abduct her to take her to Georgia, only

2  got a couple of hours away from home before she was able to

3  get away from him.  But that's when the sex -- that sex

4  trafficking ended.

5  Q    Did she tell you about being raped?

6  A    She did.

7  Q    What did she tell you?

8  A    She -- so she talked about -- she had a boyfriend in

9  high school who had then moved away so the relationship

10 ended.  She then later moved back, and she had moved on in

11 terms of the relationship.  She wasn't seeking to continue

12 the relationship.  He insisted on continuing.  And at one

13 time when they met, she reported that he raped her.

14 Q    Did you review police reports in conjunction with that

15 allegation of rape?

16 A    Yes.

17 Q    Was she raped again at 19?

18 A    Yes.  She was raped again at 19 when she went to a

19 party.

20 Q    Did she tell you about herself being involved in the

21 production of a child pornography video?

22 A    Yes.

23 Q    What did she tell you about that?  How old was she?

24 A    She was -- I think she was 17 at that time.  She was

25 in -- she was involved in being videotaped having sex, and

                                                        98

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA117

REDACTED TRANSCRIPT

```
 1  that that was then put on the Internet or wherever it was
 2  distributed somehow.  And she ended up testifying against
 3  the man who did this in court, and he was convicted.
 4  Q    Was all that important information for you when you're
 5  making your diagnosis?
 6  A    Yes.
 7  Q    Did she -- did you ask her about her self-report on her
 8  medical or psychiatric history?
 9  A    I did.  And she told me that she had been -- she had
10  seen a number of therapists over the years starting in
11  elementary school.  The only records that I had were the
12  last person that she saw, which was Dr. Jha, the records
13  that I referenced earlier.
14  Q    Did she mention being diagnosed with being bipolar?
15  A    She told me that she had been diagnosed at different
16  times with bipolar disorder, with PTSD, with anxiety
17  disorder, and there were a couple of other diagnoses that
18  she talked about.
19  Q    Did she speak about depression?
20  A    Yes.
21  Q    Okay.  What did she say about that?
22  A    She told me that she had had -- she described a number
23  of incidents, episodes of depressive disorder that she had
24  had that seemed, to me, to have risen to at least the level
25  of being moderate.  And some of them at least lasted more
```
                                                          99

JA118

REDACTED TRANSCRIPT

1   than two weeks, which is a -- an important piece of

2   information because, for it to be a bona fide depressive

3   episode, it had to last at least two weeks.

4   Q    You mentioned PTSD.  Is that the same thing as panic

5   disorder, or is that something different?

6   A    No, that's different.  PTSD is post-traumatic stress

7   disorder.

8   Q    Did she mention anything about being diagnosed with a

9   panic disorder?

10   A    Yes, she did mention panic disorder.

11   Q    And what did she say about that?

12   A    She just said that she had been diagnosed, that she

13   gets really anxious at times, and that -- some of the times

14   she described when she would get into a panic mode would be

15   when she was -- when she and Mr. M█████ were attempting to

16   be physically intimate.

17   Q    Did she ever describe situations in which she thought

18   somebody or something was following her?

19   A    Yes.  She talked about seeing sort of this black image,

20   dark image that led her to believe that she was being

21   followed or traced, and she wasn't sure what it was.  She

22   never could see it clearly.  So it's not like it was a

23   person that she could recognize, for example.

24   Q    And she -- did she describe dreams and/or nightmares?

25   A    Yes.  Many dreams and nightmares.  And many of them

100

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA119

REDACTED TRANSCRIPT

```
 1    about the sexual traumatic events.  And also just nightmares
 2    about being in a position of wanting to be intimate and not
 3    being able to.
 4    Q    Did she describe to you how she handled mentally
 5    dealing with the sexual molestation she suffered when she
 6    was in fourth grade?
 7    A    Mostly what she talked about was trying not to remember
 8    what happened and trying to block it out so that she
 9    wouldn't have to relive it, so that she wouldn't have to
10    reexperience it.  But there were times when she did have
11    those intrusive thoughts where she reexperienced the trauma.
12    Q    Would you describe that -- those situations as being
13    similar, if not identical, to the dissociative kind of
14    event?
15    A    Not necessarily dissociative.  Definitely trauma-based.
16    It's -- it meets one of the criteria for a diagnosis of
17    PTSD, for example.
18    Q    The -- how old was she when she saw Dr. Jha?
19    A    18.
20    Q    And he diagnosed her as being Bipolar II; is that
21    correct?
22    A    I believe Dr. Jha is a she.
23    Q    A she, I apologize.  Dr. Jha.
24    A    Yeah.  She diagnosed Ms. Kolhoff with having Bipolar II
25    disorder.  Bipolar has two levels.  Bipolar I is if the
```

101

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA120

REDACTED TRANSCRIPT

1    person has had a full bona fide manic episode.  Bipolar II

2    is if the person has had what's referred to as a hypomanic

3    episode.  So it might not have lasted as long, or might not

4    have been less severe.  But in either case, both of them

5    also require depressive episodes.

6            And so usually with -- well, technically with a

7    diagnosis of Bipolar II, if that is an established

8    diagnosis, there isn't a diagnosis of major depressive

9    disorder in addition to that because that encompasses a

10   depressive disorder.

11   Q    So bipolar would exclude major depressive disorder as a

12   diagnosis because it encompasses it; is that what I'm

13   understanding you to say?

14   A    It includes it, actually.

15   Q    It includes it.

16            And my understanding is she saw Dr. Jha twice?

17   A    That is my understanding.

18   Q    Do you know why she stopped going to see Dr. Jha?

19   A    She said that then she didn't have the funds to

20   continue.

21   Q    Did she indicate that she was benefiting and interested

22   in continue with Dr. Jha?

23   A    She said that she thought it was helpful.  She wasn't

24   doing therapy with Dr. Jha.  Dr. Jha is a psychiatrist who

25   was prescribing medication and had taken her off medication

102

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA121

REDACTED TRANSCRIPT

1    that was exacerbating her bipolar disorder, actually.

2         She had been on an antidepressant medication when

3    she first saw Dr. Jha, and she was getting over-activated by

4    that.  And that can happen when somebody actually -- when

5    the actual diagnosis is bipolar disorder, because if you're

6    treating just the depression, it can push you into a

7    manic-type state.

8         And so she stopped -- she slowly withdrew her from

9    that medication and put her on risperidone, which is an

10   antipsychotic medication that's used to treat bipolar

11   disorder.

12   Q    Did you review any records indicating that she's ever

13   undergone any kind of psychological testing?

14   A    She said she had never done psychological testing

15   previous to meeting with me.

16   Q    And with Dr. Jha, just to make sure the record's clear,

17   there was no therapy, it was just treatment by medication?

18   A    That's correct.

19   Q    Did Dr. Jha make any notes about whether she believed

20   or diagnosed Ms. Kolhoff with borderline personality

21   disorder?

22   A    There was actually an indication in her notes that said

23   that the presentation that Ms. Kolhoff had was inconsistent

24   with a diagnosis of borderline personality disorder.

25   Q    Did you ask her about her current legal situation the

                                                           103

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA122

REDACTED TRANSCRIPT

```
 1   way that she understood it?

 2   A    Yes, I did.

 3   Q    Okay.  What did she tell you?

 4   A    She explained to me that she had been the administrator

 5   for this Save the Children Facebook group, I guess.

 6        THE WITNESS:  I have to admit, Your Honor, I've

 7   never been on Facebook, so I'm not that familiar with it.

 8        So -- but apparently there are groups on Facebook,

 9   and this was one of them that the whole idea was to educate

10   the public about the signs of child sexual abuse so that

11   people would be able to recognize those signs and report

12   them when they saw them.

13        And she was -- as an administrator, she told me

14   that there were two of them -- two women, she and another

15   woman, who were administrators of this group.  And

16   administrators were -- if somebody wanted access to the

17   group, they had to apply for access.  And it was one of the

18   administrators who would grant them access.

19   BY MR. AMOLSCH:

20   Q    Did she model the -- did she try to model the website

21   on a site called Dads Against Predators?

22   A    Yes.

23   Q    What did you understand about how the user from

24   Rapey.su was admitted to the Save Our Children Facebook

25   group?
```

                                                                    104

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA123

REDACTED TRANSCRIPT

1   A    What she told me is that she would get a lot of

2   requests, and so sometimes she just -- you know, was just

3   making a very cursory assessment of whether it was

4   appropriate to admit the person to the group, and would

5   admit them, and then when she had time she would go back and

6   investigate a little bit further.

7        And this was a situation where somebody from that

8   website had wanted to -- had asked to get in, she didn't

9   really check it out, she admitted them, and then discovered

10  after the fact that this was -- that the site was a lot of

11  conversation about abusing -- sexually abusing children.

12  Not a whole lot of images, but there was a lot of

13  conversation she said, and that's when she realized that

14  admitting that person was inappropriate.

15  Q    Did she -- did you ask her about the pictures that are

16  being discussed here at trial?

17  A    I did.

18  Q    Did she admit to taking them?

19  A    Yes, she did.

20  Q    Did you ask her why she took them?

21  A    She told me that she didn't really remember actually

22  taking them, but that she knew that she had taken them.  She

23  had recognized these were ██████████, and she said that

24  she was -- what she was trying to do was to catch a

25  predator, in a way.  And what she -- and the way she

105

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA124

REDACTED TRANSCRIPT

```
 1  described it, you know -- even in the time that she
 2  described it to me, I could see her sort of going back down
 3  the rabbit hole of trying to find a way to capture a
 4  predator.  And her idea was that she would then report that
 5  person once they crossed a certain line to the police or to
 6  whatever authorities.  But then she just got caught up in it
 7  and -- which is consistent with what would happen in a
 8  dissociative state.
 9  Q    Did she tell you that she realized what she had done
10  was wrong?
11  A    Yes.
12  Q    What did she say that she did with the photos on her
13  phone that she had taken?
14  A    Well, she said that she shared them.
15  Q    Okay.
16  A    But then afterwards, she realized -- and this all
17  happened over the course of a couple of days, and then
18  afterwards she said she deleted the photos because she knew
19  that it was wrong.
20  Q    Did she say anything about how she ████████████
21  ███████████████████████████████████?
22  A    Yes.  She said she ██████████████████████████.
23  She -- and ███████████████████.  And she also
24  didn't want anything that happened -- like what happened to
25  her ████████████████████.
                                                         106
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA125

REDACTED TRANSCRIPT

1   Q   After concluding this interview and after having

2   reviewed the reports, did you then determine which tests to

3   begin with to give Ms. Kolhoff?

4   A   Yes, I did.

5   Q   My understanding is the first test you gave is the

6   MMPI, the Minnesota Multiphasic Personality Inventory, 2nd

7   edition?

8   A   That's correct.  Correct.

9   Q   And you did this in person at the Alexandria --

10   A   Yes.

11   Q   Why did you do it in person as opposed to over video?

12   A   So the MMPI is a computer-administered test.  It is a

13   test that can be administered virtually.  The problem is,

14   she would have to be at a computer to be able to do it

15   because she would have to be able to indicate responses with

16   a mouse or a keyboard.  And at the jail, they don't have

17   that, first of all.

18        The other problem with doing virtual testing is

19   that the norms have not really been tested on virtual

20   administration.  And so, you know, if I were doing this for

21   purely clinical purposes for doing therapy, for example, I

22   might consider doing a virtual administration.  But when I

23   have to come into court and defend the science behind it, I

24   don't feel comfortable doing something -- a type of

25   administration that hasn't been tested.

107

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA126

REDACTED TRANSCRIPT

```
 1   Q    You mentioned that it hadn't been normed.

 2          What does that mean?

 3   A    It had not been normed.  Meaning that the norms that

 4   they developed, the how do you know what's an elevated score

 5   or how elevated on any of these scales hasn't included

 6   virtual administration, so you don't know if there's some

 7   skew to the results.

 8   Q    Why did you decide to give the -- begin by giving the

 9   Minnesota Multiphasic Personality Inventory?

10   A    So the MMPI-2 is a very broad test for psychopathology.

11   So it allowed me to explore a wide range of pathology.  And

12   it also has eight different validity scales.  So it's very

13   validated, meaning that you have lots of ways of knowing

14   whether the answers that you're getting were accurate

15   answers.

16          And it's been -- it's been normed on tens of

17   thousands of people, including people who are incarcerated.

18   So this is a test that, in fact, it is the most widely-used

19   test in forensic assessment and one of the very first tests

20   to have been admitted under *Frye* in court.

21          It's -- and it has -- it has a number of scales to

22   it, and it gets to the nuance of how the person is

23   functioning psychologically.  It's not a test that will just

24   give you automatically a diagnosis, but it tells you about

25   the functioning of the person, which is what I really wanted
```

108

JA127

REDACTED TRANSCRIPT

1    to know in this case is how she's functioning and what's

2    going on with her.  From that, you can derive diagnoses, but

3    it's not a test that will just give you a clear read of this

4    is the diagnosis.

5    Q    We're going to come back to your results.  I just want

6    to finish up with the test that you gave.

7    A    Okay.

8    Q    After you administered the Multiphasic Personality

9    Inventory, did you give a test the Trauma Symptom Inventory?

10   A    Yes, I did.

11   Q    Okay.  Tell the Judge about that.

12   A    So the Trauma Symptom Inventory, or the TSI, is a test

13   specifically for trauma-based problems or symptoms.  And it

14   also is validated, it has three validity measures on it, and

15   it has ten different clinical scales that address different

16   aspects of trauma.

17          And so the -- and on the MMPI, one of the reasons

18   that -- I had thought of giving this to her anyway, but

19   one -- on the MMPI, there is -- the MMPI doesn't do a great

20   job of assessing trauma diagnoses.  But there is one measure

21   on the MMPI that is an indication that there was trauma, and

22   that was actually her highest score on the MMPI.  So that

23   gave me more reason to administer the TSI.  That would get

24   more into the details of what was going on.

25   Q    Is the TSI primarily a PTSD tool?

                                                            109

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA128

REDACTED TRANSCRIPT

```
 1   A     It is, yes.

 2   Q     All right.  And you also did this in person as well?

 3   A     Yes.

 4   Q     How would you describe Ashley during the testing in

 5   your assessment?

 6   A     She was -- she was focused, she was doing -- she was

 7   doing a test that took her a little bit on the long side,

 8   but she was -- she didn't feel like she needed to get up and

 9   take a break, she wasn't distracted or anything like that.

10   She was focused on the testing.

11   Q     Did she describe feeling anxious or calm?

12   A     Well, she said that she was anxious because of the

13   situation.  This is a forensic evaluation.  That's actually

14   not atypical for a defendant who's being evaluated.

15   Q     Okay.  So let's talk about the test results beginning

16   again with the Minnesota Multiphasic Personality Inventory.

17   A     So on this test, as I said, the one scale that measures

18   trauma symptoms was the highest scale.  It was actually four

19   standard deviations above the mean.

20   Q     I'm going to stop you there.

21         What does that mean, four standard deviations

22   above the mean?

23   A     Okay.  Okay.  So a standard -- statics -- statistics

24   lesson, I guess.

25   Q     If you can make it simple.
```

110

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA129

REDACTED TRANSCRIPT

```
 1   A     So the mean is what is the average of everybody who has
 2   taken this test, and what is the average on that scale.  And
 3   then there's deviation from the mean, because not everybody
 4   gets the exact same score.  And so a standard deviation is
 5   basically plus or minus one standard deviation encompasses
 6   68 percent of the population.  And then it gets -- it's a
 7   bell curve, so the further up you go, the fewer and fewer
 8   you capture.
 9          But four standard deviations above the mean means
10   that she's probably in the 98th percentile for this
11   particular scale, meaning only about 2 percent of people
12   would score above her.
13   Q     What does that suggest about her symptoms being related
14   to her history of severe trauma?
15   A     Well, it served as validation because, again, this is a
16   validated test and it's an objective test.  It served as
17   validation that there is a trauma base to her symptoms.  It
18   doesn't -- that, alone, doesn't tell me that she has PTSD,
19   but it does tell me that there's a trauma base to whatever
20   symptoms she's experiencing.
21   Q     And I think you told Your Honor based on that, you
22   decided to move on to the Trauma Symptom Inventory, but I
23   think you said you would have given that anyway?
24   A     I was planning on giving it anyway, but that gave me
25   all the more reason, all the more justification for giving
```

111

JA130

REDACTED TRANSCRIPT

```
 1   the TSI.
 2            The other thing with the MMPI is that there were a
 3   number of elevations on depression, anxiety, a number of
 4   different things that is sort of what you see with
 5   trauma-based diagnoses.
 6   Q    How does the TSI break down -- the Trauma Symptom
 7   Inventory break down the symptoms of post-traumatic stress
 8   disorder?
 9   A    So on the TSI, there is what's called a classic triad
10   of scales.  Each scale measures a different type of symptom
11   that is associated with PTSD, and the triad includes
12   intrusive experiences which can be flashbacks in the worst
13   case, nightmares, recurrent memories of the traumatic
14   events.
15            The -- there's also defense of avoidance, which is
16   attempts to not think about that, avoiding places, avoiding
17   people, avoiding conversations, avoiding situations in
18   general that would remind the person.  And a lot of -- some
19   of that is conscious, and some of that is unconscious.
20            And then there's also something called anxious
21   arousal, which is -- you know, people with PTSD are often
22   on -- are often hypervigilant and on high alert, and that's
23   what anxious arousal gets to.
24            And Ms. Kolhoff had elevated scores on all three
25   of those, which is a really good confirmation of a diagnosis
```
                                                                    112

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA131

REDACTED TRANSCRIPT

```
 1   of PTSD.  Because, without those three, it's kind of hard to
 2   say you don't have -- that you have PTSD.
 3            There were -- there are other scales -- a number
 4   of other scales.  As I said, there are ten of them.  Her
 5   highest scale elevation, though, was on something called
 6   impaired self-reference.  And impaired self-reference means
 7   the person doesn't have a stable sense of who they are or
 8   how they interact or what people expect of them.  And that
 9   is highly associated with early and persistent trauma.  So
10   childhood trauma, especially trauma by people who you might
11   otherwise trust, but it doesn't have to be that.  And what
12   it does is it sort of destroys the person's sense of who
13   they are.
14   Q    Did any of her validity scales on this test fall
15   outside the normal range?
16   A    None.
17   Q    What does that mean?
18   A    Which means that the results have a lot of -- have a
19   high level of validity that I could take at face value those
20   test scores.
21   Q    Not to put words in your mouth, but does that mean that
22   she's not endorsing a wide range of symptoms in order to
23   make herself look worse?
24   A    Or the way that I would put it is that she was not
25   endorsing things just for the sake of getting a high score.
```
                                                              113

JA132

REDACTED TRANSCRIPT

```
 1   I mean, wide range is -- she only elevated five scores.  I
 2   mean, she didn't elevate all of them.  If she had elevated
 3   all of them, that might have actually been an alarm bell.
 4   Q    But your sense is that she answered, based on the
 5   testing, honestly and candidly?
 6   A    Yes.
 7   Q    All right.  You talked a little bit about impaired
 8   self-reference as it relates to the triad for PTSD.
 9            If you could just repeat that again to make
10   sure --
11            THE COURT:  We heard it the first time.
12            MR. AMOLSCH:  We understood.  Thank you, Your
13   Honor.
14            THE COURT:  You don't have to repeat it.
15   BY MR. AMOLSCH:
16   Q    The impaired self-reference was her highest score.
17            Did you give her -- you described defensive
18   avoidance; is that correct?
19   A    Yes.
20   Q    Okay.  Is there a dissociation scale associated with
21   the defensive of avoidance?
22   A    Well, there's a separate dissociation scale on the
23   test.
24   Q    Okay.
25   A    And that was not one of her -- it was high, but it
```

114

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

REDACTED TRANSCRIPT

```
 1   wasn't above the critical line.
 2   Q    And what does that mean "above the critical line"?
 3   A    Above the critical line meaning that it has clinical
 4   significance.
 5   Q    Does that -- does -- dissociative identity disorder, is
 6   that what we're talking about?
 7   A    No.  Well, that can be what happens, but I didn't have
 8   any other indication that she had DID or dissociative
 9   identity disorder.
10   Q    Not to that level?
11   A    Right.
12   Q    So you diagnosed her with recurrent and complex
13   post-traumatic stress disorder?
14   A    Correct.
15   Q    Did you take into account Dr. Jha's previous diagnosis?
16   A    I did.
17   Q    Okay.  And that diagnosis involved at least one manic
18   event; is that correct?  Or one hypomanic event?
19   A    At least one hypomanic event.  If there would have been
20   a fully manic event, she would have diagnosed Bipolar I.
21   Q    And this is related in part to her PTSD diagnosis; is
22   that right?
23   A    What was?
24   Q    That bipolar is the manic event also relevant to a PTSD
25   diagnosis.
```

115

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA134

REDACTED TRANSCRIPT

1   A     It could be, but not necessarily.  So with PTSD, you

2   have that classic triad.  With complex PTSD, in addition to

3   that one of the factors that has to be there is affect of

4   instability or inability to control your mood or your

5   presentation of your affect, and that can be part of the

6   manic episode.

7   Q     All right.  So explain to the Judge exactly what you

8   mean by complex post-traumatic stress disorder.

9   A     Okay.  So complex PTSD is not in the DSM-5, which is

10  now several years old.  There is a way to sort of get that

11  diagnosis, but it doesn't actually say "complex PTSD."

12        It also wasn't in the ICD-10.  The ICD is the

13  International Classification of Diseases and Disorders.  And

14  that is actually the diagnostic guide, or Bible, if you

15  will.  The DSM is no longer the official diagnostic manual,

16  except that the DSM has very well defined criteria to meet a

17  diagnosis, so it's very helpful to use.  But the actual

18  diagnosis has to come from the ICD.  There's a pretty close

19  parody between the ICD and the -- the ICD-10 and DSM-5.

20        The ICD-11, which has now been released, does

21  include complex PTSD.  It's not an official -- it's not

22  officially recognized yet by the U.S., but the U.S. usually

23  takes a couple of years or more to adopt the ICD when it

24  comes out.  But complex PTSD in the ICD is you first need to

25  meet the classic triad for PTSD.  That has to be there.  And

116

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA135

REDACTED TRANSCRIPT

1  then there are three additional requirements.  The three

2  additional requirements are that there has to be some

3  impairment in the ability of the person to establish

4  intimacy, there has to be -- or in -- you know, having

5  problems in relationships.  There has to be -- oh, gosh, I'm

6  trying to remember.  I can refer to my notes in just a

7  moment.  I could pull this up.

8  Q    Doctor, again, if you could just make sure you're

9  speaking close to the microphone.

10 A    Sure.

11         Problems in affect regulation, meaning that they

12 are not able to control the expression of their emotions.

13 They -- and that can be consistent with a hypomanic episode

14 as well.  And also feeling -- because of all of what has

15 happened, feeling diminished, feeling worth less.  Not

16 worthless, necessarily, but worth less.  And those were all

17 present in her presentation to me in the interviews, and it

18 also came out in the testing as well.

19 Q    Are people with complex post-traumatic stress disorder

20 more susceptible to further psychological harm caused by

21 additional traumatic experiences?

22 A    Yes.

23 Q    Talk a little bit about that.

24 A    Well, what it does is it makes the person vulnerable.

25 It makes them more likely to fall back into old patterns

117

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA136

REDACTED TRANSCRIPT

1    because those are the patterns that keep replaying

2    consciously or unconsciously in the individual's head.  And

3    it's -- it takes more of a concerted effort to stay out of

4    those -- stay out of those patterns.

5            And so if somebody -- like, for example in

6    Ms. Kolhoff's case, there were several incidents where she

7    was sexually abused, not -- you know, there was the belief

8    that she had been abused as an infant, but even setting that

9    aside, there was in fourth grade and then when she was 16 or

10   17, and then the 17-year-old incident, and then when she was

11   a little bit older when she was 19.  And she -- and the idea

12   that she would keep making herself vulnerable to that is --

13   part of complex PTSD is not being able to step away from

14   that.

15           Part of what distinguishes complex PTSD is that --

16   from a regular just ordinary diagnosis of PTSD, is that a

17   PTSD diagnosis can happen from one incident like a car crash

18   or something like that.  And that's not something that

19   typically follows the person in the same way as things that

20   happened repeatedly and also over an extended period of

21   time.

22   Q    Can you rehab or take -- recover therapeutically from

23   CPTSD?

24   A    You can.

25           MR. SCHLESSINGER:  Your Honor, I object to the

                                                              118

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA137

REDACTED TRANSCRIPT

1    relevance of that.

2              THE COURT:  I think -- that doesn't really go to

3    the issues before us.

4              MR. AMOLSCH:  I was just finishing up, Your Honor.

5    Thank you.

6    BY MR. AMOLSCH:

7    Q    Explain to the Judge a little bit what dissociation is.

8    A    So dissociation comes in lots of different forms, and

9    virtually everybody at some point in their life has

10   dissociated.  So it's a range of -- you know, there's

11   dissociation that is not considered pathology.  Like, for

12   example, we call it highway hypnosis.  If you've ever had

13   the experience of driving someplace familiar to you, you've

14   made the drive many times, you get to where you're going,

15   and you don't recall everything that happened on the way

16   there, even though it may have only been a 20-minute drive.

17   That's highway hypnosis, and that's a form of dissociation.

18             Dissociation, on the other end of the spectrum,

19   could go as far as having multiple personalities, which is

20   what occurs in dissociative identity disorder.  But there

21   are lots of types of dissociation.  There's dissociation of

22   depersonalization where things just don't feel -- you

23   just -- where you might feel like you're observing yourself

24   doing something like an out-of-body-type experience or a

25   derealization where everything feels like you're sort of in

                                                           119

JA138

REDACTED TRANSCRIPT

```
 1   a dream state and it just doesn't feel real.

 2           And some of those -- some forms of dissociation

 3   have -- are associated with memory problems, and others not.

 4   Highway hypnosis obviously does, you don't remember what

 5   happened, and that's kind of how you know that you were

 6   in -- sort of in that hypnotic state.

 7           But in -- like, for example, a de --

 8   depersonalization or derealization, there isn't necessarily

 9   a memory loss because you might remember it, but it didn't

10   feel real, or you felt like you were observing yourself

11   doing this.

12           And so there's a whole range of dissociative

13   experiences, and they often occur with people who have PTSD,

14   especially complex PTSD, but they're not a diagnostic

15   criterion for the disorder.

16   Q   Is there a coincidence between dissociation and

17   childhood sex abuse survivors?

18   A   Well, the more severe the trauma, the more likely the

19   person is to have -- to be dissociating at different times

20   or more frequently.

21   Q   Can people go in and out of dissociative events?  I'm

22   not sure that's the correct word.  But can you go in and out

23   of dissociation over a period of time?

24   A   All the time.

25   Q   After you completed your testing, what did you do next?
```

120

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA139

REDACTED TRANSCRIPT

```
 1   A    So after I completed the testing, had done all of my

 2   interviews, I then completed the SVR, the Sexual Violence

 3   Risk Assessment.  And that is a structured professional

 4   judgment tool.  It's not a test that you give to the

 5   individual; it's after you have all of the data, then you

 6   have to go through these 20 items to determine which are

 7   relevant and which aren't.  And if they're relevant, how

 8   severe they are and whether they can be addressed or

 9   ameliorated in terms of future potential for reoffending.

10   Q    Did you do that before or after you conducted some

11   collateral interviews of Ashley's, ████ and her adoptive

12   father?

13   A    It was after she had everything.

14   Q    Okay.

15   A    And basically that was the beginning of writing my

16   report because that was -- I wanted to make sure I had

17   everything.

18   Q    So let's talk about the interviews you did right after

19   the testing before we get to the SVR.

20   A    Sure.

21   Q    Why do you do interviews after you do the testing?

22   A    So, especially in a forensic case, you want to make

23   sure that you're getting as much information as you can.  So

24   I wanted to circle back to talk to Ms. Kolhoff about the

25   test results.  And also I -- and, at that point, I think it
```
                                                         121

JA140

REDACTED TRANSCRIPT

```
 1   was after I also had talked to her father and her -- and
 2   Mr. M████████.
 3   Q    I'm sorry, you said --
 4   A    I think it was also after I spoke with both her father
 5   and Mr. M████████ as well.
 6   Q    So you interviewed Mr. M████████ and her adoptive father
 7   after the tests?
 8   A    Yes.
 9   Q    Okay.  Let's talk about your interview with
10   Mr. M████████.
11   A    Okay.
12   Q    How did he describe Ms. Kolhoff and his relationship
13   with her?
14   A    What he said was that he was disappointed, that he had
15   never suspected this, that he ████████████████████████████
16   ██████████████████████████████████████████████████████████
17   ████████████████████ any time.  Didn't understand -- he was
18   struggling to understand why this happened.  But when I
19   asked him about some of the things that she had reported, he
20   actually verified that.  He talked about, for example, there
21   were times when she couldn't remember things, and he said
22   that he was able to understand now that these were times
23   when there was something that was triggering the trauma
24   event for her and that that made it difficult for her later
25   to remember what had happened.
                                                              122
```

REDACTED TRANSCRIPT

```
 1   Q    Did you interview her father, Michael -- her adoptive
 2   father, Michael?
 3   A    I did.
 4   Q    Did he confirm the childhood and sexual trauma?
 5   A    He did.
 6   Q    Okay.
 7   A    There was only -- I mean, he also clarified for me that
 8   the abuse by her biological father had not happened.  That
 9   was ██████████████.
10        And she -- of the other incidents, there was only
11   one that he couldn't confirm that he had knowledge of prior
12   to all of this happening.
13   Q    So -- I'm sorry.  So he had knowledge of this before
14   any of the events that bring us here today?
15   A    Yes.
16   Q    So after that, you gave the Sexual Violence Risk --
17   now, why did you give that to Ashley as opposed to some
18   other test?
19   A    I did not give that.  That's not a test that I give.
20   Q    I'm sorry.  Why did you complete that assessment?
21   A    It was an instrument that I use.
22   Q    An instrument.  I apologize.
23   A    So ordinarily if we were talking about a male offender,
24   I might also do an actuarial test, like a STATIC or an
25   MnSOST.  But those tests are designed specifically to be
```

123

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA142

REDACTED TRANSCRIPT

1    administered to -- to be used with male offenders, and there

2    are no norms for women for those instruments.  So you --

3    they're useless when it comes to sexually offending women.

4            But the SVR is -- it's a structured professional

5    judgment.  So it's not like a -- I mean, the static is --

6    you know, it has very hard scores, and you get to the bottom

7    of it, you total it up, and it tells you what the level of

8    risk is.

9            With the SVR, it's designed more as a way for --

10   it's a structured professional judgment tool.  So it's a way

11   for the evaluator to take into account a lot of different

12   information, including things that may not even be mentioned

13   in the SVR but may be related to one of those factors.

14   And -- because it's not -- you know, where the -- where the

15   static is very clear, this is what we mean by asking this

16   question.  The SVR is much more open-ended.  And it also has

17   been used with women with success.  And the concept of it is

18   there's no reason to believe that it would be radically

19   different for women than it is for men anyway because if

20   there are factors that indicate a higher level of risk or

21   indicate a need for treatment, those would be the same for

22   men and women.

23   Q    Was there any evidence she's sexually deviant?

24   A    No.

25   Q    Any evidence she suffers from psychopathic personality

124

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA143

REDACTED TRANSCRIPT

```
 1  disorder?
 2          MR. SCHLESSINGER:  I object to the relevance of
 3  testimony designed to measure the possibility of future --
 4          THE COURT:  This would go to sentencing, and we're
 5  not at that point.  This is a case to determine guilt.  So I
 6  think that's an appropriate objection.  Sustained.
 7          MR. AMOLSCH:  Thank you, Your Honor.
 8          Court's indulgence.
 9                  (Pause.)
10  BY MR. AMOLSCH:
11  Q   All right.  So based on your testing and your
12  interviews and your interaction, can you tell us about --
13  can you give us your professional judgment or assessment or
14  opinion on some level about the likelihood or unlikelihood
15  of her being involved in some sort of dissociative event
16  during the index incident?
17  A   I think that there is a high likelihood that she was --
18  that she was dissociating at the time.
19          One, it is something that tapped directly into
20  what she understood to have been her first sexual abuse,
21  which is not one that happened, but it's what she grew up
22  believing.  It was part of her framework.  And so there's
23  that.
24          There's also -- even when I was talking to her,
25  she -- there were elements -- there were parts of what
```

125

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA144

REDACTED TRANSCRIPT

```
1    she -- what happened during that time that she had no recall

2    for.  And she hadn't indicated -- I mean, there's no

3    indication that she has full recall of it from any other --

4    you know, any other person she's talked to or anything like

5    that.

6            And she -- when she was talking about it, she also

7    became much more anxious.  I pushed through because I needed

8    her to talk about it, I needed her to tell me what happened.

9    But it was also clear that she was getting increasingly

10   anxious.  And not just because this was the subject of her

11   criminal charges, but because it was difficult for her to

12   deal with even thinking about what she had done.  And she --

13   when she was talking about it, she was often tearful, she

14   was often, you know -- what she said was that it was

15   difficult to talk about because it was, you know, sort of

16   what ████████████, even though that isn't -- we now

17   know that is not what happened.

18           So she -- and there were also -- what's -- I mean,

19   I don't think this was like an out-of-body experience or

20   anything like that because she didn't describe it that way.

21   She also didn't describe it as a dream-like experience.  But

22   as I said, there are a number of ways that people can

23   disassociate, and I think that she -- the colloquial way of

24   understanding what she did is she went down a rabbit hole.

25   She saw an opportunity, she thought, oh, I can catch
```

126

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA145

REDACTED TRANSCRIPT

```
1   somebody, and she went single-mindedly, ignoring all of the

2   context of what she was doing.

3   Q    I want to kind of finish up.

4        You talked about giving the MMPI and the TSI.  You

5   did not give a test called the DES II?

6   A    I did not.

7   Q    And what is the DES II?

8   A    DES II is the Dissociative Experiences Scale, 2nd

9   edition.

10  Q    Okay.  And why did you decide not to give that?

11  A    It doesn't have any validity measures, and I tend to

12  back away from tests that don't have validity measures if I

13  have to testify in court about them.

14  Q    And what does that say about -- without a validity

15  measure, what does it say about how reliable a score is?

16  A    Well, there's no way of measuring how reliable the

17  score is.  That's the problem with not having validity

18  measures.

19  Q    You also opted not to give a test called the PAI.

20        What is that?

21  A    PAI is similar to the MMPI except that it's -- it is

22  more targeted.  It's more specific getting at diagnostic

23  issues.  It doesn't have the -- one, it's not -- it's done

24  on thousands of people but not the tens of thousands that

25  the MMPI is normed on.  It also doesn't have any reliable
```

127

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA146

REDACTED TRANSCRIPT

```
 1   norms for incarcerated populations.  And it's -- it doesn't
 2   have the -- it doesn't give the nuance that the MMPI does.
 3            I was not so much after just a diagnosis, I wanted
 4   to know how was she functioning psychologically.  What was
 5   going on with her at the time, and what would be going on
 6   with her going forward.  That was my focus, and it -- I
 7   mean, the diagnosis is not unimportant, but it wasn't the
 8   most important part of my assessment.
 9   Q    And does the PAI test for mania?
10   A    It does.
11   Q    Does it look back in terms of how someone was feeling
12   or just measure what's happening at the moment?
13   A    It's mostly focused on what's going on at the moment.
14   Q    You did not give the test for malingering -- Test of
15   Malingering Memory, the TOMM; correct?
16   A    I did not.
17   Q    Tell Her Honor a little bit what the TOMM, the Test of
18   Malingering Memory, is designed to detect.
19   A    So the TOMM is actually a very good measure of memory
20   malingering because it tests the easiest form of memory,
21   which is recognition, as opposed to recall.  And it -- the
22   way that it's designed is you show somebody 50 photos -- or
23   not photos, drawings of common objects, and then after that,
24   you show them more cards with two objects, and you ask the
25   person which one did you see before.  So it's a recognition
```

128

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA147

REDACTED TRANSCRIPT

1  test.  And it's a good measure of memory malingering.  I

2  didn't administer it because it wasn't particularly relevant

3  to my assessment of whether she was -- whether her memory

4  was intact or not.  That wasn't key to the -- to the

5  assessment.

6           And the other thing is that the Test of Memory

7  Malingering, or the TOMM, is not an -- is not a test for

8  malingering for dissociation or for PTSD or anything else,

9  it is specifically for memory.  And I didn't administer it

10  because it wouldn't have given me anything useful, and, in

11  fact, I had sort of clinically concluded that, to some

12  extent, she was malingering memory issues.  So I --

13           THE COURT:  I'm sorry, what was that answer?

14           THE WITNESS:  That I had already concluded that,

15  to some extent, she was malingering memory issues.

16  BY MR. AMOLSCH:

17  Q    But memory issues are different than dissociative

18  events; is that correct?

19  A    Yes.

20  Q    And what does the TOMM say about the ability to tell if

21  someone's malingering on a dissociative event?

22  A    It doesn't.

23  Q    You reviewed Dr. Kalbeitzer's -- if I pronounce that

24  correctly -- her reports; right?

25  A    I did.

                                                              129

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA148

REDACTED TRANSCRIPT

```
 1    Q     And she administered the DES II?

 2    A     Yes.

 3    Q     The one that you did not?

 4    A     Right.

 5    Q     Did you go back and administer the DES II after you saw

 6    her results?

 7    A     I did.  So I -- I met with Ms. Kolhoff, and because

 8    that one I was concerned about because there was -- it was a

 9    very -- even though it doesn't have any validity measures,

10    it was a very high score that Dr. Kalbeitzer obtained.

11          And so I talked to Ms. Kolhoff about it and said

12    so you were given this test, and on this test you were asked

13    to indicate for each of these symptoms that were on the

14    test, how frequently do you experience them.  And the first

15    thing she said was, what do you mean frequently; it's how

16    intense.  I said, no, it's not intensity or severity; it's

17    frequently.  And she said she misunderstood the instructions

18    of the test, and she was responding to severity or

19    intensity.  So I readministered the test items to her and

20    ended up with a much lower score.  But with her

21    understanding that she was responding to frequency, not

22    severity.

23    Q     And Dr. Kalbeitzer's score was a 61; do I have that

24    right?

25    A     I believe so, yes.
```

130

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA149

REDACTED TRANSCRIPT

1    Q    And you came up with a score of 24?

2    A    24.

3    Q    What does that -- what does that score of 24 tell you,

4    if anything?

5    A    Well, first of all, I have to take it in context with

6    the fact that I had told her that she had gotten -- done

7    this, and she already knew that I was asking her this

8    because she got a very high score.  So I have to take that

9    into consideration as well.

10          But she did tell me spontaneously when I was

11   describing the test to her that she thought it was -- she

12   was supposed to be responding to -- or indicating severity.

13   Because for each of the -- for each of the symptoms, you

14   give a score of one to ten, and she was giving very high

15   scores because what she said was she was giving high scores

16   is because she was -- that's how severe the symptoms were,

17   but she was not indicating frequency.

18          So I -- I would suspect that what happened when I

19   gave her the test is that she even underestimated some of

20   this so that she wouldn't get a really high score, but I

21   don't know by how much.  I mean, there's no validity measure

22   on the test, so I'm sort of limited in my ability to assess

23   how valid was her score the second time around versus the

24   first time around.

25   Q    You were aware of Dr. Kalbeitzer's diagnosis of

                                                                 131

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA150

REDACTED TRANSCRIPT

```
 1    Ms. Kolhoff?

