22-4601

# United States Court of Appeals

*for the*

# Fourth Circuit

———————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

– v. –

ASHLEY NICHOLE KOLHOFF,

*Defendant-Appellant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

## OPENING BRIEF OF DEFENDANT-APPELLANT
## (PUBLIC)

CHRISTOPHER B. AMOLSCH
LAW OFFICES OF CHRISTOPHER AMOLSCH
12005 Sunrise Valley Drive, Suite 200
Reston, Virginia 20191
(703) 969-2214
chrisamolsch@yahoo.com

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ............................................................................. 1

JURISDICTION ................................................................................. 2

ISSUE PRESENTED ......................................................................... 3

STATEMENT OF THE CASE ........................................................... 3

PROCEDURAL HISTORY .............................................................. 13

SUMMARY OF ARGUMENT ......................................................... 14

ARGUMENT ................................................................................... 14

    THE IMAGES ARE NOT "LASCIVIOUS" WITHIN THE
    MEANING OF THE FEDERAL CHILD PORNOGRAPHY
    STATUTES .................................................................................. 14

        A.    Standard of Review ............................................................ 14

        B.    Elements Of The Offenses ................................................. 15

        C.    The Undisputed Facts ........................................................ 15

        D.    To Be "Lascivious" Within The Meaning Of The Federal
             Child Pornography Statutes, An Image Must Depict The
             Minor Engaging In Overt Sexual Activity. Nudity Does Not
             Fall Within The Meaning Of The Statute .......................... 16

        E.    There Is No Binding Fourth Circuit Case On Point ........... 23

CONCLUSION ................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bousley v. United States*,
    523 U.S. 614 (1998)......................................................................................23

*House v. Bell*,
    547 U.S. 518 (2006)......................................................................................23

*Miller v. California*,
    413 U.S. 15 (1973)....................................................................... 17, 18, 19

*New York v. Ferber*,
    458 U.S. 747 (1982)............................................................... 18, 19, 20, 22

*Smalis v. Pennsylvania*,
    476 U.S. 140 (1986)......................................................................................14

*United States v. 12 200-Foot Reels of Super 8mm Film*,
    413 U.S. 123 (1973)..................................................................... 17, 18

*United States v. Adams*,
    343 F.3d 1024 (9th Cir. 2003) ........................................................17

*United States v. Alvarez*,
    351 F.3d 126 (4th Cir. 2003) ........................................................14

*United States v. Courtade*,
    929 F.3d 186 (4th Cir. 2019) ........................................... 18, 23, 24

*United States v. Hillie*,
    39 F.4th 674 (D.C. Cir. 2022)........................................... *passim*

*United States v. Knox*,
    32 F.3d 733 (3d Cir. 1994) ..........................................................14

*United States v. McCauley*,
    983 F.3d 690 (4th Cir. 2020) ........................................................25

*United States v. Palmer*,
    820 F.3d 640 (4th Cir. 2016) ........................................................14

*United States v. Reedy,*
    845 F.2d 239 (10th Cir. 1988) ......................................................17

*United States v. Thirty-Seven Photographs*,
    402 U.S. 363, 91 S. Ct. 1400 (1971) ...........................................................18

*United States v. Williams*,
    553 U.S. 285 (2008)...................................................................... 18, 20, 21

*United States v. X-Citement Video, Inc.* (*X-Citement Video II*),
    513 U.S. 64, 115 S. Ct. 464 (1994) ........................................ 17, 18, 19, 20

*United States v. X-Citement Video, Inc.*,
    982 F.2d 1285 (9th Cir. 1992) ...................................................................17

**Statutes & Other Authorities:**

18 U.S.C. § 2251 ........................................................................................24

18 U.S.C. § 2251(a) ............................................................................... 1, 16

18 U.S.C. § 2251(e) ......................................................................................1

18 U.S.C. § 2252(a)(2) ..................................................................................1

18 U.S.C. § 2252(b)(1) ..................................................................................1

18 U.S.C. § 2252A(a)(3)(B) ........................................................................20

18 U.S.C. § 2255 ........................................................................................23

18 U.S.C. § 2256 ........................................................................................24

18 U.S.C. § 2256(2)(A) .................................................................. 15, 17, 21, 22

18 U.S.C. § 2256(2)(A)(v) .................................................................... 19, 23

28 U.S.C. § 1291 ..........................................................................................2

Fed. R. Crim. P. 29.................................................................................. 3, 14