 2    A     Yes.

 3    Q     Okay.  She diagnosed her as suffering from major

 4    depressive disorder recurring; is that correct?

 5    A     Correct.

 6    Q     Do you agree with that?

 7    A     I don't agree with that because there is a previous

 8    diagnosis of Bipolar II disorder, and that encompasses major

 9    depressive disorder.  And so if there had been -- if there

10    had been even one hypomanic episode in her life, then that's

11    a diagnosis of Bipolar II disorder.  And it's also supported

12    by the fact that Dr. Jha found that when she was taking just

13    an antidepressant, that it was activating her and she needed

14    to take her off that medication and put her on something

15    that was more helpful.  And when I asked -- well, at the

16    second time that Dr. Jha saw her, Ms. Kolhoff was doing much

17    better.  And when I asked her, she said that the risperidone

18    helped as well.

19          So that's sort of confirmation by medication,

20    which I don't like to do diagnosis that way, but it is an

21    indication that Bipolar II is probably the more accurate

22    diagnosis.  And with a Bipolar II diagnosis, a depressive --

23    major depressive diagnosis wouldn't factor in.

24    Q     She diagnosed her with having borderline personality

25    disorder?
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA151

REDACTED TRANSCRIPT

1    A     Correct.

2    Q     And what is borderline personality disorder?

3    A     So borderline personality disorder is a disorder

4    that -- it's a -- it's a characterological disorder, meaning

5    that the person -- it affects their whole personality and

6    affects lots of different things that they do, a lot of

7    different functions.

8          And the thing about borderline personality

9    disorder is that there is -- there is some overlap between

10   borderline personality disorder and complex PTSD because of

11   affect disregulation, because of the difficulty with

12   intimacy, because, you know, there's -- there's some

13   overlap.

14         And when a complex -- in the ICD-11 which is --

15   like I said, it isn't official yet, but it is the most

16   current science.  If complex PTSD is diagnosed, then it

17   really -- it makes you really question whether borderline

18   personality disorder is appropriate because there's --

19   there's enough of an overlap.  But if it's -- if it's clear

20   that it's caused -- if it's aligned with PTSD and is -- and

21   all the pieces fit together with the complex PTSD diagnosis,

22   then you wouldn't ordinarily diagnose borderline.

23   Q     And, lastly, she diagnosed her as having the simple

24   form of PTSD rather than the complex form.

25         And why do you not agree with that diagnosis?

133

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA152

REDACTED TRANSCRIPT

1    A    Well, according to the current DSM, that would be

2    correct.  But the science continues to evolve.  And we now

3    have this other diagnosis that has now been established in

4    the ICD, and it is a better diagnosis for what -- what

5    Ms. Kolhoff presents with.

6    Q    And does it appear Dr. Kalbeitzer took into account the

7    elevated impaired self-reference scale that you uncovered?

8    A    I don't know whether she did or not.  I mean, that

9    would still factor into a PTSD diagnosis.

10   Q    Okay.  All right.

11           MR. AMOLSCH:  Court's indulgence please.

12                    (Pause.)

13           MR. AMOLSCH:  Your Honor, I have nothing further.

14   Thank you.

15           THE COURT:  Cross-examination.

16                  CROSS-EXAMINATION

17   BY MR. SCHLESSINGER:

18   Q    Dr. Hendricks, good afternoon.

19   A    Good afternoon.

20   Q    Let me ask you first about what I understand was a --

21   was that a supplemental testing session that you conducted

22   with Ms. Kolhoff after Dr. Kalbeitzer completed her report?

23   A    It was in the course of a follow-up interview with her.

24   But yes.  I mean, it was after Dr. Kalbeitzer had done her

25   evaluation and after I read her report.

                                                        134

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA153

REDACTED TRANSCRIPT

```
 1   Q    Okay.  After it was made available to the defense team?
 2   A    Yes.
 3   Q    And it was Dr. Kalbeitzer's report and the findings
 4   contained in it that caused you to administer the test in
 5   the course of that follow-up interview; is that right?
 6   A    Yes.
 7   Q    You weren't otherwise going to administer that test
 8   during the follow-up interview, but you did because of
 9   Dr. Kalbeitzer's report?
10   A    That's correct.
11   Q    Okay.  You know, of course, that Dr. Kalbeitzer's
12   report contains significant findings of the defendant
13   fabricating and exaggerating her symptoms?
14   A    Yes.
15   Q    And you decided that you were going to, in the
16   supplemental session, administer this test to see if that
17   was true in your own testing with her; is that correct?
18   A     Well, I was not -- I was not trying to reassess her
19   memory malingering.  As I said, I think she is -- she does
20   malinger memory, memory problems.
21        I was -- I was curious.  Because the DES had been
22   administered, I wanted to see -- and I wasn't necessarily
23   going to readminister it to her until she told me
24   spontaneously that her understanding was she was supposed to
25   respond to how intense -- intense is the word she used, I
```

135

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA154

REDACTED TRANSCRIPT

1    would use the word severity -- of each of the symptoms were.

2         So I wanted to see -- I'm not presenting that as

3    my score is the valid score.  As I said before, there are no

4    validity scales on this test.  I don't know that my score is

5    valid any more than what the test -- what the score that

6    Dr. Kalbeitzer obtained was valid.

7    Q    Well, I think you said earlier in your testimony that

8    you generally wouldn't even administer the DES II because of

9    the lack of validity scale, and you said you wouldn't feel

10   comfortable testifying about it.

11   A    That's correct.

12   Q    But then subsequently you did administer it, and you

13   did testify about it, and specifically in a situation where

14   a report had already been issued in which the conclusion was

15   that the defendant was grossly malingering, and one of the

16   main pieces of evidence of that was the excessive score on

17   the DES II.

18   A    And I understand what you're saying.  But I was not --

19   I didn't -- like I said, I met with her after reading the --

20   Dr. Kalbeitzer's report.  I did not -- I did not go into

21   that planning to administer the DES.  It was only when she

22   told me that she misunderstood the instructions.  And so I

23   just wanted to know so what would it be -- what would her

24   score be if she were answering according to the instructions

25   on the test, which is how frequently do you experience these

                                                             136

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA155

REDACTED TRANSCRIPT

1    symptoms.

2         THE COURT:  Just so we have a clear picture, can

3    you recall exactly how you even raised the DES report with

4    the defendant?

5         THE WITNESS:  Sure.  So I met with her -- and this

6    was virtually.  This was over Webex.

7         I met with her to do -- to follow up on some of

8    the things that were in Dr. Kalbeitzer's report, and this

9    was one of them.  And I -- and I pointed out to her that --

10   you know, that she had responded with and obtained a very

11   high score, meaning that she experienced this virtually all

12   the time, that that's how frequently she was experiencing

13   these symptoms.  And that's when she said, but I'm -- I

14   wasn't experiencing them all the time.  I was telling you

15   how -- telling her how intense it was.

16        THE COURT:  And on the test that you gave, how

17   often was she saying that she did have these experiences?

18        THE WITNESS:  So it was an average -- it was

19   considerably less frequent.  I mean, the score was a lot

20   lower.

21        THE COURT:  So I can understand it, though, are we

22   saying I'm having this experience once a month?  Every two

23   months?  Once a week?  Is it that fine a tool?

24        THE WITNESS:  No, it's not that fine a tool.  It's

25   I give you a symptom, on a scale of one to ten, how

137

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA156

REDACTED TRANSCRIPT

```
 1    frequently do you experience it.
 2              THE COURT:  And the one to ten --
 3              THE WITNESS:  It doesn't give a time.
 4              THE COURT:  -- it's not connected to a time
 5    period?
 6              THE WITNESS:  No.
 7              THE COURT:  Go ahead.
 8    BY MR. SCHLESSINGER:
 9    Q    I want to ask you, Dr. Hendricks, about whether or not
10    the defendant's memory deficits, as you assessed them,
11    played any role in your evaluation or assessment of the
12    defendant.
13              Did they?
14    A    Well, they did, because that meant that I needed to
15    rely more on collateral information.  I needed to rely on
16    objective testing where I had validity measures, which I
17    would tend to do in a forensic case anyway.  But, with her,
18    I knew that I really needed to corroborate things before I
19    could make statements about them.
20    Q    Well, it's not just that you -- it forced you to resort
21    to other sources of information.  You also relied on what
22    she described as episodes where she blacked out and for
23    which she lacked memory as important evidence indicating
24    that she even suffered from the dissociative episodes;
25    correct?
```

138

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA157

REDACTED TRANSCRIPT

1   A     To some extent, but there was also -- I also had

2   validation from Mr. M███████ that he had seen the same sort

3   of thing happen.  I mean, and this would have been long

4   before -- before she was charged or before she engaged in

5   the behavior.

6   Q     Do you have a copy of your report there with you?

7   A     I do.

8   Q     Okay.  I would ask you to turn to page 15 of your

9   report, please.

10  A     Sure.

11         THE COURT:  Do we have a copy of that?

12         MR. AMOLSCH:  I filed it with the Court, Your

13  Honor.

14         THE COURT:  Yeah, I know.  I mean it's not one of

15  the exhibits that's here?

16         MR. AMOLSCH:  It's not an exhibit marked, no.

17         THE COURT:  Okay.

18         MR. SCHLESSINGER:  Your Honor, we'll see if we can

19  get a copy for the Court.

20         THE COURT:  Just so I have a clearer picture, when

21  you interviewed Mr. M██████, how did you present the

22  question about this dissociation situation to him?  Did you

23  ask him that specific question, or did you ask him did she

24  have many memory lapses, or how did you get into this topic

25  with him?

                                                        139

JA158

REDACTED TRANSCRIPT

1              THE WITNESS:  I asked him whether she had had

2    memory lapses, and I did not even bring up the word

3    "dissociation," actually.

4              THE COURT:  Did he ever describe -- did he

5    describe the duration of these memory lapses?

6              THE WITNESS:  He said that there were times when

7    he knew that they -- for example, he said they would have

8    conversations that she then didn't have memory for later.

9    Or he said that sometimes they would do something, and he

10   described this as it could take -- you know, it could be

11   like a couple of hours that she just didn't remember.

12             THE COURT:  Did he ever describe two-, three-,

13   four-day time periods when she was completely unable to

14   remember things?

15             THE WITNESS:  No.

16             THE COURT:  Did he describe any conduct to you

17   that would indicate that the defendant was acting in sort of

18   a zombie-like fashion or not fully aware of what she was

19   doing?

20             THE WITNESS:  No, he did not.

21             THE COURT:  How long did you spend interviewing

22   him?  A ballpark figure.

23             THE WITNESS:  Probably about half an hour,

24   45 minutes.  Maybe a little longer.

25             THE COURT:  Was it just one time, or had you

                                                          140

JA159

REDACTED TRANSCRIPT

```
 1    interviewed him --

 2              THE WITNESS:  Just one time.

 3              THE COURT:  The one time.  And that was after you

 4    administered the tests to the defendant, but before you had

 5    seen the Government's doctor's report?

 6              THE WITNESS:  Yes.  Because I wrote my report

 7    after all of that, and then the Government did their

 8    evaluation --

 9              THE COURT:  Go ahead.

10              THE WITNESS:  -- after they had my report.

11              THE COURT:  Thank you.

12              MR. SCHLESSINGER:  Thank you, Your Honor.

13    BY MR. SCHLESSINGER:

14    Q    And just following up on the Court's questions with

15    respect to your interview.

16              Mr. M████, he never expressed any concerns that

17    these memory lapses were so severe ████████████████

18    ████████████████████████████████████?

19    A    No.

20    Q    In addition to speaking to ████ M██████, you also

21    spoke to the defendant's adoptive father; is that correct?

22    A    Mike Kolhoff, yes.

23    Q    He did not report that Ms. Kolhoff had any memory

24    lapses in his experience?

25    A    Well, what he reported is that he said that when she
```

                                                                141

JA160

REDACTED TRANSCRIPT

1  was growing up, that she would repeatedly lie to him and to

2  his wife.  And he just always thought that she was a

3  masterful liar, and -- but he said that he was starting to

4  rethink that because if there are actually memory lapses

5  there, then maybe it was -- you know, she really didn't

6  remember things.

7  Q    Well, Dr. Hendricks, to be fair, you told him that she

8  had memory deficits, and that's what caused him to start to

9  rethink it; correct?

10 A    Only after he was telling me about the lies, and I

11 asked him for examples of what she was talking about.

12 Q    So what was sort of unsolicited and came from him is

13 she's a very good liar and has been throughout most of her

14 life?

15 A    Yes.

16 Q    What did not come from him, but came from you to him,

17 was that supposedly she has memory deficits?

18 A    Possibly.

19 Q    In fairness, defendant's father knows her a lot better

20 than you do?

21 A    Of course.

22 Q    Has known her for a lot longer?

23 A    Yes.

24 Q    So much better insight into her personality and her

25 mental capacity?

                                                          142

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA161

REDACTED TRANSCRIPT

```
 1   A    Well, I mean, I have the professional advantage; he has
 2   the time advantage.
 3          THE COURT:  What page of the report did you want
 4   the Court to look at?
 5          MR. SCHLESSINGER:  Page 15, Your Honor.
 6   BY MR. SCHLESSINGER:
 7   Q    And the central three paragraphs there -- I'll give you
 8   a moment, Dr. Hendricks.
 9   A    I have it.
10   Q    That central section is called "the opinion regarding
11   mens rea," the three paragraphs in the middle.
12   A    Yes.
13   Q    And is it fair to say that from the very first sentence
14   of the first of those three paragraphs, you're referencing
15   memory blackouts to begin the -- your opinion on her mens
16   rea; is that right?
17   A    Yes.
18   Q    And fair to say that in each of the other two
19   paragraphs, you also reference the idea that there are
20   episodes for which she has incomplete memory or she has
21   memory lapses or memory blackouts or something along those
22   lines?
23   A    Yes.
24   Q    So throughout your opinion about her mens rea are
25   references to what you understood to be her memory lapses?
```

143

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA162

REDACTED TRANSCRIPT

```
 1   A    I reference the memory lapses because they are also an

 2   indication of -- in -- because of the association with --

 3   with triggering events -- do I need to explain that?  I

 4   mean, with regard to PTSD, that it could -- that the memory

 5   lapses themselves could be an indication of dissociation.

 6   Q    Well, in effect, you relied on them significantly in

 7   concluding that she did have these dissociative episodes;

 8   correct?

 9   A    It was actually more the way she described what

10   happened when she described the events.  And it was pretty

11   clear to me that she had sort of, as I said, gone down the

12   rabbit hole that she was -- because there was some things

13   that she remembered; there were some things she didn't

14   remember.  But it was more the single-minded focus on what

15   she was trying to do.

16   Q    Okay.  Because, in your report, you make frequent

17   reference throughout to her memory blackouts as underpinning

18   your conclusion regarding her mens rea in your report?

19   A    Yes.

20   Q    And you thought it was so important at the time that

21   you were writing your report, you thought to bring it up

22   specifically both with Mr. M█████ and with the defendant's

23   adoptive father?

24   A    Well, I brought it up with both her father and with

25   Mr. M█████ because she had brought it up with me.  She had
```

                                                            144

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA163

REDACTED TRANSCRIPT

1  told me that she has memory problems.  That there's, like,

2  pieces of information that she doesn't remember, and that

3  this happens frequently.

4  Q    And memory problems are frequently associated with true

5  dissociative episodes; is that right?

6  A    They can be, yes.  Depending on the type of

7  dissociation.

8  Q    So her self-reporting of her memory lapses to you was

9  important to your conclusion that, in your words, she very

10  likely was suffering a dissociative episode at the time of

11  the alleged events?

12  A    So the -- okay.  Let me try this one more time.

13        The memory can be an indication of dissociation,

14  but it doesn't have to be.  And the way that she described

15  them and the types of events that she was having difficulty

16  remembering were all consistent with the kind of

17  dissociation that would occur with PTSD, especially a

18  complex PTSD.

19        And so, yes, the memory was part of it, but I

20  wasn't necessarily taking the -- you know, that she --

21  everything that she said she couldn't remember that she

22  couldn't remember because she had told different people

23  different things at different times.

24  Q    Okay.  And I think you testified earlier already that

25  you had already kind of concluded, or I guess you just

145

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA164

REDACTED TRANSCRIPT

1   assumed that she was malingering in reporting her memory

2   lapses?

3   A    Well, I wasn't -- it wasn't an assumption.  It was

4   because, over the course of different interviews I got

5   different information.  You know, there were other pieces.

6   And that can happen with real memory loss, but it was -- it

7   also seemed to me, you know, in the context of a forensic

8   case, I have to take into consideration the possibility that

9   she's malingering as well.  And malingering and real memory

10  loss are not incongruent with each other.

11  Q    You certainly wouldn't deny that somebody in

12  Ms. Kolhoff's position has a strong incentive to receive a

13  certain result on an evaluation from a professional like

14  yourself?

15  A    Correct.

16           THE COURT:  I'm sorry.  I want to make sure I

17  don't forget to ask this question.

18           You said that under the TSI triad, the second

19  component is defensive avoidance; right?

20           THE WITNESS:  Well, yeah.  There are three.

21  They're sort of equal, but yes.

22           THE COURT:  But that's one of them?

23           THE WITNESS:  Yes.

24           THE COURT:  How does that relate to the evidence

25  in the case that the defendant was going on a website that

                                                          146

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA165

REDACTED TRANSCRIPT

1    would actually put her back into that sensitive area?  In

2    other words, if you're trying to avoid something, why would

3    you go towards it?

4            THE WITNESS:  I understand.  Emotions were linear.

5            So what happened was -- the way that she described

6    it was that she saw an opportunity to catch somebody in the

7    act, and so she just sort of like became very

8    tunnel-visioned and very focused on what she was doing in

9    order to --

10           THE COURT:  But that's not avoiding; that's going

11   to.

12           THE WITNESS:  I understand.

13           THE COURT:  That's a moth going to the flame, not

14   getting away from it.

15           THE WITNESS:  And sometimes the moth goes to the

16   flame.  That's the difficulty with PTSD.

17           I mean, there are people who also will -- you

18   know, will go after somebody that they think has committed

19   something -- you know, sort of like what she was doing,

20   committed some kind of violation that they found very

21   hurtful.

22           THE COURT:  But if it was that purposeful -- I

23   mean, you've looked at the evidence, so you've seen these

24   multiple conversations.  This isn't just, you know, putting

25   a picture once or twice on this website.  It's -- and it's

                                                         147

REDACTED TRANSCRIPT

```
 1   not just a conversation with one individual; it's these

 2   interactions with multiple individuals going on over a

 3   period of a full two days.

 4           THE WITNESS:  Yes.

 5           THE COURT:  All right.  And clearly that would

 6   show a degree of consciousness; would it not?

 7           THE WITNESS:  Yes.

 8           THE COURT:  Uh-huh.  All right.  Go ahead.

 9           MR. SCHLESSINGER:  Thank you, Your Honor.

10   BY MR. SCHLESSINGER:

11   Q    And just for clarity on the Court's question, you

12   mentioned Dr. Hendricks having reviewed various

13   investigative reports that were prepared in this case; is

14   that right?

15   A    Correct.

16   Q    Did you actually review at any time prior to today the

17   messages and the images and the conversations that the

18   Court's referencing?

19   A    I did not review the images.  I -- none of us likes to

20   look at the images.

21           What I did review were descriptions of the images

22   and some of the conversation, but I didn't -- I didn't -- I

23   did not actually see images.

24   Q    "Some of the conversation," can you expand on that a

25   little bit?  How many of the messages did you review?
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA167

REDACTED TRANSCRIPT

```
 1  A     I think there were only -- I'm trying to remember, and
 2  I didn't bring them with me.
 3        I don't remember exactly how many, but it was --
 4  and I'm trying to remember if these were -- I don't remember
 5  if they were email or whatever other type of posts.  And --
 6  but there were no images there, there were no -- I mean, I
 7  just had --
 8  Q    I understand there's no images, and I understand that.
 9        I'm trying to get a sense of to what extent you
10  actually factored in the defendant's own, like, words and
11  actions as documented by the evidence into your evaluation.
12  A    So let me see if I can maybe address this a different
13  way.
14        Certainly enough that, you know, when I'm doing an
15  evaluation like this, I'm also taking into consideration is
16  this an insanity case?  And I came to the conclusion that
17  it's not, because it was clear enough to me that she knew
18  what she was doing.  She knew, essentially, the nature,
19  character and consequences of her behavior.  She also knew
20  that what she was doing was wrong, ergo, no insanity.
21        So I'm not -- I don't recall exactly what the
22  messages were that I saw, but it was enough that it was
23  clear to me that she knew -- you know, that she -- she knew
24  that she was trying to -- I mean, in her frame, she was
25  trying to capture, you know, catch a predator, but she was
```

149

JA168

REDACTED TRANSCRIPT

1    definitely moving forward.  She was doing this deliberately,

2    knowingly, and I have not questioned that.

3    Q    So if I understand, your review of the messages that

4    she exchanged convinced you that she was doing this in order

5    to catch a predator?

6    A    It was -- well, I would say it was consistent with what

7    she told me, yes.

8    Q    I mean, you don't reference the contents of any of the

9    messages anywhere in your report?

10   A    No.

11   Q    You don't even mention having reviewed them; is that

12   true?

13   A    Well, I mention that I -- that I had the reports, that

14   there were a number of reports.  But I didn't go into the

15   details of those because, as I said, I mean, if this -- if I

16   were -- if I had thought that she met either of the insanity

17   prongs, I would definitely have gone into much more detail.

18   I didn't think she met the insanity prongs, so I was focused

19   more on risk assessment.

20   Q    Leaving aside insanity though, wouldn't the nature and

21   contents of her various messages on this board have had some

22   impact to you and your conclusion that she very likely was

23   experiencing a dissociative event at the time of the alleged

24   conduct?

25   A    Not necessarily, because people can be very clear even

                                                            150

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA169

REDACTED TRANSCRIPT

```
 1   when they're dissociating.
 2   Q    People can act with perfect knowledge and understanding
 3   of what they're doing while they're dissociative?
 4   A    They can, yes.
 5   Q    So being in a dissociative state doesn't mean that
 6   you're unaware of what you're doing; is that correct?
 7   A    Correct.
 8   Q    It doesn't mean that you're incapable of controlling
 9   your actions or that you're acting reflexively or
10   involuntarily; does it?
11   A    No.
12   Q    So your conclusion that the defendant was very likely
13   in a dissociative state at the time of the alleged conduct
14   doesn't mean anything for -- as far as whether she was
15   acting knowingly, intentionally or voluntarily at the time?
16   A    That's correct.
17          MR. SCHLESSINGER:  Okay.  Court's indulgence one
18   moment, Your Honor.
19                         (Pause.)
20          MR. SCHLESSINGER:  No further questions, Your
21   Honor.
22          THE COURT:  Any redirect?
23          MR. AMOLSCH:  Yes, Your Honor.
24                    REDIRECT EXAMINATION
25   BY MR. AMOLSCH:
```

                                                               151

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA170

REDACTED TRANSCRIPT

1    Q    Dr. Hendricks, just to go back to some of the things

2    the Government asked you and Her Honor asked you, there was

3    a discussion about malingering.

4              Are there malingering scales built into the TSI or

5    the MMPI?

6    A    Yes.

7    Q    Okay.  And what did those results tell you about

8    whether she was malingering in regards to the questions

9    asked on those tests?

10   A    So the questions on the tests are specific to how she's

11   responding to the test.  And on both tests, her scores

12   were -- the validity scales, which are the scales that we're

13   referencing, were all within a range that were acceptable.

14   That -- like on the TSI, for example, none of them crossed

15   over the threshold whatsoever.  On the MMPI, there were --

16   there were a couple that crossed over, but it was also

17   consistent with the level of severity that she was reporting

18   on some of the clinical scales.

19             So, you know, the overall conclusion was I had

20   to -- you know, I had to take -- use a little bit of caution

21   in interpreting the MMPI results, but that -- overall that

22   it was a valid test.

23   Q    And that means that she answered the test honestly and

24   candidly; is that essentially what that means?

25   A    Yes.

152

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA171

REDACTED TRANSCRIPT

```
 1          THE COURT:  Just so I'm clear, the MMPI tests a
 2  person's current situation.  How -- how reliable is it to
 3  give a professional a good view of what one was doing a year
 4  or two before the test is actually administered?
 5          THE WITNESS:  So the thing about the MMPI is that
 6  it's -- that's not how it's actually -- the questions aren't
 7  necessarily just how are you feeling right now.  It's not a
 8  test at all about how are you feeling.
 9          The -- so let me give you the contrast.  The TSI
10  gives a list of symptoms and asks the person whether they've
11  experienced this and how frequently within a certain --
12  within the last six months.
13          On the MMPI, it does give that kind of frame, and
14  the questions aren't necessarily restricted to what's going
15  on right now; it's how the person answers right now.  But it
16  could -- it could ask a question like, you know, my mother
17  did a good job in raising me, true or false.  Well, that's
18  not necessarily right now.  I mean, it applies to, you know,
19  over the course of your life.
20          And so the MMPI isn't a "right now" kind of test.
21  The -- I mean, it actually does get deeper into how the
22  person is functioning.
23          And so, for example, on the -- on tests for the
24  scales for depression and for mania and for things like
25  that, it isn't just what is the person feeling right now;
```

153

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA172

REDACTED TRANSCRIPT

1    it's also what -- you know, how have they been over the

2    course of their life.

3         THE COURT:  Do you have a memory right now of the

4    particular questions to which you thought there was a

5    potential malingering answer?

6         THE WITNESS:  On the MMPI?

7         THE COURT:  On the MMPI.

8         THE WITNESS:  It's not questions; it's scales.  So

9    there are scales -- there's a -- it's called an F scale

10   which is -- the "F" stands for faking bad.  And it was

11   slightly elevated, and that's because -- but that's also

12   inconsistent -- it is consistent with the level of severity

13   that she was reporting on the clinical scales.

14        THE COURT:  But does that number -- is that

15   generated because, on the test, you're comparing one answer

16   with another, and if you look at the two together, they

17   could not be consistent?

18        THE WITNESS:  No.  There's another measure that

19   looks at that, that looks at consistency.  There's another

20   measure that looks at did she just answer everything true.

21   There's another -- I mean, there are eight different scales.

22        And, in fact, there's one scale that only looks

23   at -- there's an F scale, but it only looks at, like, the

24   last third of the test.  So is the person getting sloppy or

25   are they thinking they need to make themselves look worse

                                                    154

JA173

REDACTED TRANSCRIPT

1   because they haven't so far.

2          THE COURT:  Okay.

3   BY MR. AMOLSCH:

4   Q    To follow up on something Your Honor asked you, and she

5   mentioned that it doesn't mean the person isn't conscious.

6          But explain to me, is that relevant, like whether

7   she's conscious -- what does conscious mean?  Like in --

8   like when you say somebody is conscious of what they're

9   doing.  Relate that to a dissociative event.

10  A    Okay.  Consciously aware.

11  Q    Yes.  Relate that to a dissociative event.

12  A    I'm assuming she was conscious when she was doing all

13  this.

14  Q    Right, okay.

15  A    So -- so consciously aware is sort of -- you know,

16  especially with PTSD, what can happen is the person, they

17  know what they're doing, but they're -- it's very

18  tunnel-visioned.  It's very focused on specifically what

19  they're doing without understanding or taking into

20  consideration the implications, the context, you know, so

21  the person -- and that's why I used the phrase going down

22  the rabbit hole, because that's what happens when somebody

23  does that is they just become so single-mindedly focused on

24  something.

25  Q    Your Honor also asked you some questions about whether

155

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA174

REDACTED TRANSCRIPT

```
 1    her avoidance is consistent or internally inconsistent with

 2    her also going onto the Web page, that seemed to be running

 3    towards the trauma she was trying to avoid.  I wanted to

 4    just follow up with you on that.

 5              Is that something that you see with people who

 6    suffer from complex PTSD?  Is that an unusual behavior?

 7    A    It's not something that happens with everybody, but

 8    sometimes people will get in this frame of mind where they

 9    perceive that there's a way to correct the wrong that was

10    done before, and they just follow it.  And they -- and they

11    don't really have much ability to pull themselves back from

12    it because they can't step back from it to look at it that

13    way.

14    Q    And the last series of questions I'm going to ask you,

15    which will be brief, I'm going to direct you back to your

16    report which you have; right?  And Mr. Schlessinger asked

17    you some questions about your opinion regarding mens rea.

18    And I think that's on page 15 of your report.

19    A    Correct.

20    Q    Do you see that?  Okay.

21              So I want to go back and explore that a little

22    bit.

23    A    Okay.

24    Q    There's several factors that you took into account when

25    rendering your opinion on mens rea; is that accurate?
```

                                                              156

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA175

REDACTED TRANSCRIPT

1    A    Yes.

2    Q    Okay.  One of those was her dissociative events; right?

3    Is that correct?

4    A    Correct.

5    Q    Were those dissociative -- Mr. M██████, and to a

6    certain degree her father, Mr. Kolhoff, confirmed that she

7    had, in fact, experienced what they now realize were

8    dissociative events in the past?

9    A    Yes.

10   Q    Okay.  And she had -- it's your understanding is that

11   she sought out help from Dr. Jha.  That was at least one of

12   the reasons why she went to see him as well; is that

13   correct?

14   A    To see Dr. Jha?

15   Q    Dr. Jha, yes.

16   A    I don't know that it was because of dissociation.

17   Q    Okay.

18   A    But it was because she was -- I mean, she was

19   complaining about mood, she was complaining about just not

20   doing well, not feeling well.  I don't know that she got so

21   specific that she was talking about -- you know, that she

22   was -- I don't think she was telling Dr. Jha that she was

23   having dissociative experiences.

24   Q    But she went to Dr. Jha because she realized she was

25   having mental health issues?

                                                              157

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA176

REDACTED TRANSCRIPT

1    A    Right.

2    Q    One of the other factors was the history of memory

3    blackouts which Your Honor has asked about.

4        Is this -- just to complete the circle on that, is

5    this a question of whether she blacked out the memory of

6    what happened; or is this a question of awareness and

7    recognition of what she was doing?

8    A    It's more the -- whether she blacked out the memory of

9    it.  It doesn't necessarily mean she wasn't aware when she

10   was doing it what she was doing.  But if she was -- if she

11   was single-mindedly focused, she wasn't -- she wasn't

12   thinking about the consequences, she wasn't thinking about

13   what impact this might have or what collateral effects it

14   might have.

15   Q    And that's separate and apart from whether she can

16   remember it or not?

17   A    Yes.

18   Q    You said that her -- your opinion regarding mens rea

19   was inconsistent with her creating the Facebook page, the

20   Save Our Children; correct?

21   A    Yes.

22   Q    Expound a little bit about that.

23   A    So she -- I mean, she -- when she was -- the way that

24   she got onto this in the first place, the way that she

25   encountered this person initially, was that she -- this was

158

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA177

REDACTED TRANSCRIPT

```
 1   somebody that -- who had been trying to -- had asked for
 2   permission to get onto the Save Our Children Facebook group,
 3   I guess it is.
 4          And it was only when she did some investigating
 5   with the website that she realized what she had admitted --
 6   that she had admitted somebody to the -- to the group who
 7   shouldn't have been admitted to the group.
 8          And I think, you know, there's -- part of -- part
 9   of what -- when I -- with complex PTSD, one of the
10   diagnoses -- diagnostic criteria is also that the person
11   feels, you know, guilt or shame or, like, feels bad about --
12   and feels diminished in some way because of things that are
13   related to the incidents that happened and also their own
14   behavior and their participation in it.
15          And so what -- what could have happened is that
16   she -- well, what likely happened is she -- you know, she
17   saw this as a way of correcting what she had done, but then
18   taking it a mile further, and I'm going to catch this person
19   and then turn them into the police sort of approach.
20   Q    And the last question is, you read in your report that
21   it was only on questioning about these memory blackouts
22   coupled with the test data from the TSI that it became clear
23   she was very likely in a dissociative state during the index
24   incident; do you agree with that?
25   A    Yes.
```

159

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA178

REDACTED TRANSCRIPT

1            MR. AMOLSCH:  Thank you, Your Honor.  I have no
2    other questions.
3            THE COURT:  Any recross?
4            MR. SCHLESSINGER:  No, Your Honor.
5            THE COURT:  No.  All right.
6            Thank you, Dr. Hendricks.  We've got you on the
7    stand and off within the time limit, so I appreciate your
8    testimony.
9            THE WITNESS:  Okay.
10           THE COURT:  All right.  We do have --
11           MR. AMOLSCH:  Your Honor, I apologize.  Before we
12   leave, Doctor, I'm going to admit his report as an exhibit
13   and curriculum vitae tomorrow.
14           THE COURT:  Well, the curriculum vitae is no
15   problem.
16           Is there any objection to the report coming in as
17   well?
18           MR. SCHLESSINGER:  No, Your Honor.
19           THE COURT:  I mean, I have it in the file, but
20   we'll return this to --
21           MR. AMOLSCH:  And if I could have the Court's
22   indulgence to speak with Mr. Salvato, Your Honor?
23           THE COURT:  Yes.
24           MR. AMOLSCH:  And, Your Honor, I don't anticipate
25   needing to re-call him, but in the event that we do, then we

                                                        160

JA179

REDACTED TRANSCRIPT

```
 1    will.  But I don't think that's going to happen.
 2          THE COURT:  Doctor, we're going to ask you not to
 3    stay in the courtroom during the trial proceeding, and don't
 4    discuss your testimony with any witness who has not yet
 5    testified; all right?
 6          THE WITNESS:  Okay.
 7          THE COURT:  Thank you.
 8              (Witness excused at 12:43 p.m..)
 9          THE COURT:  So, Mr. Schlessinger, do you have
10    someone you can put on for 20 minutes?
11          MR. SCHLESSINGER:  I do, Your Honor.  We could
12    also resume the cross-examination of the case agent.
13          THE COURT:  Oh, he's still here.  That's fine.
14    All right.  Let's go because that was what we interrupted.
15          MR. AMOLSCH:  Thank you.  Can I have two seconds
16    to collect my thoughts, Your Honor?
17          THE COURT:  Yeah.  Just to remind you,
18    Mr. Amolsch, this testimony included the playing of portions
19    of the interview with your client.
20          MR. AMOLSCH:  Yes, Your Honor.
21          THE COURT:  In case you were forgetting where we
22    were.
23          MR. AMOLSCH:  Yes.  Thank you.  I appreciate that.
24          THE COURT:  No memory lapses.
25          MR. AMOLSCH:  Thank you.  One second Your Honor.
```
161

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA180

REDACTED TRANSCRIPT

```
 1                        (Pause.)
 2          MR. AMOLSCH:  Thank you, Your Honor.  Okay.
 3   Sorry, Your Honor.  All right.  Court's indulgence.  Thank
 4   you, Your Honor.
 5          (Brandon Smock resumed testimony at 12:44 a.m.)
 6                      CROSS-EXAMINATION
 7   BY MR. AMOLSCH:
 8   Q    I'm going to take you back to your initial interview
 9   with Ms. Kolhoff and then move forward to how your
10   investigation continued.
11   A    Yes, sir.
12   Q    Let's go back there initially.  Okay.
13          So the way you described the house, you described
14   that she had neither a neighbor living above her or below
15   her; is that right?
16   A    There would have been a neighborhood below her, sir.
17   Q    There was a neighbor below her.  So there were two
18   families, essentially, living there?
19   A    I don't know how many sections the bottom of the
20   residence was broken into, but the top level was all one --
21   what you would consider one apartment.
22   Q    All right.  And she told you she was using the Internet
23   connection provided by her neighbor; is that right?
24   A    The lady downstairs, yes, sir.
25   Q    Okay.  Did you interview the lady downstairs at all?
```
                                                         162

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA181

REDACTED TRANSCRIPT

```
 1   A    No, I did not.
 2   Q    Did you ask anybody in her building about whether they
 3   had ever seen any evidence of ████████████████████████
 4   ████████████████████████████████████████████?
 5   A    No, sir.
 6   Q    Did you interview anybody about how Ms. Kolhoff ████
 7   ████████████████████████████    as part of your
 8   investigation?
 9   A    I did not particularly, sir.
10   Q    Do you know of anybody else who did?
11   A    I know Mr. M█████    was interviewed by another special
12   agent.
13   Q    And his opinion was ████████████████; correct?
14   A    I can't speak to what that interview was, sir.
15   Q    My understanding is that the postings that we talked
16   about over that couple-day period occurred in September of
17   2020, and you showed up June 8th or 9th of 2021?
18   A    That's correct, sir.
19   Q    In between the time that -- the time the postings were
20   made and the time you showed up to interview Ms. Kolhoff,
21   were there any other instances of her acting or behaving in
22   a similar manner?
23   A    Not that I'm aware of, sir.
24   Q    Let's talk about what you would be aware of.
25        So did you go around and conduct any interviews of
                                                          163
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA182

REDACTED TRANSCRIPT

1   anybody else relating to her as it relates to issues of

2   child pornography or sexual predation?

3   A    We had issued other investigations across the country

4   and across the world that related to the website that had

5   users that had been in contact with her.

6   Q    Setting aside the Rapey.su website, anything else in

7   her background that suggests that she's -- she has engaged

8   in this kind of behavior before?

9   A    No, sir.

10  Q    Anything since September 11th, 2020?

11  A    Not that I'm aware of, sir.

12  Q    You seized devices from her, I believe as part of your

13  search warrant.  An iPhone; is that right?

14  A    Yes, that's correct.

15  Q    Okay.  Did you seize a -- like a laptop or other kind

16  of computer?

17  A    I believe it was a tablet, sir.

18  Q    Okay.  A tablet.

19          Were those the only two items?

20  A    That's correct.

21  Q    As part of your investigation, did you conduct a

22  forensic examination of the contents of those devices?

23  A    I did not personally, sir, but it was requested of our

24  forensic agent.