## INTRODUCTION

Ashley Kolhoff was indicted on one count of Production of Child Pornography, in violation of 18 U.S.C. §§ 2251(a) and (e) and one count of Distribution of Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1).[1]

The bench trial on these matters commenced on March 2, 2022.[2]

On March 3, 2022, Ms. Kolhoff filed a written Motion for Judgment of Acquittal.[3]

On March 30, 2022, Ms. Kolhoff filed her Closing Brief.[4]

On April 12, 2022, the district court denied the Motions for Judgment of Acquittal and found Ms. Kolhoff guilty on both counts.[5]

On April 26, 2019, Ms. Kolhoff was sentenced to, *inter alia*, 180 months in prison and 60 months in prison, to run concurrently, the mandatory minimum sentences for each offense.[6]

On July 20, 2019, Ms. Kolhoff timely noted her appeal to this Court.[7]

---

[1] JA 17
[2] JA 20
[3] JA 296
[4] JA 457
[5] JA 332
[6] JA 371-372
[7] JA 381

## JURISDICTION

Jurisdiction is proper under 28 U.S.C. §1291.

## ISSUE PRESENTED

Did the trial court commit reversible error when it improperly denied Ashley's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 given that the images in question are not "lascivious" within the meaning of the federal child pornography statutes?

## STATEMENT OF THE CASE

Ashley Kolhoff was born in Arizona to a drug addicted mother, and a father who was sent to prison for repeatedly sexually abusing her 2-year-old sister. This left Ashley and her siblings alone with their mother, who promptly abandoned them. Ashley was subsequently adopted, separated from her siblings, and moved to Sandusky, Ohio.

Ashley was aware of her father's sexually abusive behavior from a very early age and grew up believing that she had been raped and sexually assaulted by her father as well. This was the story she was told repeatedly by her adoptive parents and her older sister. So, for Ashely, who had no direct memory of these events due to her young age, it became part of her self-identity that she was the victim of child sex rape.[8]

---

[8] JA 114-115, testimony of Dr. Michael Hendricks

In addition to growing up believing that her father had raped her as an infant, Ashley's formative years were defined by a series of repeated, violent, and degrading instances of rape and sexual trauma.

Starting in 4th grade, when she was only 10, Ashley was repeatedly sexually molested by the older son of one of her babysitters. The abuse only stopped after her parents discovered what was happening; the molester, who was 17 at the time, committed suicide a few years later.[9]

At 16, Ashley was raped by force by a former boyfriend. Ashley reported the rape incident to the police, who opened a formal investigation. As the assailant was a juvenile, it is unclear what, if anything, came from the investigation.[10]

At 17, Ashley was contacted by two men who had seen her photos on Instagram. She naively agreed to meet the men, who then took her to a hotel, had sex with her to "try her out", and began trafficking her on Backpage.com, fuckbook.com and pimpchat.com under the name "Angel". Ashley estimates she was sexually trafficked approximately 10 times over a two-month period.

One of the "customers" to whom Ashley was trafficked ultimately tried to kidnap her and transport her to Georgia. After receiving a call from the police, the

---

[9] JA 116, testimony of Dr. Michael Hendricks
[10] JA 116-117, testimony of Dr. Michael Hendricks

man abandoned Ashley on the side of the road outside a small town about 2 hours from her home in Sandusky, Ohio before fleeing. No arrests were made.[11]

Again at 17, Ashley was contacted by a man who found Ashley's photo on Backpage.com and recruited her to participate in a pornographic movie with another underage girl. Ashley was ultimately taken to a hotel in Sandusky, Ohio where she and another minor were filmed engaging in sex. After the man was arrested, Ashley cooperated fully with the federal government (with Special Agent Amy Glore in particular) in support of the government's prosecution.[12] Ashely identified the man from a lineup and later testified against him before a federal grand jury.[13] Ashley believes this man ultimately pleaded guilty to Production of Child Pornography in federal court in Toledo, Ohio.[14]

At 19, Ashley was again raped, this time in her car while visiting friends in Cleveland, Ohio. No arrests were made.[15]

All of this sexual abuse has been corroborated, either by her adoptive parents or by the police themselves.[16]