25  Q    Okay.  Do you know if one was done?

164

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA183

REDACTED TRANSCRIPT

```
 1    A     Yes.

 2    Q     Okay.  So one was done of her iPhone, for instance?

 3    A     Yes, sir.

 4    Q     Are you aware, based on your investigation, of there

 5    being any other images of allegedly child pornography on

 6    that phone?

 7    A     Not that I'm aware of, sir.

 8    Q     Are you aware, on the phone we're talking about now, of

 9    any indication she visited any sites associated with child

10    pornography other than the Rapey.su site?

11    A     Not that I'm aware of.

12    Q     Are you aware of whether she entered any search terms

13    into a search engine looking for child pornography?

14    A     Not that I'm aware of.

15    Q     Are you aware of ███████████████████████████████

16    ████████████████████ in relation to the Rapey.su website?

17    A     Not that I'm aware of.

18    Q     Are you aware of her ██████████████████████████

19    ████████████████████████████████████████████████████

20    ██████?

21    A     Not that I'm aware of.

22    Q     And in one of the messages that we talked about, she

23    said that she was living alone and needed a place to live as

24    one of the reasons she put in the messages about ██████

25    ████████; do you remember that?
```
                                                                 165

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA184

REDACTED TRANSCRIPT

```
 1   A    Yes, sir.

 2   Q    Okay.  But she had a place to live; right?

 3   A    Yes, sir.

 4   Q    She had been living there for a couple years; right?

 5   A    According to her, yes.

 6   Q    So fair to say -- well, did you investigate it?

 7   A    Yes.

 8   Q    Okay.  So she had been living there for a couple years;

 9   correct?

10   A    Yes.

11   Q    So fair to say she doesn't need a place to live; is

12   that right?

13   A    That's correct.

14   Q    Okay.  And she was in a stable relationship with her

15   boyfriend ████; correct?

16   A    I can't talk to their relationship.

17   Q    In the video -- in the audio we talked about, she

18   referenced Amy Glore; do you remember that?

19   A    Yes, I do.

20   Q    Okay.  Who is Amy Glore?

21   A    I believe she is a TFO, task force officer, with the

22   FBI or is associated with the FBI.  But she is an officer, a

23   law enforcement officer.

24   Q    And your understanding is Ms. Kolhoff had a preexisting

25   relationship with Agent Glore based on her being a victim of
```

                                                              166

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA185

REDACTED TRANSCRIPT

```
 1    child pornography; is that correct?

 2    A     That is what she advised.

 3    Q     And you understood that she actually testified, at

 4    least in some context, for the Government or provided

 5    information in assistance of that prosecution; is that

 6    correct?

 7    A     That's what I was advised.

 8    Q     So we know that's true; right?

 9              THE COURT:  I'm not clear.  Did you, yourself, or

10    to your knowledge, did any members of your team contact

11    Agent Glore?

12              THE WITNESS:  Yes, Your Honor.  We had -- after

13    our investigation, we were able to obtain the reports that

14    were referenced in the interview.

15              THE COURT:  All right.  And these are all reports

16    having to do with prior instances when the defendant was a

17    victim; is that correct?

18              THE WITNESS:  No, ma'am.  I'm referencing the --

19    when they went out and spoke with her originally earlier

20    that year, earlier in 2020 in reference to the website.

21              THE COURT:  All right.  And the website you're

22    talking about now, is that the Save the Children website or

23    the Rapey website?

24              THE WITNESS:  The Rapey website, ma'am.

25              THE COURT:  Do you have a better idea as to the
```

                                                           167

JA186

REDACTED TRANSCRIPT

```
 1   time frame of when that happened?
 2          THE WITNESS:  My recollection would put it around
 3   February -- January/February of 2020.  The beginning part of
 4   2020.  Excuse me -- yes.  Of 2021.  Sorry.
 5          THE COURT:  And do you know how -- in that time
 6   frame why the FBI or why Ms. Glore's group became involved
 7   in that investigation?
 8          THE WITNESS:  It was a cyber tip from the National
 9   Center for Missing and Exploited Children I believe was
10   issued to that police department in reference to the website
11   that referenced ███████.
12          THE COURT:  All right.
13   BY MR. AMOLSCH:
14   Q   Now, what I was --
15          MR. AMOLSCH:  I'm sorry, Your Honor.  Are you
16   finished?
17          THE COURT:  That's fine.  Yep.
18          MR. AMOLSCH:  Thank you.  Thank you.
19   BY MR. AMOLSCH:
20   Q   Now, what I'm talking about is, Ms. Kolhoff reported to
21   you that detective or Task Force Officer Glore had been
22   actually one of the case agents or somehow associated with
23   her own victimization of child pornography; is that correct?
24   A   Yes.  I was verbally advised that she had been a victim
25   of sex trafficking.
```

168

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA187

REDACTED TRANSCRIPT

```
 1  Q    All right.  So we have two instances with Detective --
 2  Agent Glore.  We have when she comes to Ms. Kolhoff's house
 3  initially based on the cyber tip; correct?
 4  A    Yes.
 5  Q    But, before that, she had a preexisting relationship
 6  with Agent Glore in relation to her being a victim of child
 7  pornography?
 8  A    I believe so.
 9  Q    The Government played you a clip of her discussing how
10  it is she came in contact with the Rapey.su website saying
11  that it had happened in the context of her administering the
12  Facebook group Save Our Children; correct?
13  A    Yes.
14  Q    Do you have any evidence to suggest that she was
15  actively looking out -- looking -- trying to search out a
16  website like Rapey.su?
17  A    Not that I'm aware of.
18  Q    And there is no question that she admitted someone from
19  Rapey.su onto the Save Our Children Facebook group; correct?
20  A    Yes.
21  Q    That happened.
22       After -- after she was arrested, you had an
23  opportunity to interview her again at the U.S. Attorney's
24  Office; is that correct?
25  A    We conducted a proffer.
```

169

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA188

REDACTED TRANSCRIPT

```
1   Q    Okay.

2   A    Yes, sir.

3   Q    During that proffer, did you ask Ms. Kolhoff why she

4   made those images?

5   A    I was a witness in the proffer, and I was not asking

6   questions.

7   Q    Did anybody ask Ms. Kolhoff her purpose in making those

8   images?

9   A    I believe so, but I would have to recall my memory.

10  Q    Do you remember anybody asking her to explain why she

11  did what she did and her saying she's confused and didn't

12  really know?

13  A    I would have to review notes.  Off the top of my

14  head ...

15  Q    Last question, I think.

16       Do you remember her saying that this event was

17  really about herself ███████████████████?

18  A    I do believe that she had mentioned it was for herself.

19       MR. AMOLSCH:  Thank you, Your Honor.  I have --

20  one second, Your Honor.  I apologize.

21                  (Pause.)

22       MR. AMOLSCH:  Thank you, Your Honor.

23       THE COURT:  All right.  Mr. Schlessinger, anything

24  further for this witness?

25       MR. SCHLESSINGER:  Yes, Your Honor.  No further
```

170

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA189

REDACTED TRANSCRIPT

```
 1   questions.
 2            THE COURT:  No further questions?
 3            MR. SCHLESSINGER:  No.
 4            THE COURT:  Thank you, Agent.  You may step down.
 5                 (Witness excused at 12:53 p.m.)
 6            MR. AMOLSCH:  And he's subject to re-call if
 7   necessary because --
 8            THE COURT:  He's the case agent.  He's going to be
 9   here for the whole trial.
10            MR. AMOLSCH:  Yes, Your Honor.  I'm sorry.  Just
11   checking.
12            THE COURT:  Do you have another witness?
13            MR. SCHLESSINGER:  We do have another witness.
14   I'm not sure in nine minutes we could get done, but we could
15   get pretty close.
16            THE COURT:  Why don't we get started and then it
17   shortens tomorrow.
18            MR. SCHLESSINGER:  All right.  The Government
19   calls Mike Del Vacchio.
20            MR. AMOLSCH:  Could I have Court's indulgence,
21   Your Honor.
22                          (Pause.)
23            MR. AMOLSCH:  Thank you, Your Honor.  This should
24   be quick.
25            THE CSO:  Face the deputy clerk, please.  Raise
```
                                                          171

JA190

REDACTED TRANSCRIPT

1    your right hand.

2    Thereupon,

3                    MICHAEL DEL VACCHIO,

4    having been called as a witness on behalf of the Government

5    and having been first duly sworn by the Deputy Clerk, was

6    examined and testified as follows:

7                    (Time noted:  12:54 p.m.)

8              THE DEPUTY CLERK:  Thank you.

9              THE CSO:  You may be seated.

10                    DIRECT EXAMINATION

11   BY MR. SCHLESSINGER:

12   Q    Good morning, Mr. Del Vacchio.  Or good afternoon.

13   A    Good afternoon.

14   Q    Where do you work, sir?

15   A    I work for Homeland Security Investigations, the

16   Washington, D.C. Field Office.

17   Q    What's your title there?

18   A    Special agent and computer forensic agent.

19   Q    How long have you been a computer forensic agent

20   specifically with HSI?

21   A    Approximately six years.

22   Q    Okay.  What do you do on a day-to-day basis as a

23   computer forensic agent?

24   A    So my main responsibilities are to seize, preserve,

25   image, analyze and process electronic media for evidence of

                                                        172

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA191

REDACTED TRANSCRIPT

```
 1   a crime.
 2           MR. SCHLESSINGER:  Your Honor, at this time if
 3   there's no objection from the defense -- I would skip ahead
 4   if there's no objection and just tender Agent Del Vacchio as
 5   an expert in the field of computer forensics.
 6           MR. AMOLSCH:  No objection.
 7           THE COURT:  All right.  He's an expert.
 8   BY MR. SCHLESSINGER:
 9   Q    Thank you, Agent Del Vacchio.  I'm going to turn your
10   attention now specifically to June 6th, 2021.
11           Did you have occasion to participate in a search
12   warrant that day?
13   A    I did.
14   Q    Where was that search warrant?
15   A    In Port Clinton, Ohio.  I believe the address was
16   ██ -- I can't think of the -- it started with ██.  I
17   can't remember the full address.
18   Q    Okay.  ██ and starts with ██ in Port Clinton, Ohio?
19   A    Correct.
20   Q    Who went with you from this area to Ohio to do that
21   search warrant?
22   A    So it was myself, Brandon Smock, Dan Snyder and
23   Jeff Collins.
24   Q    And what was your role in the search warrant going to
25   be?
```

                                                              173

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA192

REDACTED TRANSCRIPT

```
 1   A    I was asked to participate in a search warrant using my

 2   forensic capabilities.

 3   Q    Okay.  Were you supposed to specifically perform a

 4   function related to any electronic media that might be

 5   recovered from the search?

 6   A    Correct.  My job was to identify any electronic media

 7   on scene, and then if I could get an extraction, conduct an

 8   extraction or at least triage the media for evidence.

 9   Q    Did you find any electronic devices in the course of

10   the search?

11   A    I did.

12   Q    All right.  Agent Del Vacchio, I'd like to go ahead and

13   hand you if we might a white binder, and I'd like you to

14   take a look at 402 through 404 all together.

15   A    Sure.

16            THE WITNESS:  Thank you, sir.

17            THE COURT:  Any objection to those exhibits?

18            MR. AMOLSCH:  No.  I'm opening it, but I don't

19   think so.

20            THE COURT:  They're in.

21            MR. AMOLSCH:  That's fine.

22            THE COURT:  I'm sorry, did you --

23            MR. AMOLSCH:  I said I have to open them up.

24            THE COURT:  Take a look.

25            MR. AMOLSCH:  No objection.
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA193

REDACTED TRANSCRIPT

```
 1              THE COURT:  All right.  They're in.
 2     (Government Exhibit Numbers 402 through 404 admitted into
 3                        evidence.)
 4   BY MR. SCHLESSINGER:
 5   Q    If we can go ahead and hand you what's marked as 601,
 6   if we might, Agent Del Vacchio.
 7   A    Sure.
 8   Q    Agent Del Vacchio, do you recognize what's marked as
 9   Exhibit 601 there?
10   A    Yes, I do.
11   Q    What is that?
12   A    This is the iPhone that was found on Exhibit 402 on the
13   couch.  This is the device that I triaged at the scene.
14              THE COURT:  Any objection to 601?
15              MR. AMOLSCH:  No objection, Your Honor.
16              THE COURT:  All right.  It's in.
17     (Government Exhibit Number 601 admitted into evidence.)
18   BY MR. SCHLESSINGER:
19   Q    If you can put 601 down, if you can, Agent Del Vacchio.
20   Thank you.
21              And back in the binder if you can look at 602
22   through 604, just take a look at those collectively and
23   describe them.
24   A    602 or 402?
25   Q    Sorry, 602 through 604.  If you could just tell me --
```

175

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA194

REDACTED TRANSCRIPT

1   describe them collectively, please.

2           THE COURT:  Is there any objection to these

3   photographs?

4           MR. AMOLSCH:  No objection, Your Honor.

5           THE COURT:  All of them are in.

6    (Government Exhibit Numbers 602 through 604 admitted into

7                        evidence.)

8           MR. SCHLESSINGER:  Thank you, Your Honor.

9   BY MR. SCHLESSINGER:

10  Q    Agent Del Vacchio, did you -- in addition to -- well,

11  apart from 602 through 604, did you conduct any sort of

12  forensic analysis on site that day.

13  A    Yes, I did.

14  Q    And did you conduct further analysis of that same

15  phone, Exhibit 601, once you got back to your office in the

16  Washington, D.C. area?

17  A    Yes, I did.

18  Q    Okay.  Now I'm going to go ahead -- did that -- did

19  that analysis permit you to locate and review the contents

20  of certain portions of that phone, Exhibit 601?

21  A    Yes.

22  Q    Flip through if you need to, but 605 through 616 all

23  together.  Are those -- are each of those items, 605 through

24  616, fair and accurate representations of certain portions

25  of the contents of that Apple iPhone 7?  And if you can take

176

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA195

REDACTED TRANSCRIPT

1  a second to page through those.

2  A    Thank you.

3       THE COURT:  I hope you have a better picture of

4  606 because it's very fuzzy in our book.

5       THE WITNESS:  Okay.

6  BY MR. SCHLESSINGER:

7  Q    So look at those together, 605 through 616.

8       Are those all collectively certain portions of the

9  contents of that phone, 601?

10 A    Yes.

11      MR. SCHLESSINGER:  Okay.  The Government moves for

12 admission into evidence of Exhibits 605 through 616.

13      MR. AMOLSCH:  No objection.

14      THE COURT:  They're all in.

15  (Government Exhibit Numbers 605 through 616 admitted into

16                      evidence.)

17 BY MR. SCHLESSINGER:

18 Q    And since the Court asked about 606 specifically, do

19 you have any insight, Agent Del Vacchio, as to why that

20 appears so blurry?

21 A    Yeah.  This is a thumbnail picture of a resume that was

22 found on the phone.  I do not recall seeing the actual

23 resume -- like, the actual photo of the resume, but this

24 would be the thumbnail version that is made when the photo

25 is viewed.

                                                        177

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA196

REDACTED TRANSCRIPT

1  Q    And unfortunately there's not going to be any higher

2  resolution of that available?

3  A    I don't believe so.

4  Q    And very briefly -- I'm not going to publish this whole

5  series, but if you could flip to 612.

6  A    Okay.

7  Q    Can you describe what's shown and what's been admitted

8  now as 612?

9  A    612 is a password artifact that was identified in the

10 key chain backup.plist from the advanced logical extraction

11 of the phone.  And it indicates that the account

12 allynichole99@gmail.com had accessed the rape.su server on

13 this device.

14 Q    Does the presence of this entry indicate a stored --

15 presence of a stored password for that rape.su website here?

16 A    There's no stored password on this.

17 Q    Thank you for that.

18       613.  What is that showing?

19 A    613 is a duplicate password artifact that was found

20 also in the key chain backup.plist file from the advanced

21 logical extraction that I conducted on site.  And it

22 indicates that the account ███████ accessed the rape.su

23 server using this device.

24 Q    614, quickly.

25 A    Okay.  So this is another duplicate password that shows

178

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA197

REDACTED TRANSCRIPT

1    that ███████ account was found in the key chain

2    backup.plist file, and it shows that the ███████ account

3    accessed the rape.su server at some point.

4    Q    615.

5    A    615 is a password artifact from the keychain.plist file

6    that was acquired when I had brought the device to the

7    forensic lab for additional extraction.  And this shows that

8    the account allynichole99@gmail.com accessed the rape.su

9    server on or about September 13th, 2020 at 1657 hours.

10   Q    And 616.

11        THE COURT:  Hold on a second.  What does date

12   modified, 12/8/2020, is that when you all were touching

13   this?

14        THE WITNESS:  No, ma'am.  The date modified would

15   be the last time that this entry in the keychain.plist was

16   modified.  Modified or accessed.

17        THE COURT:  So you can't -- you can't -- it was

18   modified or accessed means a person or somebody had to do

19   something with this particular --

20        THE WITNESS:  Yes.  In order for the

21   keychain.plist file to be updated, somebody had to have

22   either access to the rape.su server or using the account

23   shown in this -- on this page.

24        THE COURT:  All right.

25   BY MR. SCHLESSINGER:

                                                           179

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA198

REDACTED TRANSCRIPT

1    Q    All right.  And 616.

2    A    Okay.  This is another password artifact found in the

3    keychain.plist file that shows account ███████ had accessed

4    the rape.su server.  The date created here shows

5    September 11th, 2020 at 1948 hours.

6    Q    Finally, Agent Del Vacchio, the last two exhibits, 701

7    and 702.  If you can just take a look at those and tell me

8    if each of those are fair and accurate representations of

9    certain additional portions of the contents of the iPhone 7,

10   Exhibit 601.

11   A    Yes.

12           THE COURT:  Any objection?

13           MR. AMOLSCH:  Oh.  No objection.  I'm sorry.

14           THE COURT:  All right.  701 and 702 are -- I'm

15   sorry -- yeah.  701 and 702 are in.

16     (Government Exhibit Numbers 701 and 702 admitted into

17                        evidence.)

18   BY MR. SCHLESSINGER:

19   Q    Looking at 701 -- don't read the whole thing, Agent Del

20   Vacchio, but just generally speaking, what kind of record is

21   this, 701?

22   A    That appears to be a text message between the local

23   user, which is the device owner, and an individual named

24   Monica.

25   Q    And is there a discussion here in short about going on

                                                            180

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA199

REDACTED TRANSCRIPT

```
1    a walk?

2    A    Yes, that's correct.

3    Q    And what's the date?

4    A    September 11th, 2020.

5    Q    And finally Exhibit 702, the last one.

6             What type of record is indicated here in 702?

7    A    This is an email record.

8    Q    So looking at -- just focusing on the first row across

9    on the first page of 702, what does that tell us about the

10   email that was recorded in that row?

11   A    So this -- that Record Number 1 shows that

12   ashley.kolhoff2k17@gmail.com had sent an email to a

13   shannon.████@jfs.ohio.gov regarding -- the subject

14   indicates it's about food.

15   Q    I apologize for the formatting of this that we have to

16   go to the next page --

17   A    That's correct.

18   Q    -- and the first row on the next page to continue the

19   table.

20   A    That's correct.

21   Q    So continuing the table on the first row on the second

22   page, when was that email that you just referenced sent?

23   A    Sent on September 12th, 2020 at 1:40:33 p.m.

24   Q    And can you just read what the content of the email is?

25   A    Sure.  It says: "Hi, Shannon.  This is Ashley Kolhoff.
```

181

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA200

REDACTED TRANSCRIPT

1    I'm wondering if I qualify now for food.  Can I send you a

2    pay stub to see?  I am not working.  This is my boyfriend's

3    pay stub."

4              MR. SCHLESSINGER:  No further questions, Your

5    Honor.

6              THE COURT:  All right.  We're going to have to do

7    the cross tomorrow.

8              MR. AMOLSCH:  That's fine, Your Honor.

9              THE COURT:  So we'll reconvene at 9:00 tomorrow.

10   Make sure any of the witnesses that were on call for today

11   will be here.

12             MR. AMOLSCH:  Your Honor, if I may before we

13   excuse --

14             THE COURT:  Yeah.

15             MR. AMOLSCH:  I'm not certain, but to the -- I

16   know that you allowed the Government's expert to sit

17   inside -- in the room and hear Dr. Hendricks's testimony.

18             THE COURT:  Right.

19             MR. AMOLSCH:  To the extent she took any notes

20   during that, I think it's pretty clearly *Jencks*, and I would

21   just ask that to be turned over to me before her examination

22   tomorrow.

23             THE COURT:  Well, if she's just writing down what

24   the witness said.  It's different if she has her own

25   comments on that.

                                                          182

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA201

REDACTED TRANSCRIPT

1              MR. AMOLSCH:  I don't know what it says.  That may

2    be, in fact, true, but I think it's pretty clearly *Jencks*.

3    She was taking notes and writing down during the testimony.

4              THE COURT:  Is there any objection to that?

5              MR. SCHLESSINGER:  Your Honor, I'm not sure that's

6    appropriate under the Jencks Act.  I'm not sure what she's

7    writing down pertains to the subject of her --

8              THE COURT:  To the extent she's just copying down

9    what he says, I don't think it's *Jencks*.  But if she's

10   making, as I sometimes do, marginal notes or underlining

11   certain portions of what those notes show, arguably that

12   could be *Jencks*.

13             Out of an abundance of caution, let's make it

14   available.  All right.  All right.

15             We'll recess court.  See you at 9:00.

16             (Proceedings adjourned at 1:07 p.m.)

17             ----------------------------------

18   I certify that the foregoing is a true and accurate

19   transcription of my stenographic notes.

20

21             *Stephanie Austin*

22             Stephanie M. Austin, RPR, CRR

23

24

25
                                                              183

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA202

REDACTED TRANSCRIPT

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                    ALEXANDRIA DIVISION

 3   --------------------------x
     UNITED STATES OF AMERICA,  :    Criminal Action No.:
 4                              :    1:21-cr-158
          versus                :
 5                              :
     ASHLEY NICHOLE KOLHOFF,     :    Thursday, March 3, 2022
 6                              :
                Defendant.      :    Volume II - REDACTED TRANS.
 7   --------------------------x

 8        The above-entitled bench trial was heard before the
     Honorable Leonie M. Brinkema, United States District Judge.
 9
                     A P P E A R A N C E S:
10
     FOR THE GOVERNMENT:    SETH SCHLESSINGER, ESQUIRE
11                          WHITNEY KRAMER, ESQUIRE
                            OFFICE OF THE UNITED STATES ATTORNEY
12                          2100 Jamieson Avenue
                            Alexandria, Virginia  22314
13                          (703) 299-3700

14   FOR THE DEFENDANT:     CHRISTOPHER AMOLSCH, ESQUIRE
                            LAW OFFICES OF CHRISTOPHER AMOLSCH
15                          12005 Sunrise Valley Drive
                            Suite 200
16                          Reston, Virginia  20191
                            (703) 969-2214
17
                            FRANK SALVATO, ESQUIRE
18                          THE LAW OFFICES OF FRANK SALVATO
                            1203 Duke Street
19                          Alexandria, Virginia  22314
                            (703) 548-5000
20

21

22

23        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

24

25
                                                              184
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA203

REDACTED TRANSCRIPT

TABLE OF CONTENTS

WITNESSES

REBUTTAL

On behalf of the Government:

RACHEL KALBEITZER

Direct examination by Mr. Schlessinger ....196
Cross examination by Mr. Amolsch .........226
Redirect examination by Mr. Schlessinger ..264

EXHIBITS

On behalf of the Government:
Admitted

Numbers 801 and 802 ......................268

On behalf of the Defendant:
Admitted

Numbers 1 and 2 ..........................268

MISCELLANY

Proceedings March 3, 2022 .................186
Certificate of Court Reporter ............276

185

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA204

REDACTED TRANSCRIPT

```
1                    P R O C E E D I N G S
2              THE DEPUTY CLERK:  Criminal Case 21-158, United
3    States of America versus Ashley Nichole Kolhoff.
4              Would counsel please note their appearances for
5    the record.
6              MR. SCHLESSINGER:  Good morning, Your Honor.
7    Seth Schlessinger and Whitney Kramer for the Government.
8    Special Agent Brandon Smock with us at counsel table.
9              THE COURT:  Good morning.
10             MR. AMOLSCH:  Good morning again, Your Honor.
11   Christopher Amolsch and Frank Salvato for Ms. Kolhoff, who
12   is present.
13             THE COURT:  All right.  I believe we're still in
14   the -- we still have this witness on the stand and it is
15   cross-examination.
16             MR. AMOLSCH:  Yes, Your Honor.  And I have no
17   questions for him.  So I don't have any cross-examination.
18             THE COURT:  Then there's no redirect, so thank you
19   for being here.  I'm sorry that we couldn't have called you
20   off sooner.  You're welcome to stay in court and watch the
21   proceedings, but do not discuss your testimony or anything
22   you see or hear in court with any witness who has not yet
23   testified.
24             Thank you.
25             THE WITNESS:  Thank you, Your Honor.
```

186

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA205

REDACTED TRANSCRIPT

```
 1              THE COURT:  All right.  Your next witness.
 2              MR. SCHLESSINGER:  For our case in chief, the
 3    Government rests at this time then.  We do have a rebuttal
 4    witness, but we rest our case in chief.
 5              THE COURT:  You realize -- are there any other
 6    witnesses the defense is putting on?
 7              MR. AMOLSCH:  No, Your Honor.  At this point I
 8    think, if the Government's resting, we'll make our Rule 29
 9    and proceed.
10              THE COURT:  All right.
11              MR. AMOLSCH:  All right.  Your Honor, may I
12    proceed?
13              THE COURT:  Yes.
14              MR. AMOLSCH:  Your Honor, this is not a normal
15    Rule 29 in the sense that I'm preserving an objection for
16    down the road, you know, to say that I did it.
17              There's a real problem with the way that the
18    statute's being applied in this case, and it specifically
19    relates to the images in question.
20              I've prepared a bench brief for Your Honor on the
21    relevant law as it relates to what it means to be lascivious
22    within the child pornography statutes.  And I'm going to
23    take some time to go through this, Your Honor, explain it to
24    you, and then I'm going to ask you to take a moment to read
25    it.
```

187

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA206

REDACTED TRANSCRIPT

1          THE COURT:  Now, you know, these motions are

2    supposed to be filed before the bench trial.

3          MR. AMOLSCH:  Well, Your Honor, I had to wait for

4    the evidence to come in.  I didn't know how it was going to

5    be.  This is not a -- this is a Rule 29 based on the

6    Government having rested its case, and now it's a question

7    of whether they have met the burden.

8          THE COURT:  And the issue in this is going to be

9    whether the pictures are sufficiently lascivious?

10         MR. AMOLSCH:  Within the meaning of the Federal

11   child pornography statute, yes, Your Honor.  I've prepared

12   what I think is a detailed brief outlining the case law,

13   outlining the Supreme Court holdings on what it means to be

14   lascivious.  I objected to the idea that it was

15   sexually-explicit conduct in the Government's direct and

16   their cross-examination.  I'd like to take the Court through

17   it, describe for the Court what it means to be lascivious

18   within the child pornography statutes and why these images

19   don't qualify.

20         THE COURT:  Well, without having the time to read

21   these cases, I'm not going to rule on this now.  But I will

22   say this:  On the evidence that's been before the Court,

23   which is not just the raw photographs, but the full context

24   of the conversations that are going on, I cannot believe

25   that any Court or any rational fact-finder would not find

                                                        188

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA207

REDACTED TRANSCRIPT

1    that these images would constitute, in that context,

2    lascivious.  Unless you've got a case that's right on

3    point --

4            MR. AMOLSCH:  I do.

5            THE COURT:  All right.  What case is that?

6            MR. AMOLSCH:  There are two cases, Your Honor.

7    One from the D.C. Circuit and one from the Fourth Circuit

8    that goes specifically to this issue.

9            The first case is *United States v. Hillie*.  It's a

10   recent case from the D.C. Circuit decided on September 21st,

11   2021, which dealt with whether the -- whether videoing --

12   having hidden cameras, videoing young women using the

13   bathroom, bending over, exposing their genitals, exposing

14   their anus, exposing their pubic hair, exposing their

15   breasts amounted to lascivious conduct under the statute.

16           There were two videos in that case; one that went

17   on for 29 minutes, and one that went on for about

18   12 minutes.  And, in each case, the young women who were

19   minors and below age, walked around naked, again, displaying

20   their anus, displaying their genitals, displaying their

21   breasts, displaying their pubic hair.

22           THE COURT:  Well, wait.  Is the context in which

23   these pictures were taken surreptitious?  In other words,

24   these were people who were in an unclothed context that

25   they're using the bathroom facilities and they're being

                                                        189

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA208

REDACTED TRANSCRIPT

1    surreptitiously photographed, is that what was going on?

2         MR. AMOLSCH:  In this case, yes, Your Honor, but

3    that's not dispositive.  But the answer to Your Honor's

4    question is, yes, they were surreptitious.

5         THE COURT:  All right.  Go ahead.

6         MR. AMOLSCH:  So what the Court said is we're

7    going to have to figure out whether these are lascivious.

8    What does it actually mean to be lascivious within the child

9    pornography statutes?

10        So what they did is they went back and looked at

11   all the Supreme Court law that dealt with the meaning of the

12   words "lewd" and "lascivious" and how are they understood

13   within the context.

14        They started at the very beginning, *United States*

15   *v. Miller*.  Moved all the way through excitement video, up

16   to *United States v. Williams*.  And they came to the

17   undeniable conclusion that lascivious means there has to be

18   some sort of overt sexual activity more than mere nudity.

19   Nudity is not enough.

20        The Supreme Court has said it over and over and

21   over again.

22        THE COURT:  Right.

23        MR. AMOLSCH:  D.C. Circuit Court said it over and

24   over again.  The Fourth Circuit, to the extent they

25   commented on this, has said nudity is not enough, there has

                                                          190

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA209

REDACTED TRANSCRIPT

1    to be something more.  And the "something more" only makes

2    sense in relation to the other overt acts or the other

3    definitions within the child pornography statute.

4              There has to be actual or simulated genital

5    penetration, beastiality, sadomasochism.  There has to be

6    that element.  It is simply not enough for there to be an

7    image of an anus or a vagina or a breast or pubic hair and

8    have it be lascivious.

9              Whatever you or I or Webster's dictionary might

10   say lascivious is in the real world, we're talking about the

11   pornography statutes.  Like, what does the Supreme Court say

12   about what those words must mean.  And the *Hillie* court

13   comes to the undeniable conclusion that lascivious only

14   counts under the Federal child pornography statutes if

15   there's an associated sexual overtness to it, including the

16   limited acts.  And there simply isn't in this case.

17             As you heard over and over and over again, there's

18   a picture of genitals, there's an anus, there's a picture of

19   a vagina.  The only, only thing that's different is there's

20   some digital manipulation, which, again, goes to being able

21   to view the anatomy.

22             But there's no penetration, there's no

23   ejaculation, there's no simulated sex, there's no nothing.

24   They're just pictures.  And *Hillie* said that doesn't count.

25   The Supreme Court said over and over and over again, lewd

                                                        191

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA210

REDACTED TRANSCRIPT

```
 1   and lascivious means hardcore child pornography.  This is

 2   aimed at the hardcore of pornography.  That's what those

 3   words mean, and that's how they have to be understood.

 4   That's from the D.C. Circuit.  I've included the cases,

 5   included the cites from the Supreme Court and included their

 6   reasoning.

 7            There's one case in the Fourth Circuit on this,

 8   Your Honor, United States v. Courtade.  United States v.

 9   Courtade, which is also cited in my brief, Your Honor, was a

10   2255 civil proceeding on a petition of actual innocence.  It

11   was not a criminal proceeding.

12            The Court went out of its way to say that what

13   it's finding in this case has nothing to do with the legal

14   sufficiency of the statute.  It was all about actual

15   innocence, because that was the posture of the case.

16   Courtade said, again, mere nudity is not enough; there has

17   to be something more.

18            And to Your Honor's point, and this goes directly

19   to what Your Honor just said, they said you need to look at

20   the four corners of the image.  The context is not

21   important.  This photo has to excite restfulness or whatever

22   they used based on the four corners of the document.

23   Because this isn't a subjective test.  This isn't we show an

24   image to somebody who says, yeah, I'd like to have sex with

25   that and somebody who's not.  The image either is or is not
```
                                                              192

JA211

REDACTED TRANSCRIPT

```
 1   lascivious.  Where it was posted is irrelevant.  What
 2   someone said about it is irrelevant.  What she intended when
 3   she took it from a lascivious point of view is irrelevant.
 4           Courtade said you've got to look at the four
 5   corners of the document because this isn't a subjective
 6   test.  You could show this image to five people who would
 7   say, I would never do that.  Some people would say, yes, I
 8   would.  You could show a picture of a cow to somebody, or a
 9   picture of a car or sock, and they may want to have sex with
10   that.  But that doesn't mean the picture is lascivious.
11   Lascivious is you look at the four corners of the document,
12   and there's, again, nothing overtly sexual about any of
13   those images.
14           If she had taken -- I have always described these
15   images, Your Honor, as being taken right out of a medical
16   textbook.  If you were going to look at a medical textbook
17   for diaper rash or anatomy, this is kind of like the things
18   you would see.  If Ashley had taken photos out of a medical
19   journal and distributed those, they wouldn't be child
20   pornography.  If she had put those on the website saying
21   this ████████████, they don't become lascivious.  They're
22   either lascivious or they're not.
23           Now I'll get to the Fourth Circuit, and the only
24   case they've talked about this said -- had a completely
25   different context and a habeas petition on actual innocence
```

                                                              193

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA212

REDACTED TRANSCRIPT

 1   claim.

 2              THE COURT:  All right.  You want to respond?

 3              MR. SCHLESSINGER:  Yes, Your Honor.  I'm happy to

 4   respond, but -- I'm certainly happy to respond, but before I

 5   do so, Your Honor, I would like to maybe just make a couple

 6   of practical points.

 7              It sounds to me like this argument that's being

 8   said by Mr. Amolsch is not going to change between the close

 9   of all the evidence, or even after a verdict is rendered by

10   the Court.  So this argument could be raised more fully, and

11   I think probably more effectively briefed certainly by the

12   Government who just received this motion a couple of minutes

13   ago.  And maybe it would permit full consideration by the

14   Court if it's raised, you know, as a motion for judgment of

15   acquittal at the close of all the evidence or even after a

16   verdict is rendered.  The Government has its expert witness

17   currently waiting outside.

18              So -- and I note also in this current posture, I

19   understand this is a bench trial, but this is a Rule 29

20   motion.  So technically the standard that's being applied by

21   the Court here is whether there's simply, you know,

22   sufficient evidence to permit any reasonable fact-finder

23   construing all inferences and evidence in favor of the

24   Government, whether there's even sufficient evidence for a

25   rational fact-finder to find that these images are

                                                             194

JA213

REDACTED TRANSCRIPT

```
 1   lascivious, and they absolutely are.
 2           I'll --
 3           THE COURT:  I'm going to deny the motion without
 4   prejudice, because this type of technical legal argument
 5   should have been teed up more appropriately.
 6           And, you're right, it needs to be fully briefed.
 7   I have not read these decisions, and I want to be able to
 8   think about them.  I might have to see what pictures they're
 9   talking about to compare them to the ones we've got here.
10           But, again, it seems to me that, given the fact
11   that the first four of the five types of activity that is
12   described in the statute are clearly not involved here,
13   we're only looking at the lascivious exhibition of the
14   genitals, pubic or anal areas, if that's the only thing
15   we're looking at and you've already excluded the other four,
16   it means something more than that.
17           In other words, I don't understand how, in the
18   context of this case, one could find.  But I want to look at
19   the case law and see, and, in particular, concept of
20   context, all right, and whether the Courts are looking at it
21   in as myopic a way as it appears they are looking at it.
22           So we'll have to see.  All right.  I need to
23   looking at the cases.  So it's denied without prejudice.
24           MR. AMOLSCH:  Thank you, Your Honor.
25           THE COURT:  All right.  Is the defense putting on
```

195

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA214

REDACTED TRANSCRIPT

```
 1   any additional evidence?
 2          MR. AMOLSCH:  We are not.  We rest.
 3          THE COURT:  Dr. Hendricks is it.
 4          MR. AMOLSCH:  So again, procedurally, I'm remaking
 5   the Rule 29 --
 6          THE COURT:  All right.  It's denied again.
 7          MR. AMOLSCH:  Without prejudice, Your Honor?
 8          THE COURT:  Without prejudice, yes.
 9          All right.  Mr. Schlessinger.
10          MR. SCHLESSINGER:  The Government calls Dr. Rachel
11   Kalbeitzer.
12          THE COURT:  All right.
13          THE CSO:  Face the deputy clerk.  Please raise
14   your right hand.
15   Thereupon,
16                    RACHEL KALBEITZER,
17   having been called as a witness on behalf of the Government
18   and having been first duly sworn by the Deputy Clerk, was
19   examined and testified as follows:
20               (Time noted:  9:13 a.m.)
21          THE DEPUTY CLERK:  Thank you.
22          THE CSO:  You may be seated.
23                   DIRECT EXAMINATION
24   BY MR. SCHLESSINGER:
25   Q    Okay.  Dr. Kalbeitzer, good morning.
```

196

JA215

REDACTED TRANSCRIPT

```
 1   A     Good morning.

 2   Q     And, Dr. Kalbeitzer, how are you employed?

 3   A     I am a clinical and forensic psychologist.  I work full

 4   time for the Department of Defense, and I have a private

 5   practice that I also do.

 6   Q     And how long have you been practicing as a clinical and

 7   forensic psychologist?

 8   A     I was awarded my degree in 2008, and I've been

 9   practicing since then.

10   Q     All right.  And, Dr. Kalbeitzer, were you previously

11   asked to provide the Government with a CV that outlines all

12   of your training, background, education and experience in

13   that area?

14   A     Yes, I was.

15         MR. SCHLESSINGER:  Your Honor, if there's no

16   objection the Government would simply move at this time to

17   tender Dr. Kalbeitzer as an expert in the field of clinical

18   and forensic psychology based on the CV that's previously

19   been submitted.

20         MR. AMOLSCH:  That's no objection, Your Honor.

21         THE COURT:  All right.  That's fine.  She'll be

22   deemed an expert.

23   BY MR. SCHLESSINGER:

24   Q   Dr. Kalbeitzer, were you retained by the Government to

25   conduct an evaluation of a person named Ashley Kolhoff?
```
                                                              197

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA216

REDACTED TRANSCRIPT

```
 1   A    Yes, I was.

 2   Q    Do you see Ms. Kolhoff here in court today?

 3   A    I do.

 4   Q    Can you explain to the Court a little bit about -- just

 5   from an overview perspective your process in evaluating

 6   Ms. Kolhoff, and then we'll go into a little more detail

 7   about how that occurred.

 8   A    Sure.  My process of evaluation is pretty similar for

 9   all of the cases that I have.

10        I start by ensuring that I have the proper

11   authority to evaluate the defendant, that I -- that the

12   referral question is within my scope of competence, I ask

13   for requested documents that are relevant to the particular

14   question that I'm being asked to evaluate, and any other

15   additional information that I might need to ensure that I

16   have everything I need to do to schedule the evaluation with

17   the defendant.

18        I meet with the defendant, select appropriate

19   tests based on whatever the referral question is, formulate

20   difference hypotheses about what I think might be going on

21   based on all of the relevant information that I have, and

22   then over the course of the evaluation process, test those

23   hypotheses, to include questions during the review,

24   particular tests that I might administer, collateral

25   information that I might get, and then I synthesize all of
```
                                                           198

JA217

REDACTED TRANSCRIPT

1    that information in a report, usually, and provide my

2    opinion.

3    Q    You mentioned that you consider sort of various sources

4    of information.

5            When it came to particularly evaluating

6    Ms. Kolhoff, can you describe for us the sources of

7    information that you considered in conducting your

8    evaluation?

9    A    Sure.  I met with the Government attorneys, and I was

10   provided a little bit of information in terms of what the

11   allegations were against Ms. Kolhoff.  I had the opportunity

12   to review a few exhibits, including information about some

13   of her chat on the website Rapey.su.  I also obtained other

14   legal documents that the Government provided to me.  I

15   interviewed Ms. Kolhoff, I did some psychological testing

16   with her, and I did collateral interviews with Ms. Kolhoff's

17   adoptive father ███████████████████, her boyfriend at

18   the time of these offenses.

19   Q    And you mentioned that one of those things you did was

20   you performed -- conducted an interview with Ms. Kolhoff.

21           Was that done in person?

22   A    Yes, it was.

23   Q    Let me ask you a little bit about that interview.

24           Was part of it talking about Ms. Kolhoff's

25   personal background?

                                                            199

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

REDACTED TRANSCRIPT

```
 1   A     Yes, it was.