---

[11] JA 116-117, testimony of Dr. Michael Hendricks
[12] JA 185-186, testimony of Agent Smock
[13] JA 185-186, testimony of Agent Smock
[14] JA 117, testimony of Dr. Michael Hendricks
[15] JA 117, testimony of Dr. Michael Hendricks
[16] JA 142, testimony of Dr. Michael Hendricks

Given Ashley's history of sexually degrading and violent abuse, it should come as no surprise that she also has a lengthy history mental illness and, at 18, had a near complete mental breakdown:

- she began to engage in self-harm;

- she began hearing voices in her head;

- she became convinced some one or some thing was following her; and

- she tried to get herself admitted to hospital because she felt she was going crazy.[17]

The hospital refused to admit her, likely because she was destitute and without insurance. On her own, Ashley did manage to save a few dollars so that she could see a professional mental health expert on her own. Ashley was able to afford two appointments, but she did not receive any counseling or therapy. Instead, her appointments were for medication intervention only. Moreover, Ashley was (mis)diagnosed as suffering from Bi-Polar II disorder, despite the seriousness of her mental collapse and her history of mental dissociation from the world around her. Ashley's only mental health treatment, then, was a prescription for Risperidone, a

---

[17] JA 221-222, testimony of Dr. Rachel Kalbeitzer; JA 119, testimony of Dr. Michael Hendricks

drug designed to manage her psychotic events. [18] Ashley never received any follow up care or treatment because she had no insurance and was unable to afford care.[19]

As the evidence made clear at trial and will be set forth briefly below, Ashley actually suffers from a variety of mental illnesses, all of which are far more serious and debilitating than simple Bi-Polar disorder. Specifically, Ashley was diagnosed by both her expert and the government's expert as suffering from:

- Recurrent and Complex Post-Traumatic Stress Disorder;

- Post-Traumatic Stress Disorder;

- Borderline Personality Disorder; and

- Major Depressive Disorder, Recurrent.[20]

Shortly after her daughter was born, Ashley began suffering from postpartum depression, her mental health worsened, and the events in which she felt disconnected and disassociated from reality occurred with more frequency. And it was during her postpartum depression, which likely exacerbated her already significant and untreated mental illnesses, that the events in question occurred.

It began when Ashley created a Facebook group called "Save Our Children", a Facebook group dedicated to combatting the sexual abuse and online exploitation

---

[18] JA 121, testimony of Dr. Michael Hendricks
[19] JA 121-122, testimony of Dr. Michael Hendricks
[20] JA 134-135, testimony of Dr. Michael Hendricks; JA 240-242, testimony of Dr. Rachel Kalbeitzer

of minors, a reality with which she was all too personally familiar.[21] Given the sensitive nature of "Save Our Children", and the reality it might draw the very predators she was (and is) determined to eliminate, Ashley set up the site so that it was "private". That is, she set up the Facebook group so that no one could join until she had personally vetted and approved their membership.[22] Ashley was administering "Save Our Children" while simultaneously working full time and caring for her young daughter.

As she soon discovered, administering "Save Our Children" was a much bigger and more involved job than she was capable of handling. Interest in the site quickly became overwhelming, and Ashley started admitting people onto the site *en masse*, with the idea that she would go back after, vetting them one at a time.[23]

It was while vetting one of the people to whom she had already granted access that Ashley saw a link to a website she didn't recognize.[24] When she clicked on it, Ashley was directed to the rape.su. website where she was assaulted with a litany of

---

[21] JA 122-123, testimony of Dr. Michael Hendricks; JA 188, testimony of Agent Smock

[22] This level of care is consistent with her reputation for being a good and nurturing mother. It is also consistent with her suffering from Post-Traumatic Stress Disorder, Complex or otherwise. One of the hallmark symptoms of those suffering from PTSD in either of its forms is "hypervigilance", in which the person exists in a state of extreme alertness for hidden dangers, both real and presumed. *See also* JA 277-78, testimony of Dr. Rachel Kalbeitzer

[23] JA 123-124, testimony of Agent Smock; JA 123-124, testimony of Dr. Michael Hendricks

[24] JA 188, testimony of Agent Smock

sexually explicit chats discussing the virtues of child rape, and videos and other images depicting child pornography.[25]