 2   Q     And just what sort of general topics did you cover with

 3   Ms. Kolhoff?

 4   A     I covered all of the standard sort of background areas

 5   that I would cover with anyone.  So early childhood, family

 6   background, personal relationships, marital history or

 7   romantic relationship history, educational history,

 8   occupational history, legal history, substance abuse

 9   history, psychiatric history.  And then I conduct a mental

10   status, just sort of an overview of how she's functioning at

11   that particular point in time.

12   Q     And how did Ms. Kolhoff appear to be functioning at

13   that point in time when you were interviewing her?

14   A     She appeared generally unremarkable.  She reported that

15   her mood was good when I met with her, and that was

16   consistent with what my interactions with her were.  She --

17   her affect or sort of her outward expression of emotion was

18   full in range, as we call it, which means that it was

19   appropriate to what we were talking about.  She, you know,

20   was pretty -- provided information that was sufficient in

21   detail oftentimes, and she reported no -- in that moment, no

22   distressing psychiatric symptoms.

23   Q     Was one of the topics that you covered with Ms. Kolhoff

24   her level of education?

25   A     Yes.
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA219

REDACTED TRANSCRIPT

```
 1   Q     And do you recall what her level of education was?

 2   A     Yeah.  She graduated high school.

 3   Q     Do you have a general sense of how well she had done in

 4   high school?

 5   A     She reported that she generally got As.  She said that

 6   school was very important to her parents, and she did well

 7   in school.  I think -- I learned from a different document

 8   that her GPA was about a 3.5.  She didn't specifically tell

 9   me that, but she said that she did well in school.

10   Q     Did you discuss her employment history?

11   A     Yes, I did.

12   Q     Can you tell the Court a little bit about what you

13   learned about Ms. Kolhoff's employment history?

14   A     Yeah.  She reported to me that she generally worked

15   with family members.  She worked for her father's grocery

16   store and at a gas station.  She worked with her sister

17   cleaning houses.  She also reported that she worked in a

18   theater, a performing arts theater, for a period of time.

19   Q     As she reported to you, has she ever been fired from

20   any of the jobs she worked or forced to leave under threat

21   of firing?

22   A     No, she had never been fired.

23   Q     Did she report to you, had she ever been reprimanded

24   for any performance issue at any job?

25   A     She said she had not.
```

201

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA220

REDACTED TRANSCRIPT

1   Q    You mentioned one of the topics you would have covered

2   with Ms. Kolhoff was her substance abuse history?

3   A    Yes.

4   Q    Did Ms. Kolhoff report a significant history of

5   substance abuse?

6   A    I don't know if it's significant.  She reported a

7   history of alcohol consumption and marijuana use.

8   Q    How about on the day that you were interviewing her,

9   did she appear to be under the influence of any alcohol or

10   other substances?

11   A    No, she did not.

12   Q    Was one of the topics that you covered with Ms. Kolhoff

13   her history, if any, of any previous psychiatric treatment?

14   A    Yes, I did ask her about her psychiatric treatment.

15   Q    And what was the result of that portion of the

16   interview?

17   A    She reported to me that she had sought psychiatric

18   treatment at periods throughout her life.  She said she had

19   never been psychiatrically hospitalized, but she did report

20   to me that she went to the hospital on two occasions but was

21   not admitted on either time.

22         The first time she couldn't remember exactly when

23   it was, but thought it was sometime around 2017.  She said

24   she didn't remember what was happening at the time but felt

25   like she was in a bad place.  That she -- I think that her

202

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

REDACTED TRANSCRIPT

1  boyfriend at the time may have called the police and helped

2  her get to the hospital.  But, again, she was not admitted,

3  and she couldn't really remember many of the details about

4  that period.

5       The second time was she said she thought was about

6  in 2020 when she felt like she was having -- she felt like

7  she could hear herself talk before she was talking, and she

8  was very concerned about that.  It frightened her.  She went

9  to the hospital.  They told her it was anxiety and did not

10  admit her.

11  Q    In addition to that portion of her history, did you

12  discuss with Ms. Kolhoff various traumatic experiences that

13  she reported to you having had in the past?

14  A    I asked her about some of the traumatic history that

15  she had reported to Dr. Hendricks.  She said she really

16  didn't want to talk about it with me.  She said she had just

17  talked about it with Dr. Hendricks in great detail.  It made

18  her very upset.  And she said after that, she had to ask for

19  additional medication at the Detention Center so she

20  preferred not to talk to me about it.  I didn't ask her

21  further questions about that.  I took that to be fine.

22  Q    Now, was there a portion of the interview as well that

23  focused on her alleged conduct in this case?

24  A    Yes.

25  Q    All right.  Having said that, let me come back to that,

                                                        203

JA222

REDACTED TRANSCRIPT

1    because before I get to that, I'd like to ask you,

2    Dr. Kalbeitzer, about the various tests that you

3    administered to Ms. Kolhoff.

4    A    Yes.

5    Q    What were the tests that you administered to

6    Ms. Kolhoff during her evaluation?

7    A    So the first test that I administered to her was called

8    the Personality Assessment Inventory.  We call it the PAI.

9    It's kind of a standardized measure of mental and emotional

10   functioning.  It gives a broad overview of essentially how a

11   person is reporting psychological symptoms that might be

12   impacting their functioning.  This test is about 344 items.

13   It's on a modified true/false scale.  So you answer false,

14   slightly true, mainly true, or very true for how that item

15   applies to you.

16        It asks about a variety of symptoms related to

17   anxiety, depression, trauma, you know, psychosis.  And then

18   it also asks questions related to substance abuse to kind of

19   characterological functioning and interpersonal functioning.

20        And I chose this test specifically because I had

21   read Dr. Hendricks' report, and he had given the MMPI-2.

22   The PAI is very similar to the MMPI-2.  The difference is

23   it's shorter in items.  The MMPI-2 has about 567 items.  The

24   PAI was developed because the MMPI had so many items, and I

25   think the field was looking for something with the same sort

204

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA223

REDACTED TRANSCRIPT

1   of breadth but shorter in items.  It also requires lower

2   reading level.  So it's good for forensic contexts from that

3   perspective.

4   Q    Did Ms. Kolhoff appear to have any difficulty

5   understanding and completing the PAI?

6   A    She did not.

7   Q    And can you share with the Court what the results were

8   of the administration of the PAI to Ms. Kolhoff?

9   A    Yes.  So I gave her the instructions on how to complete

10  it.  It's a bubble sheet that you sort of read the item and

11  then you bubble in your answer.  And, on average, people

12  take around 30 to 45 minutes to complete it.  That was about

13  how long Ms. Kolhoff took as well.

14       So at -- the scoring program that I have for it is

15  a computer scoring program, so I wasn't able to score it in

16  the moment with her, I had to take it home and score it.

17  And the results of the scoring program showed that I wasn't

18  able to interpret the clinical scales on it because there

19  are four validity scales, that if these are elevated to a

20  degree, to render the rest of the test uninterpretable.

21  That means that it's probably not an accurate reflection of

22  what her functioning is, so it would be kind of useless to

23  interpret the clinical scales.

24       For Ms. Kolhoff's results, one of those validity

25  scales was significantly elevated, and that scale is called

205

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA224

REDACTED TRANSCRIPT

```
 1   the Negative Impression Management scale or the NIM.  That
 2   scale has -- it's made up of a variety of items that are
 3   very infrequently endorsed.  Oftentimes, people who are
 4   experiencing a lot of symptomatology would have an elevated
 5   NIM score, but hers was to the point that it was outside
 6   even individuals who are in an inpatient hospital setting.
 7   And so, based on that, I wasn't able to interpret the rest
 8   of the clinical scales.
 9   Q    Okay.  And did that suggest to you in any way that
10   Ms. Kolhoff was exaggerating -- exaggerating the extent of
11   any symptoms she might have actually been experiencing?
12   A    It suggested that she was endorsing an extraordinarily
13   high level of symptoms that are very infrequently endorsed.
14          THE COURT:  Can you give me an example of what
15   those would be?
16          THE WITNESS:  Yes.  So she said -- one of the
17   items was -- and this is particularly for the NIM scale.
18   Some -- I feel like I have more than one personality inside
19   of me.  And I think she put mainly true for that item.
20   Other items that she endorsed -- I'm sorry, I'm forgetting
21   the other items.  That one stuck out to me because that is
22   very infrequently endorsed.
23   BY MR. SCHLESSINGER:
24   Q    If we can move on if we might, Dr. Kalbeitzer, to
25   something called the Dissociative Experiences Scale.  Is
```
206

JA225

REDACTED TRANSCRIPT

1   that one of the tests you administered to Ms. Kolhoff?

2   A    Yes, it was.

3   Q    Can you describe that test a little bit, please.

4   A    Yes.  So the Dissociative Experiences Scale, it's

5   actually a revised version, so it's DES II.  This is a test

6   that -- it's probably one of the only tests available that

7   specifically asks questions about dissociative experiences

8   as an entire test.  So the instructions are -- we want to

9   know more about how often you experience -- how often you

10  experience different situations.  And so it gives 28

11  situations that people experience in their lives, and asks

12  what percentage of the time do you experience this.  And

13  then you circle on a 0 to 100 percent scale how often you

14  experience this -- what percentage of the time you

15  experience this.  And each item gives the particular

16  situation.

17          So how often do you experience driving somewhere

18  and not remembering getting there.  What percentage of the

19  time do you experience this.  And each item ends with "what

20  percentage of the time do you experience this."

21  Q    Now, you were present in court to hear Dr. Hendricks's

22  testimony that after you completed your report, Ms. Kolhoff

23  reported to him that she had misunderstood the items on this

24  test.

25  A    Yes.

207

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA226

REDACTED TRANSCRIPT

1    Q    While you were administering the test, did you have any
2    indication or experience or anything that suggested to you
3    that she was not understanding the test?
4    A    I did not question whether she understood the
5    instructions.  I read the instructions with her, and then I
6    handed the sheet to her, and she read each item and circled
7    the percentage of time that she experienced.  Well, she
8    circled her response.  And she didn't ask me any questions
9    during the administration of that.
10   Q    Stepping back from the description of the test, why did
11   you decide to administer this test in particular?
12   A    When I initially consulted with the Government, they
13   provided Dr. Hendricks' report to me, and I -- in the
14   report, it seemed as though the opinion was very much based
15   on dissociative experiences that Ms. Kolhoff has had
16   throughout her life.  And so I chose this specifically to
17   assess what that looked like.  It was -- seemed germane to
18   the referral question.
19   Q    And what was the result of the administration of that
20   test to Ms. Kolhoff?
21   A    She reported very high levels of percentage of time
22   that she experienced a variety of situations where she --
23   where, according to the test, were dissociative experiences.
24        There's 28 items.  So on 14 of the items, she
25   circled 70 percent of the time or more.  And her score ended
                                                              208

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA227

REDACTED TRANSCRIPT

1    up being a 60.  So the scores in the scoring criteria, they

2    give what has been -- what's been found in the research to

3    be sort of average scores for the normal population, and

4    then average scores for individuals who have various

5    psychotic or other sort of psychiatric issues.

6              So, for the average population, a score of 5.4 is

7    the average score.  For the population with PTSD, the

8    average score is 30.  For the population with dissociative

9    identity disorder, which is very rare and very extreme, the

10   average score was a 48.  And Ms. Kolhoff's score was 60.

11   Q    Her score was 60?

12   A    Yes.

13   Q    What, if any, sort of outward -- outwardly visible

14   symptoms or manifestations would you expect to see from a

15   person who received a score of 60 based on genuine

16   responses?

17   A    I would expect that these are -- the situations that

18   are provided in the Dissociative Experiences Scale are

19   situations that are just normal daily situations.  How often

20   do you get dressed and not realize that you remember --

21   didn't realize that you picked out the clothes that you had

22   on, or that you drove somewhere and didn't remember getting

23   there.

24             So I would have expected someone who is reporting

25   more than half -- on more than half of these normal daily

209

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA228

REDACTED TRANSCRIPT

1   situations that they're experiencing dissociation 70 to

2   90 percent of the time, I would have expected to see

3   something in a three-hour interview that would kind of go

4   along with that.

5   Q   Dr. Kalbeitzer, you gave as an example a question about

6   how often do you get dressed and not remembering getting

7   dressed.

8         Is that one of the items on the DES, or was that

9   just an illustrative example?

10   A   I want to say it is one of the items, but -- I think it

11   is one of the items.

12   Q   Did you conclude that Ms. Kolhoff's score on the DES II

13   was significantly higher than those with even the most

14   severe cases of dissociation?

15   A   Yes, I did.  That was part of the comparison with the

16   averages.

17   Q   All right.  Moving on now to a test called the Test of

18   Memory Malingering.

19         Did you administer that test to Ms. Kolhoff?

20   A   I did.

21   Q   And why did you choose to administer that test?

22   A   I initially chose to administer -- it's called the Test

23   of Memory Malingering, but we call it the TOMM.

24         I initially chose to administer the TOMM because

25   also in Dr. Hendricks' report, he indicated that she had

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA229

REDACTED TRANSCRIPT

1    these periods of memory loss and blackouts, and the TOMM is

2    a very effective tool that is very, very widely used in

3    forensic context to assess, essentially exaggeration or

4    malingering versus genuine memory impairment.  And the TOMM

5    is exceptionally simple to administer, and it is very

6    sensitive to malingering and very insensitive to

7    neurological impairment, to psychiatric symptoms.

8            To give you an example, within the normative

9    sample, there are individuals who have a variety of

10   psychological diagnoses, including very severe psychotic

11   diagnoses, PTSD, very severe depressive disorders, as well

12   as structural impairments to their brain, including one

13   person who was shot very close range with a gun and had some

14   significant traumatic brain injury.  Another person had a

15   cranial lobotomy.

16           In all of those cases, the individuals were able

17   to score very highly on this test because the brain has an

18   amazing capacity to encode pictures, visual information when

19   you don't have a verbal piece tied to it.

20           So the way this test works is you show the person

21   50 pictures, they're just kind of pencil drawings of common

22   objects like a flagpole or a desk, and you show that person

23   the picture one at a time, and then you go through a series

24   of recognition pictures where there's two pictures on a

25   page, and the person has to tell you if they saw the first

                                                            211

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA230

REDACTED TRANSCRIPT

1    or the second picture.  And each -- after each -- after each

2    of those recognition trials, they're given feedback about

3    that was correct or that was not correct.

4            And so the person has the ability -- for people

5    who are putting forth good effort, that person has the

6    ability to gauge how well they're doing.  Or if they're not

7    putting forth good effort or attempting to malinger, then

8    they're able to kind of adjust their response style based on

9    that.

10           So generally the test manual advises that based on

11   all of the data that the TOMM has -- has -- all of the

12   empirical research behind the TOMM that scores over a 45 --

13   so a perfect score is a 50 on each trial.  You give two

14   trials.  There is a third trial that is optional.  I gave

15   two trials.  And the score on the second trial, if it's over

16   45, that's determined to be the person is putting forth good

17   effort, they're not exaggerating any impairment in their

18   cognitive abilities or their memory.  If it's under 45, that

19   suggests pretty considerable concern about feigning,

20   exaggerating, malingering.

21           Those -- that cutoff is a strong cutoff, but it

22   doesn't necessarily apply to all populations.  So, for

23   example, for individuals with intellectual disability, which

24   is not an issue in this case, but that cutoff wouldn't

25   necessarily apply.  But for people who have intact cognitive

212

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA231

REDACTED TRANSCRIPT

1    functioning -- "intact" meaning no intellectual

2    disability -- you would expect the person to have a Trial 2

3    score of 45 or higher.  For Ms. Kolhoff, her score was 33 on

4    the first trial and 35 on the second trial.

5         The other important thing to note about this test

6    is both trials have exactly the same pictures.  So the high

7    capacity for being able to recognize visual information is

8    that much -- I guess more reinforced after the second trial.

9    Q    What would you expect to be sort of the psychological

10   condition of a person who achieves Ms. Kolhoff's scores of

11   33 and 35 on the TOMM through genuine responding?

12   A    I'm sorry, say that again.

13   Q    I'm sorry.

14        If somebody is putting forth true and full effort

15   and is not malingering, and nevertheless scores a 33 and a

16   35 on the two trials of the TOMM, what would you expect the

17   psychological condition of that person to be?

18   A    Probably an intellectual disability.  That's not

19   necessarily uncommon to see in individuals with intellectual

20   disability.

21   Q    Based on Ms. Kolhoff's particular situation on the

22   results of the TOMM, did you reach any conclusion about

23   the -- about her potentially exaggerating the extent of any

24   memory deficits?

25   A    On this particular measure, her scores suggest that she

213

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA232

REDACTED TRANSCRIPT

```
 1   was likely not putting forth full effort and may be

 2   exaggerating the memory problems that she does have.

 3   Q    Now, if I may, Dr. Kalbeitzer, I'd like to come back to

 4   your interview with Ms. Kolhoff, and come back to

 5   specifically a portion of the interview where you discuss

 6   the alleged conduct.

 7              Did you have an opportunity to discuss with

 8   Ms. Kolhoff her activity on the website Rapey?

 9   A    I did.

10   Q    What did Ms. Kolhoff recall about how she came across

11   the -- how she first came into contact with the Rapey

12   website?

13   A    She explained to me that she was an administrator on a

14   Facebook Web page that -- called Save Our Children.

15              And she said as an administrator, she -- she's one

16   of several administrators she said, and she was responsible

17   for, I guess, allowing people into that Facebook group.  She

18   said that she came into contact with that website because on

19   one occasion she saw that there was a link for that website

20   that had been posted to the Save Our Children website.  And

21   so out of curiosity, she said she was curious about the link

22   and what was in the link, so she clicked on it.

23   Q    Did you discuss with her anything about her taking and

24   sending a picture of herself while she was on that website?

25   A    Yes.
```

                                                              214

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA233

REDACTED TRANSCRIPT

```
 1   Q    And what was that?
 2   A    Well, I asked her what happened next after she clicked
 3   on it, and she said she saw chat dialogue.  And I said, so,
 4   did you just click on it and you saw a chat dialogue, or did
 5   you have to do anything to be able to see the chat dialogue?
 6   And she said, in order to be admitted into, I guess the part
 7   of the Rapey.su website, she had to write that website name
 8   on her stomach and take a picture of that and send it to the
 9   administrator of that website.  Which she did.
10   Q    Did she recall the general kind of nature or theme of
11   the contents of the site?
12   A    I asked her what kind of chat she saw, and she said she
13   didn't really remember.  And I said -- I asked her was it
14   chat that was kind of like what people were talking about
15   for dinner, or was it more kind of sexually-explicit chat.
16   And she said it was sexually explicit.
17   Q    Did she recall anything about any of the users of that
18   site asking about ███████████████?
19   A    Yes.  She said -- initially she said she just kind of
20   read the chat and she didn't post anything.  And then as
21   the -- sort of as we were talking about her -- what she was
22   reading and what she was seeing, she did acknowledge that
23   she did post -- post some comments and had some dialogue
24   back and forth with other people.
25   Q    Did she recall taking and sending pictures of ███
```
                                                         215

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA234

REDACTED TRANSCRIPT

1    ████████████    to other users of the website?

2    A    She did.  Initially she said that she didn't post any

3    pictures.  She said that she just had chat with people.  And

4    then when specifically -- and I asked her specifically did

5    she post any pictures of ████████████████████████

6    ██████, she said that she had posted.  And she said that

7    she didn't know why she did that, and she was -- she was

8    clearly very upset in talking about this.

9    Q    Following up on that, you mentioned she said to you she

10   didn't know why she did that.

11        Later on, or at this point in the interview, did

12   she express any sort of insight or thought about why -- as

13   to herself about why she might have done that on the

14   website?

15   A    Yes.  So initially she said I'm trying to figure this

16   out, I don't know why I did this, but I may have done this

17   for attention.  I've -- there have been times in my life

18   where I've done things that have caused problems because

19   I've wanted attention.

20        And then she described to me a time in high school

21   when she sent a picture of herself in some vulnerable

22   position or situation to a boy and that picture was

23   circulated wider than what she expected it to be and that

24   caused her some emotional problems.

25   Q    So she was -- was she suggesting to you that her

216

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA235

REDACTED TRANSCRIPT

```
 1   activity on Rapey might have been sort of another instance
 2   of her seeking attention in perhaps the wrong way?
 3   A    Yes.  She talked to me about at the time that this was
 4   happening, she was living with ████ M█████, her boyfriend
 5   at the time, and Mr. M█████ was working as a commercial
 6   fisherman.  He was gone all day, and she felt very lonely.
 7   She was ████████████████████████████████████,
 8   and she felt very lonely and very sad and very depressed and
 9   described kind of, you know, looking for some attention.
10   Q    Did you ask her during this part of the interview, or
11   at any time during the interview, about a specific post on
12   the website with the subject:  "Would anyone want me and █
13   ██████?"
14   A    I did.  I specifically asked her about that.  That was
15   one of the pieces of evidence the Government shared with me,
16   and I wanted to know what she was thinking, honestly, about
17   the time that she posted that.
18        And I specifically asked her about that post, and
19   she said that, you know, it was ████████████████; it
20   was about her.  And I asked her if it was about her, why she
21   didn't just write does anyone want me.  And she said because
22   the website was for children.  And I interpreted that to
23   mean she posted ████████████ so that she could get a
24   response because it had the child parts, since that was the
25   nature of that website.
```

                                                            217

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA236

REDACTED TRANSCRIPT

```
1   Q    Did you ask her whether she was concerned at the time
2   that she might get in trouble for this at all?
3   A    I did ask her that.  She said she wasn't thinking about
4   getting in trouble.  And she said that she -- if those
5   pictures that she had posted on that website had been shared
6   with anyone else, she didn't think that it would qualify as
7   child pornography.
8   Q    Did you ever ask her whether she told anyone else about
9   her activity on the website?
10  A    I did ask her that.  She said she had not shared it
11  with anybody at the time.
12  Q    All right.  Now, shifting a little bit, Dr. Kalbeitzer,
13  you mentioned that another of the sources of information you
14  consulted was an interview with Ms. Kolhoff's father; is
15  that correct?
16  A    That is correct.
17  Q    Michael Kolhoff?
18  A    Yes.
19  Q    Did Mr. Kolhoff express to you any experiences that he
20  had had with Ms. Kolhoff tending not to tell the truth?
21  A    Yes.  He talked about raising Ms. Kolhoff since she was
22  a small child, and that throughout her later childhood and
23  adolescence, that she lied frequently.  And I think he
24  said -- so Mr. Kolhoff described his relationship as very
25  close with his daughter.  He clearly loves his daughter
```

218

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA237

REDACTED TRANSCRIPT

```
 1   very, very much.  But he was -- in talking to me, he said

 2   that she was lying and on a regular basis.

 3           And he said that she would lie about lots of

 4   different things.  She would lie about where she was at a

 5   time, and then he found out that she was, you know,

 6   somewhere else.  On one occasion, he said that some balloons

 7   went missing at a birthday party and she denied that she had

 8   taken them and they were later found in her possession.

 9   Q    Did you ask Mr. Kolhoff also about whether he had ever

10   experiencing or noticed Ms. Kolhoff seemingly disconnected,

11   spacing out, or some other manifestation that might be

12   associated with a dissociative event?

13   A    Never.  He said -- I asked him if there were ever times

14   when she seemed disconnected or not present in a

15   conversation, and he said he did not experience that.

16   Q    Dr. Kalbeitzer, I think you said another source of

17   information was an interview that you conducted with

18   ███ M█████, ████████████████████████?

19   A    Correct.

20   Q    Did he have any experience -- or had he ever noticed

21   anything that could be -- that could indicate any

22   dissociative events being experienced by Ms. Kolhoff?

23   A    He did not.  He -- I sort of asked him questions about

24   what their life was like together, what she was doing for

25   work and ████████████████████████████
```

219

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA238

REDACTED TRANSCRIPT

```
 1   ████████████████████████  so much.  And he said  ██████
 2   ████████████████████████████████████████████████████████
 3   ████████████████████████████████████████████████████████
 4   ██████████.
 5           And he told me about a job that Ms. Kolhoff had
 6   started doing, I think in the summer of 2020, where she
 7   was -- it's called Forex, I think, Forex Trading, and he
 8   described it to me as -- it's kind of like day trading where
 9   you track the changes in money from different currencies and
10   somehow you make a profit from that.  He said that she had
11   gone to some kind of training program and she was starting
12   to do that.
13           And so in the context of that, there was no
14   concern ever that he expressed any sort of situations where
15   she was not able to attend in real time to all of her
16   responsibilities.
17   Q    Did he express any concerns about -- at all about
18   the -- or did he express having had in the past any concerns
19   about ████████████████████████████████████████████?
20   A    No.  He expressed no concerns.
21   Q    All right.  So from -- Dr. Kalbeitzer, from all of
22   these sources of information that you consulted, including
23   the one that we've discussed here in court today, did you
24   make certain diagnoses of Ms. Kolhoff?
25   A    Yes, I did.
```

220

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA239

REDACTED TRANSCRIPT

```
1   Q    And what were those?
2   A    The diagnoses I assigned to her were major depressive
3   disorder recurrent, and that diagnosis was based on her
4   report of having a long history of depressive symptoms that
5   included sadness, feeling worthless, hopeless, periods of
6   suicidal ideation, and that was corroborated, to some
7   extent, by her father.  Her father said that she's really
8   struggled with depression for a long time.
9            THE COURT:  Let me stop you on that point.
10           THE WITNESS:  Sure.
11           THE COURT:  These events occurred ████████████
12   ████████████████████████████████████████.
13           Did you, at -- ██████████████████████████████
14   ████████████████████████████████████████████████
15   ████████?
16           THE WITNESS:  I have some experience in
17   diagnosing, yes.
18           THE COURT:  Had you thought about administering
19   any tests to probe that particular possibility?
20           THE WITNESS:  That's an excellent question.  I
21   didn't particularly administer any tests related to that.
22           I'm not actually aware of any psychological tests
23   that are ████████████████████████████.  And because I
24   met with her ████████████████████████████, I would be
25   essentially just relying on her memory of what her
```
221

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA240

REDACTED TRANSCRIPT

```
 1   experience was.
 2           I did ask her about some things related to
 3   ███████████████, and she -- I think she had a
 4   preexisting ██████████████, and her ████████████
 5   ████████████████████████████████████████████████
 6   ████████████████████████ all the time.
 7           THE COURT:  Thank you.
 8           MR. SCHLESSINGER:  Thank you, Your Honor.
 9   BY MR. SCHLESSINGER:
10   Q    All right.  Dr. Kalbeitzer, I think you were in the
11   middle of discussing your diagnoses, if you want to go back
12   to that.
13   A    Sure.  The second diagnosis I gave her was
14   post-traumatic stress disorder, and that's very consistent
15   with the information that Dr. Hendricks obtained from her
16   about her trauma history.  She was avoidant in talking to me
17   about her trauma, which is consistent with that diagnosis.
18           I -- based on all of the information that I have,
19   I don't have a doubt that she has PTSD.  I did not diagnosis
20   her with complex PTSD because, frankly, it's not in the DSM.
21   It's not a diagnosis that the DSM recognizes.  And it may be
22   in the future, but the DSM uses current research that
23   determines -- it sort of adds diagnoses if there's enough
24   evidence to discriminate the existing diagnosis from a
25   different diagnosis, and that research just has not been
```

                                                        222

JA241

REDACTED TRANSCRIPT

1    made available according to the DSM yet.  I don't think it's

2    in the ICD-10, as Dr. Hendricks testified yesterday.  It's

3    in the ICD-11, but we're not using that in the United States

4    yet.  But I diagnosed her with PTSD.

5         And then finally I diagnosed her with borderline

6    personality disorder.  Now, borderline personality disorder

7    is a characterological disorder.  Personality disorders are

8    often not diagnosed with individuals in their early 20s

9    because personality is still developing.  And -- but it is

10   occasionally diagnosed when there is sufficient evidence

11   over the course of a person's history to be able to meet

12   those criteria for that diagnosis.  And in Ms. Kolhoff's

13   case, it was my opinion that she had enough of information

14   in her history for me to make that diagnosis.

15        So borderline personality disorder is

16   characterized by sort of a persistent instability in

17   relationships.  Ms. Kolhoff reported she's never had a lot

18   of close friends.  Her relationships with friends have been

19   kind of transient and not very close.  She is very close

20   with Mr. M██████ and her father, but in terms of other

21   social relationships, she's not.  It's also characterized by

22   just kind of a shallow sense of self.  Like the core of

23   oneself isn't -- is shallow and isn't completely -- it's not

24   strong.

25        And what that means is that individuals with sort

223

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA242

REDACTED TRANSCRIPT

```
 1   of a shallow sense of self rely heavily on interactions with
 2   others to fill their needs.  So for people with borderline
 3   personality disorder, that often looks like people who
 4   engage in attention-seeking behavior that may be problematic
 5   or place themselves in vulnerable situations to get those
 6   needs met.
 7           Based on Ms. Kolhoff's report about what was
 8   happening with her at the time of these alleged offenses, as
 9   well as her report that this has not been the first time
10   that this has happened and that she has always sort of had
11   this shallow sense of self, she reported feeling empty, she
12   reported feeling like she's "just here."  All of those
13   things taken together supported a diagnosis of borderline
14   personality disorder that I felt like I could make even
15   though she is just 22 years old.
16   Q   Now, Dr. Kalbeitzer, would anything about the -- those
17   psychological conditions for which you diagnosed
18   Ms. Kolhoff, would anything about those have rendered
19   Ms. Kolhoff unable to control her actions or control her
20   behavior at the time of the alleged offense?
21           MR. AMOLSCH:  Objection, Your Honor.  That's not
22   what's at issue.
23           THE COURT:  I'm sorry?
24           MR. AMOLSCH:  Objection.  That's an insanity
25   defense, and that's not at issue.  We're not claiming
```

224

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA243

REDACTED TRANSCRIPT

1   insanity.

2            THE COURT:  Dr. Hendricks already ruled that out

3   as well.

4            MR. AMOLSCH:  Yeah.  That question was directed

5   towards a response from --

6            MR. SCHLESSINGER:  I'll withdraw the question.

7            THE COURT:  All right.

8   BY MR. SCHLESSINGER:

9   Q    Would it have rendered her unaware of what was going on

10  or what she was doing?

11  A    So it is possible that any of those -- the symptoms

12  associated with any of those disorders could impair a

13  person's awareness or understanding of what they were doing

14  at a particular time.

15           And so the questions that I go through in my

16  analysis is, Number 1, does a person have a psychological

17  condition and what are those symptoms and are they

18  experiencing those symptoms at the time of a particular

19  offense.

20           And, Number 2, are they directly related or impact

21  a person's functioning so substantially at that time that

22  they are not able to be aware of their behavior and have an

23  understanding of what they're doing.

24           So, for Ms. Kolhoff, it's my opinion that she did

25  have symptoms of all of these disorders around the time of

                                                          225

JA244

REDACTED TRANSCRIPT

```
 1    the offenses, but she was -- they weren't impacting her
 2    functioning in any appreciable way.
 3            Based on all of the evidence that I was able to
 4    obtain, including collateral contacts from those who she was
 5    closest with, her boyfriend who she was living with which
 6    she had been living with for four years, her father who she
 7    saw on a weekly basis and talked to potentially more, as
 8    well as kind of her report of what was going on with her
 9    around the time, she -- she was ███████████████████████
10    ███████████████████████████. She was able to,
11    apparently, engage in, you know, sort of this trading work.
12    Nobody reported a change in her mood, in her behavior that
13    was so notable or remarkable around the time that she was
14    engaging in these offenses.
15            So I do believe that she has these disorders, but
16    I don't believe that -- there is no evidence to support that
17    any symptoms of these disorders were impacting her
18    understanding or awareness of what was going on around the
19    time of these offenses.
20            MR. SCHLESSINGER:  No further questions, Your
21    Honor.
22            THE COURT:  All right.  Mr. Amolsch.
23            MR. AMOLSCH:  Thank you, Your Honor.
24                        CROSS-EXAMINATION
25    BY MR. AMOLSCH:
```

226

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA245

REDACTED TRANSCRIPT

```
 1   Q    Good morning, Dr. Kalbeitzer.

 2   A    Good morning.

 3        MR. AMOLSCH:  May it please the Court, Your Honor.

 4   BY MR. AMOLSCH:

 5   Q    Let's start at the beginning where the Government

 6   started with you.

 7        It says you're a clinical psychologist.  Did you

 8   say the Department of Defense or with NSA?  Or is that the

 9   same thing?

10        THE COURT:  Are you unable to answer that

11   question?  You're with the Department of Defense; is that

12   correct?

13        THE WITNESS:  That is correct.

14        MR. AMOLSCH:  I'm taking these questions from her

15   vitae.

16        THE COURT:  Well, it doesn't make any difference.

17        Move on.

18   BY MR. AMOLSCH:

19   Q    Your job duty -- your job duties there, could you

20   describe them where you work?

21   A    I conduct evaluations to help decision-makers make

22   decisions about suitability for different positions.

23   Q    Is it fair to say your job duties generally involve the

24   exclusion of potentially problem candidates?

25   A    Oftentimes, yes.
```

227

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA246

REDACTED TRANSCRIPT

1   Q     Yes.  And that your job is not one of treatment or

2   therapy; is that right?

3   A     I do not do any treatment or therapy, that is correct.

4   Q     You don't do any treatment or therapy.

5         You also own an LLC, I think I understand,

6   Comprehensive Development Services, LLC?

7   A     That's the company that I contract with.  So I'm a

8   subcontractor to them.

9   Q     So are you here in your role as a Department of Defense

10  or as under the Comprehensive Development Services, LLC?

11  A     I'm here as a private practitioner forensic

12  psychologist.

13  Q     Are you being compensated for your work in this case

14  outside of your Government salary?

15  A     Yes, I am.

16  Q     You already said you don't see patients for therapy.

17        Have you ever seen patients for therapy?

18  A     Yes, I have.

19  Q     Okay.  How long ago?

20  A     When I was in graduate school.

21  Q     And how long ago was that?

22  A     Oh, 15 years ago probably.

23  Q     So you've been out of therapy for 15 years -- at least

24  15 years; is that fair?

25  A     That's fair.

228

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA247

REDACTED TRANSCRIPT

1    Q    Okay.  Let's talk -- the Government asked you about

2    some of the sources of your information that you used to

3    compile your report.

4            You interviewed Ms. Kolhoff one time; is that

5    right?

6    A    I did, yes.

7    Q    And it was -- there was no follow-up interview after

8    that?

9    A    I scheduled a follow-up interview, but there was some

10   confusion, and she wasn't available for that interview, and

11   I was not able to reschedule it prior to the date that this

12   report was due.  So that is correct.

13   Q    Did you try to schedule another follow-up interview

14   after your report was complete?

15   A    I typically don't do that unless I have additional

16   information that calls into question my opinions that I

17   would further need to evaluate.

18   Q    So your information, at least as it relates -- comes

19   from Ms. Kolhoff is based only on that one-time interview at

20   the jail?

21   A    Yes.

22   Q    All right.  And you did that in person or over video?

23   A    I did that in person.  I was with her in person.

24   Q    You gave three tests, which we'll get to later, I want

25   to make sure I have them all.  The Personality Assessment

                                                              229

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA248

REDACTED TRANSCRIPT

1    Inventory?

2    A    Yes.

3    Q    The Dissociative Experiences Scale II and the Test of

4    Memory Malingering; is that right?

5    A    Yes, that's correct.

6    Q    All right.  You did some collateral interviews you

7    talked about, ███ M███████ who basically said she ████

8    █████████?

9    A    Yes.

10    Q    Never ██████████████████████████████; is that

11    correct?

12    A    That is correct.

13    Q    Did you ask him about whether he had ever seen her

14    visiting child pornography sites?

15    A    I asked him if he knew about these charges prior to her

16    arrest, and he said no.  I don't know that I asked him

17    specifically about child pornography sites.

18    Q    How long have they known each other?

19    A    They met in 2016 or 2017.

20    Q    And how █████████████████████████?

21    A    They █████████████████.  █████████████.

22    Q    So Mr. M█████ had at least █████████████████

23    ████████████████████████████████████████████████

24    ████████████████████████; is that correct?

25    A    Yes.

230

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA249

REDACTED TRANSCRIPT

1  Q    And you said he had no concerns one way or another; is

2  that right?

3  A    No concerns.

4  Q    You talked to Mr. Kolhoff who said that, you know, she

5  lied when she was a teenager; is that right?

6  A    That's correct.

7  Q    The examples you gave were she lied about being

8  someplace where she wasn't supposed to be; is that right?

9  A    Correct.

10 Q    And she lied about, like, taking balloons that she

11 didn't take?

12 A    Those were the examples that he gave me, yes.

13 Q    In your experience, do you find it often that teenagers

14 will lie to their parents about where they are when they

15 want to be someplace else?

16 A    Absolutely.

17 Q    Okay.  So in -- would you consider these to be fairly

18 straightforward lies consistent with a teenaged person?

19 A    Absolutely.  Those were the examples he gave me.

20 Q    Your report does not indicate that you interviewed any

21 of the records from Dr. Jha; is that correct?

22 A    I did not have access to those records.  That's

23 correct.  I did not.  I reviewed the information that was

24 contained in Dr. Hendricks's report related to those, but I

25 did not review, myself, Dr. Jha's records.