It was at that instant that Ashley realized to her horror that she has done the one thing she vowed never to do: put other children at risk by allowing child sex predators onto her site. This is what is known as a triggering event: when a person who has suffered from past severe trauma encounters the same stimuli in another context and it brings on- or triggers- a reminder of their past trauma.[26] This is exactly the kind of experience one would expect to trigger Ashely into relieving her own past trauma of sexual abuse; and it is common in those who suffer from PTSD- like Ashley- to lose track of their surroundings and to experience dissociative episodes. As the government's expert testified at trial, Ashley suffered from precisely the kind of early and frequent trauma one would expect to see in those who experience periods of dissociation.[27]

That is, in fact, precisely what happened here: Ashley's mind, under extreme stress and in the midst of reliving her own history of violent sexual abuse, protected itself in the only way it knew how: by disassociating from the all too horrible reality

---

[25] JA 123-124, testimony of Agent Smock; JA 276-277, testimony of Dr. Rachel Kalbeitzer
[26] JA 275-276, testimony of Dr. Rachel Kalbeitzer
[27] JA 282, testimony of Dr. Rachel Kalbeitzer

that children- other people's children- were now at risk of sexual abuse and deprivation because of her.

In an effort to undo- or limit- the damage and harm she believed she had caused, she made the confused decision to join the rape.su website in order to expose and trap those operating it.[28] So, Ashley registered as a user and created a profile designed to make herself appear as vulnerable as possible to the site's other users: that she was alone; that she was out of money and desperate; and that she was homeless and had no place to say. The point was to make herself the target of any abuse or harm that might arise because she had mistakenly granted these people access to her site.

None of what she posted about herself in her profile was true: she had been in a stable relationship with the father of her daughter for two years; she was not homeless and in fact had a lease and a stable place to stay; she was employed and in no sense desperate.[29] In fact, the portrait she painted of herself was the polar opposite of how she was universally described by those who have known her best: a caring and loving mother who is obsessed with keeping her daughter safe.[30]

---

[28] JA 124-125, 178, testimony of Dr. Michael Hendricks
[29] JA 184-185, testimony of Agent Smock
[30] JA 184-185, testimony of Agent Smock

To complete the project, Ashley also took several still pictures of ████████ ████████ posted them to the site, and began interacting anyone who responded. These images form the basis of the indicted charges.[31]

As the Court will see, and as the evidence showed at trial, the images are essentially clinical and anatomical in nature and are not remotely sexual. None of these pictures depict any sexual activity of any kind or description, simulated or otherwise; there is a complete absence of any vaginal or anal penetration of the type and kind normally associated with these sorts of images; and the only digital manipulation is that which is required to observe the body parts.[32].

The evidence at trial also showed the following:

- Ashley did not seek out the rape.su website- it found her;[33]

- she took the photos of ████████████ immediately after visiting the rape.su website when it is highly likely she was experiencing a dissociative episode; [34]

- she interacted with the site only sporadically over the period of days;[35] and

---

[31] The government will be providing these images directly to the Court for its review as part of this appeal

[32] JA 87-88

[33] JA 188, testimony of Agent Smock

[34] JA 124-125, 144-145, testimony of Dr. Michael Hendricks; JA 85-86

[35] JA 182, testimony of Agent Smock; JA 86

- after coming back to herself, deleted the photos and told no one what she had done.[36]

A forensic exam of her devices also revealed the following:

- she never visited any other site like rape.su prior to finding it linked to the "Save Our Children" Facebook group;[37]

- in the 9-month period after her interaction with the rape.su website and the time she was arrested, she never sought out an even remotely similar website;[38]

- she had never searched for child pornography in any form or fashion; and

- there were no other images or movies of child pornography on any of her devices.[39]

This then was, in every conceivable sense, aberrant behavior and completely outside of anyone's experience with Ashley.