                                                          231

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA250

REDACTED TRANSCRIPT

```
 1   Q     Okay.  So let's talk about that.
 2              What do you mean you couldn't get ahold of them?
 3   How did you try?
 4   A     I asked -- when I initially met with the Government, I
 5   asked for available information that was contained in their
 6   report from Dr. Hendricks.  That was my request.
 7   Q     Did you ask Dr. Hendricks for Dr. Jha's report?
 8   A     I did not.
 9   Q     But you knew he had the report because he had included
10   Dr. Jha's findings in his report?
11   A     That's correct.
12   Q     And Dr. Hendricks shared with you any information that
13   basically he wanted shared with him [sic]; right?
14   A     I did ask -- we did exchange our information related to
15   the testing.  So yes.
16   Q     Okay.  So the only reason you don't have or didn't
17   review Dr. Jha's report is because you chose not to; is that
18   fair?
19   A     I did not ask him.  That is fair.
20   Q     But you could have asked him, and you didn't?
21   A     That's fair.
22   Q     So you knew that she had been diagnosed previously with
23   Bipolar II disorder; correct?
24   A     I did.
25   Q     You knew that Dr. Jha had medicated her; correct?
```

232

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA251

REDACTED TRANSCRIPT

```
1   A    I did.

2   Q    You knew the medication was risperidone, if I'm

3   pronouncing that correctly, which is used to control manic

4   episodes; correct?

5   A    Risperidone is an antipsychotic medication.  It's used

6   for lots of things.

7   Q    Is one of the things it's used for is to prevent manic

8   episodes?

9   A    It can be used for mood stabilization, yes.

10  Q    You knew that she had visited Dr. Jha years before any

11  of the incidents took place here; right?

12  A    In 2018, according to Dr. Hendricks.

13  Q    Are you supposed to just rely on Dr. Hendricks'

14  reporting of what's in Dr. Jha's records?

15  A    So Dr. Jha's records included two visits for medication

16  that was detailed in Dr. Hendricks' report.  While I

17  typically don't rely on secondhand information, in this case

18  I did not ask Dr. Hendricks for that information.  And I

19  didn't necessarily -- it was -- I didn't necessarily feel

20  like it was germane to this particular referral question

21  primarily because there was no other indication of any

22  symptoms of bipolar disorder at that time.

23  Q    So you didn't think Dr. Hendricks -- Dr. Jha's previous

24  psychiatric diagnosis of bipolar and mania was relevant to

25  your analysis about whether she suffers from post-traumatic
```

233

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA252

REDACTED TRANSCRIPT

```
 1   stress disorder or complex stress disorder or any other

 2   psychological maladies she suffers from?

 3   A    I had information about her psychological symptoms that

 4   were consistent with a major depressive disorder and PTSD.

 5   I had no other information about any manic episodes, and I

 6   did specifically ask Ms. Kolhoff about that.

 7           So, no.

 8   Q    But you would have had that information about her manic

 9   episodes if you had reviewed Dr. Jha's report; correct?

10   A    Not necessarily.

11   Q    Dr. Jha diagnosed her with Bipolar II which, by

12   definition, requires at least one manic event; is that

13   correct?

14   A    A hypomanic event.

15   Q    So if you had reviewed the records, you would have seen

16   that Dr. Jha, in fact, did recognize her as being bipolar

17   and did identify at least one manic or hypomanic event in

18   her life?  And if you had reviewed the records prior to

19   making your diagnosis, you would have seen that; am I

20   correct?

21   A    So, potentially.  Potentially.  And the reason that I

22   say that is because I did have a diagnosis of Bipolar II

23   from Dr. Jha.  My experience in reviewing doctor's records,

24   particularly for medication management, is it's very

25   variable about how much information doctors include as to
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA253

REDACTED TRANSCRIPT

1    the basis for their diagnoses.  So potentially it would have

2    given me a lot of information about a hypomanic episode.

3    Potentially, it wouldn't have.

4              I did have the information that she had been

5    diagnosed with Bipolar II, and so I did ask her about those

6    symptoms.  I also asked her father about symptoms of mania.

7    I did not have any other evidence.

8    Q    So you asked the person who's suffering from the

9    bipolar; correct?

10   A    Yes.

11   Q    You asked her father; correct?

12   A    Yes.

13   Q    Neither of whom are psychiatric experts; correct?

14   A    Well, they could --

15   Q    Neither of them are psychiatric experts; correct?

16   A    That's correct.

17             THE COURT:  Mr. Amolsch, let the witness answer

18   the question.

19             MR. AMOLSCH:  I apologize.

20   BY MR. AMOLSCH:

21   Q    Neither of them are psychiatric experts; correct?

22   A    I asked them about their -- about her symptoms.  That

23   is correct, though.

24   Q    Dr. Jha is a psychiatric expert, and he's the one

25   person you didn't ask; is that fair?

                                                              235

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA254

REDACTED TRANSCRIPT

```
1    A    I did not get Dr. Jha's records.  That is fair.
2    Q    Are you supposed to review -- before you do a diagnosis
3    and examination, are you supposed to review all the
4    available psychiatric records to complete your diagnosis
5    that are available to you and that you know exist?
6    A    Yes.
7    Q    But you did not do that.  We can agree on that;
8    correct?
9    A    I did not get Dr. Jha's records, yes.
10   Q    And yet without reviewing Dr. Jha's report, you are
11   nevertheless of the opinion that she's malingering, that
12   she's making things up?
13   A    I am of the opinion that she does have the requisite
14   symptoms to meet criteria for those diagnoses that I
15   diagnosed her with.  I also think that she was exaggerating
16   what -- the existing symptoms that she has.  That is -- that
17   is true, yes.
18   Q    You spoke earlier about her GPA.  Do you remember
19   Mr. Schlessinger asking you about that?
20   A    Yes.
21   Q    You said she had reported that she did well in school;
22   correct?
23   A    Yes.
24   Q    And you weren't satisfied with that answer; correct?
25   So you went out and found independent documentation about
```

236

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA255

REDACTED TRANSCRIPT

```
 1   her GPA; correct?

 2   A     I believe that was contained also in Dr. Hendricks'

 3   report.

 4   Q     So you verified that, but not Dr. Jha's psychiatric

 5   records?

 6   A     I got both pieces of information from Dr. Hendricks'

 7   report.

 8   Q     Let's talk about your interview with Ashley.  The

 9   Government asked you some questions about that.

10         She told you she had a mental breakdown when she

11   was 18; is that correct?

12   A     She did.

13   Q     She had panic attacks and symptoms of PTSD; correct?

14   A     That's correct.

15   Q     That she was involved in self-harm?

16   A     Yes.

17   Q     That she felt shut down and couldn't feel anything?

18   A     Yes.

19   Q     That she drove herself to the hospital in August or

20   September of 2020 feeling like I was going crazy that I

21   heard myself before I was talking?

22   A     Yes.

23   Q     That she felt like her brain was on overload and she

24   couldn't slow it down?

25   A     She reported that to me.  I'm not sure if that was at
```

237

JA256

REDACTED TRANSCRIPT

1   the same time.

2   Q    That she was referred to a psychiatrist but couldn't

3   afford it; is that correct?

4   A    Yes.

5   Q    This would be Dr. Jha we just talked about?

6   A    I believe that she was referred to a psychiatrist in

7   2020.

8   Q    Do you know when she saw Dr. Jha?

9   A    In 2018.

10  Q    So this would be another psychiatrist that she went to

11  see?

12  A    So my understanding is that she went to the hospital.

13  They didn't admit her, they told her she was having anxiety

14  and that she should go seek treatment with a psychiatrist.

15  Q    So there's at least two psychiatrists out there prior

16  to this index event; is that what we're saying?  Dr. Jha and

17  at least one other psychiatric visit that you know of?

18  A    I don't think she ever went to that psychiatrist,

19  though.  But yes.

20  Q    Let's talk about the Personality Assessment Inventory.

21        You said -- I believe your testimony was that you

22  gave this because Dr. Hendricks had already given the MMPI;

23  is that right?

24  A    Yes.

25  Q    You have no dispute with Dr. Hendricks' findings as it

                                                        238

JA257

REDACTED TRANSCRIPT

1  relates to the MMPI; do you?

2  A    The only thing that I will say, Dr. Hendricks indicated

3  that all of the validity scales on the MMPI were elevated,

4  but essentially said that she answered honestly and

5  consistent and was fine.

6         In reviewing the -- so there's seven validity

7  scales on the MMPI.  The ones that we look at first are the

8  F scale, which is infrequently endorsed symptoms.  People

9  who are significantly -- who have significant symptomatology

10 are often elevated on this.  Ms. Kolhoff's elevation was

11 very high.  She -- I can give you scores, but they're kind

12 of meaningless.  It was very high.

13        And so it's in that range where you sort of want

14 to look a little bit further to see if there are any other

15 indications that this is an invalid profile.

16        It doesn't suggest that it's an invalid profile,

17 but on another validity scale called the FP, which is F -- I

18 think it's psychosis -- I can't remember what the P stands

19 for, I'm sorry.  But, on that, it's very, very infrequently

20 endorsed symptoms.  And when that is also very high, in

21 combination with the F scale, it causes some concern about

22 exaggeration.

23        For Ms. Kolhoff specifically in the manual, it

24 says if the F score is higher than this particular score,

25 which Ms. Kolhoff's was, look at the FP.  And if the FP is

239

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA258

REDACTED TRANSCRIPT

1   greater than a specific score, then there is a chance of

2   exaggeration, and that was true for Ms. Kolhoff.

3   Q    So you read Dr. Hendricks' report; correct?

4   A    I did.

5   Q    And you will note that in his report on the MMPI, he

6   noted that the scores were high, and that he took that into

7   account and took extra care when evaluating the results?

8   A    I did, which is why I didn't take too much issue.

9   Q    Right, exactly.  So Dr. -- I think it's fair to say

10  Dr. Hendricks took all of that into account, her elevated

11  scores, when putting together his results; correct?

12  A    I'll agree.

13  Q    Personality Assessment Inventory has been normed on

14  only about thousands of people versus the hundreds of

15  thousands that have been normed for the MMPI; is that

16  correct?

17  A    So the MMPI was developed in the 1950s.  There's been

18  many iterations.  Since the MMPI-2, there's actually two

19  newer versions, the MMPI-RF, which is a restructured form,

20  and most recently the MMPI-3 which came out last year.  So

21  there is a lot of information and a lot of research that has

22  gone into the MMPI.

23       The PAI was developed in 1991, and so it has less

24  time to have so much research.  But what I will say is it

25  has an abundance of peer-reviewed articles that have looked

                                                        240

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA259

REDACTED TRANSCRIPT

1    at the PAI use with individuals in correctional context,

2    forensic context, as well as personnel selection across

3    contexts.

4            So it does not have the 70 years of research

5    because it's a newer measure, but it has an abundance of

6    research, and it is considered to be as widely used at this

7    point as the MMPI, particularly in forensic contexts.

8            In fact, there was a research article that was

9    published in, I think 2018, looking at the MMPI -- it was

10   the MMPI-RF because it's a newer version than the MMPI-2.

11   But the MMPI-RF and the PAI, and it found that -- for

12   forensic contexts that are -- they are both very widely

13   used.

14   Q    My question is simple:  Has the MMPI been normed on

15   hundreds of thousands of people versus being normed -- or

16   the PAI being normed on significantly fewer?

17   A    Yeah.

18   Q    Is that fair?  That's the answer, the answer is yes;

19   correct?

20   A    Yes.

21   Q    Okay.  The MMPI -- the PAI has not been normed on

22   incarcerated people; is that correct?

23   A    It's not normed on incarcerated people; it has an

24   abundance of research with forensic context.

25   Q    My question was:  Has it been normed on incarcerated

                                                          241

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA260

REDACTED TRANSCRIPT

1    people.  And the answer to that is, no, it's not been?

2    A    No.

3    Q    So it has only been normed against people in society,

4    you would agree, who doesn't have the same sort of stressors

5    that people who are incarcerated have; correct?

6    A    So my answer requires a little bit longer answer than a

7    yes or no.  I'm sorry.

8    Q    Go ahead.

9    A    So the PAI has a normative sample that was part of the

10   normative sample for the validation study.  But the PAI has

11   evolved over time.  And so with that evolution has come

12   additional research with specific populations.  And when

13   that specific research with those populations comes out,

14   that furthers the literature base, which is why we don't

15   always go to a manual.  We look at the existing literature

16   and what that literature looks like for the specific

17   populations we're using it for.

18   Q    So the answer is, no, the only -- the question is, it's

19   only been normed against people in society; is that correct?

20   A    It is only normed on people in society, yes.

21   Q    Would you agree that it's not as nuanced or precise an

22   instrument as the MMPI?

23   A    I wouldn't agree with that.

24   Q    Do you -- do you know what the impaired self-reference

25   is?  Have you heard the term impaired self-reference?

                                                              242

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA261

REDACTED TRANSCRIPT

1    A    I'm not very familiar with impaired self-reference.

2    Q    As a professional forensic, you're not familiar with

3    the idea or the concept of impaired self-reference?

4    A    Oh, the concept, sure.  But not on -- not on the MMPI

5    or the PAI.

6    Q    How many validity scales are on the Personality

7    Assessment Inventory versus those on the MMPI?

8    A    There are four on the personality assessment scale.

9    There are seven on the MMPI.

10   Q    So there's more on the MMPI.

11        Does the PAI test for mania only in the moment or

12   in the past of the index event?

13   A    So no measure really tests for -- so the questions on

14   the PAI are general, and I think people interpret them as in

15   the moment.  So may I provide an example?

16   Q    Sure.

17   A    So one example might be sometimes I hear voices that

18   are broadcast so that other -- or sometimes my thoughts are

19   broadcast so that others can hear them.  And then the person

20   responds.

21        So if the question is phrased like that and they

22   have heard voices that are -- or they've -- their thoughts

23   have been broadcast in the past, they might say slightly

24   true.  If that's happening to them right now, they might say

25   very true.

                                                            243

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA262

REDACTED TRANSCRIPT

```
1    Q    So does it test for mania in the moment?  Like, how the
2    person is feeling at that particular time when you're giving
3    the test?
4    A    Yes.
5    Q    Thank you.  Let's talk about the DES II.
6              My understanding is that does not have the
7    validity scale at all; is that correct?
8    A    It does not.
9    Q    Okay.  So does that mean forensically, psychologically,
10   whatever the term is, that there's really no way to know if
11   your score is valid, if Dr. Hendricks's score was valid or
12   if either one of them was valid?
13   A    It -- so the short answer is no, it doesn't.
14   Q    Okay.
15   A    It doesn't allow for that.  It just compares --
16   Q    Okay.  So the answer --
17   A    -- the average scores.
18   Q    You don't know if the score you got was correct, you
19   don't know if the score Dr. Hendricks got was correct?
20   A    It's self-report.  That's correct.
21   Q    Now, Dr. Hendricks gave the test after you gave the
22   test, and you heard his testimony about how he got the
23   different scores.  You were here for that; correct?
24   A    Yes, I was.
25   Q    And basically his explanation was that he talked to
```

244

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA263

REDACTED TRANSCRIPT

1   Ashley and explained to her the difference between intensity

2   and frequency.  Were you there for that part of the

3   conversation?

4   A    I was.

5   Q    Okay.  Now, you've already diagnosed Ashley with

6   post-traumatic stress disorder; correct?

7   A    Yes.

8   Q    We're going to get to that later, my question is as it

9   relates to PTSD.

10          In your experience, do you find that people who

11  are in stressful situations who are suffering from PTSD

12  sometimes have difficulty following instructions?

13  A    I would agree with that.

14  Q    The Test of Malingering Memory.  As I understand, this

15  test is designed to detect if someone's trying to fake

16  memory problems; correct?

17  A    That's correct.

18  Q    That is a test for recognition memory; correct?

19  A    It's a test for memory malingering, yes.

20  Q    And it's a test for memory malingering, that is not --

21  I just want to make sure I got that right.  It's a test for

22  memory malingering?

23  A    That is correct.

24  Q    And you would agree with me that the Test of Memory

25  Malingering is not a measure at all of whether someone is

                                                          245

JA264

REDACTED TRANSCRIPT

```
 1   malingering a dissociative event; would you agree with that?

 2   A    Can I expand on my answer?

 3   Q    Can you get -- yes or no, and then you can explain.

 4   A    I would agree with that.

 5   Q    Okay.  So memory is not a measure of dissociation;

 6   correct?

 7   A    Sometimes.

 8   Q    Is recall different than recognition?

 9   A    Yes.

10   Q    So let's assume she was malingering on her memories.

11   Let's assume your Test of the Memory Malingering was

12   accurate.  Does it have anything to say about whether she

13   was suffering a dissociative event at the time these events

14   happened?

15   A    Not at the time that these events occurred.

16   Q    Let's talk about the information sections in your

17   report.  I'm going to read them off to you to make sure I've

18   got them all.

19            Family background?

20   A    Yes.

21   Q    Educational/occupational history?

22   A    Yes.

23   Q    Medical history?

24   A    Yes.

25   Q    Substance abuse?
```

246

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA265

REDACTED TRANSCRIPT

```
 1   A    Yes.

 2   Q    Legal history?

 3   A    Yes.

 4   Q    She has no prior record; correct?

 5   A    No prior record.

 6   Q    Psychiatric history, which we talked about?

 7   A    Sorry.  No prior adult record.

 8   Q    No prior adult record.

 9            Psychiatric history; correct?

10   A    Yes.

11   Q    Psychological testing?

12   A    Yes.

13   Q    She had never undergone any of these kind of tests

14   before; correct?

15   A    Not that I know of.

16   Q    Mental status examination; correct?

17   A    Correct.

18   Q    Your diagnosis?

19   A    Yes.

20   Q    Assessment of the mental state and discussion of the

21   mental state; is that correct?

22   A    Yes.

23   Q    And then lastly an opinion on future risk for sexual

24   recidivism; is that right?

25   A    Yes.
```

247

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA266

REDACTED TRANSCRIPT

```
1   Q    That's the entirety of your report?

2   A    Yes.

3   Q    Would you agree that nowhere in this report is a

4   section detailing the vast history of sexual abuse she has

5   suffered?  Nowhere in your report.

6   A    She did not want to talk to me about her trauma

7   history, that's correct.

8   Q    That wasn't my question.

9        My question was:  Would you agree that nowhere in

10  your report does it document anything about her belief that

11  she was raped as an infant?

12  A    That is correct.

13  Q    Nothing in here about being repeatedly molested when

14  she was ten years old?

15  A    That's correct.

16  Q    Nothing about her being repeatedly raped in her teens;

17  correct?

18  A    Correct.

19  Q    Nothing about her sexual trafficking, nothing about her

20  child pornography victim herself --

21  A    Correct.

22  Q    -- correct?

23       So you would agree with me that after you looked

24  at this report in isolation, you would never know any of

25  that happening to her; correct?
```

248

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA267

REDACTED TRANSCRIPT

1    A    Well, I reference a -- the trauma history from

2    Dr. Hendricks' report.  But in -- in my report.  But there

3    is no explanation or description about any of those things

4    in my report.  That is correct.

5    Q    And there's no explanation or description about how

6    these traumatic events could have impacted your diagnosis

7    either, is there?

8    A    That's correct.

9    Q    That is correct.  I read your entire report.

10        Am I correct the only line in this entire report

11   referencing her history of documented sexual violence is

12   this:  "Ms. Kolhoff stated she did not want to talk in

13   detail about her history of sexual trauma, as she discussed

14   that information during an evaluation with Dr. Hendricks."

15        Do I have that right, that's it?

16   A    That's correct.

17   Q    Dr. Hendricks ran into the same problem you did; right?

18   You heard him testify that she didn't want to talk to him

19   about it either; correct?

20   A    Correct.

21   Q    And he pushed through and found a way to get her to

22   talk about her trauma so that he could come up with an

23   appropriate diagnosis; do you remember hearing that?

24   A    I remember hearing that.

25   Q    You didn't do that; correct?

249

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA268

REDACTED TRANSCRIPT

```
 1   A    I did not ask her to talk to something she recounted in

 2   great detail a few weeks ago.

 3   Q    So the answer --

 4   A    A few weeks prior.

 5   Q    -- is no, you didn't ask her to do it?

 6   A    I did not.

 7   Q    Now, you said you read the police reports in this case;

 8   correct?

 9   A    I read the -- I did, yes.

10   Q    You talked to the agents, I would imagine, about this

11   case?

12   A    I didn't talk to any agents.

13   Q    You were aware, though, of the abuse she suffered;

14   correct?

15   A    I was, yes.

16   Q    But it's not in your report in much the same way that

17   Dr. Jha's psychiatric records aren't in your report?

18           THE COURT:  All right.  Now that's getting

19   repetitive.

20   BY MR. AMOLSCH:

21   Q    Let's talk about your diagnosis.

22           Your report first addresses a potential bipolar

23   diagnosis as I read your report.  Based on available

24   information, Ms. Kolhoff has a long-standing history of

25   depressive symptoms that include sadness, hopelessness,
```

250

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA269

REDACTED TRANSCRIPT

1    worthlessness and fleeting suicidal ideation.

2             Medical records described in Dr. Hendricks' report

3    reflect a previous diagnosis of bipolar, which is

4    characterized by the contamination of a manic depressive

5    episode, as well as a current or past hypomanic episode.

6             Then you write:  "Available information does not

7    support this diagnosis, as there's no evidence that

8    Ms. Kolhoff has ever experienced a manic or hypomanic

9    episode."  That's what's in your report; right?

10   A    That is what's in my report, yes.

11   Q    But as we already talked about, there was available

12   evidence that she had suffered from this, you just didn't

13   get it?

14   A    I did not get Dr. Jha's records, yes, you are correct.

15   Q    So instead of bipolar, you gave major depressive

16   disorder recurrent; correct?

17   A    Yes.

18   Q    Which is also already -- it's also a serious

19   psychiatric issue; would you agree?

20   A    I would agree.

21   Q    Okay.  Major depressive disorder is basically, as I

22   understand it, bipolar without the manic event; is that

23   fair?  Do I have that right?

24   A    Major depressive disorder is characterized by

25   depressive episodes.  There is no element of any mania.

                                                            251

JA270

REDACTED TRANSCRIPT

```
 1   Q    So basically you're missing the manic event?

 2   A    That's correct.

 3   Q    Okay.  But even without the manic event, we can agree

 4   that's a serious psychological issue?

 5   A    Yes.

 6   Q    Your next diagnosis was post-traumatic stress disorder?

 7   A    Yes.

 8   Q    Okay.  This diagnosis, as I understand it, requires at

 9   least -- there to have been at least one traumatic event --

10   A    Yes.

11   Q    -- correct?

12        Your report doesn't reference any of the traumatic

13   events that she suffered from?

14   A    Yes.

15   Q    So which traumatic event are you talking about?

16   A    The traumatic events that I was basing my diagnoses on

17   were all of the available information that I had.  So I had

18   the very detailed information that Dr. Hendricks included in

19   his report, and Ms. Kolhoff did talk to me about one other

20   incident, one of her -- I'm trying to remember.  She did

21   talk to me about one instance of -- in which she was raped.

22   Q    So you did get her to talk about it?

23   A    It was not in the context -- I was able to talk to her

24   about -- I was able to talk to her about one instance.

25   Q    The next diagnosis is borderline personality disorder.
```

252

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA271

REDACTED TRANSCRIPT

```
 1   A    That's correct.
 2   Q    This is also another very serious psychological
 3   condition; would you agree?
 4   A    It's a personality disorder.
 5   Q    I'm sorry, personality disorder.
 6   A    Yes.
 7   Q    Would you agree with that?
 8   A    Yes.
 9   Q    Now, I know that complex post-traumatic stress disorder
10   is not in the DSM-5, I believe it's in the ICD-11.  Do I
11   have that correct?
12   A    I think so, yes.
13   Q    Okay.  Are you familiar, though, as part of your
14   responsibilities in forensic training, to -- are you
15   familiar with the symptoms in CPTSD?
16   A    I am familiar with them, yes.
17   Q    Would you agree that the symptoms of borderline
18   personality disorder and complex post-traumatic stress
19   disorder, there's some overlap?
20   A    There is some overlap.
21   Q    There's some overlap.
22         And some of those overlaps would be -- both come
23   with significant emotional distress?
24   A    That's correct.
25   Q    Emotional triggers?
```

253

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA272

REDACTED TRANSCRIPT

```
 1    A     That's correct.

 2    Q     Suicidal thoughts?

 3    A     Correct.

 4    Q     Dissociation?

 5    A     Correct.

 6    Q     Flashbacks?

 7    A     Correct.

 8    Q     Anxiety, depression?

 9    A     Sure.

10    Q     Those are common to both; correct?

11    A     Yes.

12    Q     We're going to come back to the triggers in

13    dissociation, but I want to talk about the differences as I

14    understand it.

15    A     Okay.

16    Q     With borderline personality disorder, the common

17    symptoms are emotional instability and erratic behavior,

18    patterns of intense feeling of emptiness; do I have that

19    right?

20    A     Yes.

21    Q     Whereas complex post-traumatic stress disorder is

22    characterized by flashbacks to traumatic events?

23    A     Correct.

24    Q     Is there a consensus about what causes someone to

25    suffer from borderline personality disorder?
```

254

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA273

REDACTED TRANSCRIPT

```
 1   A    Oftentimes it has to do with attachment that's not
 2   formed well in early childhood development.
 3   Q    So there's some uncertainty, is that fair to say, about
 4   what causes borderline personality disorder?
 5   A    Sure.
 6   Q    Is that fair?  Okay.
 7   A    Yeah.
 8   Q    Now, with complex post-traumatic stress disorder, it's
 9   well established that this is developed due to long-term
10   exposure to trauma such as sex abuse; is that fair?
11   A    Yes.
12   Q    And those who have experienced greater trauma
13   repeatedly at a young age are at greater risk for developing
14   complex post-traumatic stress disorder; is that fair?
15   A    That's fair.
16   Q    Exactly the kind of trauma she repeatedly suffered as a
17   young person and as she was developing; correct?
18   A    Correct.
19   Q    Would you have diagnosed her with complex
20   post-traumatic stress disorder if it were in the DSM-5?
21   A    I -- that's a good question.  So diagnoses are made
22   from the DSM based on those specific criteria.  If those
23   criteria in the DSM-5 are those that are currently listed in
24   the ICD-11?
25   Q    Yes.
```

255

JA274

REDACTED TRANSCRIPT

```
1    A    Potentially.
2    Q    So the only thing really holding you up, as I
3    understand it, it's not yet in the DSM-5, it is in the
4    ICD-11, and the U.S. hasn't yet adopted those standards; is
5    that fair?
6    A    And I don't specifically know what the criteria that
7    would be listed in the DSM-5 would be.  But, yes.  Yeah,
8    that's fair.
9    Q    That's fair.
10           All right.  I'm going to ask you -- I mentioned
11   the word trigger event.  I want to kind of explore what that
12   means; okay?
13   A    Okay.
14   Q    You're obviously familiar with the idea of a triggering
15   event; correct?
16   A    Sure.
17   Q    As I understand it, what kind of happens is, like,
18   during some sort of traumatic event, your brain will engrain
19   sensory stimuli into your memory, like it kind of gets
20   buried in there as a result of the trauma; is that fair?
21   A    That's fair.
22   Q    Okay.  And when a person encounters the same stimuli in
23   another context, it can trigger a reminder of the past
24   trauma?
25   A    Yes.
```

                                                              256

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA275

REDACTED TRANSCRIPT

```
 1   Q    And that is essentially a triggering event; right?
 2   A    Sure.
 3   Q    And it can cause someone, depending on what they have,
 4   to lose track of their surroundings or even relive the
 5   traumatic event; is that fair?
 6   A    Yes.  Yes.
 7   Q    Okay.  It can cause flashbacks?
 8   A    Uh-huh.  Yes.
 9   Q    And a triggering event can even bring on a PTSD episode
10   or a dissociative episode; is that correct?
11   A    That's fair, yes.
12   Q    Now, the Government asked you about how it is she came
13   to find the website.  And she said -- what I understood you
14   to say was that she was basically just on Facebook on the
15   Save Our -- she's a Facebook admin for Save Our Children;
16   correct?
17   A    Yes.
18   Q    She saw the link was posted?
19   A    Yes.
20   Q    Didn't know how it got there --
21   A    Right.
22   Q    -- correct?
23        Clicked on it to see what it was?
24   A    Right.
25   Q    And it brought up a chat dialogue; is that right?
```

257

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA276

REDACTED TRANSCRIPT

```
 1   A    That's what she told me.
 2   Q    And you asked her what was in the chat dialogue, and
 3   she said it was sexually explicit abusive chats?
 4   A    Yes.
 5   Q    That is exactly the kind of triggering event that would
 6   trigger her, given her past sexual trauma; correct?
 7   A    I don't know that for sure, but possibly.
 8   Q    Potentially --
 9   A    Potentially.
10   Q    -- that is exactly the kind of triggering event that
11   could trigger somebody who now sees child pornographer
12   abusers on a website she designed to prevent exactly that,
13   would trigger her into her past trauma about herself being
14   sexually abused; is that fair?
15   A    Possibly.
16   Q    So let's talk about the symptoms of post-traumatic
17   stress disorder, your diagnosis.
18        The episode -- as I understand it, when you have a
19   PTSD episode, that's characterized by feeling of fear and
20   panic; is that fair?
21   A    Fear and panic, potentially hypervigilance.  Sure.
22   Q    Okay.
23   A    Yes.
24   Q    So let's talk about that.  Thank you.  That was going
25   to be one of my next questions.
```

258

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA277

REDACTED TRANSCRIPT

```
 1              So along with the flashbacks, there can be sudden
 2   vivid memories of an intense traumatic event in your past;
 3   is that fair?
 4   A    Yes.  Yes.
 5   Q    And we talked about hypervigilance, but some of the
 6   common everyday experience of PTSD are sleep problems;
 7   correct?
 8   A    Uh-huh.
 9   Q    Hypervigilance; correct?
10   A    That's correct.
11   Q    Heightened startle reactions?
12   A    Yes.
13   Q    And dissociative symptoms, including alterations in
14   memory; is that correct?
15   A    That is correct.
16   Q    That could happen to somebody who suffers from PTSD,
17   which is exactly what you've diagnosed her with?
18   A    Yes.
19   Q    Now, when you're in a PTSD episode, that doesn't mean
20   you're in a trance; right?
21   A    That doesn't mean that you're in a trance.
22   Q    So, you know, you can still walk around and talk to
23   people and care for yourself; is that fair?
24   A    You can.
25   Q    Okay.
```

259

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA278

REDACTED TRANSCRIPT

```
 1   A     Sure.
 2   Q     And a PTSD episode, it can last for minutes; is that
 3   correct?
 4   A     Uh-huh.
 5         THE COURT:  You have to say yes or no for the
 6   record.
 7         THE WITNESS:  Yes.  I'm sorry.
 8   BY MR. AMOLSCH:
 9   Q     Could it last for hours?
10   A     Yes.
11   Q     Could you go in and out of a PTSD experience over a
12   period of days?
13   A     I can imagine that's possible, yes.
14   Q     So over -- let's hypotheticalize this.  Over a two-day
15   period from, say, September 11th to September 13th, is it
16   possible that she went in and out of a post-traumatic stress
17   disorder over that period of days triggered by the fact that
18   she saw sex abusers on her child protection website?
19   A     I don't have evidence of that.  Is it possible?  Yes.
20   Q     It's possible.
21         Back -- I know you said that you had treated some
22   people 15 years ago.  Did you ever treat anyone with PTSD?
23   A     Yes.
24   Q     Okay.  So you're familiar with the literature and the
25   science on PTSD?
```

260

JA279

REDACTED TRANSCRIPT

```
 1    A    Yes.
 2    Q    My most common experience, and tell me if I'm wrong,
 3    when I think of PTSD, I think of people who have been in
 4    war-time situations.
 5    A    That's how it was developed.
 6    Q    Okay.  Basically people who have been in war-time
 7    situations have been emotionally scarred by violence; right?
 8    A    Yes.
 9    Q    And a frequent response to that is avoidance of the
10    circumstances that remind them of the violence?
11    A    Yes.
12    Q    They want to run as far away from it as possible; is
13    that correct?
14    A    That's correct.
15    Q    But you will agree with me that frequently people who
16    suffer from PTSD are involved in violent crimes; correct?
17    A    I don't know about frequently.  That is not an uncommon
18    thing, yes.
19    Q    It's not uncommon for people who are scared of violence
20    want to avoid it to nevertheless run toward violent crimes.
21    That's not uncommon; is it?
22    A    That's not an uncommon thing.
23    Q    It's not uncommon that people with PTSD who are afraid
24    of guns now become obsessed with guns, that's not uncommon
25    either; would you agree?
```

261

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

REDACTED TRANSCRIPT

```
 1   A    I wouldn't dispute that.
 2   Q    So is it fair to say that it's not uncommon in people
 3   who suffer PTSD for them to, for whatever reason, to be
 4   drawn to the things that they're most stressed out about and
 5   the things they're most trying to avoid?
 6   A    That happens, yes.
 7   Q    Let's talk about dissociation.
 8        That's, as I understand it, a mental process of
 9   experiencing a disconnection or a lack of continuity between
10   thoughts, memories and the surroundings?
11   A    Yes.
12   Q    Okay.  It's basically a break or severing in how your
13   mind handles information --
14   A    That's correct.
15   Q    -- is that correct?
16   A    Uh-huh.
17   Q    And that there is a consensus -- tell me if I'm
18   wrong -- with mental health professionals the underlying
19   cause of dissociate disorders is chronic trauma in
20   childhood?
21   A    That is correct.
22   Q    Exactly the kind of trauma she suffered as a child;
23   correct?
24   A    I will not dispute that, yes.
25   Q    Is it fair to say the more extreme the underlying
```

262

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA281

REDACTED TRANSCRIPT

```
 1   trauma, the more extreme and frequent the dissociation can
 2   be?
 3   A    Yes, that is fair.
 4   Q    The more stressful the situation, the more extreme and
 5   frequent the dissociation can be?
 6   A    That is fair.
 7   Q    I'm going to ask you the same questions I asked you
 8   about PTSD.
 9        Dissociative episodes, they can last for minutes;
10   is that correct?
11   A    Yes.
12   Q    They can last for hours --
13   A    Yes.
14   Q    -- correct?
15        While you're in one, you could walk around and --
16   you're not in a trance.  You can walk around and interact
17   with people and care for yourself; is that fair?
18   A    Yes.
19   Q    A person can go in and out of dissociative events over
20   a period of days; correct?
21   A    Yes.
22   Q    So between September 11th and September 13th, it's
23   entirely possible she was bouncing in and out of
24   dissociative events; correct?
25   A    Again, I don't have any evidence of that.  Is it
```

263

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

REDACTED TRANSCRIPT

```
 1   possible?  Sure.
 2            MR. AMOLSCH:  Court's indulgence.
 3                         (Pause.)
 4            MR. AMOLSCH:  Thank you, Your Honor.  I don't have
 5   any more questions.
 6            THE COURT:  Thank you.
 7            Redirect.
 8                    REDIRECT EXAMINATION
 9   BY MR. SCHLESSINGER:
10   Q    Good morning again, Dr. Kalbeitzer.
11            First, you were asked a lot of questions about the
12   PAI, for example --
13   A    Yes.
14   Q    -- is that right?
15   A    Yes.
16   Q    Is there any problem with the PAI as a test?
17   A    No.
18   Q    Is there any problem with administering PAI to an
19   incarcerated person?
20   A    No.
21   Q    Okay.  You were asked a lot of questions also about the
22   DES II that you administered; do you remember those?
23   A    Yes.
24   Q    Is there any problem with the DES II as a test?
25   A    No.
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA283

REDACTED TRANSCRIPT

1    Q    Is there any problem with administering the DES II to a

2    person like Ms. Kolhoff notwithstanding that it does not

3    have any validity scales itself?

4    A    No.

5    Q    You were asked a lot of questions about whether you --

6    whether you repeated all of Dr. Hendricks' detailed

7    questions about Ms. Kolhoff's past experiences despite her

8    telling you that you -- that she didn't want to talk about

9    it; do you remember being asked those questions?

10   A    Yes.  Yes, I remember being asked those questions.

11   Q    Do you consider that to be a major shortcoming of your

12   evaluation of Ms. Kolhoff?

13   A    No, I don't.  May I expand?

14   Q    Yes.

15   A    As we were talking about -- so part of the questioning

16   is determining what the symptomatology is that a person

17   might have at the time of the offenses, and then the other

18   part of that is how that symptomatology impacted their

19   behavior at the time of the offenses.

20          And if I had reason to believe that her symptoms

21   of trauma were so significantly impacting her behavior at

22   the time of these offenses, I probably would inquire --

23   would have inquired further and in more detail about her

24   trauma history apart from what I already had.  I didn't have

25   reason to feel like I needed to do that.

                                                              265

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA284

REDACTED TRANSCRIPT

```
 1   Q    And I guess related to that, Dr. Kalbeitzer, you were

 2   asked a series of questions on cross-examination about

 3   whether it's possible that Ms. Kolhoff's PTSD could have

 4   been triggered by the website resulting in a reaction in and

 5   out of which she slipped for a period of three days; do you

 6   remember being asked those questions?

 7   A    Yes.

 8   Q    Do you have any evidence that that is, in fact, what

 9   happened in Ms. Kolhoff's case?

10   A    I do not have any evidence that that's what happened.

11   Q    Is there any reason to believe that that is what

12   occurred based on everything you reviewed?

13           MR. AMOLSCH:  Objection to the form of the

14   question, Your Honor.

15           THE COURT:  I don't think --

16           MR. AMOLSCH:  Is there any reason to believe.

17           THE COURT:  Then she can answer what the reason

18   is.  Yes, I'm going to overrule the objection.

19           MR. AMOLSCH:  Thank you, Your Honor.

20   BY MR. SCHLESSINGER:

21   Q    Do you have any reason to believe that's what happened?

22   A    I don't have any evidence that that's what happened.

23   And based on the information that I do have from her report

24   and from collateral information, I don't have any reason to

25   believe that that is what happened.
```

266

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA285

REDACTED TRANSCRIPT

```
1   Q    And just the same question with respect to the

2   dissociative suggestion.

3          Do you remember being asked questions by

4   Mr. Amolsch about whether being on the website would have

5   caused Ms. Kolhoff to enter a dissociative state in and out

6   of which she was slipping for a period of three days; do you

7   remember being asked that?

8   A    Yes.

9   Q    Do you have -- did you uncover any evidence or other

10  reason to believe that that is what occurred in

11  Ms. Kolhoff's case?

12  A    I don't have any reason to believe that's what

13  occurred.

14          MR. SCHLESSINGER:  I don't have any other

15  questions.

16          THE COURT:  All right.  Is there any recross?

17          MR. AMOLSCH:  No, Your Honor.  Thank you.

18          THE COURT:  No, all right.

19          Thank you, Doctor.

20            (Witness excused at 10:45 a.m.)

21          THE COURT:  I think that's concluding all the

22  evidence, or is there anything further?

23          MR. SCHLESSINGER:  That concludes the Government's

24  rebuttal case, Your Honor.  Thank you.

25          THE COURT:  All right.  Anything from the defense.
```

267

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA286

REDACTED TRANSCRIPT

1          MR. AMOLSCH:  Your Honor, as we spoke yesterday, I

2    would like to admit Dr. Hendricks's CV and his report.

3          THE COURT:  All right.  That will be Defense

4    Exhibit Number 1.

5          MR. AMOLSCH:  And I can include the CV as a

6    separate exhibit or together.

7          THE COURT:  Oh, the CV is 1.  Defense Exhibit 2 is

8    the report itself.

9          MR. AMOLSCH:  Thank you, Your Honor.

10    (Defense Exhibit Numbers 1 and 2 admitted into evidence.)

11          MR. SCHLESSINGER:  And I did mean to ask Your

12    Honor if we could simply do the same with respect to

13    Dr. Kalbeitzer's --

14          THE COURT:  Yes.

15          MR. SCHLESSINGER:  -- CV and report.  We'll mark

16    those 801, 802 respectively.

17          MR. AMOLSCH:  That's fine, Your Honor.  Thank you.

18          THE COURT:  801 and 802 are in as well.

19     (Government Exhibit Numbers 801 and 802 admitted into

20                          evidence.)

21          THE COURT:  All the evidence is in.  You know,

22    both sides gave an extensive opening statement.  I think the

23    better use of time, frankly, right now would be to give you

24    a chance to develop these legal issues.

25          As I understand, the basic core issues that the

268

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA287

REDACTED TRANSCRIPT

1    Court has to decide in this case is whether or not the

2    depictions themselves qualify as the type of depiction

3    which, under the case law, is considered child pornography.

4    And, Number 2, I guess the level of the mens rea of the

5    defendant at the time the events occurred.

6          Mr. Amolsch, would you agree that those are the

7    two and the only two facts the Court has to determine in

8    this case?

9          MR. AMOLSCH:  Your Honor, yes and no.  I think yes

10   as it relates to the initial -- the lasciviousness of the

11   pictures applies to both counts, the distribution of child

12   pornography and the production of child pornography.  So

13   those two things are the same.

14         If Your Honor concludes they're not lascivious,

15   then neither one of them -- then they can't meet their

16   burden on either of them.  But they can -- but they're

17   separate and apart elements from -- and I filed a bench

18   brief on this.