---

[36] JA 125, testimony of Dr. Michael Hendricks
[37] JA 85-86
[38] JA 182-183, testimony of Agent Smock
[39] JA 183-184, testimony of Agent Smock

PROCEDURAL HISTORY

On March 2nd and 3rd of 2022, Ashley was tried by the Court on the charges of production and distribution of child pornography. The evidence was largely undisputed and at the conclusion of the trial, Undersigned Counsel argued for a judgment of acquittal or findings of Not Guilty on the following grounds:

- given Ashley's well documented history of sexual assault, severe mental illness, and episodic mental dissociation, the government had not proven that Ashley did -or even could- act with the *mens rea* required by the statutes; and

- even if the trial court found Ashley did act with the requisite *mens rea*, these images- which are completely and entirely devoid of any actual or simulated sexual activity – are not "lascivious" within the specific context of the federal child pornography statutes given the United States Supreme Court's directives on how the term "lascivious exhibition" must be interpreted and understood.[40]

The trial court denied the motions and this appeal follows.

---

[40] JA 296, 457

## SUMMARY OF ARGUMENT

Ms. Kolhoff's convictions must be vacated because the images are not "lascivious" within the meaning of the federal child pornography statutes and do not involve the use of a minor engaged in *sexually explicit conduct*.

## ARGUMENT

### THE IMAGES ARE NOT "LASCIVIOUS" WITHIN THE MEANING OF THE FEDERAL CHILD PORNOGRAPHY STATUTES

#### A. Standard of Review

The question raised by a motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29 is whether "as a matter of law the government's evidence is insufficient to establish factual guilt on the charges in the indictment." *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir. 2003) (quoting *Smalis v. Pennsylvania*, 476 U.S. 140, 144 (1986)). This appeal concerns the trial court's legal conclusions regarding the meaning of the term "lascivious exhibition", which the Court reviews *de novo. United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016). *See also United States v. Knox*, 32 F.3d 733, 744 (3d Cir. 1994) (the meaning of the statutory phrase 'lascivious exhibition' poses a pure question of law over which the Court exercises "plenary" review).

B.    <u>Elements Of The Offenses</u>

For each of the indicted charges, the government was required to prove, among other things, that the images involved the use of a minor engaged in *sexually explicit conduct* (emphasis added). Fortunately, Congress has provided a definition of "sexually explicit conduct."

18 U.S.C. § 2256(2)(A), reads, as relevant:

> "sexually explicit conduct" means actual or simulated—
>
> (i)    sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
>
> (ii)    bestiality;
>
> (iii)    masturbation;
>
> (iv)    sadistic or masochistic abuse; or
>
> (v)    lascivious exhibition of the anus, genitals, or pubic area of any person.

C. <u>The Undisputed Facts</u>

As the evidence showed- and this Court will see- none the images at issue depict actual or simulated sexual intercourse, bestiality, masturbation, or sadistic or masochistic abuse. Accordingly, part (v) of the relevant definition- "lascivious exhibition of the anus, genitals, or pubic area"- is the only definition which could possibly apply to the facts of this case.

D. To Be "Lascivious" Within The Meaning Of The Federal Child
Pornography Statutes, An Image Must Depict The Minor Engaging In
Overt Sexual Activity. Nudity Does Not Fall Within The Meaning Of
The Statute

In *United States v. Hillie*, 39 F.4th 674 (D.C. Cir. 2022) the United States

Court of Appeals for the District of Columbia authored an exhaustive opinion on

the meaning of "lascivious" in federal prosecutions involving child pornography.

In *Hillie*, the defendant was charged with, among other things, Production of

Child Pornography in violation of 18 U.S.C. § 2251(a), after it was discovered he

had installed hidden cameras in the bedroom and bathroom of two minors with

whom he shared a house. Using these cameras, he recorded six videos, two of

which are of particular interest here.

In the first video, which is 29 minutes and 49 seconds long, one of the minor

girls is seen bending over and exposing her genitals to the camera for

approximately nine seconds; cleaning her genital area with a towel, with her

breasts and pubic hair visible; walking around naked with her breasts and pubic

hair visible; and rubbing lotion on her naked body with her breasts and pubic hair

visible. *Hillie,* 39 F.4th at 677-78.

The second video, which is 12 minutes and 25 seconds long, shows a minor

sitting on the toilet and subsequently cleaning her genital area with a towel,

exposing her genital area for approximately 16 seconds. *Id.* at 678.

The only question on appeal was whether these videos were "lascivious" *within the context of the federal child pornography statutes*, the same question before this Court on this appeal.