19         THE COURT:  And the mens rea is different from

20   Count 1 and 2.  I understand that.

21         MR. AMOLSCH:  Not only that, Your Honor.  I

22   followed the bench brief on this, but I'll briefly

23   articulate it here.

24         The statute reads that the sexual image has to be

25   produced for the purpose -- the sexual activity has to be

269

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA288

REDACTED TRANSCRIPT

1   for the purpose -- for the purpose of producing an image.

2   That's how the statute reads.  The sex -- the sexual conduct

3   has to be for the purpose of creating the image.  That's how

4   the statute's been read.  There's a lot of case law on this,

5   all of which I put in my bench brief, about what exactly

6   "the purpose" means.

7            What I can tell the Court is it doesn't mean that

8   the Government has to prove she acted single-mindedly, even

9   though the use of the definite article "the purpose" might

10  suggest that they have to prove that the purpose she had

11  when creating the -- engaging in the sexual conduct was to

12  create an image, that's not accurate.

13           The Government doesn't have to prove that she was

14  single-minded or that she was operating only with one

15  purpose.

16           What the most recent case law from the Fourth

17  Circuit says in *United States v. McCauley* is that the -- the

18  defendant's purpose -- it must be her dominant purpose or

19  her significant motivating purpose depending on where you

20  look in the opinion.

21           Two other circuits -- three other circuits have

22  said dominant purpose, that it can't be ancillary to some

23  other purpose.  That the creation of the image can't be in

24  connection with some other purpose she had to which creating

25  the image was incidental.

                                                           270

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA289

REDACTED TRANSCRIPT

1          So it's not enough for Your Honor to conclude that

2     it's been lascivious and that she took the picture.  It's

3     not enough to prove that it was lascivious and she

4     intentionally took the picture.  The Government has to prove

5     that her dominant purpose for engaging in the sexual

6     activity, dominant purpose for engaging in the sexual

7     activity was just to create the image, as opposed to any

8     other dominant purposes she may have had going on in her

9     mind.

10         So there's the question of the mens rea, which

11    I've articulated, because 2251 doesn't contain a mens rea

12    requirement.  It needs to be read as woeful.  And there's a

13    specific intent crime which goes specifically to the purpose

14    for which that image was created.

15         I put that in the bench brief, Your Honor.  Those

16    are the -- those are the issues that we need to discuss.

17         THE COURT:  All right.  All right.

18    Mr. Schlessinger, do you -- all I want right now is an

19    agreement that those are the issues.  All right.

20         So do you agree that those are the issues that

21    need to be focused on?  And I'm going to give both sides a

22    chance to brief these.  At the lectern, please.

23         MR. SCHLESSINGER:  Yes.  And I'm -- I apologize, I

24    was checking my notes, because there were really -- there

25    was sort of a panoply of different issues that have been

                                                          271

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA290

REDACTED TRANSCRIPT

1  raised by the defense both in opening and since then in the

2  Rule 29 context.

3        I -- I tend to agree with the Court.  It seems

4  that the -- the factual conduct of Ms. Kolhoff being

5  ███████, joining the website, taking the pictures, sending

6  the pictures to various users, none of that appears to be in

7  dispute at all.

8        THE COURT:  I agree.  There's no factual dispute

9  in this case.  This is going to be purely a question of law,

10  that is applying the legal standards that apply to these

11  types of cases to the facts that have been developed in this

12  case.

13        MR. SCHLESSINGER:  That's correct, Your Honor.

14        THE COURT:  And there's no dispute about the

15  facts.

16        MR. AMOLSCH:  Yeah.  No.  I agree with

17  Mr. Schlessinger.  I mean, I think we've said from the very

18  beginning, what happened is largely not in dispute.

19        THE COURT:  Right.

20        MR. AMOLSCH:  There's a question of mens rea,

21  specific intent, purpose, her dissociative experiences.

22        MR. SCHLESSINGER:  So I think what the issues are

23  that are in play are, first of all, whether they're, in

24  fact -- whether these images, in fact, depict a lascivious

25  exhibition.  And I note, because Mr. Amolsch mentioned in

                                                          272

JA291

REDACTED TRANSCRIPT

1    his opening that they were required to be a graphic

2    lascivious exhibition, which is wrong.  There's no word

3    "graphic" in the statute.  It's a lascivious exhibition.  He

4    has raised whether it's a lascivious exhibition.  That is

5    one -- that is one issue that will have to be raised, and

6    the Government will certainly address that in closing.

7           There's a suggestion about whether -- what the

8    relevant mens rea in Section 2251(a) is.  And again here

9    Mr. Amolsch's inaccurate when he says there's no mens rea

10   contained within the statute itself because it mentions in

11   the statutory text itself the requirement that a person have

12   acted with the intent of -- with the intent that a minor

13   engage in sexually-explicit conduct, and also, for the

14   purpose of taking the visual depiction.

15           So he's argued that there's --

16           THE COURT:  Well, do we have a problem here as

17   well with the word "conduct"?

18           MR. SCHLESSINGER:  Well, sexually-explicit conduct

19   is defined by statute to include the lascivious exhibition.

20           THE COURT:  All right.

21           MR. SCHLESSINGER:  So luckily the statute helps us

22   out here.  And lascivious exhibition of the genitals or anus

23   of a person is sexually-explicit conduct by statute.

24           And I understand Mr. Amolsch suggests that these

25   images of Ms. Kolhoff spreading apart the anus and the labia

273

JA292

REDACTED TRANSCRIPT

1    in separate pictures are not lascivious exhibition of the

2    ███████'s anus and labia, and, therefore, we'll have to

3    address that in detail at closing.

4             So those issues, the existence of the mens rea

5    standard, which is spelled out in the statute, contrary to

6    defense representations, that will have to be discussed.

7    And whether -- then we'll have to discuss whether

8    Ms. Kolhoff was, as has been contended, slipping in and out

9    of a dissociative state or some other state that's --

10            THE COURT:  That's the only -- the only factual

11   issue that is in dispute is the state of the defendant's

12   mental -- mental state at the time of the events.

13            MR. AMOLSCH:  And its impact on her ability to

14   form the necessary purpose and intent.

15            THE COURT:  Yeah.  I understand.  All right.

16            Well, you know -- you know what the job is.  So

17   the Government has the burden in this case on all these

18   issues, and so I'll direct within 14 days that you provide

19   your post-trial brief on these issues, and then defense will

20   have 14 days to respond to that.  Whether I have you come

21   back into court for an oral argument on those pleadings or

22   whether I do it on the papers we'll determine once we've

23   looked at the papers.  All right.

24            MR. SCHLESSINGER:  All right.  Thank you, Your

25   Honor.

                                                          274

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA293

REDACTED TRANSCRIPT

```
 1          THE COURT:  In the meantime, we'll leave the case
 2   as it is.
 3          I'm going to have the -- this evidence returned to
 4   the Government for your safekeeping.
 5          MR. SCHLESSINGER:  We'll do that.  And we'll
 6   certainly anticipate -- unfortunately the Court is going to
 7   have to review that in making its decision, and we'll
 8   obviously have that available to bring back to the Court for
 9   its review on the question of whether it's a lascivious
10   exhibition or not.
11          THE COURT:  Yeah.  I'm not sure -- I took pretty
12   careful notes.  I'm not sure that I need to see it again.
13          MR. SCHLESSINGER:  Understood.
14          THE COURT:  All right.  Anything further on this
15   case?
16          MR. AMOLSCH:  So we're not giving closings?
17          THE COURT:  I don't need closings.
18          MR. AMOLSCH:  Okay.
19          THE COURT:  I mean, you practically made your
20   closing argument in your opening statement, Mr. Amolsch.
21          But, again, you'll make your closing arguments
22   essentially in your briefs; all right?
23          MR. AMOLSCH:  Thank you, Your Honor.  Okay.  Thank
24   you.
25          THE COURT:  If there's nothing further, we'll
```

275

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA294

REDACTED TRANSCRIPT

```
1   recess court until 2:30.
2           (Proceedings adjourned at 10:53 a.m.)
3           -----------------------------------
4   I certify that the foregoing is a true and accurate
5   transcription of my stenographic notes.
6
7                           Stephanie Austin
8                   Stephanie M. Austin, RPR, CRR
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                        276
```

JA295

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 1:21CR158 (LMB) |
| | : | The Hon. Leonie M. Brinkema |
| ASHLEY KOLHOFF | : | |
| Defendant | : | |
| | : | |

<u>MOTION FOR JUDGMENT OF ACQUITTAL</u>

COMES NOW ASHLEY KOLHOFF, Defendant in the above styled case, by and
through Counsel, and respectfully moves this Court, pursuant to Rule 29 of the Federal Rules of
Criminal Procedure for a judgement of acquittal on the charges for which Ms. Kolhoff has been
indicted and tried; namely Production of Child Pornography in violation of 18 U.S.C. § 2251 and
Distribution of Child Pornography in violation of 18 U.S.C. § 2252.

I.      **BACKGROUND**

On February 23, 2022 the government filed with Your Honor its Trial Brief, describing
the evidence it intended to submit and the significance of that evidence as it related to the
government's burden in meeting the elements of the above cited statutes by proof beyond a
reasonable.

In its Brief, the government correctly sets forth the essential elements it must satisfy by
proof beyond a reasonable doubt.

Regarding the Production of Child Pornography charge, the government must prove the
following essential elements beyond a reasonable doubt:

1.      That the victim was less than 18 years old;

2.      That the defendant employed, used, or coerced the minor to engage in *sexual'y
        explicit conduct* for the purpose of producing a visual depiction of that conduct; and

3.      That the defendant knew or had reason to know that such visual depiction would
        be transported or transmitted using any means or facility of interstate or foreign
        commerce or in or affecting interstate or foreign commerce or mailed; or if that
        visual depiction was produced or transmitted using materials that have been

JA296

mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed. *See* 18 U.S.C. § 2251(a); *United States v. Engle*, 676 F.3d 405, 412 (4th Cir. 2012); *United States v. Malloy*, 568 F.3d 166, 171 (4th Cir. 2009). (Emphasis added)

Regarding the Distribution of Child Pornography charge, the government must prove the following essential elements beyond a reasonable doubt:

1.  The defendant knowingly distributed any visual depiction;

2.  The defendant did so using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer;

3.  The production of the visual depiction involved the use of a minor engaged in *sexually explicit conduct*, and the visual depiction was of such conduct; and

4.  The defendant knew that the visual depiction involved the use of a minor engaging in sexually explicit conduct. *See* 18 U.S.C. § 2252(a)(2). (Emphasis added)

In both instances, then, the government is required to prove, among other things, that the images which were produced or distributed by Ms. Kolhoff involved the use of a minor engaged in *sexually explicit conduct*.(emphasis added).

Fortunately, Congress also provided a definition of "sexually explicit conduct."

18 U.S.C. § 2256(2)(A), reads, as relevant: "sexually explicit conduct" means actual or simulated—

(i)   sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

(ii)  bestiality;

(iii) masturbation;

(iv)  sadistic or masochistic abuse; or

(v)    lascivious exhibition of the anus, genitals, or pubic area of any person.

Tying it all together, this means the government must prove beyond a reasonable doubt that Ms. Kolhoff produced or distributed an image depicting a minor engaging in actual or simulated:

i.    sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

ii.    bestiality;

iii.    masturbation;

iv.    sadistic or masochistic abuse; or

v.    lascivious exhibition of the anus, genitals, or pubic area of any person.

## II.    THE UNDISPUTED FACTS

As the evidence showed- and the Government must acknowledge- none the images at issue depicted actual or simulated sexual intercourse, bestiality, masturbation, or sadistic or masochistic abuse.  Accordingly, only part (v) of the relevant definition- lascivious exhibition of the anus, genitals, or pubic area- is the only definition which could possibly apply to the facts of this case.

III.    TO BE "LASCIVIOUS" WITHIN THE MEANING OF 18 U.S.C. § 2256(2)(A), AN IMAGE MUST DEPICT THE MINOR ENGAGING IN OVERT SEXUAL ACTIVITY.  NUDITY DOES NOT FALL WITHIN THE MEANING OF THE STATUTE

A.  *United States v Hillie*, 14 F.4th 677 (D.C. Cir 2021), decided September 17, 2021.

In *United States v. Hillie*, the United States Court of Appeals for the District of Columbia authored an exhaustive opinion on the meaning of "lascivious" in federal prosecutions involving child pornography.

In *Hillie*, the defendant was charged with, among other things, Production of Child Pornography in violation of 18 U.S.C. § 2251(a) after it was discovered that he had installed hidden cameras in the bedroom and bathroom of two minors with whom he shared a house. Using these cameras, he recorded six videos, two of which are of particular interest here.

In the first video, which is 29 minutes and 49 seconds long, one of the minor girls is seen bending over and exposing her genitals to the camera for approximately nine seconds; cleaning her genital area with a towel, with her breasts and pubic hair visible; walking around naked with her breasts and pubic hair visible; and rubbing lotion on her naked body with her breasts and pubic hair visible. *Hillie,* 14 F.4th at 680.

The second video, which is 12 minutes and 25 seconds long, shows a minor sitting on the toilet and subsequently cleaning her genital area with a towel, exposing her genital area for approximately 16 seconds. *Id.* at 681.

The question on appeal was whether these videos were "lascivious" within the context of the federal child pornography statutes.

The DC Circuit began its exhaustive review of the meaning of "lascivious" within the federal child pornography statutes at the beginning, with *Miller v. California*, 413 U.S. 15 (1973), which held that the prohibition on the "lewd" or "lascivious" exhibition of the genitals within the federal child pornography statutes applied only to patently offensive "hard core sexual conduct." *Id.* at 27.

From *Miller,* the DC Circuit then drew a straight line through *United States v. 12 200-Foot Reels of Super 8mm,* 413 U.S. 123 (1973), *New York v. Ferber,* 458 U.S. 747 (1982), *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) and *United States v. Williams*, 553 U.S. 285 (2008) to

JA299

conclude that, to be "lascivious" within the federal child pornography statutes, the government is required to prove that a video or image must depict the minor engaging in overt sexual activity. Nudity, in other words, is not enough. *See also United States v. Courtade*, 929 F.3d 186, 191 (4th Cir. 2019).

As set forth above, *Miller v. California*, 413 U.S. 15 (1973) held that the prohibition on the "lewd" or "lascivious" exhibition of the genitals within the federal child pornography statutes applied only to patently offensive "hard core sexual conduct." *Hillie* at 684 (citing *Miller* at 27).

In *United States v. 12 200-Foot Reels of Super 8mm. Film*, decided the same day as *Miller*, Justice White opined that "[i]f and when such a 'serious doubt' is raised as to the vagueness of the words 'obscene,' 'lewd,' 'lascivious,' 'filthy,' 'indecent,' or 'immoral' as used to describe regulated material" in federal statutes, "we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific '*hard core*' *sexual conduct* given as examples in *Miller v. California*." *Id.* (emphasis added).

In *New York v. Ferber,* 458 U.S. 747, 765 (1982), the Court noted that "[t]he term 'lewd exhibition of the genitals,'" in particular, "is not unknown in this area and, indeed, was given in *Miller* as an example of a permissible regulation." The Court reiterated that "the reach of the statute is directed at the *hard core* of child pornography," (*emphasis added*), repeating the characterization of prohibited "hard core sexual conduct" that was articulated in *Miller*. *Hillie* at 684 (citing *Ferber* at 773).

JA300

In *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994), the Court rejected vagueness and overbreadth challenges to the statutory term "lascivious exhibition of the . . . genitals," as used in 18 U.S.C. § 2256(2)(A)(v), because "'[l]ascivious' is no different in its meaning than 'lewd,' a commonsensical term whose constitutionality was specifically upheld in *Miller v. California* and in *Ferber*" as being limited to "hard core sexual conduct." *Hillie* at 685 (citing *X-Citement Video*, 513 U.S. at 78–79).

In other words, the Supreme Court in *X-Citement Video* "expressly engrafted the 'hard core' characterization of the prohibited 'lascivious exhibition of the genitals' from *Miller* onto the construction of the federal child pornography statute. *Hillie* at 685. The *Hillie* court went onto to note that Justice Scalia, even in dissent, indicated his agreement with that aspect of the Court's holding. *Hillie* at 685 (citing *X-Citement Video*. at 84.)

Finally, in *United States v. Williams*, 553 U.S. 285 (2008), the Court considered a constitutional overbreadth challenge to the promotion of child pornography statute, 18 U.S.C. § 2252A(a)(3)(B), which uses the same definition of "sexually explicit conduct" as the offenses herein. Just as in *X-Citement Video*, the Court in *Williams* made clear that "sexually explicit conduct" as used in the federal child pornography statutes must be construed consistently with the "sexual conduct" prohibited in *Ferber* and *Miller*; i.e. the reach of the federal child pornography statutes is directed at the *hard core* of child pornography. *Hillie* at 686.

And the *Williams* Court went one step further. In addition to relying on the Supreme Court holdings universally finding that the reach of the statute is directed at the *hard core* of child pornography, *Williams* also relied upon the *noscitur a sociis* canon to interpret the child

JA301

pornography statute at issue. *Noscitur a sociis* counsels that a word is given more precise content by the neighboring words with which it is associated:

> Because "lascivious exhibition of the anus, genitals, or pubic area"
> appears in a list with "sexual intercourse," "bestiality,"
> "masturbation," and "sadistic or masochistic abuse," its
> "meaning[] [is] narrowed by the commonsense canon of *noscitur a*
> *sociis*—which counsels that a word is given more precise content by
> the neighboring words with which it is associated.
>
> *Id.* at 294

Given all of that, the DC Circuit necessarily concluded that to be "lascivious" within the meaning 18 U.S.C. § 2256(2)(A), the "exhibition of the anus, genitals, or pubic area" must be performed in a manner that connotes the commission of one of the four sexual acts listed in 18 U.S.C. § 2256(2)(A), either actual or simulated.

This understanding of "lascivious" is in perfect harmony with how the prosecutors construed "lewd exhibition of the genitals" when asking the Supreme Court to uphold the New York statute in *Ferber*. *Hillie* at 688. Moreover, this construction is consistent with the Supreme Court's repeated description of the conduct prohibited by the terms "sexual conduct" and "sexually explicit conduct" in child pornography statutes as "hard core" sexual conduct, as described above.

In conclusion, "lascivious exhibition of the anus, genitals, or pubic area of any person" in 18 U.S.C. § 2256(2)(A)(v) covers only those visual depictions in which a minor, or someone interacting with a minor, engages in conduct displaying their anus, genitalia, or pubic area in a

lustful manner that connotes the commission of sexual intercourse, bestiality, masturbation, or sadistic or masochistic abuse.

As neither of the two videos at issue *Hallie* contained such depictions, the DC Circuit reversed Hallie's convictions, finding that no rational trier of fact could find the conduct depicted in the videos to be a "lascivious exhibition of the anus, genitals, or pubic area of any person," as defined by § 2256(2)(A).

The same can be said about the images in the instant case, compelling the same conclusion: the images in no way depict the minor's anus, genitalia, or pubic area in a lustful manner that connotes the commission of sexual intercourse, bestiality, masturbation, or sadistic or masochistic abuse. Indeed, the images contain not even a hint of such conduct.

Accordingly, Ms. Kolhoff is not- and cannot be- guilty of any the charged crimes in her indictment.


B.  *United States v Courtade*, 929 F.3d 186 (4th Cir. 2019)

*Courtade* is the only Fourth Circuit case addressing the meaning of "lascivious exhibition of the anus, genitals, or pubic area of any person" in 18 U.S.C. § 2256(2)(A)(v). However, it is important for this Court to recognize that the Fourth Circuit analyzed this question only in a civil proceeding and in the context of a § 2255 habeas claim of actual innocence. It did not address this question in the criminal context of a Rule 29 motion based legal insufficiency, as Your Honor is doing here. *See Courtade* at 191 (Actual innocence "means factual innocence, not mere legal insufficiency")(citing *Bousky v. United States*, 523 U.S. 614, 623 (1998)).

JA303

That being said, *Courtade* likewise supports the finding that the images are not "lascivious" within the meaning of the federal child pornography statutes.

Like *Hillie*, the Fourth Circuit recognized that 18 U.S.C. § 2251 "requires more than mere nudity"; i.e. there must be "sexually explicit conduct." *Courtade*, 929 F.3d at 191 (4th Cir. 2019).

The Fourth Circuit also recognized that courts should only look to the four corners of the image or video, rather than to the subjective intent of the creator, when deciding whether the image is "lascivious" under in 18 U.S.C. § 2256. *Courtade*, 929 F.3d at 192.[1]

That means, in this case, everything but the pictures themselves- standing alone- is irrelevant when considering whether the images contained within the four corners of the picture are "lascivious":

- Where the images were posted is irrelevant and beside the point;

- Anything Ms. Kolhoff might have posted about the images is irrelevant and beside the point;

- Anything anyone else might have posted about the images is irrelevant and beside the point.

In short, the question of "lasciviousness" concerns the content of the images, not where they were posted or what was said about them.

---

[1] It is important to note that the Court in *Courtade* relied upon Webster's to define how "lewd" or "lascivious" are commonly understood in everyday discourse. That may be proper in an "actual innocence" proceeding but is not proper when determining legal sufficiency. The proper inquiry is into how the Supreme Court jurisprudence defines the meaning of "lewd" or "lascivious" words within 18 U.S.C. § 2256.

Whether an image is "lascivious" is not- and cannot- be a subjective inquiry into what may or may not be in someone's mind when they view it or create it. Such an approach would invariably lead to an impossible situation in which the law would apply differently to pretty much everyone.

The question then is whether under *Courtade* a reasonable person- looking at the four corners of the images, and no further- would consider them as depicting the minor displaying their anus, genitalia, or pubic area in a lustful manner that "excites lustfulness or sexual stimulation" in a reasonable person. *Courtade* at 192.

No rational trier of fact could reach this conclusion.

Within the four corners of the images, they are in fact exactly the sorts of images one would expect to appear in a medical journal: they are completely devoid of any suggestion of sexual conduct of the sort omnipresent in the images of child pornography with which this Court is intimately familiar.

There is no penetration of any kind and the only digital manipulation is that which is required to observe the body parts.

So when considering whether these images are "lascivious", the Court must ask itself the following question:

> If Ashley had taken these images from a textbook on human
> anatomy or medical journal and posted those images instead, would
> she still be guilty under the relevant statutes?

JA305

Or this question:

> If a rational trier of fact were see to these pictures for the first time,
> with no context, would he or she be convinced- beyond a
> reasonable doubt- that the images would "excite lustfulness or
> sexual stimulation" in a reasonable person?

The answer to each question is, and must be, "No".

These images are nowhere close to the heartland of the statutes' proscriptions and therefore this Court must view their application to the relevant statutes with the utmost caution. *United States v. McCauly*, 983 F.3d 690, 698 (4th Cir. 2020) (When charged conduct does not fall in the heartland of a statute's proscription, the risk of prejudice becomes more palpable.)

Accordingly, Ms. Kolhoff is not- and cannot be- guilty of any the charged crimes in her indictment.

Respectfully Submitted,

ASHLEY KOLHOFF
By Counsel

_____/s/_____
CHRISTOPHER AMOLSCH
VSB #43800
12005 Sunrise Valley Drive
Suite 200
Reston, Virginia 20191
Ph: 703.969.2214
chrisamolsch@yahoo.com
Counsel for Ms. Kolhoff

JA306

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on the 3rd day of March 2022 I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties of record.

                              _____/s/_____
                                CHRISTOPHER AMOLSCH
                                VSB #43800
                                12005 Sunrise Valley Drive
                                Suite 200
                                Reston, Virginia 20191
                                Ph: 703.969.2214
                                chrisamolsch@yahoo.com
                                Counsel for Ms. Kolhoff

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 1:21-CR-158 |
| | ) | |
| v. | ) | The Hon. Leonie M. Brinkema |
| | ) | |
| ASHLEY NICHOLE KOLHOFF, | ) | Bench Trial: March 2, 2022 |
| | ) | |
| Defendant. | ) | **REDACTED PURSUANT TO** |
| | ) | **18 U.S.C. 3509(d)(2)** |

## GOVERNMENT'S CLOSING BRIEF

On March 2 and March 3, 2022, Ashley Nichole Kolhoff appeared for a bench trial on an indictment charging her with one count of production of child pornography, in violation of 18 U.S.C. § 2251(a) and (e), and one count of distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1). After the parties presented evidence, the Court ordered closing briefing addressing the only three issues remaining in dispute: (1) whether the defendant had sufficient mental capacity to form the necessary *mens rea*, (2) whether the defendant had the requisite purpose in employing ███████████████, to engage in sexually explicit activity, and (3) whether the images the defendant produced and repeatedly distributed depict a minor engaged in "sexually explicit conduct." For the following reasons, the United States respectfully submits that the evidence the government adduced at trial proved well beyond a reasonable doubt that the defendant knowingly produced and distributed images ████ that depicted the lascivious exhibition of her genitals and anus. Accordingly, the Court should find the defendant guilty of production and distribution of child pornography.

JA308

# I. EVIDENCE ADMITTED AT TRIAL OVERWHELMINGLY ESTABLISHED THAT THE DEFENDANT POSSESSED THE NECESSARY MENTAL STATE TO COMMIT THE CHARGED OFFENSES

At trial, the defendant did not contest that she was user ███████ on the Rapey website, and that she had personally engaged in all of the conduct (including the creation and widespread dissemination of sexually explicit photographs of ██████████ genitals and anus) that █████████ was seen to have undertaken on the website. Her sole contention in defense was that the government had failed to prove that she acted with the *mens rea* required to prove her guilt of the production and distribution of child sexual abuse material, as charged in the indictment. The claim is utterly contrary to the extensive evidence presented at trial - including evidence presented both by the government and the defendant - of the deliberateness of the defendant's choices and the voluntariness of her actions, and should thus be rejected.

### A. Evidence of Defendant's Activity at Time of the Charged Offenses

The most direct and compelling evidence of the defendant's state of mind between September 11, 2020, and September 13, 2020, naturally consists of the unchallenged record of the defendant's own words and actions during that period, including the details of her interactions with other members of the Rapey website. The documented activity of █████████ on the Rapey website provides the Court with a reliable, unbiased, and contemporaneous account of the defendant's state of mind at the time of the charged offenses. By contrast, the testimony of a mental-health professional retained by the defendant after the initiation of federal criminal proceedings involving serious allegations against the defendant is far less reliable. This is especially true here, where the testimony consisted of mere speculation based nearly exclusively on (and yet nevertheless unsupported by) the dubious and self-serving symptoms alleged by the

2

JA309

defendant herself. In other words, the actual evidence in this case overwhelmingly established that the defendant was fully aware of her actions and had a complete understanding of what she was doing – but chose to do it anyway.

One trial exhibit after another documented the defendant engaging competently, coherently, and deliberately with other members of the website in her pursuit of the sexual abuse of ███████████.  These actions began with the defendant's decision to register the ██████████ user profile with the website, in which she correctly described herself as a 21-year-old woman from Ohio ████████████  More specifically, the defendant volunteered, in response to a prompt reading simply "Tell us about yourself," that she was a ████████████ ███████  GX 205.  They continued with the initiative displayed by the defendant in creating a message thread titled "Who wants me ██████████ the body text of which read "Would anyone want me ████████████ and another thread titled "██████ is beautiful," whose body text read "Anyone wants pics?"[1] – both threads displaying an accurate and clear-eyed understanding of the purpose of the Rapey website and the avowed interests of its members.  GX 209, 210.

The defendant continued her lucid interactions with Rapey website members in a lengthy direct-message conversation with Rapey user ██████ in the course of which the defendant engaged in a long, entirely coherent discussion regarding her desire to have ██████ sexually abused by ████████ the fact that she and ██████ both lived in Ohio within driving distance of each other, and the defendant's wish to become a "confirmed" member of the Rapey website (which the defendant successfully accomplished by sending a picture of herself with the website's name written on her

---

[1] The defendant posted the former thread in the "Rapey Misogyny" message board in the "Rapey Discussion" section, and the second in the "Femoid Discussion" board within the "Whores" section.

3

body, as directed by ▓▓▓▓). GX 208. Over the course of this conversation, the defendant transmitted numerous sexually explicit images of ▓▓▓▓▓▓▓▓ to ▓▓▓▓ complying responsively with his requests and continuing to engage with him coherently.

The defendant herself initiated a private conversation with a user known to law enforcement to be the administrator of the Rapey website, titled "▓▓▓ pics" and reading in the body: "Here are some pics. Hope you like them." GX 211; DE 91 (transcript of trial testimony given on March 2, 2022) at 38. To her very first message, the defendant attached five photographs of ▓▓▓▓▓▓▓, including multiple photographs depicting the lascivious exhibition of her infant's genitals or anus. GX 211A – 211E.

The defendant further participated in numerous direct-message exchanges with other Rapey users in which the defendant – acting at all times with the utmost apparent clarity, coherence and responsiveness – distributed the sexually explicit photographs of ▓▓▓▓ she had created. By way of example, in response to user ▓▓▓▓ who told the defendant "I want to see you ▓▓▓ ▓▓▓▓▓▓," the defendant transmitted numerous images of herself and ▓▓▓▓▓, including sexually-explicit images of ▓▓▓▓▓, just as ▓▓▓▓ had requested – prompting an extended discussion of the possibility of ▓▓▓▓ having an opportunity to physically abuse ▓▓▓▓▓ ▓▓▓▓ himself. GX 212; DE 91 at 49-51. Similarly, in response to a query from Rapey user ▓▓▓▓▓▓▓▓▓ concerning whether the defendant was "really giving out pic ▓▓▓▓▓▓ the defendant accurately answered "yes," subsequently sending ▓▓▓▓▓▓▓ the sexually explicit photos of ▓▓▓▓ she had produced. GX 213, DE 91 at 51-52. The above references are merely illustrative examples; the defendant actively distributed the explicit images of ▓▓▓▓▓ to numerous other Rapey users in a similar fashion. See GX 214, 216-220, 223.

4

The defendant also actively managed her ███████ account on Rapey in a manner that clearly establishes the knowing and volitional nature of her conduct on the website. Evidence introduced at trial established that, while her year of birth was initially visible as part of the ███████ profile, the defendant subsequently altered her settings to conceal it. GX 207. The defendant also changed the Instagram account she had chosen to associate with her Rapey account on September 11, 2020, before ultimately deleting the reference to an associated Instagram account altogether on September 13, 2020. Id. The defendant also changed her associated email account from one Gmail account to another on September 13, 2020. Id. This evidence manifestly demonstrates the defendant's considered and deliberate approach to her conduct on the Rapey website.

Moreover, additional evidence of the defendant's behavior outside of the Rapey context on the relevant dates further confirms the defendant's lucidity and coherence. Text messages recovered from the defendant's iPhone revealed that on September 11, 2020 (the same day that the defendant first offered pictures of ███████ to Rapey members), the defendant was calmly and rationally arranging a walk in the neighborhood with an apparent friend. See GX 701. An e-mail message recovered from the phone demonstrates that on the subsequent morning of September 12, 2020 (squarely in the middle of the three-day period during which the defendant distributed the explicit images to Rapey members), the defendant inquired about her eligibility for assistance with an employee of Ohio's Department of Job and Family Services (JFS), asking with perfect clarity: "Hi Shannon this is Ashley kolhoff. I'm wondering if I qualify now for food? Can I send you a paystub to see? I am not working, this is my boyfriends paystub." GX 702.

In light of the above, there is no question that the defendant was of perfectly sound mind at all times relevant to the conduct charged in the indictment.

5

JA312

**B. Dr. Hendricks**

The defendant contested none of the above-described evidence, instead opting to call a single witness in order to dispute the conclusions obviously to be drawn from it about the defendant's awareness and volition – Dr. Michael Hendricks, a clinical psychologist and therapist. Dr. Hendricks testified, in substance, that the defendant ████████████████████████████ ████████████ and that in committing the acts charged in the indictment, the defendant experienced a dissociative event and "went down a rabbit hole." DE 91 at 126. Far from raising any doubt about the defendant's mental state, however, Dr. Hendricks' testimony, to the extent it had probative value at all, actually confirmed that the defendant acted with the mental state required for conviction.

Analysis of the overarching significance of Dr. Hendricks' testimony must begin with his own frank acknowledgment that his testimony regarding her dissociative state had zero probative value with respect to the determination of the defendant's mental state at the time of the events:

> Q:    So your conclusion that the defendant was very likely in a dissociative state at the time of the alleged conduct *doesn't mean anything* for -- as far as whether she was acting knowingly, intentionally or voluntarily at the time?
>
> A:    That's correct.

DE 91 at 151 (emphasis added).  Thus, even were this Court to credit Dr. Hendricks' testimony in full, it would logically also have to credit Dr. Hendricks' candid admission that his evaluation of the defendant and subsequent testimony did absolutely nothing to suggest that the defendant was not acting with the required mental state at the time of the offense.

Indeed, even during direct and redirect examination, Dr. Hendricks consistently stopped short of testifying that the defendant suffered from any conditions that would have impaired her ability to act knowingly, intentionally and voluntarily.  Instead, Dr. Hendricks' testimony included

JA313

(in addition to at least four separate references to a "rabbit hole," a term that appears to lack any scientific meaning, see DE 91 at 106, 126, 144, 155) the following observations: that the defendant "got caught up in" her activity on Rapey, id. at 106; that the results of one of the tests he administered suggested the defendant ██████████████████████████" id. at 113; that the defendant ████████████████████, id. at 117; that the defendant ██████████████ ████████████████████, id. at 118; and that "sometimes people will get in this frame of mind where they perceive that there's a way to correct the wrong that was done before, and they just follow it," id. at 156. Nothing in Dr. Hendricks' testimony raised any doubt (let alone a reasonable one) about whether the defendant acted with the required mental state to commit the offenses charged.

Dr. Hendricks' testimony differed significantly in its critical conclusion from his report. In his report, Dr. Hendricks suggested that the defendant "very likely was in a dissociative state during the index incident." Hendricks Rpt. at 15. But Dr. Hendricks notably did not testify to that conclusion, or anything remotely similar to it, during trial. There was simply nothing in Dr. Hendricks' trial testimony supporting the conclusion that the defendant experienced any dissociative event at the time of the events being discussed.

But even if Dr. Hendricks had testified to the conclusion in his report, that testimony would have failed to raise any doubt about whether the defendant was acting knowingly and voluntarily even while in a dissociative state, as Dr. Hendricks himself acknowledged:

>      Q:    Leaving aside insanity though, wouldn't the nature and contents of her various messages on this board have had some impact to you and your conclusion that she very likely was experiencing a dissociative event at the time of the alleged conduct?
>
>      A:    Not necessarily, because people can be very clear even when they're dissociating.

Q:    People can act with perfect knowledge and understanding of what they're doing while they're dissociative?

A:    They can, yes.

Q:    So being in a dissociative state doesn't mean that you're unaware of what you're doing; is that correct?

A:    Correct.

Q:    It doesn't mean that you're incapable of controlling your actions or that you're acting reflexively or involuntarily; does it?

A:    No.

DE 91 at 150-51.  Thus, even if fully credited by the Court, Dr. Hendricks' testimony does nothing to cast doubt on the overwhelming evidence establishing that the defendant acted knowingly and intelligently on the Rapey website.

In any case, there are substantial reasons to question the reliability of Dr. Hendricks' evaluation of the defendant and his subsequent testimony.  Dr. Hendricks relied nearly exclusively on the defendant's self-reporting of her own memory problems in concluding in his report that she ████████████████████████████████████████████████████ ██████████████████████████ – notwithstanding his acknowledgment that during his evaluation of the defendant he had "already concluded that, to some extent, she was malingering memory issues."  DE 91 at 129.  Moreover, Dr. Hendricks implausibly suggested that he did not administer a test designed to detect memory malingering because "it wouldn't have given me anything useful," id., notwithstanding the vastly predominant role of the defendant's self-reported memory problems in his report.  See Hendricks Rpt. at 7 (noting defendant's claim not to remember having taken sexually explicit photos of ████████████); id. at 8 (noting defendant's description of ████████████████████████████ id. at 9 (noting defendant's report of ██████████████████████████████"); id. at

JA315

13 (noting that defendant "denied memory for much of the activity involved in her charged offense"); id. at 15 (noting defendant's suggestion to Dr. Hendricks that "she had no memory for much of that time frame," referring to the period of time during which she engaged in the conduct charged by the indictment).[2]

Despite his conclusion about a dissociative episode "very likely" afflicting the defendant at the relevant times, Dr. Hendricks notably declined to administer a test specifically designed to detect the occurrence of dissociative episodes, such as the Dissociative Experiences Scale, 2d Edition (DES-II).  DE 91 at 127.  Dr. Hendricks testified that he decided not to administer the DES-II because "[i]t doesn't have any validity measures, and I tend to back away from tests that don't have validity measures if I have to testify in court about them."  Id.  Inexplicably, however, Dr. Hendricks went on to testify about the results of his administration of the DES-II to the defendant in a follow-up meeting that occurred after the government had already disclosed to the defense the report of Dr. Rachel Kalbeitzer (discussed further below), including Dr. Kalbeitzer's results indicating that the defendant ███████████████████████████████████████████████
███████████████████████████████.[3]  Id. at 130-31.  Thus, Dr. Hendricks testified both

---

[2] Indeed, in light of the strong emphasis placed by Dr. Hendricks' report on the defendant's claimed memory deficits, the defendant's suggestion in opening statements that "this case is not about Ashley's memory" is puzzling.  DE 91 at 24.

[3] Dr. Hendricks testified that the defendant indicated to him that ██████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

9

JA316

that: 1) the DES-II generally is insufficiently reliable to form the basis of testimony in court, and

2) that he apparently made an exception in the defendant's case, a situation in which the defendant

had already previously been administered the DES-II and had been made aware that the results

████████████████████████████████████████████████████████████████████████████

██████   The irreconcilability of these two statements is readily apparent.

Dr. Hendricks also credulously accepted the defendant's absurdly far-fetched suggestion

that her sexual abuse of ████████████, and her dissemination of a photographic record of that

abuse into the sea of sexual predators that was the Rapey website – a decision that effectively

ensured that dozens, if not hundreds, of individuals will likely have access to these images,

perpetuating ██████████ abuse indefinitely -- was motivated by a desire to investigate sexual

predators and protect children from harm.  His testimony that the defendant had been "sort of going

back down the rabbit hole of trying to find a way to capture a predator" and that "her idea was that

she would then report that person once they crossed a line to the police or to whatever authorities",

DE 91 at 106, is totally unpersuasive, and for the same reasons that his opinion regarding the

defendant's mental state lacks credibility – it depends entirely on Dr. Hendricks' uncritical

acceptance of the defendant's own highly-motivated description of her actions and experiences.

It entirely ignores the defendant's failure to even mention her supposed vigilante efforts to law

enforcement agents when confronted in June 2021 (or several months prior, when law enforcement

first contacted her regarding the website), even as she was being taken into custody for having

committed child sex offenses herself.  And it ignores the fact that when asked by agents about the

username ██████████ the defendant's stated that "someone literally had stolen my identity . . .

───────────────────────

████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████

10

and gone onto something, some random website, and taken my information and put it on there."
It simply – like his testimony regarding the defendant's mental state – ignores both the evidence
and common sense.

### C. Dr. Kalbeitzer

In its rebuttal case, the government called Dr. Rachel Kalbeitzer, an experienced clinical
and forensic psychologist whom the government had retained to conduct an independent
psychological evaluation of the defendant.  Dr. Kalbeitzer's testimony further underscored the
extent to which the defendant was attempting to manipulate the psychological testing in order to
appear more impaired than she actually is, as well as the voluntariness and intentional nature of
her actions on the Rapey website.