Before beginning its exhaustive review of the meaning of "lascivious" within the federal child pornography statutes, the DC Circuit correctly noted that the Supreme Court, in a line of cases going back nearly fifty years, had provided precise guidance to the lower courts on how they must understand and apply the same or similar phrasing in federal prosecutions in order to save the statutes from being vague, overly broad and therefore unconstitutional. *See e.g., United States v. 12 200-Foot Reels of Super 8mm Film,* 413 U.S. 123 (1973).

Beginning with *Miller v. California*, 413 U.S. 15 (1973), the Supreme Court held that the federal prohibition on the "lewd" or "lascivious" exhibition of the genitals within the child pornography statutes applied only to patently offensive "hard core sexual conduct." *Id.* at 681.[41]

_____

[41] The Courts of Appeals have uniformly treated the terms "lewd" and "lascivious" as materially equivalent. *See, e.g., United States v. Adams, 343 F.3d 1024, 1035* (9th Cir. 2003) ("We hold that the statute at issue in *Ferber* is legally indistinguishable from 18 U.S.C. § 2256(2)(A). . . . [T]his court has equated 'lascivious' with 'lewd.'"; *United States v. Reedy,* 845 F.2d 239, 241 (10th Cir. 1988). The Supreme Court has itself endorsed this position. *See United States v. X-Citement Video, Inc.* (*X-Citement Video II*), 513 U.S. 64, 78-79, 115 S.Ct. 464 (1994) (approving of *United States v. X-Citement Video, Inc.,* 982 F.2d 1285, 1288 (9th Cir. 1992), *rev'd on other grounds, X-Citement Video II,* 513 U.S. 64, 115 S.Ct. 46).

From *Miller,* the DC Circuit then drew a straight line through *12 200-Foot Reels of Super 8mm Film, New York v. Ferber,* 458 U.S. 747 (1982), *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) and *United States v. Williams*, 553 U.S. 285 (2008) to conclude that, to be "lascivious" within the federal child pornography statutes, the video or image *must* depict the minor engaging in overt sexual activity. Nudity, in other words, is not enough. *See also United States v. Courtade*, 929 F.3d 186, 191 (4ᵗʰ Cir. 2019).

In *12 200-Foot Reels of Super 8mm Film*, decided the same day as *Miller,* Justice White specifically pointed out the necessity of interpreting "lascivious" in this way, opining that "[i]f and when such a 'serious doubt' is raised as to the vagueness of the words 'obscene,' 'lewd,' 'lascivious,' 'filthy,' 'indecent,' or 'immoral' as used to describe regulated material" in federal statutes, "we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific '*hard core*' *sexual conduct* given as examples in *Miller v. California*." *Id.* (emphasis added) (*quoting United States v. Thirty-Seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400 (1971). As set forth above, *Miller* held that the prohibition on the "lewd" or "lascivious" exhibition of the genitals within the federal child pornography statutes applied only to patently offensive "hard core sexual conduct." *Miller* at 27.

18

In *New York v. Ferber,* 458 U.S. 747, 765 (1982), the Court found that "[t]he term 'lewd exhibition of the genitals,'" in particular, "is not unknown in this area and, indeed, was given in *Miller* as an example of a permissible regulation." Again, the Court reiterated that "the reach of ["lewd or lascivious"] is directed at the *hard core* of child pornography," (*emphasis added*), the characterization that was approved in *Miller. Hillie* at 682 (citing *Ferber* at 773).

In *United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994), decided some twelve years later, the Court again rejected vagueness and overbreadth challenges to the statutory term "lascivious exhibition of the . . . genitals," as used in 18 U.S.C. § 2256(2)(A)(v), but only because the constitutionality of this phrase as used in the statute was specifically upheld in *Miller v. California* and in *Ferber* as being limited to "hard core sexual conduct." *Hillie* at 682 *(*citing *X-Citement Video*, 513 U.S. at 78–79). Thus, the Supreme Court in *X-Citement Video* "expressly engrafted the 'hard core' characterization of the prohibited 'lascivious exhibition of the genitals' from *Miller* onto the construction of the federal child pornography statute." *Hillie* at 682-83.