Dr. Kalbeitzer administered the Personality Assessment Inventory (PAI) to the defendant.
One of the validity scales (the internal measure on the test designed to indicate whether the subject
of the test has responded honestly to the questions, and therefore whether the test results should be
considered valid) associated with the defendant's results ███████████████████████
████████████████████████████████████████████████ DE
92 at 23.

Dr. Kalbeitzer also administered the Dissociative Experience Scale, 2d Edition (DES-II).
Dr. Kalbeitzer noted that the DES-II is "probably one of the only tests available that specifically
asks questions about dissociative experiences as an entire test."  Id. at 24.  Although after receiving
Dr. Kalbeitzer's report indicating that the defendant had been fabricating her symptoms on the
DES-II and other tests, the defendant suggested to Dr. Hendricks that she had misunderstood the
questions on the DES-II, at the time of the test's administration, Dr. Kalbeitzer perceived no reason
to doubt that the defendant had in fact understood the test instructions correctly.  Id. at 25.  The

11

defendant's score on the DES-II ▮▮▮ compared to an average score of 5.4 for the population in

general, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and one with which even Dr. Hendricks declined to

diagnose the defendant. Id. at 26. Dr. Kalbeitzer testified that ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ Id. at 26-27.

The third test administered by Dr. Kalbeitzer was the Test of Memory Malingering

(TOMM). Dr. Kalbeitzer decided on the TOMM because of the defendant's suggestion to Dr.

Hendricks ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Id. at 27-28. The TOMM's design is such

that even persons with "very severe psychotic disorders" and severe structural brain impairments,

such as those resulting from a close-range gunshot wound to the head or a cranial lobotomy, are

able to score "very highly" on the test. Id. at 28. Persons with "intact cognitive functioning," that

is, persons not suffering from an intellectual disability, typically score 45 or higher on the second

of the TOMM's two trials. Id. at 29-30. The defendant scored ▮▮▮ Id. at 30. This score suggested

to Dr. Kalbeitzer that the defendant "was likely not putting forth full effort and may be

exaggerating the memory problems that she does have." Id. at 31.

Dr. Kalbeitzer also testified about her interview of the defendant, which included a

substantial discussion with the defendant regarding her actions on the Rapey website. The

defendant remembered that she had clicked a link to the Rapey website because she was "curious"

about it, and further remembered her decision to participate in the "confirmation" process in which

JA319

she wrote the name of the website on her body and sent a picture of that to the website's administrator.  Id. at 31-32.  The defendant recalled that the focus of the website was "sexually explicit chat," that she had posted pictures of herself and ████████ on the website, and that she believed that she "may have done this for attention." Id. at 32-33.  After being asked specifically about her post asking substantially "Would anyone want me and ████████?" (referring to GX 209), the defendant responded that her actions were "never about ████████; it was about her." Id. at 34.  Dr. Kalbeitzer specifically inquired why she chose to involve ████████████ instead of just herself in her Rapey activity; the defendant responded by observing (accurately) that "the website was for children," which Dr. Kalbeitzer understood to mean that she posted pictures of ██ ████████████ in order to elicit a greater response and obtain more attention from other Rapey users, "since that was the nature of the website." Id.

The inescapable conclusion is this: the defendant repeatedly gave false answers in response to tests administered both by Dr. Kalbeitzer and Dr. Hendricks in an attempt to grossly exaggerate or altogether fabricate psychological symptoms in a deliberate effort to avoid responsibility for her offenses.  Her responses to the tests were no more honest than her outright lies to Special Agent Smock that the user ████████ on Rapey was someone who had stolen her identity, GX 409 at 9, that the "confirmation" photo of herself with the website name written on it did not actually depict her, id. at 10, that she had never engaged in online conversations about ████████████ ████████, id. at 12, and that she had not sent photographs of ████████ directly to the administrator of Rapey, id. at 23.  The defense's suggestion, via Dr. Hendricks, that the defendant suffered from a dissociative episode during the entire three-day period during which she produced and distributed child pornography not only finds no support in these entirely unreliable test results, it is overwhelmingly refuted by far more trustworthy evidence – including, most significantly, the

defendant's own words, particularly those exchanged with other Rapey users at the time of the

offenses in September 2020, and her recall of her conduct as shared with Dr. Kalbeitzer.  The

defendant's excuses, justifications and falsehoods must finally end, and the defendant should be

held accountable for her actions.  The Court should find her guilty as charged.

## II.    THE DEFENDANT'S PURPOSE IN HAVING ████████ ENGAGE IN SEXUALLY EXPLICIT CONDUCT WAS CLEARLY TO PRODUCE A VISUAL DEPICTION OF THE CONDUCT

To find the defendant guilty of producing child pornography, the government must prove

that she employed, used, persuaded, induced, enticed, or coerced ████ "to engage in . . . any

sexually explicit conduct *for the purpose of producing* any visual depiction of such conduct." 18

U.S.C. § 2251(a) (emphasis added).  The Fourth Circuit has interpreted § 2251(a)'s specific intent

element to require that before the defendant engaged in sexually explicit conduct with the minor,

she must have been motivated—at least in part—by the desire to create a visual depiction of that

conduct.  See United States v. McCauley, 983 F.3d 690, 697 (4th Cir. 2020).  In other words,

producing a visual depiction of sexually explicit conduct must be "a significant or motivating

purpose" driving a defendant's conduct in the first instance, United States v. Thompson, 807 F.

App'x 251, 252 (4th Cir. 2020), not merely a purpose that could arise at any time while engaging

in the sexual conduct, see McCauley, 983 F.3d at 696-97.  As the Fourth Circuit explained in

McCauley, the government does not have to prove that the defendant's *only* purpose or "sole

purpose" in causing a minor to engage in sexually explicit conduct is to produce images of that

conduct, but must prove that the purpose of producing the images was more than "merely

incidental" to other, more important purposes. See id. at 695. 697.

After the first day of trial, the defendant submitted a bench brief arguing that the Court

must find that the defendant "act[ed] with the dominant purpose of creating an image of the

JA321

sexually explicit conduct for engaging in this conduct." DE 88 ("Def. Bench Brief"). This is an incorrect statement of the controlling legal standard—the Fourth Circuit has made clear that the purpose of creating the visual depiction may be "*a* significant or motivating purpose," see Thompson, 807 F. App'x at 252 (emphasis added), and is not required to be the *only* one.

It bears emphasizing that under McCauley, the required "purpose" set forth in § 2251(a) means the purpose of the defendant in employing, using, or coercing a minor to engage in sexually explicit conduct – *not* the defendant's purpose in producing images of child pornography. This latter purpose, which could equivalently be described as the defendant's motive, is not an element of the offense and is irrelevant. Cf. United States v. Morison, 844 F.2d 1057, 1073 (4th Cir. 1988). A person may produce and distribute child pornography for personal sexual gratification, to earn money or other goods from the sale or bartering of the images, or – as particularly relevant to this case – to ingratiate herself with an online community of predators. A person may also produce and distribute child pornography for some other reason, or even for no ascertainable reason at all. The person is guilty of production and distribution of child pornography in each such case, regardless of her reason for doing so.

The evidence presented at trial overwhelmingly demonstrated that the defendant acted with the purpose of creating a visual depiction when she lasciviously exhibited ███ genitals and anus. In fact, while not required by McCauley, it appears to have been the *only* reason she chose to manipulate and lasciviously exhibit ███ genitals, anus, and pubic area.

At trial, the government proved beyond a reasonable doubt that the defendant went onto this notoriously exploitative website and immediately posted a public thread titled "███ is beautiful[…]" asking, "Anyone want pics?" GX 210. After countless users responding encouraging her to do so, she took a series of photos where she manipulates ███ labia

15

JA322

and buttocks, spreading each of them apart with her fingers in order to lasciviously exhibit and photograph ███ genitals and anus for the website. As detailed above, she then initiated a direct message thread to the main administrator of the website titled "███ Pics" where she writes, "Here's some pics hope you like them". GX 211; DE 91. Included in the message were five photographs of ███, including multiple photographs depicting the lascivious exhibition of ███ genitals or anus. GX 211A – 211E. Additionally, the government proved that during the defendant's "confirmation" conversation with another administrator of the website, the defendant posted several non-explicit images of ███, as well as one closeup picture of ███ ███ genitals. After the administrator responded, "Omg [*face emoji with hearts*] so fuckable... more [*face emoji*]," the defendant responded by posting additional images of ███ two of which depict the defendant's hand spreading open her labia, graphically exhibiting ███ vagina, and the defendant captions the images "you want her." GX 208. Further, as discussed in more detail above, the defendant also engaged in a litany of direct messages with users requesting pictures of ███, and she proceeded to distribute the images of ███ to multiple site members. See GX 212-214, 216-220, 223; DE 91 at 49-52. Unquestionably, then, the defendant's purpose in doing so was specifically to create the sexually explicit visual depictions of ███ that would then be shared with other Rapey users. Her purpose to create the visual depictions could not be clearer.

The defendant has claimed that she produced and distributed these images in a misguided attempt to catch a predator. DE 91 at 106. At trial, the defense focused heavily on the lack of any documented history of sexual predation prior to the instant offense and the fact that—other than her decision to create and distribute sexually abusive images of ███, as well as her decision to engage in countless conversations offering ███ to others for sexual abuse—

16

she was regarded by those close to her as ███████████████ who lacked any sexual interest in children. See id. at 122. Some of these assertions – such as the notion that the defendant's activity on Rapey was part of a vigilante effort to save children from predators – are demonstrably false; all of them are totally irrelevant.

Consequently, the government has not only met but exceeded its burden to prove that producing the images was a significant or motivating purpose of the defendant's when she manipulated and lasciviously exhibited ████████ genitals, anus, and pubic region. Indeed, the overwhelming weight of the evidence suggests that, in this case, it was her *only* purpose.

### III.    THE IMAGES PRODUCED AND DISTRIBUTED BY THE DEFENDANT QUALIFY AS "SEXUALLY EXPLICIT CONDUCT" AS THEY CLEARLY DEPICT THE LASCIVIOUS EXHIBITION OF ███████████ GENITALIA AND ANUS

On the second day of trial, the defendant submitted a Rule 29 Motion for Acquittal arguing that the images the defendant produced are not a "lascivious exhibition" of ██████ genitals. *See* Dkt. No. 90 ("Def. Motion.").[4]  As the Court is aware, in order to meet its burden at trial, the government was required to prove that the images produced and distributed by the defendant depicted a minor engaged in "sexually explicit conduct," which is defined as:

Actual or simulated—

(i)    sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

(ii)    bestiality;

(iii)    masturbation;

---

[4] The government respectfully requests that the Court accept this closing brief as the government's response in opposition to the defendant's Rule 29 motion for acquittal, DE 90, and respectfully submits that the motion should be denied for the same reasons described herein.

(iv)    sadistic or masochistic abuse; or

(v)    lascivious exhibition of the anus, genitals, or pubic area of any person.

18 U.S.C. § 2256(2)(A).

In support of her argument that the images of Luna are not lascivious, the defendant relies almost exclusively on United States v. Hillie, 14 F.4th 677 (D.C. Cir. 2021), a recent decision of the D.C. Circuit holding that, in order to constitute a lascivious exhibition of the genitals, a child victim is required to have displayed her genitals or pubic area "in a lustful manner" that "connotes" the commission of one of the *other* acts defined as "sexually explicit conduct": intercourse, bestiality, masturbation, or sadistic or masochistic abuse. Id. at 687. Further, the majority opinion relied on a line of First Amendment vagueness and overbreadth cases that, it claimed, "repeatedly describe[] 'lascivious exhibition of the genitals' to mean depictions showing a minor engaged in 'hard core' sexual conduct." Id. at 684. The United States has submitted a petition for *en banc* review in Hillie, as the decision overlooks the statute's plain meaning, conflicts with the decisions by every other court of appeals that has construed "lascivious exhibition of the genitals," and effectively eliminates § 2256(2)(A)(v) by requiring that the conduct it encompasses also meet one of other provisions. The petition is currently pending before the D.C. Circuit.

Indeed, the Fourth Circuit and every other court of appeals have interpreted "lascivious exhibition" consistent with its ordinary meaning (*e.g.*, a depiction of the child's genitals or pubic area designed to elicit a sexual response in the viewer), and do not require the innocent child victim to have displayed her genitals or pubic area in a lustful manner or in a way that connotes the commission of one of the other four types of sexually explicit conduct the statute addresses. In United States v. Courtade, 929 F.3d 186 (4th Cir. 2019), the Fourth Circuit specifically addressed the definition of "lascivious exhibition" under § 2256(2)(A)(v) and held "that 'lascivious

18

JA325

exhibition' means 'a depiction which displays or brings forth to view in order to attract notice to the genitals or pubic area of children, in order to excite lustfulness or sexual stimulation in the viewer.'" Id. at 192 (quoting United States v. Knox, 32 F.3d 733, 745 (3d Cir. 1994) (citing *Black's Law Dictionary*). The Fourth Circuit's decision is consistent with every other circuit that had addressed the meaning of lascivious exhibition previously. See United States v. Steen, 634 F.3d 822, 828 (5th Cir. 2011); see also United States v. Al-Awadi, 873 F.3d 592, 600 (7th Cir. 2017) ("[A] lascivious exhibition 'is one that calls attention to the genitals or pubic area for the purpose of eliciting a sexual response in the viewer.'") (citation omitted); United States v. Wiegand, 812 F.2d 1239, 1244 (9th Cir. 1987) ("The picture of a child 'engaged in sexually explicit conduct' . . . is a picture of a child's sex organs displayed lasciviously–that is, so presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur."); United States v. Holmes, 814 F.3d 1246, 1251 (11th Cir. 2016) ("We have previously defined 'lascivious exhibition' as one that 'excites sexual desires or is salacious.'") (citation omitted).

The defendant, citing Courtade, claims the Fourth Circuit "recognized that courts should only look to the four corners of the image or video, rather than to the subjective intent of the creator, when deciding whether the image is "lascivious" under in 18 U.S.C. § 2256." Dkt. No. 90 ("Def. Motion") at 9. However, this is incorrect. Courtade noted that the defendant had made that argument before and specifically declined to address this issue, stating: "we need not venture into the thicket surrounding the *Dost* factors or define the parameters of any subjective-intent inquiry, because we can dispose of this case based on the objective characteristics of the video alone. The plain meaning of 'lascivious exhibition' requires that we ask whether the video depicts Jane Doe's genitals or pubic area 'in order to excite lustfulness or sexual stimulation in the viewer.'" Id. at 192 (citing Knox, 32 F.3d at 745).

The "*Dost* factors" referred to in <u>Courtade</u> are used by some courts as an aid in determining whether an image is lascivious. The Fourth Circuit has not explicitly adopted the <u>Dost</u> factors, and expressly declined to consider the matter in <u>Courtade</u>. <u>See</u> <u>id.</u> However, several circuits – including the Second, Third, Fifth, Sixth, Eighth, Ninth, and Tenth Circuits – use the <u>Dost</u> factors. <u>See</u> <u>United States v. Rivera</u>, 546 F.3d 245, 252-53 (2d Cir. 2008); <u>Salmoran v. Attorney General</u>, 909 F.3d 73, 80 n.11 (3d Cir. 2018); <u>United States v McCall</u>, 833 F.3d 560, 563 (5th Cir. 2016); <u>United States v. Hodge</u>, 805 F.3d 675, 680 (6th Cir. 2015); <u>United States v. Petroske</u>, 928 F.3d 767, 774 (8th Cir. 2019); <u>United States v. Perkins</u>, 850 F.3d 1109, 1121 (9th Cir. 2017); <u>United States v. Isabella</u>, 918 F.3d 816, 831 (10th Cir. 2019). Critically, none of the <u>Dost</u> factors requires a lustful display of the minor's genitals or pubic area in a manner that connotes the commission of intercourse, bestiality, masturbation, or sadistic or masochistic abuse. Rather, consistent with the ordinary meaning of "lascivious exhibition," the <u>Dost</u> factors ask factfinders to consider:

1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;

2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

4) whether the child is fully or partially clothed, or nude;

5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

JA327

United States v. Dost, 636 F.Supp. 828, 832 (S.D. Cal 1986). And while the Fourth, First, Seventh, and Eleventh Circuits have not expressly adopted the Dost factors, only the Seventh "discourage[s]" their "routine use," reasoning that § 2256(2)(A)(v)'s text is otherwise "clear." United States v. Price, 775 F.3d 828, 840 (7th Cir. 2014). The Eleventh Circuit has declined to decide if the Dost factors apply in its circuit, see United States v. Grzybowicz, 747 F.3d 1296, 1306 n.8 (11th Cir. 2014), and the First Circuit has only cautioned that Dost should not "be used to limit the statutory standard," United States v. Frabizio, 459 F.3d 80, 90 (1st Cir. 2006).

However, regardless of whether the Court chooses to analyze the depictions at issue here using the Dost factors, the legal standard in the Fourth Circuit for "lascivious exhibition" indisputably encompasses the images the defendant produced and distributed, as they are very clearly "'depiction[s] which display[] or bring[] forth to view in order to attract notice to the genitals or pubic area of children, in order to excite lustfulness or sexual stimulation in the viewer.'" Courtade, 929 F.3d 186 at 192 (quoting United States v. Knox, 32 F.3d 733, 745 (3d Cir. 1994) (citing Black's Law Dictionary). Under this standard, both the closeup images of ███ genitals and pubic area without the defendant manipulating her and the images where the defendant is spreading apart ███ labia and buttocks to expose her genitals and anus would constitute lascivious exhibitions under Courtade, as each of them clearly "displays and brings forth" ███ genitals "in order to attract notice to" them and "excite lustfulness or sexual stimulation in the viewer." In particular, though, the images where the defendant's hand can be observed spreading open ███ labia in order to *even more* lasciviously and graphically exhibit her genitals and spreading open her buttocks to even more lasciviously and graphically expose her anus are irrefutably encompassed by the Fourth Circuit's definition of lascivious exhibition. If manipulating and spreading apart ███ labia to expose her vagina and prying apart her

21

buttocks to expose her anus do not constitute a lascivious exhibition of ███████ genitals, it is hard to imagine what could.

It is helpful to compare the images in this case with those in Courtade, which were found by the Fourth Circuit to depict a lascivious exhibition of the genitals. The videos in Courtade involved surreptitiously recording a minor's genitals in a shower or bathroom setting. In Courtade, the video shows the defendant placing the camera on a counter facing the shower and leaving while the victim undresses and gets into the shower. See Courtade, 929 F.3d 186 at 188. The defendant then returns and hands the victim the camera—which he had assured her was turned off and that he was just seeking to test whether it was waterproof—and instructs her to place it on the shower floor. Id. at 188-89. The Court notes that, "During the video, Jane Doe's breasts and genitals are visible at various points." Id. at 188. As the Fourth Circuit held, this video certainly constitutes lascivious exhibition of a child's genitals. The images produced by the defendant in this case – which include images of the defendant physically manipulating ███████ genitals and anus in order to expose more of them to her closely-positioned cell phone camera – are far more obviously lascivious than the depiction already determined by the Fourth Circuit in Courtade to be lascivious, and must therefore also qualify as "lascivious exhibitions." Indeed, it is difficult to conceive of any images that would meet the statutory standard for "lascivious exhibition" of a child's genitals or anus if the images produced and distributed by the defendant do not.

Accordingly, the government has met and exceeded its burden in proving that the images the defendant produced and distributed depicted lascivious exhibition of a minor's genitals, anus, or pubic region.

<u>**CONCLUSION**</u>

Because of the defendant's actions, ████████ will grow up with the immeasurable pain of knowing of that ████████████████████, create a permanent record of this abuse, and send it to a horde of predators on the Rapey website.  For the foregoing reasons, and based on the evidence presented at trial, the United States respectfully submits that the Court should find the defendant guilty of production and distribution of child pornography.

Respectfully submitted,

Jessica D. Aber
United States Attorney


By:    _____/s/_____
Whitney Kramer
Special Assistant United States Attorney (LT)
Seth M. Schlessinger
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Ave.
Alexandria, Virginia 22314-5794
Phone: 703-299-3700
Fax: 703-299-3981
Email: Whitney.Kramer2@usdoj.gov

JA330

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on March 17, 2022, a copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will cause a copy to be electronically sent to counsel of record.


By:     _____/s/_____
        Whitney Kramer
        Special Assistant United States Attorney (LT)

24

JA331

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION

 3   --------------------------x
     UNITED STATES OF AMERICA,  :    Criminal Action No.:
 4                              :    1:21-cr-158
          versus                :
 5                              :
     ASHLEY NICHOLE KOLHOFF,     :    Tuesday, April 12, 2022
 6                              :
                 Defendant.     :    Volume III - Ruling
 7   --------------------------x

 8        The above-entitled bench trial was heard before the
     Honorable Leonie M. Brinkema, United States District Judge.
 9
                         A P P E A R A N C E S:
10
     FOR THE GOVERNMENT:    SETH SCHLESSINGER, ESQUIRE
11                          WHITNEY KRAMER, ESQUIRE
                            OFFICE OF THE UNITED STATES ATTORNEY
12                          2100 Jamieson Avenue
                            Alexandria, Virginia  22314
13                          (703) 299-3700

14   FOR THE DEFENDANT:     CHRISTOPHER AMOLSCH, ESQUIRE
                            LAW OFFICES OF CHRISTOPHER AMOLSCH
15                          12005 Sunrise Valley Drive
                            Suite 200
16                          Reston, Virginia  20191
                            (703) 969-2214
17
                            FRANK SALVATO, ESQUIRE
18                          THE LAW OFFICES OF FRANK SALVATO
                            1203 Duke Street
19                          Alexandria, Virginia  22314
                            (703) 548-5000
20

21

22

23        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

24

25
                                                          184
```

JA332

```
 1                    P R O C E E D I N G S

 2          THE DEPUTY CLERK:  Criminal Case 21-158, United

 3   States of America versus Ashley Nichole Kolhoff.

 4          Would counsel please note their appearances for

 5   the record.

 6          MR. SCHLESSINGER:  Good morning, Your Honor.

 7   Seth Schlessinger and Whitney Kramer for the United States.

 8   We're joined by Special Agent Brandon Smock of HSI.

 9          THE COURT:  Good morning.

10          MR. AMOLSCH:  Good morning, Your Honor.

11   Christopher Amolsch and Frank Salvato for Ashley Kolhoff,

12   who is present.

13          THE COURT:  All right.  Well, as you know, we

14   continued the bench trial to allow counsel to file

15   post-trial briefs, which both sides have now done, briefing

16   the legal and factual issues in the case.  There really is

17   just about no factual issue in dispute.  This case involves

18   a couple of legal arguments defense counsel have raised.

19          Mr. Amolsch or Mr. Salvato, is there anything you

20   want to add to your positions?

21          MR. AMOLSCH:  I don't believe so, Your Honor.  Our

22   brief, I think, was fairly comprehensive.  I certainly can

23   answer any questions the Court has about the brief.

24          THE COURT:  No.  I mean, we've read both briefs.

25   I just wanted to know if there's anything further.
```

                                                        185

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA333

```
1              MR. AMOLSCH:  Nothing, Your Honor.  Thank you.

2              THE COURT:  Mr. Schlessinger, is there anything

3    further the Government wants to add to its papers?

4              MR. SCHLESSINGER:  No, Your Honor.  Except,

5    similarly, if the Court had any questions other than that.

6              THE COURT:  Well, I'm satisfied having gone

7    over -- excuse me, allergy season -- having gone over the

8    record, as well as your briefs, I'm still satisfied, as I

9    really was at the end of the trial, that the Government has

10   produced more than enough evidence to establish guilt beyond

11   a reasonable doubt as to both counts.

12             I mean, there's no dispute in this case that the

13   child victim was under the age of 18 years of age.  There's

14   no question that a computer was used and that there were

15   transmissions across state lines, some of which wound up in

16   this district.

17             And so the only real issue are the two main

18   arguments, which defense counsel made, which was, one, that

19   the images themselves were not truly -- under the

20   definitions of the statute, would not qualify as child

21   pornography because the victim -- the pictures, as

22   Mr. Amolsch tried to characterize them, were no different

23   than one might find on any Google hit for diaper rash or in

24   a medical journal.  And I simply cannot find on the record

25   before this Court that that would be the case.
```

186

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA334

1          In my view, these images would qualify as a

2    lascivious depiction of the child's genitals by themselves,

3    and then when you put them into the context of the exchange

4    of emails, there can be no question in my mind that that

5    would qualify as child pornography, and there's no question

6    that the defendant produced those images and did so with the

7    intent to distribute them.

8          And so I'm satisfied that there is also the

9    necessary scienter.  Although the defendant clearly is a

10   very sympathetic defendant, in this type of case an

11   unusually sympathetic defendant, has a documented horrible

12   history of herself being a victim, which is why I would hope

13   that even though I'm finding the defendant guilty of both

14   counts, that before sentencing, the Government gives some

15   careful consideration to, in the interests of justice, where

16   this case should really be.  Because a 15-year exposure for

17   a defendant with this type of case where there's absolutely

18   no evidence that there was a monetary or a prurient

19   incentive to engage in this conduct, I think a wise

20   prosecutor's ought to think very carefully about how this

21   case should have been prosecuted.

22          Nevertheless, I mean, I am presented with these

23   two counts, I've been presented with the evidence and the

24   arguments which counsel had presented.  I'm satisfied the

25   law will support both convictions.

                                                          187

1          The scienter was there.  Even though there may

2   have been a motivation that is, as I said, unusual for this

3   type of case, the Government has, in my view, appropriately

4   pointed to multiple activities during that three-day span

5   which undercut an argument that the defendant was in some

6   sort of dissociative state such that she could not

7   appreciate what she was doing or know and intent what she

8   was doing.

9          The motive might have been different from what we

10  normally see in these child pornography cases, but in terms

11  of the necessary scienter to commit a crime, I'm satisfied

12  the Government has met its burden.

13         The fact that a defendant during this same time

14  period was able to contact public officials about whether

15  she was still eligible for food stamps or food support, that

16  she could make communications with friends about going for a

17  walk, in other words, engage in completely rational conduct

18  during the same time period is -- I think undercuts an

19  argument that she was, for a three-day period, in this kind

20  of strange dissociative state.

21         So I'm finding the defendant guilty of both

22  counts.  As I said, before we go to the sentencing hearing,

23  it would be very wise for everybody to reconsider where this

24  case should finally be.

25         But we need to set a date for sentencing.

                                                              188

JA336

```
 1   Counsel, I hope you brought your calendars with you or that
 2   you know --
 3           MR. AMOLSCH:  We did not, Your Honor.
 4           THE COURT:  Well, I'm going to give you some dates
 5   then, and you're going to have to figure out when -- with
 6   two attorneys, one of you should be able to make it.  I
 7   think in this case we're well into the latter part of July.
 8           Are all of your major trials over by then,
 9   Mr. Amolsch?
10           MR. AMOLSCH:  They should be, Your Honor.
11           THE COURT:  At this point, do you or your family
12   have a plan for a vacation in July?
13           MR. AMOLSCH:  I'm usually the last to know of
14   these sorts of things, Your Honor.  So, no, not that I know
15   of.
16           THE COURT:  Well, July 19th would give you all
17   98 days from today.
18           MR. AMOLSCH:  July 19th Mr. Salvato and I start a
19   trial with Judge Ellis that should take a week-ish.  So that
20   probably means two.
21           THE COURT:  How about July 12th?
22           MR. AMOLSCH:  Sure.  Thanks.
23           THE COURT:  Is that all right with the United
24   States?
25           MR. SCHLESSINGER:  Yes.
```

189

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA337

```
1              THE COURT:  All right.  That will be at 9:00.

2              And, Ms. Kolhoff, you'll be visited in your cell

3    by a federal probation officer who will be conducting a

4    background investigation.  Your full cooperation with the

5    officer is to your advantage; do you understand that?

6              THE DEFENDANT:  Yes.

7              THE COURT:  All right.  Anything further on this

8    case?

9              MR. SCHLESSINGER:  Not from the Government, Your

10   Honor.

11             THE COURT:  Anything further, Counsel?

12             MR. AMOLSCH:  (Gesturing negatively.)

13             THE COURT:  All right.  I've got you out of here

14   in time to get back upstairs.  All right.  We'll recess

15   court until 9:00.

16             (Proceedings adjourned at 8:40 a.m.)

17             ----------------------------------

18   I certify that the foregoing is a true and accurate

19   transcription of my stenographic notes.

20

21                            _Stephanie Austin_____

22                            Stephanie M. Austin, RPR, CRR

23

24

25
                                                            190
```

JA338

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA     )
                                   )
     v.                          )
                                   )     1:21-cr-158 (LMB)
ASHLEY NICHOLE KOLHOFF,     )
                                   )
     Defendant.         )

ORDER

For the reasons stated in open court and to be further developed in a Memorandum

Opinion, the government has produced evidence establishing that defendant Ashley Nichole

Kolhoff is guilty beyond a reasonable doubt of Production and Distribution of Child

Pornography in violation of 18 U.S.C. §§ 2251 and 2252, as described in Counts I and II of the

indictment; and it is hereby

ORDERED that a sentencing hearing in this case be and is scheduled for Tuesday, July

12, 2022 at 9:00 a.m. in Courtroom 700.

The Clerk is directed to forward copies of this Order to counsel of record and to the

United States Probation Office.

Entered this 12 day of April, 2022.

Alexandria, Virginia

/s/ [signature]
Leonie M. Brinkema
United States District Judge

JA339

REDACTED TRANSCRIPT

```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3    --------------------------x
      UNITED STATES OF AMERICA,   :    Criminal Action No.:
 4                                 :    1:21-cr-158
           versus                  :
 5                                 :
      ASHLEY NICHOLE KOLHOFF,      :    Tuesday, July 12, 2022
 6                                 :
                 Defendant.        :    REDACTED TRANSCRIPT
 7    --------------------------x

 8         The above-entitled sentencing was heard before the
      Honorable Leonie M. Brinkema, United States District Judge.
 9    This proceeding commenced at 9:21 a.m.

10                   A P P E A R A N C E S:

11    FOR THE GOVERNMENT:   SETH SCHLESSINGER, ESQUIRE
                            WHITNEY KRAMER, ESQUIRE
12                          OFFICE OF THE UNITED STATES ATTORNEY
                            2100 Jamieson Avenue
13                          Alexandria, Virginia  22314
                            (703) 299-3700
14
      FOR THE DEFENDANT:    CHRISTOPHER AMOLSCH, ESQUIRE
15                          LAW OFFICES OF CHRISTOPHER AMOLSCH
                            12005 Sunrise Valley Drive
16                          Suite 200
                            Reston, Virginia  20191
17                          (703) 969-2214

18                          FRANK SALVATO, ESQUIRE
                            THE LAW OFFICES OF FRANK SALVATO
19                          1203 Duke Street
                            Alexandria, Virginia  22314
20                          (703) 548-5000

21    COURT REPORTER:       STEPHANIE M. AUSTIN, RPR, CRR
                            Official Court Reporter
22                          United States District Court
                            401 Courthouse Square
23                          Alexandria, Virginia  22314
                            (571) 298-1649
24                          S.AustinReporting@gmail.com

25        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
                                                          1
```

JA340

REDACTED TRANSCRIPT

```
 1                    P R O C E E D I N G S

 2           THE DEPUTY CLERK:  Criminal Case 21-158, United

 3   States of America versus Ashley Nichole Kolhoff.

 4           Would counsel please note their appearances for

 5   the record.

 6           MR. SCHLESSINGER:  Good morning, Your Honor.

 7   Seth Schlessinger and Whitney Kramer for the United States.

 8           THE COURT:  Good morning.

 9           MR. AMOLSCH:  Good morning, Your Honor.

10   Christopher Amolsch and Frank Salvato for Ms. Kolhoff.

11           THE COURT:  Good morning.  We're just waiting on

12   the defendant.

13                    (Defendant present.)

14           MR. AMOLSCH:  Ms. Kolhoff is now present, Your

15   Honor.

16           THE COURT:  All right.  This matter comes on for

17   sentencing.

18           Mr. Amolsch, have you and Mr. Salvato had enough

19   time to go over the presentence report yourselves and with

20   your client?

21           MR. AMOLSCH:  Yes, Your Honor.

22           THE COURT:  Are there any factual corrections,

23   changes, additions or deletions you want made to the report

24   itself?

25           MR. AMOLSCH:  No, Your Honor.
```
                                                          2

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA341

REDACTED TRANSCRIPT

1          THE COURT:  As you know, the guidelines in this
2     case are, again, stratospheric.
3          MR. AMOLSCH:  Horrific would probably be the best
4     word.
5          THE COURT:  Yeah.  The offense level here is a 43.
6     Your client has a criminal history of one.  The guidelines
7     actually go to life, but because of the statutory limits,
8     it's 600 months.  The period of supervised release is
9     five years to life.  The fine range is 50,000 to $250,000,
10    and there's, of course, a total of $200 of special
11    assessments.
12          The Government has also filed a preliminary order
13    of forfeiture.  I did not see any objection to that.  Is
14    there any objection to that being entered?
15          MR. AMOLSCH:  Not to the forfeiture, Your Honor,
16    no.
17          THE COURT:  Okay.  Mr. Amolsch, when you went over
18    this report, this presentence report with your client, did
19    you carefully review pages 12 through 13, the ones that have
20    the list of conditions?
21          MR. AMOLSCH:  Your Honor, we reviewed the entire
22    thing, yes.
23          THE COURT:  All right.  That's fine.
24          All right.  I'll hear first from the United
25    States.

                                                        3

JA342

REDACTED TRANSCRIPT

1            MR. SCHLESSINGER:  Thank you, Your Honor.

2            Both parties are in agreement that the probation

3     office has correctly calculated the guidelines.  And the

4     Government -- as the Court's aware from the Government's

5     written submission, the Government nevertheless is

6     recommending a reasonable downward variance from those

7     guidelines.  Nevertheless, the Government finds it

8     significant or important to emphasize to the Court certain

9     of the 3553(a) factors, some of which I think the Court is

10    already particularly well acquainted with since the Court

11    presided over this bench trial.  I think the most

12    significant is certainly the nature and circumstances of the

13    offense.

14            We're talking about production of child

15    pornography, not merely in some technical sense or, you

16    know, outlier sense, but Ms. Kolhoff created images,

17    sexually-explicit images, ██████████████

18    ████████████████████████████████████████████████

19    ████████████████████████████████████████████████

20    ██████.  She took photographs with her own hands, her own

21    fingers spreading open the genitals of her own baby for

22    maximum exposure to the camera.

23            Another image, spreading open the anus of ██████

24    ██████  for maximum exposure to the camera all to create an

25    image of that.  And the whole purpose of creating those

                                                              4

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA343

REDACTED TRANSCRIPT

1  images was to disseminate them into this community of

2  atrocious predators who were desperately interested in those

3  things.  And she did do that.  She distributed it to

4  numerous users of that community.  She did so totally

5  unsolicited.  She signed up for this site, for this

6  community, all by herself, she created her own account.  She

7  posted the initial threads offering to take

8  sexually-explicit pictures of ████████████ herself.  She

9  received a very predictable enthusiastic response from

10  members of the community, and then she did it.

11        So it's a horrific offense, it's one that

12  absolutely constitutes the heartland of production of child

13  pornography, and it's well deserving of the applicable

14  sentences.

15        Nevertheless, another factor that the Court has to

16  consider is the history and characteristics of the

17  defendant.  I anticipate, as in prior hearings in this

18  matter, defense counsel is going to emphasize those, as he

19  well should.  And the Government doesn't deny that

20  Ms. Kolhoff's life has, in certain respects, been difficult.

21  She's -- as I understand it, it's been represented to us,

22  that she's been the victim of abuse at different times of

23  her life, and the suggestion has even been made that that's

24  contributed to some of the conduct that she's here to be

25  sentenced for now.  That may well be the case, and, to that

                                                        5

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA344

REDACTED TRANSCRIPT

```
 1   extent, again, the Government's supported or recommended a

 2   downward variance.

 3          I do know that if it is the case, that sexual

 4   abuse of her has caused her to engage in misconduct, that's

 5   really a double-edged sword, because it also makes it more

 6   likely that █████████████████ who she sexually abused,

 7   if her argument is correct, is herself more susceptible to

 8   engaging in that behavior in the future because she's

 9   inflicted the same conduct on her.  So it's an atrocious

10   offense.  Ms. Kolhoff has never, ever expressed a shred of

11   remorse or regret for the offense.

12          And, you know, I -- again, unless the Court has

13   any questions, the Government with that would ask the Court

14   to recommend a sentence below the applicable guideline range

15   of 50 months, but one that's nevertheless sufficient to

16   serve the sentencing goals enumerated in Section 3553(a).

17          THE COURT:  All right.  Mr. Amolsch.

18          MR. AMOLSCH:  Your Honor, I had not anticipated

19   taking much issue with what the Government had to say, but

20   to suggest that Ms. Kolhoff has had a difficult life

21   suggests a complete misunderstanding of the trauma that

22   she's suggested, and it minimizes it in a way that I find

23   offensive.