The *Hillie* Court also noted that Justice Scalia, even in dissent, agreed that 'lascivious exhibition of the genitals' survived vagueness and overbreadth challenges only because its reach was limited to instances of hardcore sexual conduct. *Id. (*citing *X-Citement Video* at 84.):

> [S]exually explicit conduct,' as defined in the statute, does
> not include mere nudity, but only conduct that consists of
> 'sexual intercourse ... between persons of the same or
> opposite sex,' 'bestiality,' 'masturbation,' 'sadistic or
> masochistic abuse,' and 'lascivious exhibition of the
> genitals or pubic area.' <u>What is involved, in other words,
> is not the clinical, the artistic, nor even the risqué, but hard-
> core pornography</u>." (emphasis added).

Finally, in *United States v. Williams*, 553 U.S. 285 (2008), the Supreme
Court considered a constitutional overbreadth challenge to the promotion of child
pornography statute, 18 U.S.C. § 2252A(a)(3)(B), which uses the same definition
of "sexually explicit conduct" as the offenses herein. Just as in *X-Citement Video*,
the Court in *Williams* made clear that the federal child pornography statutes
remained constitutional only if construed consistently with *Ferber, Miller, et al*:.
the "lascivious exhibition of the anus, genitals, or pubic area" is directed at- and
limited to- overt sexual activity and the *hard core* of child pornography. *Hillie* at
683.

And the *Williams* Court went one step further. In addition to relying on the
Supreme Court holdings universally finding that the reach of the statute is directed

20

at the *hard core* of child pornography, *Williams* also relied upon the *noscitur a sociis*[42] canon to interpret the child pornography statute at issue:

> Because "lascivious exhibition of the anus, genitals, or pubic area" appears in a list with "sexual intercourse," "bestiality," "masturbation," and "sadistic or masochistic abuse," its "meaning[] [is] narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated.
>
> *Id*. at 294

Given all of this - the nearly fifty years of Supreme Court jurisprudence on the precise issue in dispute and the controlling principles of statutory interpretation - the DC Circuit necessarily concluded that to be "lascivious" within the meaning 18 U.S.C. § 2256(2)(A), the "exhibition of the anus, genitals, or pubic area" must be performed in a manner that connotes the commission of *some* sexual act, either actual or simulated. *Hillie* at 685. This understanding of "lascivious" is faithful to, and consistent with, every single Supreme Court decision on the only constitutionally approved way in which to understand "lascivious" within the meaning the federal child pornography statutes. Indeed, this understanding of

---

[42] *Noscitur a sociis* counsels that a word is given more precise content by the neighboring words with which it is associated

"lascivious" is exactly what the prosecutors successfully argued when asking the Supreme Court to uphold the New York statute in *Ferber*. *Id.*

As the two videos at issue in *Hillie* contained only nudity and not the commission of *some* sexual act, the DC Circuit reversed Hallie's convictions, finding that no rational trier of fact could find the conduct depicted in the videos to be a "lascivious exhibition of the anus, genitals, or pubic area of any person," as defined by § 2256(2)(A).[43]

The same can be said about the images in the instant case, compelling the same conclusion: the images in no way depict the minor's anus, genitalia, or pubic area in a manner that connotes the commission of any sexual act, simulated or otherwise. Indeed, the images contain not even a hint of such conduct.

Accordingly, Ms. Kolhoff is not- and cannot be- guilty of any the charged crimes in her indictment and her convictions must be vacated.

---

[43] On December 13, 2021, the government filed a Petition For Rehearing *En Banc* Or Panel Rehearing. On June 28, 2022, the DC Circuit denied the Petition and reissued the Opinion with only slight modifications. On September 14, 2022, the government filed with the Supreme Court an Application to extend the time to file in which to a petition for a writ of certiorari, which the Chief Justice granted that same day. From the record, it appears the government never filed a writ of certiorari, despite asking for- and receiving- an extension of time in which to do so.

E.  There Is No Binding Fourth Circuit Case On Point

*United States v Courtade*, 929 F.3d 186 (4th Cir. 2019) is the only Fourth

Circuit case addressing the meaning of "lascivious exhibition of the anus, genitals,

or pubic area of any person" in 18 U.S.C. § 2256(2)(A)(v). However, it is

important to recognize that the Fourth Circuit Panel analyzed this question only in

a civil proceeding and only in the context of a § 2255 habeas claim of actual

innocence. It specifically did not address this question in the criminal context

based on a claim of legal insufficiency. *See Courtade* at 191 (Actual innocence

"means factual innocence, not mere legal insufficiency") (citing *Bousley v. United

States*, 523 U.S. 614, 623 (1998)). *See also House v. Bell*, 547 U.S. 518, 53 (2006)

(emphasizing that establishing factual innocence- rather than legal insufficiency -

is a far more demanding standard that is seldom ever met).