24          Her life hasn't been difficult.  She's been raped,

25   abused, trafficked, kidnapped, sodomized, beaten, abandoned.
```
                                                              6

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA345

REDACTED TRANSCRIPT

```
 1   Does that sound difficult?  That sounds horrible.
 2   Difficult?  Difficult is the fact when I almost couldn't get
 3   into the courthouse today because there was a line out
 4   front, and I was worried you were going to be mad at me for
 5   being late.  That's difficult.
 6          To suggest that this case is not outside the
 7   heartland, I want to just remind the Court exactly how we
 8   got here, and then we'll move on to sentencing.  This case
 9   started because the Government exercised its federal
10   prosecutorial discretion quite reasonably, to shut down a
11   website that was trafficking humans and children.  Obviously
12   everybody agrees that's horrible.  Everybody agrees the
13   production of child pornography statute should apply to that
14   kind of behavior.
15          THE COURT:  Has anybody connected with that
16   website been prosecuted, to your knowledge?
17          MR. AMOLSCH:  I think the guy who ran it was
18   prosecuted.  I mean, that's how this happened.  I mean, I'll
19   let the Government speak to their prosecution, but my
20   understanding is that they ultimately arrested him, and, as
21   a result, seized his server and found the images.  That's my
22   understanding of what happened.
23          Six, seven months, eight months, nine months,
24   five months after those images were discovered, they come --
25   the server was searched.  They found the images.  And upon
```
                                                              7

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA346

REDACTED TRANSCRIPT

1  doing that, six, seven months later, what the agent did --

2  and I'm not -- it's not against the agent.  He testified he

3  got in his car and drove nine hours through the night to

4  Sandusky, Ohio.  Now, why would he do that?

5           Nominally I understand, it's the safety of the

6  children, you want to make sure everything's okay.  But you

7  know what's quicker than driving?  Calling somebody.

8  Saying, hey, local police, state police, local federal

9  agents, can you ██████████████ see what's going

10 on, because we just discovered this.

11          And we know there's a federal presence in

12 Sandusky, Ohio, because she was the victim of child

13 pornography herself and assisted the Government in

14 prosecuting someone, working hand-in-hand with an FBI agent.

15 So we know that there's a federal presence there.

16          That agent, with all good intentions, drove

17 eight hours through the night because, in my humble opinion,

18 there are too many federal agents and not enough federal

19 crimes.  So to suggest that this is in the heartland, I

20 think is not accurate.  I think this is part of a practice

21 of stretching these federal statutes to the absolute limits.

22          There's no question the initial prosecution of the

23 guy who was hosting the server is a legitimate federal

24 prosecution.  But these federal statutes are designed to

25 supplement state and local law; they're not supposed to

8

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA347

REDACTED TRANSCRIPT

```
1   usurp them.  And there's no federal interest here that is
2   satisfied -- that couldn't have been satisfied in Sandusky,
3   locally, anything.  Instead, we're here.  Here.  Talking
4   about something that happened there.
5         If there's anything that is coming out of the
6   federal courts, it's the pushback of the expansion of these
7   statutes to incorporate activities that was never intended.
8   And I understand the statutes are -- they can cover
9   anything.  Congressional intent is important, we've got to
10  think about it.  I understand, the words are the words, and
11  we're all kind of stuck with them.  But somebody needs to be
12  a bulwark against the stretching of these statutes to
13  incorporate behavior that was never intended.  Nobody
14  thought that this was what they were talking about.  When
15  they wrote those statutes, they were talking about
16  commercial sex, selling children, all the traditional things
17  that you think about.  And I don't agree that these images
18  are in the heartland.  We talked about that.  I've made my
19  Rule 29 based on that.  I don't think they satisfy it.
20        This is going to cost the federal taxpayers about
21  $700,000 based on my estimation.  15 years, assuming Your
22  Honor only gives her the minimum, at $40,000 a year, plus
23  supervision, plus the agent's time.  $700,000 in federal
24  taxpayer money went out the door when this conviction
25  happened because they didn't just call local state Sandusky
```
                                                        9

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA348

REDACTED TRANSCRIPT

1    police.  There has to be limits, Your Honor.

2         THE COURT:  All right.

3         MR. AMOLSCH:  This is not a case that should be

4    here in federal court, in my humble opinion.  There's no

5    federal interest here that could not have been vindicated

6    someplace else.  And we need to say that out loud.

7         And the last thing I'll leave Your Honor with is

8    this.  It's really important we all think about this.  The

9    best estimates are that 70 percent of the world's Internet

10   traffic goes through Loudoun County.  70 percent of the

11   world.  That's probably 90 percent of the United States.

12   But 70 percent of the world, which gives this courthouse

13   theoretical jurisdiction over 70 percent of any crime

14   committed in the United States from a venue point of view.

15   If the statutes are stretched to cover and take over state

16   prosecutions, we will do nothing but spend time here in this

17   courthouse.

18        So, again, I'm renewing my Rule 29.  I understand

19   Your Honor is probably going to deny it.  This is not a

20   federal case.  These statutes are designed to be hard to

21   meet.  Not every photo, no matter how -- the pictures of

22   genitalia is sexually explicit within the child pornography

23   statutes.

24        Ms. Kolhoff has made the very best use of her time

25   she can at the jail.  I can pass up some letters, Your

10

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA349

REDACTED TRANSCRIPT

```
 1   Honor, of all the things -- the classes she's taken, the
 2   certifications she's received, her active participation and
 3   life at the jail.  When I told her we were -- we talked
 4   about getting sentenced tomorrow, she was, to a certain
 5   degree, sad that she's going to leave behind all the friends
 6   that she's made and all the progress that she's made within
 7   the jail.  It speaks to what she really needs.  She needs
 8   mental health treatment.  She needs supervision.  She needs
 9   that kind of thing to turn her into a productive person.
10   She doesn't need 15 years.  I can't imagine anybody thinking
11   she needs 15 years.
12           Her own mother abandoned her when she was, what, a
13   year. ██████████████████████████████████████████████
14   ████.  I just don't see how this is winning for anybody.
15           That's all I've got, Your Honor.  I understand the
16   Court's rulings.  15 years is way more than this case or
17   this person requires.
18           THE COURT:  All right.  Mr. Schlessinger, I do
19   want to get from the Government more of a picture of what
20   happened with that website.
21           MR. SCHLESSINGER:  Yes, Your Honor.
22           There was -- a search warrant was executed at the
23   home of the administrator of the website in December 2020.
24   Now, that's located -- his home from where he was
25   administering the website and to which the website was
```

                                                          11

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA350

REDACTED TRANSCRIPT

1    backing up was located in the Eastern District of Virginia.

2             THE COURT:  Where was he prosecuted?

3             MR. SCHLESSINGER:  He's currently being prosecuted

4    in the Eastern District of California, because in the course

5    of using -- shortly before the search at his home, he

6    traveled from the Eastern District of Virginia to the

7    Eastern District of California to abduct a 12-year-old girl

8    that he had met on the website to bring her back to Virginia

9    to live with him and to be sexually abused by him.  They

10   were stopped in -- during a layover on a flight in Colorado,

11   and he ended up and is currently being prosecuted in the

12   Eastern District of California.

13            THE COURT:  So he's not yet been convicted?

14            MR. SCHLESSINGER:  Correct.  The case is pending

15   in that district.

16            THE COURT:  What about the other people who were

17   using that website?  I mean, you know, you've got multiple

18   players on that website.  I assume when it was taken down,

19   there were other images besides the images of the child in

20   this case.

21            MR. SCHLESSINGER:  There were.  There was a huge

22   numbers of users and there was a huge amount of activity on

23   the site, which is a major part of the reason why it took so

24   long to identify Ms. Kolhoff as the one who was abusing --

25   actively abusing ███████████████████████████████████

                                                            12

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA351

REDACTED TRANSCRIPT

1    ██ .

2           THE COURT:  But has anybody -- has anybody else

3    been prosecuted who was posting improper images on that

4    site?

5           MR. SCHLESSINGER:  Not prosecuted yet.  I don't

6    think I'm fully at liberty to discuss that currently in

7    court right now, Your Honor.

8           THE COURT:  All right.  It's interesting that in

9    the course of the allocution, no real discussion occurred

10    about the defendant's mental health situation.

11           I mean, there were two issues at trial.  I thought

12    that the argument about the images not, you know, complying,

13    I thought that was a weak argument.

14           MR. AMOLSCH:  Yes, Your Honor.

15           THE COURT:  And, you know, I haven't given out my

16    written opinion yet.  But, I mean, it's just -- in my view,

17    the Fourth Circuit is going to clearly not have any problem

18    with that issue.

19           The issue as to the defendant's mental health, you

20    know, was the main focus, really, of the evidentiary portion

21    of the trial, and there was no question that the doctors on

22    both sides did conclude that, at the very least, the

23    defendant has a personality disorder, most likely is

24    bipolar, and has some form of PTSD, whether it's this new

25    more intense type of complex or just the more standard one.

                                                        13

JA352

REDACTED TRANSCRIPT

1          I mean, there's no question that this plaintiff is

2     not a heartland defendant.  It is not uncommon for

3     defendants who have been the victim of child abuse to

4     themselves then participate in child pornography or child

5     abuse.  But the type of background that this defendant has

6     is truly way beyond the heartland, and it is extraordinarily

7     unjust that that is not adequately taken into consideration.

8          As you know -- and I know the main argument you've

9     made is that the two statutes involved here have these

10    statutory mandatory minimums.

11         So the Court --

12         MR. AMOLSCH:  Your Honor, again -- not to cut you

13    off, I didn't go through all that because that's all through

14    my pleadings.  Right.

15         THE COURT:  I know.  I know.

16         MR. AMOLSCH:  They don't want you to have

17    discretion.  They don't want you to.  They could -- the

18    statutory maximums are the same --

19         THE COURT:  Well, the beautiful thing --

20         MR. AMOLSCH:  -- on both of these cases.

21         THE COURT:  -- is the Court now has a new type of

22    discretion, and that is under the compassionate release

23    doctrine, which we have been using extensively given the

24    unique situation about COVID and the *McCoy* decision from the

25    Fourth Circuit, this Court is going to have the ability to

                                                              14

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA353

REDACTED TRANSCRIPT

1    look at this defendant down the road as she serves her

2    sentence; all right?

3         MR. AMOLSCH:  Yes, ma'am.

4         THE COURT:  And I certainly would be looking at

5    that quite seriously in the future.

6         MR. AMOLSCH:  I will be, too, Your Honor.  Thank

7    you.

8         THE COURT:  All right.  So, at this point -- I,

9    frankly, spent a lot of time thinking about whether I was

10   going to do something more creative in this case, but I feel

11   intellectually bound by the decisions that I'm comfortable

12   with, that is that the Government did prove its case beyond

13   a reasonable doubt as to guilt.

14        I don't agree with you about the stretching of

15   this statute.  I mean, I think that there's no question that

16   the production of child pornography and the use of a

17   computer to send it across interstate lines is an

18   appropriate federal statute.  I mean, making that kind of

19   conduct illegal.  I don't think there's a problem there.

20        MR. AMOLSCH:  I understand.

21        THE COURT:  The problem I have is the sentencing

22   restrictions.  Because I think each case still has to be

23   evaluated on its own merits, and I don't think this

24   defendant is the standard type of child pornographer in

25   terms of just the amount of pornography, the length of time.

                                                          15

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA354

REDACTED TRANSCRIPT

```
 1    This was, at most, a 24- -- a 48-hour aberrational act.
 2              MR. AMOLSCH:  Yes, Your Honor.
 3              THE COURT:  Now, what would have helped your
 4    client is, if after she pulled out of sending out those
 5    images, if she had called this FBI agent, with whom she had
 6    a relationship, and said, hey, I've got to tell you this is
 7    going on, that would have -- she wouldn't be here today,
 8    most likely.
 9              MR. AMOLSCH:  Mental illness is a difficult thing,
10    Your Honor.
11              THE COURT:  I understand.
12              MR. AMOLSCH:  You know, it's easy for us to say
13    that that's what we would do, but we probably wouldn't have
14    done it to begin with.
15              And I'm not minimizing what the Court's saying.  I
16    get it.  There's a lot of ways she could have handled this
17    better once she recognized the error of her ways.  And I
18    think she told -- when she sat down for her debriefing and
19    she talked to Dr. Hendricks, she's trying to understand
20    exactly why she did what she did.
21              THE COURT:  Right.
22              MR. AMOLSCH:  So I get what the Court is saying,
23    but her thought process probably isn't as linear as yours
24    and mine.
25              THE COURT:  And I also have to tell you, frankly,
```

                                                               16

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA355

REDACTED TRANSCRIPT

1   if I had been the U.S. attorney handling this case, it would

2   have been the 5-year statute.

3           MR. AMOLSCH:  That's exactly what this --

4           THE COURT:  I think that's the right fit for this

5   case.  And I don't buy the argument that this case, for some

6   principal reason, had to be at a 15-year level; however,

7   that's what we are faced with.

8           MR. AMOLSCH:  I understand.

9           THE COURT:  As I said, there are still some ways

10  of addressing that situation.

11          All right.  Ms. Kolhoff, come up to the lectern.

12          MR. AMOLSCH:  Your Honor, just so you know, I've

13  advised her not to say anything because she's got an appeal

14  and all of that.  I will tell the Court -- I know you need

15  to sentence her from the podium, but she's not going to say

16  anything.

17          THE COURT:  Well, I'm not sure that serves her

18  best interests.  You know, I mean --

19          MR. AMOLSCH:  Okay.  Well --

20          THE COURT:  -- I still have no sense of who this

21  person is.  I have paper, I have testimony from

22  third-parties.  It is her day in court.

23          Look, everything's been admitted.  I mean --

24          MR. AMOLSCH:  I know.  I just -- it makes me so

25  nervous, Your Honor.

                                                        17

REDACTED TRANSCRIPT

```
 1              THE COURT:  All right.  It's up to you.

 2              MR. AMOLSCH:  No, well, it's up to her.  I'm just

 3    telling you what I've advised her.  We talked about --

 4    whenever I go to trial with somebody and in front of a

 5    judge, I have an appeal down the road and everything's been

 6    written down, I just get really nervous that someone's going

 7    to mess that up.

 8              But I understand the Court's position.  I'll let

 9    her come up and say, you know, what she wants to say.  But

10    there's no question, she feels horrible about all of this.

11    And to suggest that she hasn't expressed remorse is simply

12    not accurate.

13              THE COURT:  All right.

14              MR. AMOLSCH:  She's been sad in trying to

15    understand why she did -- she's been struggling with this

16    stuff her entire life.

17              I mean, I'll let her come up.  I just wanted to

18    tell the Court the background about my discussions with her.

19              THE COURT:  All right.  Ms. Kolhoff, come up to

20    the lectern.

21              MR. AMOLSCH:  Oh, Your Honor, I apologize.  And

22    before you, Judge, I have the certificates and letters that

23    she's gotten from --

24              THE COURT:  Just make them part of the file.

25              MR. AMOLSCH:  Yeah.  I don't know if you want to
```

                                                              18

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA357

REDACTED TRANSCRIPT

```
 1   ask her questions about them, so I'll pass those up to you.

 2            THE COURT:  That's all right.

 3            MR. AMOLSCH:  And I've given copies to the

 4   Government.

 5            THE COURT:  All right.  These are nice

 6   certificates.  I mean, frankly, these are the originals.  I

 7   don't think you want to give these up.

 8            MR. AMOLSCH:  I'm sorry, Your Honor?

 9            THE COURT:  These are originals.  You don't want

10   to give these up.

11            MR. AMOLSCH:  We also have copies.  I'll take them

12   back and make them part of the record, but I wanted Your

13   Honor to see them in case you wanted to ask Ms. Kolhoff

14   about her -- just for context.

15            THE COURT:  All right.  Send me copies for the

16   file.

17            MR. AMOLSCH:  Yes, Your Honor.

18            THE COURT:  Actually, send it to probation so they

19   go with the presentence report.

20            THE DEFENDANT:  We have copies of these.

21            MR. AMOLSCH:  Yes.  I will, Your Honor.  All

22   right.  I will, Your Honor.

23            THE COURT:  Ms. Kolhoff, this is your chance if

24   you want to say anything.  I don't want you to feel

25   pressured into doing it, but this is your day in court, so
```

19

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA358

REDACTED TRANSCRIPT

```
 1   to speak; all right?
 2              THE DEFENDANT:  Yes.
 3              Honestly, I was not prepared to speak, as I've
 4   been advised not to.  But this whole situation, sitting back
 5   and listening and reflecting on everything that's happened,
 6   I am grateful.  I'm grateful that, you know, I came here
 7   when I did, because it completely changed my life.  It
 8   completely turned my life around.  And I've been through so
 9   much in my life, so much.  And getting the help that I
10   needed and getting the mental health medication that I
11   needed, that has helped me think clearly.  I mean, it's been
12   a blessing, it has.
13              But I'm extremely sorry for the actions that it
14   took, that I -- I mean, obviously what got me here, I'm
15   extremely sorry.  You know, I can't -- I can't express to
16   the Court enough how terrible I feel about what I did
17   because of what I've personally been through.  And I don't
18   wish that upon anybody, ███████████████████, you
19   know.
20              I ███████████████████████████████████
21   ███████.  You know, ███████████████████████████
22   ███████.  And there's no excuse for what I did, and I'm
23   just -- I'm extremely sorry.  And I don't -- I don't agree
24   at all that they think that I'm not remorseful, because I
25   haven't even had a chance to express how I feel about the
```

                                                              20

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA359

REDACTED TRANSCRIPT

```
 1    whole situation, you know.  I've been told to sit here and

 2    be quiet.  And I'm extremely sorry, and I wish that you guys

 3    could see how I feel inside.

 4            THE COURT:  How old are your adoptive parents; do

 5    you know?

 6            THE DEFENDANT:  My dad is 73, and my mother is 56

 7    or 57.

 8            THE COURT:  All right.  And they ████████████

 9    ████████████████████████  at this point?

10            THE DEFENDANT:  They ████████████████████.  They

11    ████████████████████.

12            THE COURT:  All right.  But you're ████████████

13    ██████████████?

14            THE DEFENDANT:  Yes.

15            THE COURT:  ███████████████████████████████████?

16            THE DEFENDANT:  Yeah.  Yeah.

17            THE COURT:  And how does ████  --  ████████████████

18    ███████████████████████?  How are ████████████████

19    ██████?

20            THE DEFENDANT:  ██████████████████████

21    ████████████████████████████████████████

22    █████████████████████████████████████████

23    ██████████████████

24        ████████████████████████████████████

25    ████████████████████████████████████████
                                                                21
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA360

REDACTED TRANSCRIPT

1 ███████████████████████████████████

2 ███████████████████████████████

3 ███████████████████████████████

4 ████████████████████████████████

5 █████████████████████████████████

6 ████████████████████████.

7         THE COURT:  Okay.

8         MR. AMOLSCH:  Thank you, Your Honor.

9         THE COURT:  All right.  Well, Ms. Kolhoff, as I'm

10 sure Mr. Amolsch has explained to you, these two statutes

11 for which you've been found guilty have mandatory minimum

12 sentences.  The Court is going to sentence you at the

13 minimum, and if it were not for those statutory minimums, I

14 would sentence you to less.  But the first count, which is

15 the production count, is the one that has that 15-year

16 mandatory minimum.

17         So the Court is sentencing you to 15 years in the

18 custody of the Bureau of Prisons, which consists of 15 years

19 on Count 1, 5 years on Count 2, concurrent with the sentence

20 on Count 1.  You'll get credit for all time that you've

21 served against that sentence.  And, as I said before, at the

22 appropriate time, I will certainly consider, under the law

23 that currently exists unless it changes, looking at that

24 sentence in terms of the principles of compassionate release

25 and the *McCoy* decision.

       22

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA361

REDACTED TRANSCRIPT

```
 1            MR. AMOLSCH:  Thank you, Your Honor.

 2            THE COURT:  Do you have a recommendation?  Have

 3     you spent some time looking at a facility that you think

 4     would be best for your client?

 5            MR. AMOLSCH:  I have, Your Honor.  I've consulted

 6     with Ms. Kolhoff.  I've spent, you know, a fair amount of

 7     time trying to figure that out.

 8            THE COURT:  Yeah.

 9            MR. AMOLSCH:  Alderson seems to be the best place

10     for her.  She made some friends in the jail, she established

11     relationships with them.  It's relatively close kind of to

12     Ohio because it's in West Virginia.  If Your Honor would be

13     so kind as to recommend, she will be designated there.

14            THE COURT:  All right.  Do they have the medical

15     facilities capable of treating the plaintiff -- the

16     defendant?

17            MR. AMOLSCH:  My understanding is they do, Your

18     Honor.

19            THE COURT:  They do?

20            MR. AMOLSCH:  Yes.  I'm not a BOP expert, but

21     based on my preliminary research, it appears that they do.

22            THE COURT:  All right.  I will recommend that you

23     be designated to the Alderson facility and that you be

24     allowed to participate in the 500-hour intensive drug

25     treatment program, because there was the marijuana usage in
```

                                                            23

JA362

REDACTED TRANSCRIPT

```
1    this case.

2              MR. AMOLSCH:  Yes.

3              THE COURT:  So that will have some benefit for an

4    earlier release as well.

5              When you complete the 15-year sentence, you will

6    be serving a period of 15 years of supervised release.  The

7    terms and conditions of supervised release -- and, again,

8    that's imposed concurrent on each of the two counts.  The

9    terms and conditions are, first of all, your uniform good

10   behavior.  That means you cannot violate any federal, state

11   or local laws, and that includes traffic laws; do you

12   understand that?

13             THE DEFENDANT:  Yeah.

14             THE COURT:  Then the second condition is you

15   follow all the conditions of supervision.  Those were

16   already spelled out in pages 12 and 13 of the presentence

17   report.  Those are called the standard conditions; do you

18   understand that?

19             THE DEFENDANT:  Yes, ma'am.

20             THE COURT:  The special conditions of supervision,

21   and there are quite a few because of the nature of the

22   offense, is, first of all, you must satisfactorily

23   participate in such mental health evaluation and treatment

24   as directed by the probation officer.  That mental health

25   evaluation and treatment will include psychosexual
```

                                                          24

JA363

REDACTED TRANSCRIPT

1   evaluation and sex offender treatment as required; do you

2   understand that?

3           THE DEFENDANT:  Yes, ma'am.

4           THE COURT:  As part of that, you will have to

5   submit to polygraph examinations to ensure that you are

6   complying with the program; do you understand that?

7           THE DEFENDANT:  Yes, ma'am.

8           THE COURT:  The Court is waiving all fees

9   connected with the mental health evaluation and treatment,

10  but you will have to waive any privacy rights that you have

11  to the evaluation and treatment so that the probation

12  officer can monitor your compliance; do you understand that?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  All right.  Number 2, you must

15  satisfactorily participate in such drug evaluation and

16  treatment as directed.  In other words, you cannot use any

17  illegal drugs while you are on supervision.  You will have

18  to submit to drug testing, and if the testing shows that you

19  are in need of treatment, then you must satisfactorily

20  participate in such in or outpatient drug treatment as

21  directed; do you understand that?

22          THE DEFENDANT:  Yes, ma'am.

23          THE COURT:  Again, the Court is waiving the costs

24  for testing and treatment, but you will have to waive any

25  privacy rights that you have to the testing and treatment so

                                                          25

JA364

REDACTED TRANSCRIPT

```
 1   the probation office can monitor your progress; do you
 2   understand that?
 3              THE DEFENDANT:  Yes, ma'am.
 4              THE COURT:  Now, you are not permitted to have any
 5   employment or volunteer positions that would allow you to
 6   have access to minors; do you understand that?
 7              THE DEFENDANT:  Yes, ma'am.
 8              THE COURT:  I'm not imposing a restriction on
 9   computer usage because in this day and age if I said you
10   can't use a computer, there's almost no job in the world
11   that you could get these days, so I don't think that's an
12   appropriate restriction.
13              MR. AMOLSCH:  Your Honor, I'm sorry.  Could you --
14   on the minors, I didn't quite hear what Your Honor said in
15   terms -- I understood the computer part.
16              THE COURT:  No employment or volunteer activity.
17              MR. AMOLSCH:  Employment or volunteer.
18              THE COURT:  Yes.  I'm █████████████████████
19   █████████████████████████████.
20              MR. AMOLSCH:  I understand.
21              THE COURT:  But ████████████████████, you know,
22   ███████████, obviously.
23              MR. AMOLSCH:  Yes, Your Honor.
24              THE COURT:  All right.  You may not possess any
25   sexually-explicit materials that would involve any
```
                                                        26

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA365

REDACTED TRANSCRIPT

```
 1   depictions of minors; do you understand that?
 2            THE DEFENDANT:  Yes, ma'am.
 3            THE COURT:  And that includes any magazines, print
 4   versions, video versions, anything like that; do you
 5   understand that?
 6            THE DEFENDANT:  Yes, ma'am.
 7            THE COURT:  All right.  You cannot have any
 8   contact with minors unless in the presence of a responsible
 9   adult and with pretrial -- I'm sorry, with probation office
10   approval; do you understand that?
11            THE DEFENDANT:  Yes, ma'am.
12            THE COURT:  ▮▮▮▮▮▮, you know, ▮▮▮▮▮▮▮▮▮▮
13   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, that's going to ▮▮▮▮
14   ▮▮▮▮▮▮; do you understand that?
15            THE DEFENDANT:  Yes, ma'am.
16            THE COURT:  And ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17   ▮▮, but ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18   ▮▮▮▮▮▮▮▮▮, you're ▮▮▮▮▮▮▮▮
19   ▮▮▮▮▮▮ that; do you understand that?
20            THE DEFENDANT:  Yes, ma'am.
21            THE COURT:  And the probation officer has ▮▮▮
22   ▮▮▮▮▮▮▮▮▮▮▮▮▮; do you understand that?
23            THE DEFENDANT:  Yes, ma'am.
24            THE COURT:  All right.  You are not permitted
25   within 100 feet of a school or any other place where
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA366

REDACTED TRANSCRIPT

1   children are frequently -- when I say "children," minors are

2   frequently present without the permission from the probation

3   office; do you understand that?

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  All right.  You must fully comply with

6   the Adam Walsh Child Protection and Safety Act of 2006, and

7   that requires, among other things, that you must register as

8   a sex offender in any state which has such a requirement and

9   any state in which you are residing, working or attending

10  school; do you understand that?

11         THE DEFENDANT:  Yes, ma'am.

12         THE COURT:  That statute will also require that

13  you agree to submit to a search of your person, property or

14  any other things that belong to you like your computer at

15  the probation officer's request; do you understand that?

16         THE DEFENDANT:  Yes, ma'am.

17         THE COURT:  All right.  And lastly, you'll have to

18  comply with the computer monitoring program that the

19  probation office has, which means that they're going to be

20  putting restrictions on your computer so that they can tell

21  what sites you're visiting.  There'll be a notice on the

22  computer indicating to anybody who communicates with you

23  that the computer is being monitored, that sort of thing; do

24  you understand that?

25         THE DEFENDANT:  Okay.  Yes, ma'am.

                                                              28

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA367

REDACTED TRANSCRIPT

```
1           THE COURT:  All right.  I'm finding the defendant
2    is not financially able to satisfy any of the AVAA
3    assessments, so I'm not imposing any of those financial
4    obligations on her.  She has nothing.
5           MR. AMOLSCH:  She has nothing, Your Honor.  Thank
6    you.
7           THE COURT:  Yeah.  And, you know, the opportunity
8    for her to work is going to be, to some degree, restricted.
9    So that's not appropriate in this case.
10          However, the $200 of special assessments are going
11   to have to be paid; $100 per count of conviction.  I find
12   financially you are unable to afford any other costs in this
13   case.  So no costs of incarceration, costs of supervision or
14   any of the other types of fines or assessments other than
15   the $200 in special assessments.  Again, I'm going to
16   recommend Alderson and the 500-hour intensive drug treatment
17   program.
18          And I want to make sure you know, you have a right
19   to appeal both your conviction and your sentence.  Any
20   notice of appeal must be filed within 14 days of today's
21   date.  You have the right to be represented by counsel, and
22   if you can't afford an attorney, then we will appoint
23   counsel for you; do you understand that?
24          THE DEFENDANT:  Yes, ma'am.
25          THE COURT:  Is there anything further you want the
```
                                                              29

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA368

REDACTED TRANSCRIPT

```
 1   Court to address?
 2          MR. AMOLSCH:  Your Honor, if you could just make a
 3   note, I'll be filing the notice of appeal.
 4          THE COURT:  All right.
 5          MR. AMOLSCH:  And she's still indigent, so if the
 6   Court would -- I don't know if you appoint me or the --
 7          THE COURT:  I think the Fourth Circuit has to do
 8   it, but I think it would make sense for them to appoint same
 9   counsel.
10          MR. AMOLSCH:  If you could make some -- if it's
11   appropriate, if you could make some notation in the order
12   that I will take this case court-appointed for the appeal if
13   the Fourth Circuit decides they want to appoint me.  And I
14   don't know if she needs to fill out another financial
15   affidavit either.
16          THE COURT:  No, I don't think she does.
17          Actually, you know what, you filed the notice of
18   appeal --
19          MR. AMOLSCH:  Yes, ma'am.
20          THE COURT:  -- so that will show that she has
21   counsel of record, and I suspect the Fourth Circuit will
22   just continue that.
23          MR. AMOLSCH:  Okay.  That will be it, Your Honor.
24   Thank you.
25          THE COURT:  Anything further from the United
```

30

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA369

REDACTED TRANSCRIPT

```
 1   States?

 2             MR. SCHLESSINGER:  No, Your Honor.

 3             THE COURT:  All right.  Then the defendant is

 4   remanded.

 5             (Proceedings adjourned at 9:53 a.m.)

 6             ----------------------------------

 7   I certify that the foregoing is a true and correct copy of

 8   the transcript originally filed with the clerk of court on

 9   August 15, 2022, and incorporating redactions of personal

10   identifiers requested by Whitney Kramer, attorney of record,

11   in accordance with Judicial Conference policy.  Redacted

12   characters appear as ███ in the transcript.

13

14                    _____
                          Stephanie Austin
15                    Stephanie M. Austin, RPR, CRR

16

17

18

19

20

21

22

23

24

25
                                                           31
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

JA370

AO 245B (Rev. 09/19) (VAE 01/22) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| | ) | |
| v. | ) | Case Number:   1:21CR00158-001 |
| | ) | |
| ASHLEY NICHOLE KOLHOFF | ) | USM Number:   49897-509 |
| | ) | Christopher B. Amolsch and Frank Salvato, Esquires |
| | ) | Defendant's Attorney |
| | ) | |
| | ) | |

The defendant was found guilty by a Jury on Counts 1 and 2 of the Indictment after a plea of not guilty.

The defendant is adjudged guilty of these offenses:

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§2251(a) and (e) | Production of Child Pornography | 10/2020 | 1 |
| 18 U.S.C.§§2252(a)(2)and (b)(1) | Distribution of Child Pornography | 10/2020 | 2 |

The defendant is sentenced as provided in pages 2 through 7 of this Judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

July 12 2022
Date of Imposition of Judgment

/s/ _____

Leonie M. Brinkema
United States District Judge

July 12, 2022
Date

JA371

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 2 - Imprisonment

| | |
|---|---|
| Case Number: | 1:21CR00158-001 |
| Defendant's Name: | KOLHOFF, ASHLEY NICHOLE |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for for a total term of FIFTEEN (15) YEARS, consisting of fifteen (15) years as to Count 1 and five (5) years as to Count 2, to be served concurrently, with credit for time served.

The Court makes the following recommendations to the Bureau of Prisons:
1. The defendant to be designated to F.C.I. Alderson, West Virginia.
2. The defendant to participate in the Residential Drug Abuse Treatment Program (RDAP).

The court makes the following recommendations to the Bureau of Prisons:

☒ The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to _____
at _____, with a certified copy of this Judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

JA372

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3 – SUPERVISED RELEASE

Page 3 of 7

---

| | |
|---|---|
| Case Number: | 1:21CR00158-001 |
| Defendant's Name: | KOLHOFF, ASHLEY NICHOLE |

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of FIFTEEN (15) YEARS as to each of counts 1 and 2, to run concurrently.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☒ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

JA373

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 3 – SUPERVISED RELEASE

Page 4 of 7

---

Case Number:       1:21CR00158-001
Defendant's Name:    KOLHOFF, ASHLEY NICHOLE

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov

Defendant's Signature _____     Date

JA374

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case                                                                                      Page 5 of 7
Sheet 3A – SUPERVISED RELEASE

---

| | |
|---|---|
| Case Number: | 1:21CR00158-001 |
| Defendant's Name: | KOLHOFF, ASHLEY NICHOLE |

# SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall undergo a mental health evaluation and, if recommended, participate in a program approved by the United States Probation Office for mental health treatment which shall include a psychosexual evaluation and sex offender treatment. The defendant shall take all medications as prescribed and waive all rights of privacy concerning her sex offender/mental health treatment to allow the release of information to the probation office and authorize communication between the probation officer and the treatment provider. The costs for the evaluation, testing and treatment are waived.

2. The defendant shall submit to polygraph testing as directed by the probation officer. The costs of the testing is waived.

3. The defendant must remain drug free and her probation officer may require random testing at any time. Should a test indicate illegal drug use, then the defendant must satisfactorily participate in, and complete, any inpatient or outpatient treatment to which defendant is directed by the probation officer. The defendant shall waive all rights of confidentiality regarding treatment to allow the release of information to the United States Probation Office and authorize communication between the probation officer and the treatment provider. The costs for testing and treatment are waived.

4. The defendant shall not engage in employment or volunteer services that allow her access to minors.

5. The defendant shall not purchase, possess or view any sexually explicit material or images using minors in any format including, but not limited to, in magazines, books, on the computer, or any electronic device, in videos, movies, and television.

6. The defendant shall have no contact with minors unless supervised by a competent, informed adult, approved in advance by the probation officer.

7. The defendant shall not go to and/or loiter within 100 feet of school yards, parks, playgrounds, arcades, or other place primarily used by minors, without prior written permission of the probation officer.

8. Pursuant to the Adam Walsh Child Protection and Safety Act of 2006, the defendant shall register with the State Sex Offender Registration Agency in any state where the defendant resides, is employed, carries on a vocation, or is a student, according to federal and state Law and as directed by the probation officer.

9. Pursuant to the Adam Walsh Child Protection and Safety Act of 2006, the defendant shall submit to a search of her person, property, house, residence, vehicle, papers, computer, other electronic communication or data storage devices or media, and effects at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of supervision.

10. The defendant shall comply with the requirements of the comuter monitoring program as administered by the probation office. The defendant shall consent to the installation of computer monitoring software on any computer to which the defendant has access. Installation shall be performed by the probation officer. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. The defendant shall also notify others of the existence of the monitoring software. The defendant shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

---

JA375

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 5a – Criminal Monetary Penalties

Page 6 of 7

| Case Number: | 1:21CR00158-001 |
|---|---|
| Defendant's Name: | KOLHOFF, ASHLEY NICHOLE |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| **TOTALS** | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment*** | **JVTA Assessment**** |
|---|---|---|---|---|---|
| Count 1 | $ 100.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| Count 2 | $ 100.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

☐   The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss**** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| **TOTALS** | $ | $ | |

☐   Restitution amount ordered pursuant to plea agreement  $

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:
     ☐ the interest requirement is waived for the ☐ fine ☐ restitution.
     ☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996..

JA376

AO 245B (Rev. 09/19) (VAE 11/21) Judgment in a Criminal Case
Sheet 7 – Schedule of Payments

Page 7 of 7

Case Number:        **1:21CR00158-001**
Defendant's

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☐     Lump sum payment of $_____ due immediately, balance due
        ☐  not later than _____                             , or
        ☐  in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B**  ☐     Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C**  ☐     Payment in equal       *(e.g., weekly, monthly, quarterly)* installments of $       over a period of       *(e.g., months or years)*, to commence       *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐     Payment in equal       *(e.g., weekly, monthly, quarterly)* installments of $       over a period of       *(e.g., months or years)*, to commence       *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**  ☒     Payment during the term of supervised release will commence within 60 days after release from imprisonment.

**F**  ☐     Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

☐     Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐     The defendant shall pay the cost of prosecution.

☐     The defendant shall pay the following court cost(s):

☒     The defendant shall forfeit the defendant's interest in the following property to the United States:
    **Forfeiture is directed in accordance with the Preliminary Order of Forfeiture entered by this Court on July 12, 2022.**

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

JA377

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 1:21CR158 (LMB) |
| | : | The Hon. Leonie M. Brinkema |
| ASHLEY KOLHOFF | : | |
| Defendant | : | |
| | : | |

<u>DEFENSE POSITION ON SENTENCING (REDACTED)</u>

COMES NOW ASHLEY KOLHOFF, Defendant in the above-styled case, by and through

Counsel, and hereby presents this Court with her position on sentencing.

On April 12, 2022, Your Honor found Ashley guilty 1 count of Production of Child

Pornography and 1 count of Distribution of Child Pornography.

By statute, Ashley is facing a mandatory minimum sentence of 15 years for the Production

of Child Pornography and 5 years for the Distribution of Child Pornography.

Since April 12, 2022 Counsel has been in contact with the United States Attorney Office,

and those in a position to exercise a modicum of prosecutorial discretion when it comes to

prosecuting this young woman to this degree. Undersigned Counsel implored them to work with

Ashley to find a middle ground which would ensure she receives the mental health treatment she

desperately needs while not punishing her far in excess of what is required or even humane. In

response, Undersigned Counsel was informed that, after much consideration, the United States

Attorney's Office considered this to be a "principled prosecution", whatever that might mean.

Undersigned Counsel is at a loss as to what "prosecutorial principle" requires a 15-year sentence

vs a 5-year sentence, on these facts and for this individual; even the government does not seem to

actually believe that Ashely truly intended to prostitute herself and REDACTED.

JA378

It also bears repeating that both experts agreed at trial that Ashley suffers from numerous and severe mental health issues. Dr. Hendricks concluded that Ashely suffers from, among other things, Complex Post Traumatic Stress Disorder, and was likely experiencing a series of dissociative episodes in which she had only a limited capacity to direct or control her actions and judgment. Dr. Kalbeitzer, who diagnosed Ashley as suffering from, among other things, Post Traumatic Stress Disorder, testified that it is entirely possible that, as someone who suffers from PTSD, Ashley was triggered when she discovered sex abusers on her child protection website and, as a result, went in and out of dissociative events during the time period in question.[1]

In other words, this is not a case where one expert disagrees with another and the Court is required to make a credibility determination (though such a determination would necessarily favor Dr. Hendricks, give his vast clinical and therapeutic backgrounds and the exhaustive nature of expert report). In this case, there is no dispute: both experts agree that there is at least some question about Ashley's mental state at the time of the index incidents, a question which must give rise to a reasonable doubt.

Accordingly, given the United States Attorneys' Office unwillingness to exercise its vast prosecutorial discretion, Undersigned Counsel is asking Your Honor to revisit its initial conclusions regarding whether the government has, in fact, proven all the essential elements of the offenses. If Dr. Kalbeitzer had even a small doubt about Ashley's mental state, surely Your Honor, upon reflection, must have one as well.

If the Court is unwilling revisit its earlier conclusions and/or to sentence Ashley below the mandatory minimums, Ashley objects to these mandatory minimum sentences as being cruel and

---

[1] Testimony of Dr. Rachel Kalbeitzer at 260-61

JA379

unusual in violation of the 8th Amendment. Counsel makes this objection fully aware of the current state of the law.

Instead, Ashley respectfully moves this Court to impose the following sentences which would run concurrently with one another: 15 years for the Production of Child Pornography and 5 years for the Distribution of Child Pornography, yielding a total active sentence of 15 years in prison. An active sentence of 15 years in prison for this young woman- and for this these offenses- is already a draconian and abhorrently disproportionate sentence, one that in no way properly reflects who she is or the nature and circumstances of her offenses.

Respectfully Submitted,

ASHLEY KOLHOFF
By Counsel

_____/s/_____
CHRISTOPHER AMOLSCH
VSB #43800
12005 Sunrise Valley Drive
Suite 200
Reston, Virginia 20191
Ph: 703.969.2214
chrisamolsch@yahoo.com
Counsel for Ms. Kolhoff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20th day of July 2022 I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties of record.

_____/s/_____
CHRISTOPHER AMOLSCH

JA380

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 1:21CR158 (LMB) |
| | : | The Hon. Leonie M. Brinkema |
| ASHLEY KOLHOFF | : | |
| Defendant | : | |
| | : | |
| | : | |

NOTICE OF APPEAL

Notice is hereby given that **ASHLEY KOLHOFF**, Defendant in the above-named

case, by and through Counsel, hereby appeals to the United States Court of Appeals for the Fourth

Circuit from the convictions and sentences imposed on July 12, 2022.

Respectfully Submitted,

**ASHLEY KOLHOFF**
By Counsel

_____/s/_____
CHRISTOPHER AMOLSCH
VSB #43800
12005 Sunrise Valley Drive
Suite 200
Reston, Virginia 20191
703.969.2214 (Phone)
703.774.1201 (Fax)
chrisamolsch@yahoo.com (email)
Counsel for Ms. Kolhoff

CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of July, 2022, I electronically filed the foregoing pleading

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

parties of record.

/s/ Christopher Amolsch
CHRISTOPHER AMOLSCH
VSB #43800
12005 Sunrise Valley Drive
Suite 200
Reston, Virginia 20191
703.969.22124 (Phone)
chrisamolsch@yahoo.com (email)
Counsel for Ms. Kolhoff

JA381