Moreover, it is critical to recognize that the panel in *Courtade* relied upon

Webster's Dictionary to understand how "lewd" or "lascivious" are commonly

understood in everyday discourse, rather than on the relevant and binding Supreme

Court jurisprudence. *See Courtade* at 191-92. While reliance on dictionary

definitions may be proper in an "actual innocence" proceeding when the question

is one of factual innocence, it is no way proper for this Court do so when the

determining legal sufficiency of Ms. Kolhoff's convictions. *Id.* at 191. As has been

set forth above, the proper inquiry at this stage is into how the Supreme Court has

instructed the lower courts to understand the meaning of "lewd" or "lascivious" within the federal child pornography statutes- and any dictionary definition is of no moment and outside the proper scope of inquiry.

That being said, *Courtade* likewise supports the finding that these images are not "lascivious" within the meaning of the federal child pornography statutes. Like *Hillie*, the *Courtade* panel recognized that 18 U.S.C. § 2251 "requires more than mere nudity"; *i.e.,* there must be "sexually explicit conduct." 929 F.3d at 191 (4th Cir. 2019). The panel also seemed to recognize that courts should only look to the four corners of the image or video, rather than to the subjective intent of the creator, when deciding whether the image is "lascivious" under in 18 U.S.C. § 2256. *Courtade*, 929 F.3d at 192.

That means, in cases such as these, everything but the pictures themselves- standing alone- is irrelevant when considering whether the images contained within the four corners of the picture are "lascivious":

- where the images were posted is irrelevant and beside the point;

- anything Ashley might have posted about the images is irrelevant and beside the point;

- anything anyone else might have posted about the images is irrelevant and beside the point.

In short, the question of "lasciviousness" within the federal child pornography statutes concerns the *content* of the images, not where they were posted or what might be said about them. Whether an image is "lascivious" is not- and cannot be- a subjective inquiry into what may or may not be in someone's mind when they view it or create it. Such an approach would invariably lead to an impossible situation in which the law would apply differently to pretty much everyone.

The question then is whether under *Courtade* a reasonable person- looking at the four corners of the images- would consider them as depicting the minor engaging in the commission of *some* sexual act, either actual or simulated. As this Court has seen, the images are completely devoid of any suggestion of sexual conduct of the sort omnipresent in the images of child pornography with which this Court is intimately familiar. There is no penetration of any kind, and the only digital manipulation is that which is required to clinically observe the body parts.

In short, these images are nowhere close to the heartland of the statutes' proscriptions and this Court must view their application to the relevant statutes with the utmost caution. *United States v. McCauley*, 983 F.3d 690, 698 (4th Cir. 2020) (When charged conduct does not fall in the heartland of a statute's proscription, the risk of prejudice becomes more palpable.) Accordingly, as the images are not "lascivious" within the meaning of the federal child pornography

statutes, Ms. Kolhoff is not- and cannot be- guilty of any the charged crimes in her indictment.

## CONCLUSION

For all the foregoing reasons, Ms. Kolhoff respectfully request this honorable Court to reverse the District Court's Judgments, vacate the sentence, and provide any other relief this Court deems appropriate.

January 26, 2023                    Respectfully submitted,

/s/ Christopher Amolsch
CHRISTOPHER B. AMOLSCH
LAW OFFICES OF CHRISTOPHER AMOLSCH
12005 Sunrise Valley Drive, Suite 200
Reston, Virginia 20191
(703) 969-2214
chrisamolsch@yahoo.com
*Attorneys for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Ms. Kolhoff respectfully requests oral argument as she believes the Court would benefit from further discussion of the facts and applicable law in this case.


/s/ Christopher Amolsch
Christopher Amolsch

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, typestyle, and type-volume limitations. This brief was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 5,242 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

/s/ Christopher Amolsch
Christopher Amolsch

**CERTIFICATE OF SERVICE**

The undersigned certifies that on January 26, 2023, the foregoing brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit through the appellate CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ Christopher Amolsch
Christopher Amolsch